IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

## MOTION FOR TEMPORARY RESTRAINING ORDER

Comes now Plaintiff Mary-Louse Zanoni by and through counsel, pursuant to Fed. R. Civ. P. 65(b), and respectfully moves this Court for an order enjoining defendant, the United States Department of Agriculture (USDA) and its components, from "conversion" of the National Premises Information Repository (NPIR) into a Privacy Act system of records, a "conversion" presently scheduled to become effective on **Monday, June 9, 2008**. Plaintiff further moves that this Court order that the 17,000 pages of NPIR records USDA printed out in Oct/./Nov. 2007, and has been storing at the USDA/APHIS FOIA offices in Riverdale, Maryland, be delivered into the custody of the Court. No possible harm could befall defendant USDA from either the delay in "conversion" of the NPIR into a Privacy Act system of records or the mere transfer of the records from Riverdale, MD to the Court's chambers in Washington, D.C.

In support of her Motion, plaintiff relies on the following:

(A)    Plaintiff's Verified Complaint.

(B)    Affidavit of Dr. R. M. Thornsberry, attached hereto as Exhibit 1.

(C)    Affidavit of Ray Hill, attached hereto as Exhibit 2.

(D)    National Animal Information System Draft Strategic Plan 2005-
2009, attached hereto as Exhibit 3.

(E)    National Animal Identification System A User Guide November
2006, attached hereto as Exhibit 4.

(F)    Business Plan - Draft December 12, 2007, attached hereto as
Exhibit 5.

(G)    NAIS Strategies for Implementation, attached hereto as Exhibit 6.

(H)    Plaintiff's memorandum of law filed herewith.

WHEREFORE, plaintiff respectfully requests that this Honorable Court
grant her Motion for Temporary Restraining Order.

CLYMER AND MUSSER, P.C.

Respectfully submitted,


_s/Leonard G. Brown, III_____
LEONARD G. BROWN, III
Pennsylvania Bar No. 83207
408 West Chestnut St.
Lancaster, PA 17603
(717) 299-7101
(717) 299-5115—facsimile

ATTORNEYS FOR PLAINTIFF

Dated: June 2, 2008

## Service Certificate of Counsel

I hereby certify pursuant to LCvR 65.1(a) that I am serving the foregoing documents upon the following parties by facsimile and/or electronic mail. Such service is expected to be completed by 5:00 p.m., June 2, 2008.

United States Department of Agriculture
Office of General Counsel
1400 Independence Ave., S.W.
Washington, DC 20250

United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

United States Attorney for the District of Columbia
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530

CLYMER AND MUSSER, P.C.

_s/Leonard G. Brown, III_____
LEONARD G. BROWN, III

Dated:___June 2, 2008___

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

**Memorandum in Support of Plaintiff's Motion
For Injunctive Relief**

**Table of Contents**

Table of Contents ....................................................................... i

Table of Authorities ................................................................. iii

I.    INTRODUCTION .......................................................... 1

II.    FACTS ........................................................................ 3

III.    ARGUMENT ................................................................ 8

    A.    Standard of Review ............................................... 8

    B.    NPIR Records Must Be Disclosed to Plaintiff; FOIA Exemption 6 Does Not Apply to These "Phone Book" Records....................... 11

    C.    Defendant USDA Has No Authority Under the Privacy Act to Convert the NPIR and Other NAIS Systems into a "Privacy Act System of Records" Effective June 9, 2008. ................................ 17

    D.    Section 1619 of the Food, Conservation, and Energy Act of 2008 Does Not Apply to Plaintiff's FOIA Request; Section 1619 Was Enacted in Violation of the Presentment Clause of the United States Constitution, Article I, § 7, and in Violation of the Doctrine of Separation of Powers. ........................................... 23

1.    The Information Contained in the NPIR Is Not The Type of Information Whose Disclosure is Limited by Section 1619... 24

2.    Section 1619 Is Not Retroactive and Therefore Does Not Affect Plaintiff's Right to Disclosure of the NPIR................... 26

3.    Congress's Passage of The Food, Conservation, and Energy Act of 2008 Violated the Presentment Clause of the United States Constitution, Article I, § 7, and the Doctrine of Separation of Powers.......................................................28

IV    CONCLUSION ............................................................... 34

<u>Table of Authorities</u>

Cases

<u>Buckley v. Valeo</u>, 424 U.S. 1 (1976). ..................................................... 32

<u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290 (D.C. Cir. 2006)........................................................................................ 8

<u>CityFed Financial Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738 (D.C. Cir. 1995) ........................................................................... 8

<u>CityFed Financial</u>, 58 F.3d 738 (D.C. Cir. 1995)...................................... 9

\* <u>Clinton v. City of New York</u>, 524 U.S. 417 (1998) ................30, 31, 33, 34

<u>CSX Transportation, Inc. v. Williams</u>, 406 F.3d 667 (D.C. Cir. 2005)...... 8

<u>Department of Air Force v. Rose</u>, 425 U.S. 352 (1976).......................... 13

<u>Department of Justice v. Tax Analysts</u>, 492 U.S. 136 (1989) ................ 12

<u>Department of State v. Ray</u>, 502 U.S. 164 (1991) ............................12, 25

<u>Department of State v. Washington Post Co.</u>, 456 U.S. 595 (1982) ..14, 15

<u>Ellipso, Inc. v. Mann</u>, 480 F.3d 1153 (D.C. Cir. 2007) ........................... 8

<u>Elnashar v. Department of Justice</u>, 446 F.3d 792 (8th Cir. 2006).......... 17

<u>Environmental Protection Agency v. Mink</u>, 410 U.S. 73 (1973) ............. 12

<u>Enwonwu v. Chertoff</u>, 376 F. Supp. 2d 42 (D. Mass. 2005) .................. 26

<u>Fernandez-Vargas v. Gonzales</u>, 548 U.S. 30 (2006) .............................. 26

\* <u>INS v. Chadha</u>, 462 U.S. 919 (1983) ...................................30, 31, 32, 33

<u>INS v. St. Cyr</u>, 533 U.S. 289 (2001)....................................................... 26

<u>Landgraf v. USI Film Products</u>, 511 U.S. 244 (1994) ............................ 26

<u>Marshall Field & Co. v. Clark</u>, 143 U.S. 649 (1892)............................... 30

_Mova Pharmaceutical Corp. v. Shalala_, 140 F. 3d 1060 (D.C. Cir. 1998) 8

\* _Multi Ag Media LLC v. Department of Agriculture_, 515 F.3d 1224 (D.C.

  Cir. 2008) .............................................................................2, 13, 14

_National Archives & Records Admin. v. Favish_, 541 U.S. 157 (2004) .... 12

_National Ass'n of Home Builders v. Norton_, 309 F.3d 26 (D.C. Cir. 2002)

  ................................................................................................ 13

\* _National Ass'n of Retired Federal Employees v. Horner_, 879 F.2d 873

  (D.C. Cir. 1989) ...................................................................13, 14, 16

_News-Press v. Department of Homeland Security_, 489 F.3d 1173 (11th

  Cir. 2007) ............................................................................14, 18

_NLRB v. Robbins Tire & Rubber Co._, 437 U.S. 214 (1978).................... 12

_OneSimpleLoan v. Secretary of Education_, 496 F.3d 197 (2d Cir. 2007)30

\* _Public Citizen v. District Court_, 486 F.3d 1342 (D.C. Cir. 2007)........... 30

_Qualcomm Inc. v. FCC_, 181 F.3d 1370 (D.C. Cir. 1999) ...................... 27

_Quinn v. Stone_, 978 F.2d 126 (3rd Cir 1993) ...................................... 18

_Serono Laboratories, Inc. v. Shalala_, 158 F.3d 1313 (D.C. Cir. 1998) ..... 8

_Vymetalik v. FBI_, 785 F.2d 1090 (D.C. Cir. 1986) ................................ 20

Statutes

5 U.S.C. § 552.....................................................................5, 12, 13, 14

5 U.S.C. § 552a .........................................................................17, 21

Section 1619 of the Food, Conservation, and Energy Act of 2008, P.L.

  110-234, 112 Stat. 923............................................................ passim

Constitutional Provisions

United States Constitution, Article I, § 7 ...................................... passim

## I.    INTRODUCTION

Plaintiff, Mary-Louise Zanoni, a freelance journalist covering USDA policy and practices on the National Animal Identification System (NAIS) for, <u>inter alia</u>, dairy industry monthly The Milkweed, should have received records from the National Premises Information Repository (NPIR) in November 2007, over six months ago.  Defendant USDA's front-line FOIA officer did not perceive any elements needing redaction in the basic name-address-phone number contents of the NPIR.  And rightly so, since such information is not even arguably within the Exemption 6 claim subsequently made by USDA a month later, in USDA's written denial of Ms. Zanoni's request.

NAIS, and in particular the contents of the NPIR, are issues of the utmost public importance.  There are many indications that tens of thousands, perhaps hundreds of thousands, of Americans have been placed in this "voluntary" database without their knowledge and against their will.  If the NPIR contains only the bare-bones information that USDA claims, and if all submissions to the NPIR have been truly "voluntary," then why would USDA:

1.  first apparently agree to produce the records; and subsequently deny the records on the spurious basis of Exemption 6;

2.  fail to respond to Ms. Zanoni's internal agency appeal;

3.  attempt a highly irregular "conversion" of the NPIR into a "Privacy Act system of records;" and,

4. seek to bar disclosure (as plaintiff anticipates that USDA will) by reliance upon a purported legislative reversal of <u>Multi Ag Media LLC v. Department of Agriculture</u>, 515 F.3d 1224 (D.C. Cir. 2008), in the secretive and undeliberated Section 1619 of the unconstitutionally enacted recent Farm Bill?

Indeed, unless there is something worth hiding in the NPIR – and therefore something vitally in the public interest to disclose – USDA is pursuing an unseemly and unnecessarily scorched-earth resistance to transparent disclosure of USDA records generally, and to Ms. Zanoni's very simple FOIA request in particular. Ms. Zanoni therefore seeks the assistance of the Court in imposing two very modest restraints on USDA to preserve the ability of the Court to order the production of the requested records later in the course of litigation. Her motion for temporary relief requests:

1. that the 17,000 pages of NPIR records USDA printed out in Oct/./Nov. 2007, and has been storing at the USDA/APHIS FOIA offices in Riverdale, Maryland, be delivered into the custody of the Court. No possible harm could befall defendant USDA from the mere transfer of the records from Riverdale, MD to the Court's chambers in Washington, D.C.

2. that the Court order (or that USDA agree, by consent order) to delay USDA's purported "conversion" of the NPIR into a Privacy Act system of records (a "conversion" presently scheduled to become effective on Monday, June 9, 2008). USDA/APHIS has maintained the NPIR for four years without the NPIR being a Privacy Act system of records, so a temporary delay to assess the legality of this extraordinary action by

USDA is wholly appropriate and without any possible prejudice to defendant USDA.

## II.    FACTS

Defendant USDA began compiling the NPIR in 2004. (USDA/APHIS NAIS Draft Business Plan[1], Dec. 12, 2007, p. 61; Compl., ¶ 48.)  In April 2005, with the release of the NAIS Draft Strategic Plan and Draft Program Standards, USDA/APHIS revealed that it planned to mandate 100% government registration of "premises" for every property and every person owning any livestock; 100% individual animal ID, primarily with RFID tags and microchips,[2] and 100% reporting, to private fee-based databases, of all changes in status and changes in location of all livestock.   The premises registration and animal ID were to be completely mandatory by January 2008, and the animal tracking was to be completely mandatory by January 2009.  (Compl., ¶¶ 21-23.)

Grassroots groups of livestock owners mobilized to defeat efforts by certain states, working in conjunction with USDA, to establish the mandatory premises ID component of the NAIS system.  To defendant USDA, the anger and resistance of livestock owners was apparently unexpected.  During most of 2006 USDA restructured its approach to NAIS and finally, by late 2006, announced that NAIS would "remain

---

[1] The Draft Strategic Plan, NAIS User Guide, Draft Business Plan and NAIS Strategies for Implementation are attached to Plaintiff's motion for injunctive relief as Exhibits 3, 4, 5, and 6 respectively.
[2]  USDA has giving an exemption to massive industrial confinement livestock operations from this ID requirement and from the reporting requirement.

voluntary at the Federal level." (USDA/APHIS NAIS User Guide, Nov. 22, 2006, p. 4; Compl., ¶¶ 24-31.)

However, in practice, it appears that very little about USDA's implementation of NAIS is "voluntary" for the farmers and animal owners targeted by USDA-funded state and private-entity efforts to increase NAIS participation. As early as mid-2006 accounts began to surface of livestock owners who had been put into the USDA/APHIS National Premises Information Repository without their knowledge. The frequency and number of these complaints increased throughout 2006 and 2007. Livestock owners were finding themselves placed in the "voluntary" NPIR through such routine transactions as renewals of brand registrations, or requests for routine livestock health testing or vaccinations. Some USDA-funded state NAIS efforts went so far as to force farmers in severe drought regions to "volunteer" for NAIS premises ID as a condition of receiving government-funded emergency hay supplies. (Compl., ¶¶ 31-32; R.M. Thornsberry Aff., attached to Pl.'s Mot. Inj. Relief as Exhibit 1; R. Hill Aff., attached to Pl.'s Mot. Inj. Relief as Exhibit 2).

Plaintiff Mary-Louise Zanoni has been writing about NAIS issues for agricultural publications for several years, and she thus was familiar with the growing litany of complaints from farmers about USDA's novel ways of capturing the farmers' information for the NPIR database. Knowing that only an examination of the NPIR database could reveal the extent to which farmers had been placed in NPIR without their

knowledge or against their will, in the fall of 2007 Ms. Zanoni retained

counsel to pursue a FOIA request for the NPIR database.  The NPIR data,

according to defendant USDA/APHIS, contains only an entity name,

contact person's name, address, telephone number, and operation type.

(USDA/APHIS 2005 Draft Program Standards, p. 11; see also NAIS User

Guide 2006 p. 63.)  Ms. Zanoni requested only three items:

> 1.    All records of registered premises contained in the
> National Premises Information Repository, which we
> understand  . . . to consist[] of basic contact information, i.e.,
> name of the entity, name of a contact person, address,
> telephone number, operation type, and alternative telephone
> number.
>
> 2.    The number of requests to be removed from the
> premises database that APHIS has received from
> owners/managers of registered premises; and
>
> 3.    The number of premises that actually have been
> removed from the database.

Compl. ¶ 35.

As more fully set forth in the Complaint, Ms. Zanoni's FOIA

request for the NPIR was sent to USDA/APHIS on October 24, 2007.  At

first, a USDA/APHIS FOIA officer indicated that NAIS staff had supplied

him with 17,000 pages of printed NPIR records, and that he would review

the documents and send 200 pages at a time to Ms. Zanoni's counsel.

However, shortly thereafter, Ms. Zanoni received from USDA/APHIS a

complete denial of her FOIA request, purportedly on the basis of FOIA

Exemption 6, which by its terms exempts from disclosure only

"personnel and medical and similar files the disclosure of which would

constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Ms. Zanoni sent an appeal of the FOIA denial to USDA/APHIS on December 21, 2007 and she has never received any response to her appeal. (Compl., ¶¶ 42-44.)

More recently, on April 30, 2008, USDA/APHIS published a notice in the Federal Register announcing USDA/APHIS's intention to declare the NPIR (and several other NAIS databases) to be systems of records covered by the Privacy Act, effective June 9, 2008. (73 FR 23412-14.)

In the course of congressional consideration of a new Farm Bill,[3] on May 13, 2008 a Conference Report for the bill was filed. The Conference Report contained a completely new provision, unrelated to earlier versions of the legislation, purporting to prohibit USDA from disclosing "information provided by an agricultural producer or owner of agricultural land concerning the agricultural operation, farming or conservation practices, or the land itself, in order to participate in programs of the Department." P.L. 110-234, 112 Stat. 923, § 1619. Section 1619 was inserted into the Commodities Title despite having no specific relation to commodities programs and was placed under the inapposite heading of "Information Gathering." Section 1619(b) is vaguely drawn, was never publicly discussed before enactment, and is not mentioned in the Conference Committee's Statement of Managers.

---

[3] Ultimately enacted as the Food, Conservation, and Energy Act of 2008, P.L. 110-234, 112 Stat. 923.

The Conference Report was passed by the House on May 14, 2008 and by the Senate on May 15, 2008.

On May 20, 2008 a Farm Bill was presented to the President, who had often and consistently voiced his intention to veto this legislation. However, this was a different bill than the bill passed by the House and Senate on May 14 and 15, respectively. An entire title of the Farm Bill, Title III, although it had been duly adopted by both chambers, had been omitted from the bill that had been presented to the President. Title III-Trade occupies 35 pages of the Conference Report and covers such vital programs as all U.S. food aid to foreign countries, agricultural export programs, and crucial amendments to the Tariff Act of 1930 to address longstanding trade issues concerning softwood lumber.

On May 21, 2008, the President vetoed the bill that had been presented to him and returned the bill and his objections to the originating legislative chamber, the House of Representatives. By this time Congress was fully aware that the bill presented to the President was not the same bill that had been passed by both chambers. Nonetheless, faced with deadlines of a Memorial Day recess and the looming expiration (on May 23, 2008) of a temporary extension of existing law in the form of the 2002 Farm Bill, the House of Representatives chose to pass a materially different bill (without any Title III) on May 21, 2008 to override the President's veto. The Senate also passed the different bill on May 22, 2008. Thus, Congress purported to

override a Presidential veto by knowingly passing a materially different bill than the original bill that had been passed by the House and Senate. (See Compl., ¶¶ 59-62.)

## III.  ARGUMENT

### A.  *Standard of Review*

When deciding whether to grant a preliminary injunction, the court must weigh four factors:  (1) whether plaintiff has a substantial likelihood of success on the merits; (2) whether plaintiff may suffer an irreparable injury absent an injunction; (3) whether an injunction might substantially injure the other party; and (4) whether the public interest would be furthered by the injunction.  Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007) Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).  The four factors interrelate on a sliding scale, and must be balanced against one another. Serono, 158 F.3d at 1318; Mova Pharmaceutical Corp. v. Shalala, 140 F. 3d 1060, 1066 (D.C. Cir. 1998).  In the court's balancing process, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Ellipso, 480 F.3d at 1157 (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)); Full Gospel Churches, 454 F.3d at 297; CSX Transportation, Inc. v. Williams, 406 F.3d 667, 670 (D.C. Cir. 2005); Serono, 158 F.3d at 1318.  Though a movant must demonstrate

"at least some injury," <u>Full Gospel Churches</u>, 454 F.3d at 297, an injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits, even if there is a relatively slight showing of irreparable injury.  <u>CityFed Financial</u>, 58 F.3d 738, 747 (D.C. Cir. 1995).

In the present case, the public interest in disclosure of the NPIR records is vital.  As described by former Secretary of Agriculture Mike Johanns, NAIS is a massive undertaking that would profoundly change the nature of livestock farming.  NAIS has provoked an unprecedented resistance by farmers, ranchers, and noncommercial livestock owners. The resistance may have briefly slowed USDA's imposition of NAIS. However, the USDA/APHIS 2006 NAIS User Guide and 2007 NAIS Business Plan, as well as the actions of states working under USDA NAIS cooperative agreements, all reveal that defendant USDA will use extreme means to build its NPIR database.  Under what defendant perceives as a threat that animal ID programs will be demanded by international trading partners, USDA/APHIS is undertaking more and more coercive and secretive tactics for placing livestock owners into NAIS generally and into the NPIR in particular.  Defendant USDA has turned NAIS into a government plan to overcome citizen resistance by forced compliance. Bringing this government behavior to light by obtaining access to the NPIR is of the utmost public interest.

Plaintiff's request for preliminary relief has been very narrowly structured.  Plaintiff asks only that (1) USDA transfer the printed records it had originally prepared for its aborted process of disclosure, from its Riverdale, MD offices to the Court's chambers in Washington, D.C.; and (2) that USDA postpone, for a limited time period, its designation of the NPIR as a "Privacy Act system of records" – a designation that the NPIR apparently has had no need of, during the first four years of its existence.  No possible harm to USDA can arise from these narrowly tailored measures to preserve the status quo and indeed, it is not clear what harm USDA could even credibly assert.

USDA is proceeding with ever more extreme measures to impose NAIS and draw unwitting and unwilling farmers into the NPIR, as is clear from the Dec. 2007 NAIS Business Plan and the April 2008 AMS Business Plan.  USDA also has taken and can be expected to take extraordinary measures that are intended to delay and ultimately prevent any public access to the NPIR.  Under these circumstances, plaintiff has already suffered injury in being stymied in her attempts to bring the true nature of the NPIR's contents and construction into the public forum. Plaintiff will suffer irreparable injury should USDA succeed in delaying and frustrating public disclosure of the NPIR until a de facto or de jure mandatory NAIS becomes a fait accompli, and it then becomes too late to question the process by which USDA has apparently compelled NAIS compliance while claiming that NPIR participants are all "volunteers."

Plaintiff's likelihood of success on the merits is very strong. Clearly the bare-bones contact information of the requested records does not fall within FOIA Exemption 6, the only grounds USDA has claimed for its refusal to disclose.  USDA's attempt to "convert" its NPIR into a "Privacy Act system of records" violates several basic facial requirements of the Privacy Act, i.e., publication of notice at the establishment of the system of records, reporting to Congress and OMB, collecting records directly from subject individuals, and provision of Privacy Act notices to subject individuals.  USDA presumably may advance a new argument that Section 1619 of P.L. 110-234, 112 Stat. 923, can bar fulfillment of plaintiffs' FOIA request.  However, the Section 1619 argument also cannot defeat plaintiff's claims on the merits.  Section 1619 does not even apply to plaintiff's Privacy Act claim; the entire Farm Bill of which Section 1619 is a part was enacted in violation of the Presentment Clause, U.S. Constitution, Article I, §7, and the doctrine of separation of powers; Section 1619 is not retroactive so as to bar plaintiff's right to fulfillment of her FOIA request; and Section 1619 does not on its face apply to the NPIR "phone book" records.

### B.   NPIR Records Must Be Disclosed to Plaintiff; FOIA Exemption 6 Does Not Apply to These "Phone Book" Records.

"Without question, the [Freedom of Information] Act is broadly conceived.  It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially

enforceable public right to secure such information from possibly unwilling official hands." Environmental Protection Agency v. Mink, 410 U.S. 73, 80 (1973). "In enacting the FOIA . . ., Congress sought to open agency action to the light of public scrutiny. Congress did so by requiring agencies to adhere to 'a general philosophy of full agency disclosure.'" Department of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989) (quoting S. Rep. No. 89-813, at 3) (other quotation marks and citations omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978). "FOIA is often explained as a means for citizens to know 'what the Government is up to.' This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." National Archives & Records Admin. v. Favish, 541 U.S. 157, 171-72 (2004) (citation omitted). Consistent with FOIA's purpose and plain language, FOIA's "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." Department of State v. Ray, 502 U.S. 164, 173 (1991).

The FOIA is structured as a basic requirement for broad disclosure set forth in 5 U.S.C. § 552(a), with a series of nine circumscribed and carefully delineated exemptions set forth in 5 U.S.C. § 552(b). Thus, FOIA requires that "an agency must disclose all records requested by

'any person,' 5 U.S.C. § 552(a)(3), unless the information sought falls within a specific statutory exemption.  5 U.S.C. § 552(d)." <u>National Ass'n of Retired Federal Employees v. Horner</u>, 879 F.2d 873, 874 (D.C. Cir. 1989).  "FOIA's basic purpose reflects 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' " <u>Multi Ag Media LLC v. Department of Agriculture</u>, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (quoting <u>Department of Air Force v. Rose</u>, 425 U.S. 352, 360–61 (1976)).

FOIA's "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act" and the exemptions therefore "must be narrowly construed." <u>Rose</u>, 425 U.S. at 361.  The Supreme Court has "repeatedly stated that the policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly." <u>Rose</u>, 425 U.S. at 366 (quotation marks and citations omitted).

The only FOIA exemption at issue in the present case is Exemption 6, which allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "[T]here is nothing about invoking Exemption 6 that lightens the agency's burden.  In fact, 'under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act.' " <u>Multi Ag</u>

<u>Media</u>, 515 F.3d at 1227 (quoting <u>National Ass'n of Home Builders v.</u>
<u>Norton</u>, 309 F.3d 26, 32 (D.C. Cir. 2002)).

There are four elements in the judicial analysis of Exemption 6
issues.  First, the court must determine whether the records are "similar
files" under 5 U.S.C. § 552(b)(6).  <u>Department of State v. Washington Post</u>
<u>Co.</u>, 456 U.S. 595, 600-602 (1982); <u>Multi Ag Media</u>, 515 F.3d at 1227-28;
<u>News-Press v. Department of Homeland Security</u>, 489 F.3d 1173, 1198-
99 (11th Cir. 2007).  Second, even if the requested records are "similar
files," would disclosure constitute a "clearly unwarranted invasion of
personal privacy" within the meaning of Section 552(b)(6)?  <u>Washington</u>
<u>Post Co.</u>, 456 U.S. at 602; <u>Multi Ag Media</u>, 515 F.3d at 1227-28.  Third,
even if the records are "similar files" and an "unwarranted invasion of
personal privacy" may be at stake, is the privacy interest substantial, <u>i.e.</u>,
greater than <u>de</u> <u>minimis</u>?  If not, the records must be disclosed.  <u>Horner</u>,
879 F.2d 873, 874.  Fourth, even if the privacy interest is substantial, a
strong public interest in disclosure can outweigh the privacy interest and
compel disclosure.  <u>Multi Ag Media</u>, 515 F.3d at 1230; <u>National Ass'n of</u>
<u>Home Builders v. Norton</u>, 309 F.3d at 35.

In the present case the NPIR records fail every one of the four
considerations.

First, the bare-bones NPIR "phone book" information – name of
entity, contact person, address, telephone number, and operation type –
is not the sort of detailed information that has been held to constitute

"similar files" within the meaning of 5 U.S.C. § 552(b)(6).  It is true that "similar files" has a "broad, rather than a narrow, meaning" and includes any "detailed Government records on an individual which can be identified as applying to that individual." <u>Washington Post Co.</u>, 456 U.S. at 600, 602.  However, the NPIR records simply do not contain any details about the entities or persons listed.  The NPIR is basic contact information solely for the purpose of giving USDA/APHIS a list of livestock owners.  The sample form provided by USDA in its NAIS User Guide 2006 at p. 63 even states, "This is the contact information . . ."

In contrast, the records at issue in <u>Washington Post Co.</u> were passport application files that might contain a great deal of information beyond mere contact information.  Similarly, the records sought in <u>News-Press</u> were addresses of recipients of FEMA disaster relief; the addresses would link their owners to a great deal of detailed information about their applications for the relief funds.  In <u>Multi Ag Media</u>, the records at issue contained not only locations of farms, but also data on agricultural practices, acreage, soil, crops, and livestock.  In contrast, the NPIR information sought by Ms. Zanoni reveals nothing about the practices, size, or possible financial status of the livestock owners.  Indeed, a livestock owner's appearance in the NPIR, in light of the numerous reports of farmers placed in the database without their knowledge, does not even tell us if the livestock owner ever applied for a NAIS premises ID.

If the NPIR records do not even meet the definition of "similar records" because they are just bare contact information, then a fortiori none of the other three considerations commonly addressed in Exemption 6 analysis could bar disclosure of the NPIR database. Disclosure of a list of names, addresses and telephone numbers is not an "unwarranted invasion of personal privacy" insofar as people do not generally consider contact information to be "private." If contact information can raise any question whatsoever of a "privacy interest," surely the interest is de minimis. Since records must be disclosed under FOIA whenever a privacy interest is merely de minimis, Horner, 879 F.2d at 874, the bare-bones NPIR contact information must be disclosed in response to Ms. Zanoni's request.

Finally, if the NPIR "phone book" information is subjected to the fourth element of Exemption 6 analysis, namely, a weighing of the public interest in disclosure against any privacy interest, the public interest unquestionable prevails. In News-Press, disclosure of addresses was found to be appropriate even though the information could be linked to quite personal details of disaster relief applications, because of the great public interest in scrutiny of FEMA's management of disaster response. Id. at 1178. In the present case, disclosure of the NPIR "phone book" information, information that most people would not even consider private, will serve a very significant public interest in shedding light on USDA's management of the NAIS program, a program that is, in the

words of former Agriculture Secretary Johanns, a "massive project" unprecedented in American agriculture.

### C.    Defendant USDA Has No Authority Under the Privacy Act to Convert the NPIR and Other NAIS Systems into a "Privacy Act System of Records" Effective June 9, 2008.

Under the Privacy Act, 5 U.S.C. § 552a(g)(1)(D), "[w]henever any agency . . . fails to comply with any other provisions of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."  An "individual" is defined under Privacy Act, § 552a(a)(2), as "a citizen of the United States or an alien lawfully admitted for permanent residence." The right of action created under § 552a(g)(1)(D) is distinct from, and in addition to, causes of action created under §§ 552a(g)(1)(A), 552a(g)(1)(B), and 552a(g)(1)(C), respectively, for agency failures to amend records, agency failures to give individuals access to their records, and agency failures to maintain accurate and complete records resulting in determinations adverse to individuals.[4]

---

[4]  Most actions under the Privacy Act are claims by individuals seeking disclosure of their own personal records from an agency, or seeking the correction of erroneous records.  In those instances, exhaustion of administrative remedies normally is required.  See, e.g., Elnashar v. Department of Justice, 446 F.3d 792 (8th Cir. 2006) (district court lacked jurisdiction where claimant had failed to make request of agency for amendment of records).  However, in this action under § 552a(g)(1)(D), challenging defendant's violations of the Privacy Act in the manner of establishing a new Privacy Act system of records, agency procedure does not offer any internal process of redress, and thus exhaustion of administrative remedies does not apply.

Plaintiff, as a citizen of the United States, is an "individual" with standing to challenge, under 5 U.S.C. § 552a(g)(1)(D), defendant USDA's purported conversion of several NAIS databases into "Privacy Act systems of records," as announced on April 30, 2008 at 73 Federal Register 23412-14.  The purported "conversion" will have a real and immediate adverse effect on plaintiff in that, if the NPIR and other NAIS databases are in the future made subject to the Privacy Act, this status will burden, delay, and in many instances may entirely frustrate plaintiff's access to records needed to examine USDA's past and future management of NAIS. Whereas plaintiff's access to records of contact information may be supported under FOIA, access to the same type of information would be greatly complicated and placed in doubt by the completion of USDA's after-the-fact attempt to designate the NPIR and related systems as "Privacy Act" records.  See, e.g., Quinn v. Stone, 978 F.2d 126 (3rd Cir 1993) (addresses may be protected by the Privacy Act); see also News-Press v. Department of Homeland Security, 489 F.3d 1173, 1189-90 (11th Cir 2007) (defendant agency claimed it could not disclose certain records in response to a FOIA request because records were protected under Privacy Act).

Defendant USDA cannot "convert" the NPIR and other pre-existing NAIS databases into Privacy Act records because nothing in the Privacy Act permits such "conversion."  To the contrary, several requirements of the Privacy Act establish that a collection of records can only be placed

within the purview of the Privacy Act at the same time the compilation of the records is begun.

USDA/APHIS issued its "Notice of a proposed new system of records" for the "APHIS National Animal Identification System (NAIS)" on April 30, 2008.  (73 Federal Register 23412-14.)  In the Notice, APHIS defines the NAIS system of records as including:  "the Standardized Premises Registration System (SPRS), the National Premises Information Repository (NPIR), the Animal Identification Number Management System (AINMS), and the Animal Trace Processing System (ATPS)."  (73 Federal Register 23412.)

These record systems are described in the USDA/APHIS Draft Business Plan for NAIS, released in December 2007.  The NPIR is the USDA/APHIS "phone book" listing of livestock-owner contact information; the SPRS is a database of similar records used by the states to feed premises registration information into the NPIR.  The AINMS is a system assuring the unique assignment of individual animal identification numbers.  The ATPS is USDA's metadata system for interfacing with private animal tracking databases to permit collecting a history of movement and ownership information on a particular animal or group of animals.

Measuring from the time when each of these databases or systems was first compiled, the NPIR is about four years old; the SPRS appears from USDA/APHIS's description to be somewhat older; the AINMS

appears to be well over a year old; and the ATPS is about fourteen months old. The Business Plan (p. 61) states that the NPIR (APHIS's own database of all registered livestock premises in the country) "became operational in mid-2004." The Standardized Premises Registration System, SPRS, used by the states to interface with the NPIR, "is the most mature NAIS application." Due to obsolescence, sections of the SPRS "will be rewritten" in 2008. (Business Plan, pp. 61-62.) This suggests the SPRS is even older than the NPIR. We are told that the AINMS had allocated some 2 million individual animal ID numbers by August 1, 2007, and thus it must have been in existence well before that date. (Business Plan, p. 62.) Lastly, APHIS states that "USDA deployed the ATPS in March 2007." (Business Plan, p. 63)

It is clear that all the systems of records mentioned in the April 30, 2008 Privacy Act notice existed long before the notice was issued. In particular, the NPIR and SPRS databases, containing names, addresses, and contact information for a total of over 450,000 livestock owners, have been in existence for four years or more.

USDA's attempt suddenly to claim that these NAIS records are covered by the Privacy Act, many years after the use of the record systems began, violates both the letter and the spirit of the Privacy Act. The Privacy Act is intended to provide individuals with more control over gathering, dissemination, and accuracy of information about themselves contained in government files. <u>Vymetalik v. FBI</u>, 785 F.2d 1090, 1092

(D.C. Cir. 1986). Contrary to those purposes of the Privacy Act, as explained below, USDA has compiled the NAIS records with a complete disregard for the privacy of many of the individuals included in the system.

When an agency wants to set up a system of records that is covered by the Privacy Act, the agency must publish the required Federal Register notice "upon ***establishment*** or revision" of the system. 5 U.S.C. § 552a(e)(4) (emphasis added).[5] USDA failed to publish the required notice at the "establishment" of the NPIR, SPRS, AINMS, or ATPS and cannot do it years after the fact. At this point, if USDA/APHIS wants to make the NPIR, SPRS, and other NAIS data collections into Privacy Act systems of records, the agency must dismantle the present databases and start over, following from the outset the correct procedures under the Privacy Act.

Several other requirements of the Privacy Act also demonstrate that USDA/APHIS cannot use a Privacy Act notice to convert pre-existing systems of records. Under Privacy Act § 552a(r), an agency must report all new Privacy Act systems to Congress (i.e., the House Committee on Oversight and Government Reform and the Senate Committee on Homeland Security and Governmental Affairs), and to the Office of Management and Budget. This reporting is intended "to permit an

---

[5] "Revision" of a system of records in this context would mean, e.g., a change in uses of the records, or a new use in a matching system. USDA cannot credibly claim that its attempt to convert record systems not covered by the Privacy Act into records covered by the Privacy Act, is in itself a "revision" within the meaning of Section 552a(e)(4).

evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r). Reporting to Congress and OMB over four years after the establishment of the NPIR and SPRS defeats this statutory requirement of legislative and OMB oversight. Privacy Act § 552a(e)(2) requires collecting the record system's information "to the greatest extent practicable directly from the subject individual." It is well known that many of the records in the NPIR were not collected from individual livestock owners, but instead were dumped into the NPIR (with no prior notice to, or consent from, the individual livestock owners) from states' pre-existing databases for records of brands, calfhood vaccination programs, Coggins testing for horses, etc. Because NAIS is unpopular with livestock owners, it is improbable that USDA/APHIS could have collected over 450,000 records in the NPIR without such circumventing of the Privacy Act requirement to obtain records directly from individuals. Importantly, Privacy Act § 552a(e)(3) requires an agency to give written notice to individuals of the legal authority for the record system, and of the uses to be made of the information. USDA/APHIS has been collecting NPIR/SPRS information for over four years with no coherent system for giving such Privacy Act notices to affected individuals.

For all the foregoing reasons, USDA/APHIS's Privacy Act notice of April 30, 2008, 73 Federal Register 23412ff, violates the terms of the Privacy Act and USDA must not be permitted to proceed with its stated

intention of converting the pre-existing NAIS records into a purported Privacy Act system of records on June 9, 2008.

**D.    Section 1619 of the Food, Conservation, and Energy Act of 2008 Does Not Apply to Plaintiff's FOIA Request; Section 1619 Was Enacted in Violation of the Presentment Clause of the United States Constitution, Article I, § 7, and in Violation of the Doctrine of Separation of Powers.**

Section 1619 of the Food, Conservation, and Energy Act of 2008, P.L. 110-234, 112 Stat. 923, provides that, generally, the USDA "shall not disclose . . . information provided by an agricultural producer or owner of agricultural land concerning the agricultural operation, farming or conservation practices, or the land itself, in order to participate in programs of the Department."  (Section 1619(b)(2)(A).)  "Agricultural operation" is defined as including "the production and marketing of agricultural commodities and livestock."  (Section 1619(b)(1).)

Plaintiff anticipates that defendant USDA will try to invoke Section 1619 to defeat plaintiff's right under FOIA to disclosure of the NPIR records requested in October 2007.   However, plaintiff's right to disclosure is unaffected by Section 1619 because:  (1) the information described in Section 1619 does not include the NPIR "phone book" records sought by plaintiff; (2) Section 1619 is not retroactive and therefore cannot apply to plaintiff's right to disclosure of the NPIR records; and (3) the statute of which Section 1619 is a part, the Food, Conservation, and Energy Act of 2008, P.L. 110-234, 112 Stat. 923, was enacted by a highly irregular process that violated the Presentment

Clause of the United States Constitution, Article I, § 7, and violated the doctrine of separation of powers.

1.    The Information Contained in the NPIR Is Not The Type of Information Whose Disclosure is Limited by Section 1619.

There are two respects in which all or a large portion of the NPIR records are not encompassed in Section 1619's definition of information that the USDA shall not disclose.  First, Section 1619 forbids disclosure of "information concerning the agricultural operation" (i.e., concerning "the production and marketing of agricultural commodities and livestock"), or concerning "farming or conservation practices, or the land itself."  The NPIR contains, for each farm or location record, only an entity name, contact person's name, address, telephone number, and operation type.  (USDA/APHIS 2005 Draft Program Standards, p. 11.; NAIS User Guide 2006 p. 63).   Certainly this contact information does not tell us anything about "farming or conservation practices, or the land itself" – it is not, for instance, information about soil types, uses of particular fields, participation or lack thereof in the Conservation Reserve Program, or typography.

As to Section 1619's prohibition of disclosures of "information concerning the agricultural operation," defined as "the production and marketing of agricultural commodities and livestock," NPIR contact information gives us no details whatsoever about production and marketing.   Indeed, USDA/APHIS encourages completely non-

commercial animal owners to register their premises in the NPIR, so appearance in the NPIR is not even an indication that the locations listed are engaged in any sort of agricultural production.  At most, perhaps the NPIR inclusion of an "operation type" for each listing might in some instances tell us that the premises is a "farm" or "feedlot," as opposed to an auction or a veterinary clinic.  But even this reveals only the fact that there is an "agricultural operation" corresponding to some NPIR locations; it does not reveal any "information concerning" that agricultural operation beyond its existence.

Further, Section 1619 purports to exempt from disclosure only "information **provided** by an agricultural producer or owner of agricultural land."  (Emphasis added.)  Even if Section 1619 could otherwise be construed to include the type of bare-bones "phone book" records contained in the NPIR – which it cannot – Section 1619 still would not bar disclosure of any information that was not provided to USDA directly by a farmer or landowner.  Many, perhaps most, of the records in the NPIR were obtained not from farmers or landowners, but from state or federal databases created for livestock programs unrelated to NAIS or the NPIR.  Thus, even if Section 1619 were effective to bar disclosure of any information in the NPIR that actually had been submitted directly to the NPIR by livestock owners, USDA, bearing the burden of justifying any nondisclosure, Department of State v. Ray, 502

U.S. 164, 173, would have to prove such direct submission for each record withheld.

    2.    <u>Section 1619 Is Not Retroactive and Therefore Does Not Affect Plaintiff's Right to Disclosure of the NPIR.</u>

The legal presumption against statutory retroactivity is founded upon elementary considerations of fairness and is deeply rooted in the Supreme Court's jurisprudence. <u>Landgraf v. USI Film Products</u>, 511 U.S. 244, 265 (1994).

If a statute may impose some burden on an act or event preceding the statute's enactment, the courts must apply retroactivity analysis to determine if the statute properly may be applied to the past act or event. Retroactivity analysis involves: (1) examining whether Congress has expressly prescribed the statute's proper reach, <u>e.g.</u>, whether the statute is expressly retroactive; (2) if a statute is not expressly retroactive, a court applies normal rules of statutory construction to assess whether the statute may apply retroactively; (3) if those efforts fail definitively to answer the question of retroactivity, the court asks whether applying the statute would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties arising before the statute's enactment. If the statute would negatively affect existing substantive rights, a court applies the presumption against retroactivity by construing the statute as inapplicable to the event or act in question. <u>Fernandez-Vargas v. Gonzales</u>, 548 U.S. 30 (2006) (application of an immigration statute to individual who entered U.S. illegally before its

effective date did not retroactively affect any right of the illegal alien); Landgraf, supra; INS v. St. Cyr, 533 U.S. 289 (2001) (barring retroactive application of a change in law that would have prevented alien from seeking waiver of deportation) (later superseded by statute on other grounds, see Enwonwu v. Chertoff, 376 F. Supp. 2d 42 (D. Mass. 2005).

In Landgraf, the Supreme Court found that a provision of civil rights law creating additional remedies of compensatory and punitive damages should not be applied retroactively to permit a Title VII plaintiff to seek the new additional remedies. "As Landgraf and similar authority make clear, absent an express statement that a statute will apply to events preceding its enactment, it may not be interpreted to impair rights a party possessed when Congress acted." Qualcomm Inc. v. FCC, 181 F.3d 1370, 1378 (D.C. Cir. 1999) (statute extinguishing FCC's authority to grant certain preferences did not extinguish pre-existing entitlement to preference).

The Food, Conservation, and Energy Act of 2008, P.L. 110-234, 112 Stat. 923, of which Section 1619 is a part, contains no general retroactivity provision. In one isolated part of the statute, Section 13105(k), amending the Commodity Exchange Act, Congress did determine that the subsection should apply retroactively and thus Congress included language in § 13105(k) specifying this retroactive application. In contrast, Section 1619 contains no retroactivity provision. Therefore, Section 1619 cannot be applied to impair rights

existing before its effective date, i.e., the date of its purported enactment, May 22, 2008.

Defendant USDA/APHIS apparently intended to fulfill Ms. Zanoni's FOIA request in November, 2007. The subsequent denial of her request by a letter dated December 13, 2007 invoked only FOIA Exemption 6 as a basis for the denial, an Exemption obviously not supporting the denial under prevailing law. Therefore Ms. Zanoni's legally valid FOIA request gave her a right to disclosure of the NPIR records as of the expiration of the statutory time period for such disclosure, i.e., by December 2007. At the latest, Ms. Zanoni was fully entitled to disclosure of the NPIR records when USDA/APHIS allowed the period for ruling on her agency appeal to expire without providing any response to her appeal, i.e., by January 2008. USDA should not be permitted to escape its clear obligation under FOIA to disclose the NPIR records, merely because of the fortuitous circumstance of enactment of an undebated last-minute addition to a non-retroactive statute passed months after defendant USDA was obligated to have delivered the NPIR records to Ms. Zanoni.

    3.   Congress's Passage of The Food, Conservation, and Energy Act of 2008 Violated the Presentment Clause of the United States Constitution, Article I, § 7, and the Doctrine of Separation of Powers.

In the process of enactment of the Food, Conservation, and Energy Act of 2008 (the "2008 Act"), both Houses of Congress first passed identical bills. Then, however, an entire 35-page Title of the bill, dealing with vital concerns such as all foreign food aid programs, agricultural

export programs, and controversial softwood-lumber trade issues, was omitted from the enrolled bill as it was presented to the President for his approval or disapproval. In the event, the President expressed his longstanding disapproval of this Farm Bill with a veto of the bill that had been presented to him, by any meaningful standard a different bill from that which both Houses of Congress had passed. After the different bill was conveyed back to Congress, both Houses were made well aware that this was not the bill they had originally passed; members of the House of Representatives and Senate, respectively, stated during the floor debate on the veto override vote that there were serious constitutional problems because Congress was about to vote on a different bill than the bill that originally had been passed. Nonetheless, first the House of Representatives and then the Senate purported to override the President's veto by passage of the different bill. This highly irregular process, whether originally arising from inadvertency or not, was consciously pursued in the face of serious constitutional questions by both the House and the Senate. The plain fact is that this irregular process violated the Presentment Clause of the United States Constitution, Article I, §7, and also violated the doctrine of separation of powers, and as a result the Food, Conservation, and Energy Act of 2008 is not a law.

The Presentment Clause provides:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it

become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.

U.S. Const. Art 1 sec.7.

The 2008 Act is not a law because two requirements of the Presentment Clause clearly were not met – the bill – the same bill – that had passed the House and Senate was not presented to the President, and the bill – the same bill – that originally had passed the House and Senate was not the bill that was reconsidered after veto and passed by a two-thirds vote of each chamber.

A determination that the 2008 Act is not law is required by the Supreme Court's decisions in the Line Item Veto case, Clinton v. City of New York, 524 U.S. 417 (1998), and in the legislative veto case, INS v. Chadha, 462 U.S. 919 (1983). "The procedures governing the enactment of statutes set forth in the text of Article I were the product of the great debates and compromises that produced the Constitution itself. . . . [T]he power to enact statutes may only 'be exercised in accord with a

single, finely wrought and exhaustively considered, procedure.' " <u>Clinton v. City of New York</u>, 524 U.S. at 439, quoting <u>Chadha</u>, 462 U.S. at 951.[6]

In <u>Clinton v. City of New York</u>, the Court held that a statutorily created line item veto was unconstitutional under the Presentment Clause.   The line item veto permitted the President to cancel certain budgetary and tax provisions in legislation that previously had been duly passed by Congress and approved by the President.   The Court found this process impermissible because it essentially allowed the President to create a statute whose text was not voted on by either House of Congress or presented to the President for signature.   In the view of the <u>Clinton</u> Court, the Constitution simply does not permit a "unilateral Presidential action that either repeals or amends parts of duly enacted statutes." <u>Id.</u> at 439.   The President's exercise of the line-item veto had resulted in "truncated versions of two bills that passed both Houses of Congress. They are not the product of the 'finely wrought' procedure that the Framers designed." <u>Id.</u> at 440.

---

[6]  The present issues surrounding the profound irregularities in the enactment of the Food, Conservation, and Energy Act of 2008 are not controlled by <u>Marshall Field & Co. v. Clark</u>, 143 U.S. 649 (1892), and its progeny.  In <u>Field</u>, the Court held that a trivial variance involving a paragraph included in a bill passed by both houses of Congress but inadvertently dropped from the enrolled-bill text presented to the President and signed into law, did not constitute a violation of Article I.  Essentially, the <u>Field</u> court pronounced an evidentiary rule that the enrolled bill should control as to the authenticity of the text, and prior legislative history would not be admitted to contradict the enrolled bill.  Later cases have elevated the <u>Field</u> holding to the status of an "enrolled bill rule."  <u>See, e.g.</u>, <u>Public Citizen v. District Court</u>, 486 F.3d 1342 (D.C. Cir. 2007), and <u>OneSimpleLoan v. Secretary of Education</u>, 496 F.3d 197 (2d Cir. 2007).  <u>Public Citizen</u> and <u>OneSimpleLoan</u> both dealt with an unintentional variance in the number of months specified for certain Medicare reimbursements in a single section of a bill.  The provision at issue had no effect on the actual plaintiffs in either case.  Neither case dealt with the profound questions of significant variance from Article I procedures that were presented in <u>Clinton v. City of New York</u> and <u>Chadha</u> and are at issue in the present case.

The legislation creating the line item veto was invalid under Article I, § 7 because it would give "the President the unilateral power to change the text of duly enacted statutes." Id. at 447.  By way of explaining the distinction between purported laws resulting from exercise of the line-item veto and the normal constitutional procedures of enactment, the Court noted in relation to the Balanced Budget Act of 1997, Public Law 105-33, that the "exact text" of the bill had been passed by the House of Representatives and the Senate, and "that text" was then signed into law by the President.  "If **one paragraph** of that text had been omitted at any one of those three stages, Public Law 105-33 would not have been validly enacted." Id. at 448 (emphasis added).

In Chadha, the Court invalidated, as a violation of the Article I procedures for enacting legislation, a statutory one-house legislative veto of an Executive Branch determination that an alien's deportation be suspended.  Even though the legislative veto had become a common procedure, existing in hundreds of statutes at the time of the decision in Chadha (see id. at 944-45), the Court nonetheless found that it offended the doctrine of separation of powers.  "These provisions of [Article I, § 7] are integral parts of the constitutional design for the separation of powers.  We have recently noted that '[t]he principle of separation of powers was not simply an abstract generalization in the minds of the Framers:  it was woven into the document that they drafted in Philadelphia in the summer of 1787.' " Chadha, 462 U.S. at 946,

quoting <u>Buckley v. Valeo</u>, 424 U.S. 1, 124 (1976).  In particular, the <u>Chadha</u> Court noted that a legislative veto of an otherwise Executive Branch  power ran contrary to the Framers' concerns that the power of Congress to enact legislation needed to be limited.  "The decision to provide the President with a . . . veto was based on the profound conviction of the Framers that the powers conferred on Congress were the powers to be most carefully circumscribed." <u>Id.</u> at 947.  No detail of the Article I process can be omitted without offending the Constitution:

> The bicameral requirement, the Presentment Clauses, the Presidents veto, and Congress' power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps.  To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded.

<u>Chadha</u>, 462 U.S. 957-58.

Under the decisions in <u>Chadha</u> and <u>Clinton v. City of New York</u>, legislative procedural errors as serious as those which occurred in the passage of the Food, Conservation, and Energy Act of 2008 cannot stand. The omission of the entire Title III of the Act from the bill presented to the President essentially allowed Congress to effect a significant amendment of the bill as originally passed, yet without any new vote by either house.  The fact that Congress then passed the different bill as a purported override does not cure the defect; in fact, it makes it worse. Surely Congress cannot pass a different bill than the one originally

passed and have it count as a valid override according to the carefully balanced requirements of Article I, § 7.

Just as the line-item veto was invalidated in <u>Clinton v. City of New York</u> because it allowed the President to create a statute whose text was not voted on by either House of Congress or presented to the President for signature, so in the present case the purported veto override votes created a statute that was not originally voted on by either House of Congress and was not presented to the President. The <u>Clinton</u> court noted that even a variance of "one paragraph" among the texts passed by both Houses of Congress and signed by the President would render a law's enactment invalid under the Presentment Clause. <u>A fortiori</u>, the enactment of the Food, Conservation, and Energy Act of 2008, in which an entire Title of the bill was omitted, must be held invalid under Article I, § 7 of the Constitution.

**IV     CONCLUSION**

Ms. Zanoni is entitled to the fulfillment of her Freedom of Information Act request for defendant USDA's NPIR records. In her motion for preliminary relief, Ms. Zanoni has narrowly tailored the requested remedy to preserve her right ultimately to receive the NPIR records. She now asks only that defendant USDA move the existing, already collected subject records from its Riverdale, Maryland offices to the court's Washington, D.C. chambers; and that defendant USDA temporarily continue to maintain the NPIR records in the status – a

status of not formally being within the provisions of the Privacy Act – that this database has had from its establishment four years ago. The significant public interest in gaining access to the NPIR records and in shining a light on USDA's policies and practices in implementing the massive undertaking of a National Animal Identification System, strongly supports a grant of preliminary relief.

CLYMER AND MUSSER, P.C.

Respectfully submitted,


_s/Leonard G. Brown, III_____
LEONARD G. BROWN, III
Pennsylvania Bar No. 83207
408 West Chestnut St.
Lancaster, PA 17603
(717) 299-7101
(717) 299-5115—facsimile

ATTORNEYS FOR PLAINTIFF

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF R. M. THORNSBERRY

I, R. M. Thornsberry Jr., hereby swear and depose as follows:

1.  I make this declaration pursuant to 28 U.S.C. § 1746 upon my
    personal knowledge of the facts, am over the age of 18 and am
    competent to testify to the facts stated herein.

2.  I am a citizen of the United States and a resident of the State of
    Missouri.

3.  I am a licensed Doctor of Veterinary Medicine, graduating from
    the University of Missouri in 1977.

4.  I am president of the Board of Directors for Ranchers and
    Cattlemen's Action Legal Fund / United Stockgrowers of
    America ("R-CALF USA").  R-CALF USA represents the U.S.
    cattle industry in national and international trade and

1

marketing issues to ensure the continued profitability and viability of U.S. cattle producers.

5.    In addition to being a practicing veterinarian and President of the Board of Directors of R-CALF USA, I also own and operate a working cattle ranch, a 500 head capacity feedlot, and a commercial feed supply for cattle, swine, poultry, and companion animals.

6.    Prior to being elected President of the Board of Directors for R-CALF USA I served as President of the Missouri Cattlemen's Association, President of Missouri Stockgrower's Association, and President of the Pulaski County Landowner's Association.

7.    In my capacity as a cattle producer and veterinarian, I have been engaged in discussions since 2001 regarding the National Animal Identification System and the USDA's National Premises Information Repository ("NPIR"). I personally have a Premise ID Number attached to my farm, veterinary facility, and feedlot.

8.    One of my earliest concerns, once it was announced that individual animal identification was to be voluntary, with the NPIR was the manner in which cattle producers may opt out of receiving a Premise Identification Number and if not having opted out, how a producer may remove himself from the repository once a Premise ID Number has been issued to a specific farm, feedlot, or ranch.

2

9.   At a bi-annual meeting of the Pulaski County Landowner's
     Association, at which officials from the Missouri Department of
     Agriculture addressed the group in Waynesville, Missouri, in or
     about 2005, I was present when department officials were
     asked, what happens when a producer requests to be removed
     from the NPIR.  We were informed that when a producer asks to
     be removed from the NPIR an asterisk would be placed next to
     the name indicating that the person wished to be removed.  The
     persons name and records were not removed from the NPIR,
     however.  We were informed that once the property is part of the
     NPIR it is linked to coordinates identifying its location and is
     not removed from the repository.

10.  Since this meeting, I have repeatedly asked about the process
     by which producers may be removed from the NPIR and have
     repeatedly asked that if I were to review the database, would
     there be a blank where a producer had been removed from the
     database.  It is my understanding, gained from my discussion
     with the Missouri Department of Agriculture officials, that once
     the Premise ID Number is issued, the USDA will not remove it
     from the property or the property from the repository.

11.  There may be cattle producers whose farms or ranches are
     currently listed in the NIPR.  Some of these cattle producers
     may wish to be removed from the NIPR, as well as have their

3

property de-listed, and the assigned Premise ID Number removed from association with their private property. Cattle producers that may ask to be de-listed need a method to verify the USDA has in fact removed the Premise ID Number from their personal property. An asterisk placed by their name, or some other method of flagging their record in the NIPR database is not acceptable if NAIS is indeed voluntary.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Executed on 5-27-08          R. M. Thornsberry Jr., D.V.M.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

**AFFIDAVIT OF RAY HILL**

I, Ray Hill, hereby swear and depose as follows:

1.    I make this declaration pursuant to 28 U.S.C. § 1746 upon my

       personal knowledge of the facts.  I am over the age of 18 and am

       competent to testify to the facts stated herein.

2.    I am a citizen of the United States and a resident of the State of

       New York.

3.    I own and operate a dairy farm in Potsdam, New York.

4.    On or about August 2006, I received a packet in the mail from the

       New York State Department of Agriculture and Markets, assigning

       me a National Animal Identification System ("NAIS") premises ID

       number that I had never requested.

5.    I did not want to be in the NAIS premises ID program, so I called

       an 800 number listed on the paperwork and the person who took

1

my call said they could not help me.  They referred me to Dr. John

Huntley, the New York State Veterinarian.  (The Department of

Agriculture and Markets website lists Dr. Huntley's official title as

Director, Division of Animal Industry of the New York Department

of Agriculture and Markets.)

6.      I called Dr. Huntley and asked to be taken out of the NAIS

premises ID program.  Dr. Huntley told me that he (Huntley) had

the authority to take me out of the NAIS records but that he

refused to do so.

7.      I then called a deputy undersecretary of the New York Department

of Agriculture and Markets.

8.      I directed this official to take me out of the NAIS database and

send me a letter confirming that I had been removed; otherwise, I

threatened to call my attorney and the press.

9.      Some time later I did receive a letter from the New York

Department of Agriculture and Markets saying I had been removed

from the NAIS list.

10.     I believe that while I may have been removed from the NAIS list, it

is unlikely that my property has been removed from the NAIS

database.

I declare under penalty of perjury that the foregoing is true and

correct.

Executed on _5-29-08_          _Raymond S. Hill_
                                                        Ray Hill

2

# National Animal Identification System (NAIS)

*A State-Federal-Industry Cooperative Effort*

## *DRAFT*
## *Strategic Plan*
## *2005 to 2009*

*April 25, 2005*



**United States Department of Agriculture**

Animal Plant Health Inspection Service



*USDA and our stakeholders in animal agriculture must continue moving forward with the National Animal Identification System.  NAIS must be implemented for our country to maintain its reputation as having the most efficient and effective animal health surveillance and response system in the world.  I believe a fully functional animal tracking system will keep us competitive in international markets, helping us retain and expand our market share.  This Department is wholly committed to making NAIS a reality.*

> *Mike Johanns*
> *Secretary of Agriculture*

*We have been working on an animal identification plan here at USDA in conjunction with a lot of interested parties over a number of years now, and our goal has remained consistent—to be able to track animals within a 48-hour period.   We are prepared to roll up our sleeves and get this implemented.*

*The attention garnered from the BSE case last December, coupled with the increasing number of animal disease outbreaks worldwide over the last decade, has intensified the level of interest in developing NAIS.  September 11, 2001, also taught us that we have to prepare for potential intentional disease introductions.  NAIS is a top USDA priority.*

> *William "Bill" Hawks*
> *Under Secretary for Marketing and*
> *Regulatory Programs*

*APHIS is committed to helping producers maintain healthy animals and prosperous industries, and one of the best ways to do this is to continue to build a national animal identification program that will support Federal, State, tribal, and industry efforts to respond to future disease outbreaks.  The NAIS will be a great tool in containing and eliminating diseases that could affect all species that will become a part of the system.*

> *W. Ron DeHaven*
> *Administrator*
> *Animal and Plant Health*
> *Inspection Service*

*For nearly 2 years, industry and government have worked to develop a comprehensive animal identification system.  We value industry's strong leadership in this effort.  Much of the framework for NAIS—the data standards in particular—is the result of these partnership efforts.  We will rely on these partnerships as we move forward to implement NAIS.*

> *John R. Clifford*
> *Deputy Administrator*
> *Veterinary Services*

## Executive Summary

**Introduction**
- **Background** – For years, animal health officials have used animal identification to help trace animals so diseases could be eradicated. In 2002, the National Institute of Animal Agriculture (NIAA) initiated meetings that led to the development of the U.S. Animal Identification Plan (USAIP). That work provided the foundation data standards for the National Animal Identification System (NAIS). This Draft Strategic Plan represents the current thinking of the Animal and Plant Health Inspection Service (APHIS) regarding the implementation of the NAIS.
- **Organizational location** – The NAIS is administered by Veterinary Services (VS), a division of the Animal and Plant Health Inspection Service (APHIS), which is an agency of the U.S. Department of Agriculture (USDA).

**Critical Issues**
- **Driving force** – The strongest driving force for developing the NAIS is the risk of an outbreak of a foreign animal disease (FAD). There is broad support for NAIS among government, industry, and public stakeholders.
- **Overall support** – External to APHIS, stakeholders provide broad support for national animal identification.
- **Voluntary versus mandatory** – Most individuals (by a ratio of 3:1) who spoke about this in the listening sessions prefer a mandatory program or one that becomes mandatory to a purely voluntary program. A survey of members of the NIAA shows even stronger support (a ratio of 8:1) for a mandatory program or one that becomes mandatory.
- **Four key stakeholder concerns:**
  1. Financial – Who will pay what costs and how will the program be funded?
  2. Confidentiality – Who will have access to the data, and how will the data be used?
  3. Flexibility – Will the NAIS accept data from existing identification systems, and will producers be able to use the NAIS for other purposes?
  4. Liability – Will producers be exposed to unfair financial or legal liability?

**Goal, Key Components, and Guiding Principles**
- **Goal** – The goal of the NAIS is to be able to identify all animals and premises that have had contact with a foreign or domestic animal disease of concern within 48 hours after discovery.
- **Key components –** The NAIS consists of three key components: (1) Premises registration, (2) animal identification, and (3) animal tracking.
- **Principles** – There are five principles that guide the development of NAIS:
  1. Uniform – The NAIS must be based on national data standards to ensure that a uniform and compatible system

evolves throughout the United States.
2. Flexible – The NAIS must allow producers to use NAIS in coordination with production management systems, marketing incentives, etc.
3. Inclusive – APHIS is developing the NAIS for various species and must make the NAIS mandatory at a specified date to drive investment and progress.
4. Cooperative – Successful achievement of the 48-hour traceback goal will result through State, Federal, and industry partnerships.
5. Secured, reliable, and confidential information – To ensure that animal heath officials have immediate, reliable, and uninterrupted access to essential information that is protected from open disclosure.

**Timeline**

**Key milestones:**
- July 2005:  All States capable of premises registration.
- July 2005:  Animal Identification Number system operational.
- April 2007:  Premises registration and animal identification "alerts".
- January 2008:  Premises registration and animal identification required.
- January 2009:  Reporting of defined animal movements required; entire program mandatory.

**Stages of Development**

- Much of the responsibility for delivering the program remains at the State level.  Stages of development will allow States to more readily establish their local action items. Additionally, the stages provide a system for APHIS to measure performance at regular intervals to ensure uniform progress is achieved.

**VS Lines of Action**

- **Resources and staffing** – Hire staff for APHIS to help develop and implement NAIS; develop a cooperative budget; and use cooperative agreements to fund initial implementation and the infrastructure that States and Tribes need.
- **Regulation, policy, and guidance** – Develop strategic, implementation and operational plans; develop Uniform Methods and Rules; develop an interim rule to allow new identification and a proposed rule to make the system mandatory; develop memorandums of understanding with States and Tribes as needed; and propose legislation to resolve confidentiality issues.
- **Information systems development and implementation** – Develop information and supporting systems for premises registration and animal identification and tracking; and establish a help-desk to support users of the NAIS information systems.
- **Input, outreach, and training** – Develop a network of input through a Subcommittee of the Secretary's Advisory Committee and associated working groups; receive and track input from stakeholder organizations; develop and implement outreach plans targeting industry, States, Tribes, USDA, and APHIS; and

develop a Web site to help with outreach; and develop and implement systems training.

**Measurement**
- **Annual test exercises** – APHIS would sponsor test exercises to check on the progress of tracking animal movements. These would include most species, States, and Tribes each year.
- **Milestones** – Progress would be measured by determining whether key milestones have been reached.
- **Stages of development** – Progress of States and Tribes can be measured against prescribed stages. National progress can be measured by counting numbers of States and Tribes at each stage.



Under the proposed plan, all locations that hold, manage, or board animals will be required to have a unique Premises Identification Number by January 2008. *(Photo by USDA Agricultural Research Service photographer Scott Bauer.)*

# Introduction

**Background**

Animal identification is not a new concept in the United States.  In the 1940s, the predecessor agency of the U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS) initiated an extensive program to identify cattle vaccinated for brucellosis.  The official brucellosis vaccination tag and an ear tattoo has provided the United States with a highly successful animal identification program for cattle for decades.  However, since brucellosis is almost eradicated in the United States, that system of tagging and identification is being phased-out rapidly.

Animal identification did not start or stop with brucellosis.  Other animal health programs also include an animal identification component, and certain classes of livestock must be officially identified before entering interstate commerce.  In addition, some animals must be identified before they can compete in shows or race on a track.  So, there are multiple identification systems in place that exist for different purposes, but no uniform nationwide animal identification system exists for all animals of any given species.  That is about to change.  For the past several years, a State-Federal-industry effort has been underway to develop a nationwide animal identification system.  This Draft Strategic Plan represents APHIS' current thinking regarding the implementation of the NAIS.

**USAIP**

The effort began to take shape in April 2002 when the National Institute for Animal Agriculture (NIAA) established a task force to provide leadership in creating an animal identification plan.  APHIS and over 30 livestock organizations were part of this task force.  A preliminary report was given at the NIAA's ID Info/Expo in July 2002.  The final report was presented at the United States Animal Health Association's (USAHA) annual meeting in October 2002, where the work plan was accepted through a unanimous resolution.  APHIS then established the National Identification Development Team (NIDT), a joint, State, Federal, and industry group to further advance this effort.

Throughout 2003, the NIDT, consisting of approximately 100 animal and livestock industry professionals representing more than 70 associations, organizations, and government agencies, expanded upon the work plan to produce the initial draft of the U.S. Animal Identification Plan (USAIP).  Although early versions of the USAIP focused on food animals only, other livestock species (such as alpacas, llamas, and horses) were incorporated into the plan.

The USAIP was well underway when one case of bovine spongiform encephalopathy (BSE) was confirmed in the United States on December 25, 2003.  On December 30, 2003, the Secretary of Agriculture announced additional protection to guard against BSE and indicated that USDA would expedite the implementation of the

National Animal Identification System (NAIS).  In making the announcement, the Secretary stated:

> USDA has worked with partners at the Federal and State levels and in industry for the past year and a half on the adoption of standards for a verifiable nationwide animal identification system to help enhance the speed and accuracy of our response to disease outbreaks across many different animal species.

**Beginning of NAIS**

Animal identification is worthwhile to producers and animal owners for various reasons, including performance recording and marketing opportunities.  However, APHIS is focusing on animal identification for one reason:  to establish the animal information foundation necessary to support animal disease monitoring, surveillance, control, and eradication programs.

Individuals associated with animal industries recognize that finding potentially infected animals early in a disease outbreak is essential to containing the disease quickly.  The NAIS is designed for rapid tracing of animals during an outbreak situation, limiting the scope and expense of the outbreak, and allow APHIS and its partners to minimize the impact on domestic and foreign markets.  NAIS will also be critical as APHIS works to complete disease eradication programs in which the Federal government, States, and industry have invested many years and millions of dollars.

NAIS is for all animals that will benefit from having a system in place that facilitates rapid tracing in the event of a disease concern.  Currently, working groups are developing plans for alpacas and llamas, bison, cattle (beef and dairy), deer and elk, horses, goats, poultry, sheep, and swine.

In implementing the NAIS, APHIS is drawing from some of the data standards first established in the USAIP.  However, the USAIP should not be viewed as an exact blueprint for the NAIS.  APHIS continues to seek recommendations from industry and other interested parties throughout the design and implementation of the NAIS.

APHIS has established a Subcommittee of the Secretary's Advisory Committee on Foreign Animal and Poultry Diseases that focuses on the implementation of NAIS.  This Subcommittee is made up of State and industry stakeholders, with Federal staff providing administrative resources.

The NAIS Subcommittee is responsible for making regular, formal recommendations to the Secretary's Advisory Committee about how the NAIS should progress.  As part of this process, the Subcommittee will accept recommendations about the NAIS from species and issue-specific working groups.  The Subcommittee will also accept recommendations from national organizations, such as USAHA, NIAA,

and other industry associations.

The NAIS is continually evolving as those responsible for its implementation receive input from various sources. For example, policymakers will:
- incorporate the results of field trials funded through cooperative agreements between USDA and States/Tribes;
- review information submitted as part of an advance notice of proposed rulemaking and through USDA listening sessions; and
- work to integrate recommendations they receive from various advisory committees and working groups.

**Organizational Placement**

The program to support the NAIS is administered by the USDA, APHIS, VS.

The USDA is a department of the executive branch of the Federal Government responsible for providing leadership on food, agriculture, natural resources, and related issues. APHIS is the agency of USDA whose mission is to protect the health and value of American agriculture and natural resources. VS is the program within APHIS that protects and improves the health, quality, and marketability of our nation's animals, animal products, and veterinary biologics by:
- Preventing, controlling, and eliminating animal diseases and
- Monitoring and promoting animal health and productivity

NAIS integrates smoothly within all three of its sponsoring organizations.



Animal identification is not a new concept. In the United States, many animals are already identified through eartags, brands, or tattoos. The NAIS will help standardize animal identification at the national level for all animals of a given species. *(USDA Photo by Neil Hammerschmidt.)*

## Critical Issues

**Driving Force**    The strongest driving force is the risk of adverse animal health events that require quick response.  With the outbreak of exotic Newcastle disease in California in 2002 and 2003 and the Canadian cow that tested positive for BSE in 2003, the need for rapid tracebacks has become more urgent.  Recent outbreaks worldwide of foot-and-mouth disease (FMD), especially in the United Kingdom in 2001, show the United States is at risk, too.  In addition, the September 11, 2001, attacks make clear that an intentional introduction of an animal disease is a real risk.

**Overall Support**    In a meeting (October, 2004) to discuss Strengths, Weaknesses Opportunities, and Threats (SWOT) participants said one of the strengths of the program is the broad industry, governmental, and stakeholder support for a national animal identification program.  In listening sessions held by APHIS (June-November, 2004), 59 of 60 comments indicated support for NAIS.

**Voluntary Versus Mandatory**    In the listening sessions, 47 people commented on whether an animal identification system should be mandatory or voluntary.  Only 12 of the 47 said they prefer a voluntary system.  17 people suggested that the system should be mandatory, while 18 people suggested the program begin as voluntary, but should eventually become mandatory.  Therefore, a ratio of 3:1 respondents preferred a mandatory program to a purely voluntary program.

In addition, the NIAA conducted a survey of its members about national animal identification.  In results that are even stronger than the listening sessions, 8:1 prefer a mandatory program.  A majority preferred a voluntary program that eventually becomes mandatory on a future date.  See the table below and the NIAA Web site (www.animalagriculture.org/survey/NAIS.htm) for more information:

Do you support a voluntary or mandatory program?

| | |
|---|---|
| No response | 08% |
| Voluntary | 10% |
| Voluntary during developmental stages, but with a decided future date for making the program mandatory | 54% |
| Mandatory | 25% |
| Unsure/No Opinion | 03% |

# Transition from Voluntary to Mandatory

**Phased-in
Approach**

We must ensure the participation requirements of the NAIS not only provide the results necessary to maintain the health of the national herd, but also that the program is practical for producers and all others involved in production. Therefore, full implementation of the NAIS will be a phased-in plan.

During the initial implementation period, participation is voluntary. Stakeholders have the opportunity to obtain experience with the system and provide feedback as successful and practical solutions evolve.

The first priority is to identify locations that hold and manage livestock with the nationally unique, 7-character Premises Identification Number. States and Tribes administer premises registration.

Producers that have registered their premises may obtain official identification devices with the Animal Identification Number (AIN). As producers acquire these AIN Tags, the initial record of which premises receives tags also provides NAIS with information to determine the origin of the animal. or where the animal was first tagged. The AIN provides a unique lifetime number for each animal identified as an individual.  Producers with species identified as groups or lots may use their premises number to establish the official Group/Lot Identification of their animals.

Advancing animal identification data collection systems at packing plants will be a priority, so animals removed from the population can be recorded as efficiently as possible. Collecting interstate movements will be another priority, thus the USDA will implement the electronic interstate certificate of veterinary inspection and electronic movement permit systems.  As more animals are identified, the systems necessary to record animal movements through other concentration points will be tested and implemented.

USDA anticipates that adequate advances in the NAIS will continue to occur, and it will enact regulations by early 2008, requiring stakeholders to identify their premises and animals.  At that time, all animals leaving their current premises must be identified with the AIN or Group/Lot ID.

Collecting and recording animal movements is the greatest challenge ahead.  USDA will continue to support field trials and gradual implementation of successful data collection systems to collect animal movement records.  Ongoing collaboration with market operators, dealers, and service providers will be essential.  The requirement for collecting and reporting defined animal movements to the national animal identification and tracking repository is

scheduled for January 2009.

A full timeline of the phased-in approach to the NAIS implementation is available, beginning on page 16.  Additionally, greater detail of how the NAIS will work is in the NAIS Program Standards document. This resource document will be updated as species and issue-based working groups provide feedback on the mechanics of the plan.

**Regulatory Process**

The Animal Health Protection Act (AHPA) authorizes the Secretary of the USDA to carry out operations and measures to detect, control, or eradicate livestock pests or disease.  It also provides ample authority to establish and implement either a mandatory or voluntary system of animal identification.  Further, the AHPA enables the Secretary of the USDA to enter into agreements with States or other stakeholder organizations to implement either a mandatory or voluntary animal identification program.

USDA will follow the normal rulemaking process in changing the status of NAIS from voluntary to mandatory. The public will have the opportunity to comment on any proposed regulations.  The following provides an overview of how the USDA plans to move forward with distributing information about the NAIS requirements and revising regulations in the Code of Federal Regulations (CFR).

Timeline:

June 2004: USDA listening sessions began, providing stakeholders the opportunity to discuss the development, structure, and implementation of NAIS and to submit public comments.

July, 2004: USDA, along with the Department of Health and Human Services, publishes a joint advance notice of proposed rulemaking (ANPR), which gives interested parties the opportunity to comment on additional regulatory and policy measures under consideration to strengthen protections against the spread of bovine spongiform encephalopathy (BSE).  Among other things, APHIS sought comments on the implementation of NAIS, specifically, when and under what circumstances the program should move from voluntary to mandatory, and which species should be covered now and over the long term.  The comment period for this section of the ANPR closed on September 13, 2004

April 2005: USDA publishes a notice of availability in the Federal Register announcing the publication of a Draft Strategic Plan for NAIS and a Draft NAIS Standards Document.

Summer 2005: Taking into consideration all of the public input received through the listening sessions and comments on the ANPR and draft standards document, USDA will begin drafting a proposed rule that will establish new regulations for requiring premises to be

registered and for animals to be identified and tracked according to NAIS standards.

July 2006: USDA will publish a proposed rule establishing new requirements for premises registration and animal identification that follow NAIS standards.  (The rule may define rolling effective dates, allow for delays in implementation as producers transition from scrapie ID to NAIS AINs, etc.)  Premises registration and animal identification according to NAIS standards will be required by January 2008.

Fall 2007: USDA will publish the final rule establishing mandatory animal identification and premises registration requirements.

January 2008: Final rule requiring premises registration and animal identification as defined under NAIS program standards will become effective.

January 2009: The animal tracking component will become mandatory.



By January 2009, USDA anticipates that the animal tracking component of NAIS will become mandatory.  USDA will continue to support field trials and gradual implementation of successful data collection systems to collect animal movement records.  Technology such as these radio frequency identification panel readers may be incorporated into the system for certain species.  *(USDA Photo by R. Anson Eaglin.)*

**Stakeholder Concerns**

Even with general support for the program and further support for a mandatory program, participants in the listening sessions and the SWOT meeting have some concerns about a national animal identification system.  According to these two sources of information, the main concerns are:

1. **Financial** – There are two financial concerns:  costs and funding.  Producers are concerned about the costs of national identification generally and personally.  Some suggest sharing the costs between the program and industry.  Also, participants indicated that because of the benefit to the public at large, much of the funding of the animal identification program should be supported by public funds.  Even with public funding, there will be costs to producers.

2. **Ability to Maintain Confidentiality** – Producers who will be providing data for the system want assurances about who will have access to the data and how the data will be used.  First, they are concerned that the data collected be used only for animal health tracing and not for other purposes by government or businesses without permission (such as food safety, animal welfare, or environmental concerns).  Second, they are concerned about public access to data through the Freedom of Information Act and sunshine laws.  Their concern is that someone could use the data to harm them or their businesses.

3. **Flexibility** – It is important that the national system be flexible enough to accept data from existing identification systems (particularly branding systems).  Also, the system needs to be flexible enough to allow producers to use it for their herd management needs.

4. **Liability** – Some participants voiced concerns that the NAIS information would be used by individuals (other than animal health authorities) for food safety issues and that traceability of food products would increase the participants' risk of liability and financial loss from food safety issues for which they are not responsible.

# Goals, Key Components, and Guiding Principles

**NAIS Goal**

The goal of NAIS is to be able to identify all animals and premises that have had contact with a foreign or domestic animal disease of concern within 48 hours after discovery.  As an information system that provides for rapid tracing of infected and exposed animals during an outbreak situation, the NAIS will help limit the scope of such outbreaks and ensure that they are contained and eradicated as quickly as possible.

Partnerships among all stakeholders are the foundation for achieving this tremendously important and extremely challenging goal.

**The Key Components**

The NAIS will be established gradually through the integration of these key components:

- **Premises identification:**

  To track animals, we must know where they are born and where they could be moved.  Therefore, identifying locations that manage or hold animals, referred to as premises, is the starting point of the NAIS.  Each premises will be identified with a unique seven-character identifier, or a premises identification number.

- **Animal identification:**

  To track animals as they move from premises to premises, we must also have a standard way to identify them.  Animals will be identified either individually with a unique, Animal Identification Number (AIN) or, if they are managed and moved through the production chain as a group, with a Group/Lot Identification Number (Group/Lot ID).

- **Animal tracking:**

  As animals move from one premises to another, a few basic pieces of information will be reported to the national animal records repository:  the AIN or Group/Lot ID, the premises number of the receiving location, and the date of the event being reported.  Our ability to achieve the 48-hour traceback objective will be directly affected by the percentage of animal movements we are able to record.  Collecting animal movement information might be the most challenging component of the NAIS.

**NAIS Guiding Principles**

In achieving the 48-hour traceback goal, APHIS believes the system must follow several core guiding principles that include the following:

- **Uniform** – The NAIS will be based on national data standards to ensure that a uniform and compatible system evolves throughout the United States.  The program will support all needs of official identification, including animal disease programs, intrastate,  and interstate commerce.

- **Flexible** – The NAIS must allow producers to use NAIS in coordination with production management systems, marketing incentives, etc., allowing for the transition to a "one number – one animal" system for disease control programs and other industry administered programs.

   While animals must be identified before moving from their current premises, producers can decide whether to identify their stock at birth or through other management practices.

   The integration of animal identification technology standards (electronic identification, retinal scan, DNA, etc.) will be determined by industry to ensure the most practical options are implemented, and that new ones can easily be incorporated into the NAIS.

- **Inclusive** – The NAIS is being developed for animals that will benefit from a system that facilitates rapid tracing in the event of a disease concern.  Currently, working groups are developing plans for camelids (llamas and alpacas), cattle and bison, cervids (deer and elk), equines, goats, poultry, sheep, and swine.

   The NAIS is now voluntary, so producers and other stakeholders can participate in the design, development, and testing of the system to ensure practical solutions evolve.  To achieve the goal of 48-hour traceback, all producers and affected industry segments must eventually participate.

   While market forces may eventually create more inclusiveness, the clear stakeholder support for transitioning to a mandatory program and the urgency of achieving the goal, suggest that setting a date for that transition would benefit the program.  Being clear about when the program will become mandatory will increase producer participation in the initial, voluntary phase and will help move the overall cooperative development and program implementation  of the program along more quickly.  Other stakeholders in the preharvest production chain will know when they must participate and can plan accordingly.  Establishing a date when the program will become mandatory will also help bring more and earlier investment of private funds to the effort, particularly for the support of the integration of automated data collection systems.

In keeping with the gradual approach, the transition from voluntary to mandatory will occur in phases. An extensive communication "alert" for mandatory premises registration and animal identification is targeted for April 2007. The 9-month campaign provides a period during which everyone can acclimate to the new requirements for premises registration and animal identification beginning in January 2008. The requirements for reporting of animal movements would then be implemented January 2009.

- **Cooperative** – The NAIS is a joint effort. Successful achievement of the 48-hour traceback goal will occur through State, Federal, and industry partnerships. While animal health authorities have significant responsibilities, it is important to ensure that this effort does not unduly increase the size and scope of Federal or State governments.

  Both public and private funding will be required for the NAIS to become fully operational. The Federal government is providing the standards, national databases, and basic infrastructure. States and Tribes will register premises within their areas. They will also support the administration of animal identification and tracking systems that will feed information into the national databases. Producers will identify their animals and provide necessary records to the databases. Managers of shows and events will report a record of participating animals. Market operators and processing plants will provide animal location records. Service providers and third parties will assist by providing animal identification and movement records to the NAIS on behalf of their producer clients. All groups will need to provide labor.

- **Secured, reliable, confidential information** – The NAIS will store a limited amount of essential information, just enough for animal health officials to be able to track an animal's movements and identify any other animals it may have exposed. To ensure that animal heath officials have immediate, reliable, and uninterrupted access to this information in the event of a disease concern, certain basic data must be maintained at the Federal level. Accordingly, essential information will be maintained within data repositories managed by APHIS.

  Animal identification and tracking systems maintained by the States or regional alliances will be an integral part of the overall NAIS information infrastructure. The essential data from those systems will be sent to the national repositories. The State/regional systems will be able to collect and maintain more information than is required for the NAIS, but will send only the minimally required information to the national animal records repository.

  At our listening sessions held throughout the country, producers have consistently identified as a prerequisite for participation in

the NAIS, the need for assurance that their information will be kept confidential.

The Freedom of Information Act (FOIA) (5 U.S.C. 552 et seq.) creates a presumption towards disclosure of Federal agency records, unless the records fall within one of the exemptions contained in that statute.  Information withheld from a FOIA requester under exemption (b)(4) [confidential business information] and (b)(6) [privacy] may be required to be released in the event that a court finds that these exemptions do not apply. While much of the information collected by the NAIS might qualify for these exemptions, the USDA cannot assure the confidentiality of all the information at the present time.  Consequently, in order to secure full participation from livestock producers, the USDA is pursuing legislation to establish a system for withholding or disclosing information obtained through the animal identification system established by the Secretary of the USDA.



The NAIS is a cooperative effort.  The exact definition of "premises" will be determined by each State's or Tribe's animal health authority.  Local animal health officials will be better able to address regional variations in production systems and methods, including how to identify open range and public grazing lands such as those found in the West. *(USDA photo.)*

# Timeline

**Introduction**   The plan reflects a phased-in approach for each of the next 4 years to ensure practical implementation through producer and stakeholder input and participation.  Actions for each component are targeted within each phase to support the transition from voluntary to mandatory as full implementation is achieved.

**2005:**

- Premises registration:  July 2005:  All States operational

- Animal identification:  August 2005:  Initiate "840" number with AIN tag manufacturers and AIN tag managers

- Animal tracking:  January-December 2005:  Test identification and automated data collection technologies

**2006:**

- Premises Registration:  April 2006: Performance measure: 25% of all premises registered

- Animal identification:  April 2006:  AIN Management System fully operational

- Animal tracking:
    - July 2006: Interstate Certificate of Veterinary Inspection (ICVI) operational in all States
    - Focus on integration of management systems to forward animal locations/sightings

**2007**

- Premises registration:  April 2007:  Premises registration "alert" (scaled up communication campaign to create awareness of January 2008 requirements for premises registration).

- Animal identification:  April 2007:  Animal identification alert (scaled up communication campaign to create awareness of January 2008 requirements for animal identification).

- Animal tracking:
    - April 2007:  Incentives to report interstate movements using ICVI or electronic movement permit system.
    - October 2007: Infrastructure established to collect animal termination records at high capacity abattoirs.
    - Initiate collection of animal movements at concentration points (markets, feedlots, etc.).
    - Expand the integration of management systems to forward animal locations/sightings.

**2008:**

- Premises registration:  January 2008:  All premises registered with enforcement (regardless of livestock movements).

- Animal Identification:  January 2008:  Animal identification required with enforcement.

- Animal tracking:
  - July 2008:  Collect high percentage of animal termination records at abattoirs (processing plants).
  - July 2008:  Collection and reporting all defined movements.

**2009:**

- January 2009:  Enforcement for the reporting of animal movements.

- NAIS fully implemented and all components are mandatory.

\* See Transition from Voluntary to Mandatory, page 8.

## NAIS Timeline



# Stages of Development

**Introduction**    The concept of using stages of progress as a way of measuring national implementation is not new. It is how we measure progress in the brucellosis, tuberculosis, and pseudorabies eradication programs. The NAIS is also a cooperative State-Federal-industry program and lends itself to similar tracking.

**Stage I: Preparatory**

Qualifications:

To qualify for Stage I recognition, the State would have meet the following standards:

1. A State animal identification committee composed of representatives of major segments of the farm animal industry is formed and functioning. Membership could include, but not be limited to the following stakeholders:
   a. Major producer organizations;
   b. Major breed organizations;
   c. Major marketing organizations;
   d. Major packer organizations;
   e. State and Federal animal health agencies and Tribal organizations;
   f. Technology providers (tags, readers, integrators);
   g. Data service providers; and
   h. Transportation (trucking industry).
2. Plans are formulated for a reliable system of determining the number of animals and the number of premises in the State.
3. State officials and/or industry representatives have, or are actively seeking, legislative and regulatory authority to:
   a. Participate in the NAIS;
   b. Require the registration of premises where animals reside that are susceptible to known foreign animal diseases or diseases with State or Federal eradication programs; and
   c. Require identification of animals that move to a point where they are commingled with other animals.
4. A system for distribution of the NAIS literature to producers and other interested groups is developed and functioning.
5. Applicable regulations are enforced.
6. The States will prepare a quarterly report of NAIS activities and submit it to APHIS, VS for tabulation and distribution in a national progress report. APHIS VS shall make reports as requested and at least, annually, to the NAIS Subcommittee of the Secretary's Advisory Committee on Foreign Animal and Poultry Diseases, on progress, operation, and use of Federal funds.

**Stage II:  Premises Identification**
Qualifications:
To qualify for Stage II recognition, the State would have to meet the following standards:
1.  All qualifying requirements of Stage I continue to be met.
2.  The State has implemented a premises registration system that is compliant with the NAIS data standards.
3.  35 percent of the qualifying premises in the State are registered, and that information has been reported to the National Premises Information Repository
4.  The State has a requirement that registered premises update the contact information at least annually

**Stage III:  Animal Identification**
Qualifications:
To qualify for Stage III recognition, the State would have to meet the following standards:
1.  All qualifying requirements of Stage II continue to be met.
2.  The State has begun to identify Nonproducer Participants within their State who may qualify as AIN Managers.  These entities will need to apply to APHIS, VS to make certain they meet the strict requirements.  APHIS, VS will make a list of all certified AIN Managers available to the States.
3.  A system to issue AIN's to producers has been implemented in the State.
4.  80 percent of the qualifying premises in the State are registered, and that information has been reported to the National Premises Information Repository.
5.  25 percent of the qualifying animals in the State are identified, and that information has been reported to the National Animal Identification and Tracking Repository in accordance with the requirements of the NAIS.

**Stage IV:  Animal Tracking**
Qualifications:
To qualify for Stage IV recognition, the State would have to meet the following standards:
1.  All qualifying requirements of Stage III continue to be met.
2.  The State has begun to implement an animal tracking system that is compliant with the NAIS data standards.
3.  Key locations where animals commingle are equipped with the infrastructure to record the information required by the NAIS and report it to the National Animal Tracking Information Repository.
4.  95 percent of the qualifying premises in the State are registered, and that information has been reported to the National Premises Information Repository.
5.  60 percent of the qualifying animals in the State are identified, and that information has been reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS.

6. 25 percent of the qualifying animal movements in the State are recorded and reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS

**Stage V:  NAIS Full implementation**

<u>Qualifications</u>
To qualify for Stage V recognition, the State would have to meet the following standards:
1. All qualifying requirements of Stage IV continue to be met.
2. 100 percent of the qualifying premises in the State are registered, and that information has been reported to the National Premises Information Repository.
3. 90 percent of the qualifying animals in the State are identified, and that information has been reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS
4. 80 percent of the qualifying animal movements in the State are recorded and reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS

**Duration of status**

Twelve to fourteen months following assignment of any Stage status by APHIS, VS, a State must (1) indicate that it continues to meet the current Stage requirements, utilizing the same certification procedures as followed initially, or (2) certify that it meets the requirements of a subsequent Stage.  States failing to recertify as required will automatically lose their current status and revert to the next lowest Stage.

Once the NAIS is fully implemented, producers should be able to register their premises and then contact a USDA-approved Animal Identification Number Manager to obtain official AIN Tags.  Group/Lot Identification Numbers will be an option for species, such as swine, that typically move as a group through the production chain.  *(USDA photo by Gene Alexander.)*



## VS Lines of Action

**Introduction**  APHIS, VS, will successfully manage the NAIS through its National Animal Health Programs by following these lines of action:

**1. Acquire Resources**  Acquire and use the needed **resources** to develop and implement the program

1. Develop the APHIS infrastructure to support the NAIS
   a. Develop organizational structure and workforce plan for the NAIS for APHIS, VS
   b. Develop a budget and ongoing plan to fund NAIS
2. Encourage the development of State infrastructure through the use of cooperative agreements
   a. Support the State infrastructure where needed through the use of cooperative agreements
   b. Support implementation projects through the use of cooperative agreements
3. Develop a cooperative financial plan
   a. Prepare financial analysis that documents complete annual cost for implementing the NAIS
   b. Develop a cost-benefit analysis

**2. Develop Regulations, Policies, and Guidance**  Develop the needed **regulations, policies, and guidance** documents to support the implementation of the NAIS

1. Develop strategic, implementation, and operational plans
2. Develop Uniform Methods and Rules
3. Develop regulations:
   a. Interim rule allowing alternative numbering systems
   b. Proposed rule to make system mandatory for:
      i. Premises registration and animal identification by January 2008
      ii. Reporting defined animal movements by January 2009
      iii. Unify animal identification requirements, definitions, and devices for all animal disease programs
   c. Support regulation development needed at the State or Tribal level
4. Establish stages of development to measure performance of States
5. Develop memorandums of understanding as needed with Tribes and States
6. Submit proposed legislation to support confidentiality

**3. Develop Information Systems**  Design, develop, implement, and support the NAIS **information systems**

1. Develop and implement components of the National Premises Registration System
2. Develop and implement components of the Animal

Identification and Tracking System
3. Establish a user help desk for NAIS

**4. Input, Outreach, and Training**

Develop ways to allow stakeholder **input** into the development of the system and **outreach and training** to help stakeholders understand and use the system

1. Input
    a. Develop a Subcommittee of the Secretary's Advisory Committee to advise the agency on national animal identification
    b. Develop a network of working groups to provide input about species implementation and general implementation issues
    c. Stay connected to existing networks of input through USAHA, NIAA, and other industry organizations
2. Outreach
    a. Develop and implement outreach plan for industry and external stakeholders
    b. Develop and implement outreach plan for USDA.
    c. Develop and implement outreach plan for APHIS
    d. Update APHIS and USDA leaders of progress
    e. Develop informational web site
3. Training
    a. Develop and deliver training for the premises and animal identification systems provided by APHIS
    b. Train Area Veterinarians in Charge and State Veterinarians in cooperative agreements process

## Measuring Success

**Three Measures**

There would be three ways to measure success of the NAIS:

1. **Annual test exercises** – Annual test exercises would be conducted to determine how long it would take to complete the tracings compared to the NAIS goal. These would be done to include most species and most States and Tribes each year.
2. **Milestones** – The timelines lay out key milestones to be achieved nationally. Progress would be measured against the planned milestones.
3. **Stages of development** – While it would be best if the program progresses equally nationally, that may not be practicable. States and tribal progress can be measured against prescribed stages of development. National progress can be measured by counting the number of States and Tribes at each stage.



**United States Department of Agriculture**

# National Animal Identification System (NAIS)

## A User Guide
### And Additional Information Resources

Draft Version
November 2006

*A State - Federal - Industry Partnership*
*The NAIS is a Voluntary Program*

*The November 2006 User Guide is the most current plan for NAIS and replaces all previously published program documents, including the 2005 Draft Strategic Plan and Draft Program Standards and the 2006 Implementation Strategies.*

# TABLE OF CONTENTS

Preface ......................................................................................................................................................X

NAIS: At a Glance ..................................................................................................................................X

**PART I:   OVERVIEW OF NAIS** ...........................................................................................................1

*Introduction to NAIS* ...........................................................................................................................1
*Why NAIS?* ..........................................................................................................................................2
*Voluntary Participation* .......................................................................................................................4
*NAIS Components and How They Would Work Together* .....................................................................5
*The Benefits of a Voluntary Program* ..................................................................................................8
*The Concept Behind NAIS* ....................................................................................................................9
*Estimated Costs Associated with NAIS* ..............................................................................................10
*Economic Benefit of NAIS* ..................................................................................................................11
*Roles and Responsibilities* ..................................................................................................................13
*Outstanding Issues and the Role of the Species Working Groups* .......................................................15

**PART II:   PREMISES REGISTRATION** ..........................................................................................17

*Background on Premises Registration* ................................................................................................17
*Which Locations Should Be Registered* ..............................................................................................19
*Multiple Premises Numbers for the Same Owner* ...............................................................................20
*The Premises ID Numbering System* ...................................................................................................22
*Process for Collecting Premises Information* ......................................................................................23
*Non-Producer Participants* .................................................................................................................24
*Protection of Information* ....................................................................................................................25
*The Costs Associated with Premises Registration* ..............................................................................26
*How to Register a Premises* ................................................................................................................27

**PART III:   ANIMAL IDENTIFICATION** .........................................................................................28

Section 1 .................................................................................................................................................28
*An Overview of Animal Identification* .................................................................................................28
*Individual Animal Identification* ........................................................................................................29
*Group/Lot Identification* .....................................................................................................................30
*Animals Not Needing Identification Numbers* .....................................................................................31
Section 2 .................................................................................................................................................32
*Options for Identification Devices* ......................................................................................................32
*Existing Animal Health Identification Systems* ...................................................................................34
*Cost Considerations for Identification Devices* ..................................................................................35
*USDA's Role in Authorizing Manufacturers and AIN Device Distribution Databases* .......................36
*How to Obtain Identification Devices* ..................................................................................................37
*Applying Identification Devices to Animals* ........................................................................................38
*Intentional Removal of Identification Devices* ....................................................................................39
*Loss or Malfunctioning of Identification Devices* ...............................................................................40

**PART IV:   ANIMAL TRACING** ........................................................................................................41

Section 1 .................................................................................................................................................41
*An Overview of Animal Tracing* ..........................................................................................................41
*Animal Tracking and Traceback Processing Systems* .........................................................................42
*Selecting an Animal Tracking Database* .............................................................................................43
*Costs Associated with Animal Tracking Databases* ............................................................................44
*How the Systems Work When Responding to an Animal Disease* .........................................................45
Section 2 .................................................................................................................................................46
*The Goals of Tracing Animal Movements* ............................................................................................46

*Reportable Animal Movements* ............................................................................................................47
*Additional Comment Regarding Reportable Animal Movements*..................................................49
*Additional Producer Guidance* ..........................................................................................................50
APPENDIX ...................................................................................................................................................51
*USDA AVIC Contact List*....................................................................................................................52
*States, Territories, and Tribes Contact List* ...................................................................................56
*Sample Premises Registration Form*..................................................................................................63
*Glossary* ..................................................................................................................................................64

# PREFACE

The purpose of this comprehensive document is to provide the public with basic information about the National Animal Identification System (NAIS)—a voluntary national program that will help producers protect the health of their animals and their investment in the case of an animal disease event.

Part I of the document provides a brief overview to familiarize producers with NAIS, the need for this voluntary program, its advantages and benefits, and other helpful information concerning its cooperative development and implementation. In Parts II through IV of the document, each of NAIS' components are discussed in greater detail and operational-level information—meaning "*how to*" information—and resources are provided.

Again, NAIS is a voluntary program at the Federal level[1]. This document provides guidance to producers[2] and owners of animals included in the NAIS, as well as other sectors involved in the animal agricultural industry, on how to participate in the NAIS if they so choose, and how participation would benefit them.

At the end of this comprehensive document, we have also included additional documents for reference and a glossary of terms that producers may encounter in reading this and other documents concerning NAIS.

**The November 2006 User Guide is the most current plan for NAIS and replaces all previously published program documents, including the 2005 Draft Strategic Plan and Draft Program Standards and the 2006 Implementation Strategies.** These documents provided the opportunity for the public to comment and offer feedback on the NAIS as USDA worked through many issues with industry and the States and Tribes. The User Guide represents the most up-to-date information resource on NAIS today. NAIS will continue to evolve as details are addressed through ongoing dialogue with all stakeholders.

---

[1] NAIS is voluntary at the Federal level. U.S. animal health is protected by existing Federal and State regulations for disease surveillance, control, eradication, and response. While NAIS is a national system, it does not alter any regulations in the *Code of Federal Regulations* or any regulations that exist at the State level. Rather, NAIS enhances ongoing animal health protection efforts by offering national standards and increasing the level of participation beyond what is already required in existing disease programs.

[2] In this guide, the term "producer" is used to simplify the reference to all individuals engaged in the ownership, management or marketing of livestock included in NAIS. While owners and or managers of certain species may not typically be referred to as a "producer," owners of horses for example, these individuals are to be interpreted as being included in this broad use of "producer" in the context of the NAIS User Guide.

# NAIS: AT A GLANCE

## *What is NAIS?*

Simply put, NAIS is a modern, streamlined information system that helps producers and animal health officials respond quickly and effectively to animal disease events in the United States.  The NAIS program—a voluntary State-Federal-Industry partnership—is beneficial because it helps us protect U.S. livestock and poultry from disease spread, maintain consumer confidence in our food supply, and retain access to domestic and foreign markets.

USDA is not requiring participation in the program.  NAIS can help producers protect the health and marketability of their animals—but the choice to participate is theirs.

Animal health officials across the country agree that premises registration, the foundation of NAIS, is a necessary first step to achieving these goals.  Premises information ensures that producers will be notified quickly when a disease event might impact their area or the species of animals they have.  In an animal health emergency, we cannot help producers protect their animals if we do not know they are there.  By voluntarily registering their premises and providing contact information, producers will ensure that they receive the information they need—when they need it most—to protect their animals and their investment.  In an emergency, animal health officials will be able to quickly locate at-risk animals and take precise actions to address the situation, minimize hardships, and speed disease eradication efforts as much as possible.

The voluntary NAIS also encompasses animal identification and animal movement tracing systems.  These components are currently being refined by NAIS' industry and private sector partners.  While the focus today is on premises registration, animal owners should know that the other components of NAIS will be additional options for them when they're ready to make decisions about what level of participation best suits their needs.

USDA is required by law to protect individuals' private information. Regardless of the level of participation animal owners choose, the voluntary NAIS is limited in terms of the type and quantity of information maintained by the Federal Government.  At the Federal level, the system will hold and maintain only minimal premises information.  Beyond the premises registration system, USDA will not "own" any additional data on participants in the system.  If USDA needs animal movement and location information to respond to an animal health emergency, data will be requested from the private and State databases where it is held.  Federal law protects individuals' private information and confidential business information from public disclosure.

## *Costs of Participating in the NAIS*

Premises registration is free in all States and participating Tribes.  NAIS participants will have the opportunity to choose which animal identification devices and which database they wish to use. (Participants should check with their respective State for the various options.)  Participants will pay the cost of the animal identification devices and any fees that may be associated with participating in a database.  The cost of animal identification methods will vary among species and will also depend on the device chosen by the animal owner, as well as whether the owner or a veterinarian applies the device. The cost will also be determined by the services that may be packaged with the device.

The animal tracking databases will be provided by industry organizations and State entities. Costs associated with the databases may vary depending on the services the producer/owner elects to use. Competition among these databases will help keep costs down.

### *Basic Steps for Participating in NAIS*

**Animal owners who are interested in taking part in the voluntary NAIS may participate in premises registration only, premises registration and animal identification, or all three components when the program is fully operational.** The following information provides a brief explanation of how to participate in NAIS.

**Step 1: Register your premises and obtain a Premises Identification Number.**

To register your premises, contact your State (e.g., State Veterinarian office) or Tribal animal health authority. Contact information for each State and Tribe is provided in the Appendix of this document. Premises registration forms are available on each State's department of agriculture Web site; participants may opt to register their premises online or by mailing or faxing the forms to their State or Tribal NAIS contact. Part II (Premises Registration), located on pages 17-27, includes detailed information regarding the premises registration process.

**Step 2: Identify your animals.**

After you have registered your premises, you may participate in the animal identification component of the voluntary NAIS. Animals of the same species that typically move through the production chain as a group can be identified by a group/lot identification number (GIN), rather than by individual numbers. The GIN is determined by the animal owner using the premises identification number and the date the group was assembled. For more information about assigning animals a group/lot identification number, NAIS participants should refer to page 30 of Part III (Animal Identification).

Animals that move through commerce individually can be identified with a USDA-recognized animal identification number (AIN) tag or device. NAIS participants interested in identifying their animals individually should refer to pages 37-38 for the basic steps and requirements involved in obtaining and applying AIN tags and devices to their animals. Owners should contact authorized AIN manufacturers for the AIN device managers in their area. A list of authorized AIN devices and AIN manufacturers is available through the AIN Management System Information Web page (http://animalid.aphis.usda.gov/nais/animal_id/ain_mngt_sys.shtml). Identification devices can be applied by the owners themselves or by tagging service providers; additionally, owners can use approved tagging sites to apply the devices to their animals. We recommend that livestock owners first check with their States to find out what animal identification options and requirements may already be in place at that level.

**Step 3: Choose an Animal Tracking Database (ATD) for tracing certain individual animal or group/lot movements.**

After NAIS participants have registered their premises and identified their animals either individually or by group/lot, they may choose an ATD. USDA recognizes that every animal movement does not need to be recorded or reported. To ensure that the system is practical and workable for NAIS participants, only those movements that pose a greater risk of disease transmission will be the focus of tracing efforts. A number of factors—the number of animals, their source(s), health status/certification, and nature and location of the event—influence disease risk. For a list of recommendations regarding reportable animal

movements, please see page 47.  Participants should contact State or local animal health officials if they are uncertain about the need to report an animal movement.

Private industry groups and States will operate and maintain the ATDs; NAIS participants can choose the ATD they wish to use for reporting animal movements.  USDA will operate a portal or communication system that will enable animal health officials to submit requests for information to the ATDs in the event of a disease occurrence.  A list of NAIS State and private databases that have an approved cooperative agreement with USDA is available on USDA/APHIS' Animal Identification Web site at www.usda.gov/nais.

***For further information on how you can take part in this important initiative, please review the November 2006 User Guide and visit the USDA/APHIS Animal Identification Web site at www.usda.gov/nais.  You may also call the USDA-NAIS Staff at (301) 734-0799 to request copies of NAIS documents.***

# PART I:  OVERVIEW OF NAIS

This part of the comprehensive document discusses:
- Introduction to NAIS
- Why NAIS?
- Voluntary Participation
- NAIS Components and How They Would Work Together
- The Benefits of Voluntary Participation
- The Concept Behind NAIS
- Estimated Costs Associated with NAIS
- Economic Benefit of NAIS
- Roles and Responsibilities
- Outstanding Issues and the Role of the Species Working Groups

## INTRODUCTION TO NAIS

NAIS is a modern, streamlined information system that helps producers and animal health officials respond quickly and effectively to animal disease events in the United States.

When producers consider participating in NAIS, there are three key points to remember in understanding how this program works:

1) Participation in NAIS is *voluntary* at the Federal level.  There is no Federal requirement for producers to participate in any aspect of the program.
2) Federal law *protects* individuals' private information and confidential business information from disclosure.  USDA will continue using its authority to protect individuals' private information and confidential business information provided by NAIS participants.
3) NAIS is a State-Federal-industry *partnership* that continues to evolve to meet producer demands.  NAIS works best if there is active involvement and feedback from the States, industry, and producers.

# WHY NAIS?

When an animal disease event occurs, producers and animal health officials must be able to act quickly to prevent disease spread to surrounding premises, protect valuable animals against infection, and preserve producers' business and economic interests. NAIS is a valuable animal health management tool that helps accomplish these goals. It provides timely, accurate information in the case of a disease event, allowing producers and animal health officials to coordinate their efforts and respond as quickly, efficiently, and effectively as possible.

There are a number of reasons for producers to participate in NAIS. One of the most important reasons is to better protect animal health. People who own or work with animals, or depend on them for income, understand how absolutely important this is—for themselves, their neighbors, and their surrounding communities. Producers who choose to participate in NAIS become part of a national animal disease response network, which ensures that they will receive timely information and assistance to protect their animals against disease threats. This gives producers more control over the health of their animals in a disease situation and facilitates rapid response. Rapid response reduces the hardships caused by disease spread and eases the economic strain on affected communities.

Participating in NAIS also protects market access and gives producers a competitive advantage in domestic and international trade. Prices are dictated by the overall demand for U.S. products. To maintain and protect prices for domestic commodities, it is crucial for international markets to stay open. In a disease situation, local and State officials can use NAIS information to quickly define which regions of our country are, and are not, affected by an outbreak—keeping markets open for unaffected producers and preventing unnecessary movement restrictions.

Participating producers can also opt to use NAIS information for marketing purposes. For example, a producer who participates in the voluntary animal identification and animal tracing components of NAIS may use the same methods of identification and information reporting to support source and/or age verification programs—a strategic advantage in a highly competitive market. The greater the level of participation in NAIS, the greater the potential for producers to expand their marketing opportunities at home and abroad.

The NAIS will also assist first responders and State and Federal officials in conducting disease investigations. When an outbreak occurs, three essential questions must be answered as quickly as possible— "Where has the infected animal been?"; "What other animals have been exposed?"; and, "What additional premises and animals are at risk of exposure?" The information included in NAIS will answer these questions, which are critical in determining the size and scope of a disease outbreak. The more quickly these answers can be found, the less the disease will spread, and the less impact the outbreak will have on producers and the economy.

It is important to understand that NAIS is ***not*** a "real-time" tracking system for animals. Government agencies will not have constant, continuous, or routine access to the locations of animals in NAIS. Additionally, NAIS is not a food safety protection system. The United States already has a comprehensive system of food safety policies, testing, and inspection requirements in place to ensure the safety of our products.

Simply put, the NAIS is an ***information system*** that helps provide producers with timely information in a disease situation, supports State and Federal disease response efforts, and enables the livestock and poultry industries to quickly respond to and minimize the health and economic effects of animal disease outbreaks.

The focus of NAIS is protecting animal health and minimizing the hardships associated with an animal disease outbreak.  With this in mind, the goal is to have a system that will:

- Enable industry partners and State and Federal animal health officials to respond rapidly and effectively to animal health emergencies such as foreign animal disease outbreaks or program diseases with potentially significant animal health, public health, economic, or social consequences;
- Support ongoing animal health safeguarding and disease detection and response capabilities in order to complete current eradication programs;
- Protect U.S. exports and meet the growing international market demand for systems that provide timely animal identification capabilities, thus expanding international trade opportunities; and,
- Protect domestic markets and consumer confidence, thus increasing overall consumer demand that benefits all producers.

NAIS brings many positive benefits to animal agriculture. A modern, streamlined national animal identification system ensures that producers, industry representatives, and animal health officials are prepared to address urgent animal health concerns—as quickly and effectively as possible.  Defending the health of our Nation's animals supports consumer confidence in a secure and safe food supply and protects producers' access to markets at home and abroad.  Producers already take so many measures to safeguard the health of their animals, which ultimately protects their industries and contributes to a safe and wholesome food supply.  By choosing to participate in NAIS, producers demonstrate their total commitment to doing everything they can to protect their animals, their investment, and their neighbors.

## VOLUNTARY PARTICIPATION

Participation in NAIS is voluntary at the Federal level.  Under our current authorities, USDA could make the NAIS mandatory, but we are choosing not to do so—again, participation in every component of NAIS is voluntary at the Federal level.  The NAIS does not need to be mandatory to be effective; we believe the goals of the system can be achieved with a voluntary program.  As producers become increasingly aware of the benefits of the NAIS and the level of voluntary participation grows, there will only be less need to make the program mandatory.

Producers who choose to participate in NAIS will find many positive benefits.  They will be better informed to protect their premises and their livelihood.  They will be better positioned to protect their market access and expand their marketing opportunities.  And they will be better equipped to reduce the hardships caused by animal disease events in their communities.

NAIS participants will also find that the program's scope is limited in terms of the type and quantity of information held by the Federal government.  Moreover, Federal law protects individuals' private information and confidential business information from disclosure.

NAIS is a State-Federal-industry partnership.  The program works best if there is active involvement and feedback from the States, industry, and producers.  As NAIS has evolved, we have put participant feedback to work to adjust the program and address their thoughts and concerns.  We will continue working collaboratively to ensure that NAIS is easy to use and makes sense for everyone.  The best way to know if the system is working is for producers to participate and provide input.

All individuals who are responsible for the care and management of livestock and/or poultry would benefit from and are encouraged to participate in the program.  Specifically, these animals include cattle and bison; poultry; swine; sheep; goats; cervids (e.g., deer and elk); equines (e.g., horses, mules, donkeys, burros); and camelids (e.g., llamas and alpacas).

Household pets (e.g., cats and dogs) and animals not listed in the paragraph above are *not* included.

For producers who choose to participate in NAIS, the procedures they follow and level at which they participate will vary based on how they move animals to other premises and/or the extent to which their animals have contact with animals from other premises.  (Further guidance on participation is provided throughout this document.)

# NAIS COMPONENTS AND HOW THEY WOULD WORK TOGETHER

NAIS consists of three components:  premises registration, animal identification, and animal tracing. Each of these components continues to evolve to meet producer demands.

Premises registration is available now and is a valuable tool for any producer.  Animal identification is progressing; this component is available for several species and is being expanded to others.  The animal tracing options for producers will be available in the future.  The States and private industry are working at this time to perfect these components.

NAIS is a voluntary program at the Federal level.  Individuals' private information and confidential business information is protected by Federal law.

Producers may choose to participate only in premises registration, both premises registration and animal identification, or all three components.  Voluntarily registering a premises does ***not*** automatically enroll a producer in the other components of NAIS.  If producers choose to participate, NAIS will offer additional options for them when they are ready to make decisions about what combination of tools best suits their needs.

## *Premises Registration*
Premises registration, the foundation of NAIS, ensures that producers are notified quickly when a disease event might impact their area(s) or the species of animals they have.  This is fundamental to containing animal diseases.  In a disease situation, we cannot help producers protect their animals if we do not know they are there.  Contact information provided during premises registration opens the lines of communication between producers and animal health officials—which is critical in preventing the spread of disease.  By choosing to register their premises, producers ensure that they will receive the information they need—when they need it most—to protect their animals and their investment.

The first step is for producers to register their premises—a location where livestock or poultry are housed or kept—and provide their contact information.  A unique premises identification number, or PIN, is then assigned and contact information recorded for that location.  Premises information is securely held in databases maintained by the States and by USDA (see page 25 of this document for details on premises databases and USDA's minimum data standards).  The goal is to establish a complete record of all locations, or premises, in the United States that manage or hold livestock and/or poultry.  Because NAIS is a voluntary program at the Federal level, this goal can only be reached if producers choose to register their premises.

## *Animal Identification*
Based on their needs, producers may choose to participate in the second component of NAIS whenever they are ready.  Animal identification is currently available for some species, but not all.  The States and private industry continue working on this component.  Eventually, animal identification will be an option for all animals that are moved from one location to another where the risk of exposure to disease increases (e.g., auctions, feedlots, or fairs).  In addition to being useful for protecting livestock and poultry and investigating diseases, animal identification will provide producers with an efficient, cost-effective tool for managing their animals.

The animal identification component involves assigning animals or groups of animals a unique identification number.  The number is assigned at the animal's birthplace (premises of origin).  Initially, the number may also be assigned to a location that is not the birthplace, if that location is where the animal is first identified.  This information gives animal health officials a "starting point" for epidemiologic investigations when necessary.  Distribution data on animal identification numbers/devices is held in an animal identification number (AIN) device distribution database maintained by the private sector or the States. [3]

Only animals that enter commerce or commingle with animals at other premises (e.g., salesyards; State or national exhibits/shows) would be identified.  However, producers may elect to use the AIN devices within their operation to support herd management identification at any time they desire.

### Animal Tracing

The final NAIS component is under development by the States and private sector.  Once complete, voluntary animal tracing will offer another option to improve animal management and better protect animal health.  Producers will be able to choose an animal tracing database (operated and maintained by private industry groups or States) and report certain animal movements that might pose a significant risk of disease transmission.  When linked with other information, animal tracing will provide timely, accurate records that show where animals have been and what other animals have come into contact with them.  In addition to protecting livestock, a producer who chooses to participate in the animal identification and animal tracing components of NAIS may use the same methods of identification and information reporting to support source and/or age verification programs; this offers a strategic advantage in a highly competitive market.

Animal movement records will be securely held in animal tracking databases owned, managed, and controlled by the private sector or the States.  Animal health officials will only request animal movement information from these databases when there is a risk to animal health—such as an outbreak of avian influenza, brucellosis, or tuberculosis.

### How All Three Pieces Would Work Together

All three of the NAIS components would be used together to provide a streamlined system of information in a disease situation.  This information would be available to help investigate the source of a disease outbreak and identify any animals and/or locations in the United States that may be at risk of spreading disease.

> **Example:**  *A diseased animal is detected at a slaughterhouse.  Authorized animal health officials enter the animal's identification number into the NAIS information search portal.  The search will provide information on AIN devices distributed to a premises and animal movement records for that animal from the private/State animal tracking database, along with animal health events recorded in systems maintained by USDA/APHIS for animal health purposes.  Authorized animal health officials then have a listing of locations (premises identification numbers) associated with the animal.  The search will also provide the other animal identification numbers that were present on the premises during the time the animal in question was there.  This helps officials identify animals that may have been exposed to the disease.  Animal health officials can then*

---

[3]  During the initial phase of the AIN devices, the distribution record of AIN devices distributed to a premises will be maintained by USDA. The transition to having AIN device distribution records to the private sector and States is explained on page 36.

*begin an epidemiologic investigation and take precise actions to address the situation, minimize its impact on producers, and speed disease eradication efforts as much as possible.*

While NAIS will not "prevent" the initial occurrence of a disease, it can reduce or prevent the spread of disease.  Without this system of information, it can take days, weeks, and too often, months of manual searching to complete a disease investigation.  Moreover, the inability to quickly address an emerging animal disease can have negative economic and domestic/international trade implications for the livestock industry and governments.  Having NAIS—a streamlined, modern information system—in place will not only speed up disease response and eradication work but also ensure that these efforts are as comprehensive and accurate as possible.  The faster and more precise the response, the sooner life gets back to normal for everyone.

By making the choice to participate in NAIS, producers have the power to protect their animals and their community against the impact of a disease situation.  Premises registration is available for use now and is a valuable tool for any producer.  Animal identification and animal tracing are additional options for producers in the future.  The States, industry, and producers are working together to actively shape a system that meets everyone's needs.  NAIS can help producers protect their animals and their investment—but the choice to participate is theirs.

# THE BENEFITS OF A VOLUNTARY PROGRAM

Participation in NAIS is voluntary at the Federal level.  There are no Federal penalties or enforcement mechanisms associated with the program.  USDA believes that measures of this nature are simply unnecessary.  NAIS brings a range of positive benefits to producers, and these advantages offer strong reasons for voluntary participation.  Signing up for the first component of NAIS—premises registration—is a quick and easy process, and Federal law protects individuals' private and confidential business information from disclosure.

Everyone who lives off of the land understands how important it is to protect the health of the animals, plants, and humans who share it.  Producers also know that we must promote both domestic and foreign markets and remain competitive in trade.  They also recognize our added responsibility to be vigilant against any attempt to tamper with our food supply.  NAIS helps producers achieve all of these goals.  For producers and others in the animal agriculture sector, NAIS will ensure that—in the case of a disease event—everyone can benefit from rapid response.

In a market-driven economy, the ability to locate and rapidly respond to a disease situation is key to protecting access to both domestic and international markets.  A single report of disease can shut down consumer demand for U.S. products.  With NAIS, animal health officials will be able to use premises information to quickly define which regions of our country are, and are not, affected by an outbreak—keeping markets open for unaffected producers and preventing unnecessary movement restrictions.  Prices at home are dictated by the overall demand for U.S. products.  Therefore, to maintain and protect prices for domestic commodities, it is crucial for international markets to stay open.

Rapid disease response reduces the number of producers impacted by an outbreak.  This, in turn, reduces the hardships associated with an outbreak—the loss of irreplaceable breeding stock and bloodlines, the animal distress and loss resulting from the disease itself and the eradication effort, as well as the labor and time involved with this work.  By facilitating rapid disease response, NAIS also helps to protect the larger community from the impact of a disease situation.  Rapid disease response reduces the strain on social programs, the environmental impact, and the loss of jobs and tourism in affected communities.

Market demands—such as product and source verification, etc.—are increasing in importance and are another important reason for producers to participate in NAIS.  A number of other countries are already using animal identification to give their exports a competitive edge.  NAIS allows American producers to share that advantage.  The greater the level of participation in NAIS, the greater the potential to expand marketing opportunities—which is of merit to the entire industry.

In this regard, USDA believes participation in the main components of NAIS can occur as a result of standard business practices.  For example, in order for producers to obtain official identification devices, they first need to register for a premises identification number.  Accordingly, the success of the premises registration component would be achieved through the participation of producers in longstanding disease management programs and compliance with interstate movement regulations.

Every producer can find good reason to participate in NAIS.  Premises registration—which is available now—is a valuable tool for producers and is independent of the other NAIS components.  Signing up for premises registration in no way obligates a producer to participate in the other parts of the program.  Producers can register their premises today and decide later whether to participate in the rest of the program.  Whatever decision they make, NAIS will provide additional options for producers when they are ready to make decisions about what combination of tools best suits their needs.

# THE CONCEPT BEHIND NAIS

Animal identification is not a new idea.  Federal and State animal health programs—such as cooperative eradication programs for brucellosis and scrapie—include an animal identification component, and certain classes of livestock must be officially identified before entering interstate commerce.  In addition, under current laws and rules, some animals must be identified before they can compete in shows or races.

There are already multiple identification systems in place that exist for various purposes.  (For more information about how existing animal health identification systems fit into the NAIS, please see 34.)  The critical difference with NAIS is the national scope and uniformity of the system across many animal species.   But, the basic components of NAIS—identifying premises and animals—are not any different from the approaches Federal and State officials have taken for centuries through animal disease programs to maintain the health of livestock and poultry in the United States.

When diseases such as bovine tuberculosis and brucellosis were widespread in this country, animals were identified through disease eradication and control activities.  Animals were identified with a unique number every time they were tested or vaccinated for a disease for which there was a program.  During the height of these eradication programs, a large percentage of the U.S. livestock population was identified.  Now, with the successful eradication of many diseases, the need for and level of vaccination and testing is low—as is the percentage of uniquely identified animals and premises in the United States.  With this void of information, the ability to quickly find, control, and eradicate disease can be hindered.

Today, new challenges in the industry pose new risks.  In commerce and the production chain, animals move from place to place and are in close contact before moving yet again.  Contagious diseases can spread quickly and across great distances.  Many States have information systems in place to locate at-risk animals and premises during an outbreak.  But these systems are not consistent or connected, which can slow the disease response should an infected animal cross State lines—just when time counts most.

The voluntary NAIS program will help producers and animal health officials respond more quickly.  It offers a modern, streamlined information system that fills the current void in animal identification and provides a vital tool for rapid disease response.

# ESTIMATED COSTS ASSOCIATED WITH NAIS

The NAIS is a voluntary, cooperative program, with all partners sharing the costs of the system.  While State/Federal government and industry will bear the overall costs of developing and implementing NAIS, certain costs will fall to individual producers who choose to participate in certain components of the program.

## *Participation Costs*

For each NAIS component, the anticipated costs for producers are briefly explained below:

- **Premises registration**
  Premises registration is free in all States and participating Tribes.
- **Animal identification**
  The cost will vary among species and the method of identification selected by the producer/owner.  For example, animal identification number (AIN) devices for cattle may range from $1 for visual identification tags to $2-$3 for devices with radio frequency identification.  In other species where injectable radio frequency transponders can be used, the cost will vary depending on whether the owner implants the animal him/herself or has a veterinarian perform this work.  Some sheep producers are using injectable transponders for approximately $5 to $7, while some horse owners are paying $20 to have a horse implanted with injectable transponders.  If the owner has the expertise to implant the transponder him/herself, the cost of the transponder would be a few dollars.  Again, the service associated or "packaged" with the device determines the cost that the provider of the device(s) charges.
- **Animal tracing**
  The animal tracking databases are provided by industry organizations and the States.  Because many of the animal tracking databases provide additional services to the producer/owner, cost may vary depending on what services the producer elects to use.  The development and integration of animal tracking databases is being established by the private sector and the States through 2006; therefore, no specific participation cost figures are available at this time.  USDA expects that competitive forces in the free market will help keep costs down.

## *Development/Implementation Costs*

By the end of fiscal year (FY) 2006, USDA had made available $84.8 million to develop and implement NAIS.  Approximately 60 percent of these Federal funds are used through cooperative agreements with the States and Tribes to carry out NAIS activities at the local level.  Because premises registration is the foundation of NAIS, the priority focus has been on implementing this component.  Through these cooperative agreements, States and Tribes have additional resources to conduct education and outreach efforts and to administer the program.

USDA has also devoted significant resources to the development of the information system, including the National Premises Information Repository, the Web-based Standardized Premises Registration System (available free of charge to any State wishing to use it), and the Animal Identification Number (AIN) Management System.  In addition, USDA is providing the interfaces and information technology needed to implement NAIS.  The Animal Trace Processing System, which supports the integration of multiple private and State animal tracking databases and AIN device distribution databases, is now under development.  USDA has also funded selected field trial projects to explore innovative methods of animal identification and automated data collection technology.

# Economic Benefit of NAIS

The threat of a foreign animal disease outbreak in the United States is real.  Unfortunately, the timing and severity of an outbreak are impossible to predict.

It is, however, certain that—when it comes to a disease event—the time it takes to contain and control or eradicate the disease is the key factor that determines the economic losses and other social harms associated with the situation.  This is true both for producers and for animal health officials on the ground.  In other words, time is money.

Rapid response has a number of economic benefits for producers.  Any producer whose premises has been impacted by disease can attest to the serious losses and hardships that result—the loss of irreplaceable breeding stock/bloodlines, lower prices, lost business and income, animal distress and loss resulting from the disease and eradication effort, and the labor and time involved with this work.  The more quickly and effectively a disease is contained, the less likely it is that the disease will spread to additional premises.  This means all the difference for producers who are spared from the losses of having their premises exposed to disease.  When fewer producers are affected by disease, the economic strain—decreased incomes, lost jobs, loss of animals and livelihoods—on entire communities is reduced.  The faster the disease response, the faster an animal disease is isolated, the sooner life gets back to normal for everyone.

NAIS can also help maintain valuable domestic and foreign markets for producers, or even achieve new ones.  Choosing to participate in NAIS helps producers preserve the marketability of their animals—whether their markets are at home or abroad.  For example, if producers' animals are not linked to any affected premises or areas in the event of a disease outbreak, they could use NAIS animal identification numbers and movement records to demonstrate that their animals are disease free.

Furthermore, prices are dictated by the overall demand for U.S. products.  To maintain and protect prices for domestic commodities, it is crucial for international markets to stay open.  In many foreign trade situations, having the ability to quickly define which regions of our country are—and are not—affected by an outbreak translates into real savings for U.S. livestock industries and producers.  For example, in February 2004, when the first U.S. case of highly pathogenic avian influenza in more than 20 years occurred, more than 30 countries placed nationwide bans on U.S. poultry meat.  NAIS offers the ability to generate detailed data showing the scope of a disease outbreak very quickly.  This can be a valuable tool in helping to prevent widespread market closures.

Future competition in today's market-driven economy depends on producers' ability to maintain consumer confidence and protect the health of their animals.  A modern disease response system helps reassure consumers and trading partners that we are doing everything we can to contain disease spread and protect animal health.

By facilitating rapid response, NAIS also brings economic benefits to the U.S. economy as a whole.  For example, while our work to eradicate exotic Newcastle disease in 2002-2003 was ultimately successful, this year-long eradication effort cost U.S. taxpayers nearly $200 million.  Given the high expense associated with such efforts, reducing the time it takes to eradicate a disease by several months—or even several weeks—can save millions of dollars in costs for everyone involved.  When fewer animals and herds/flocks become infected, the number of quarantined and/or depopulated animals is reduced.  This saves the producer both time and money, and government agencies spend significantly less in terms of eradication (i.e., surveillance, testing, euthanasia, carcass disposal, cleaning and disinfection) and manpower costs.

Rapidly locating potentially infected animals is an essential first step for the rapid control and eradication of a disease outbreak. The length of time it takes to gain control over the situation in the initial days of the outbreak often dictates the overall success of the eradication effort and the ultimate extent of its economic impact. NAIS facilitates such activities by increasing the efficiency of the disease response.

Consider the following example:

> If a highly infectious foreign animal disease (such as foot-and-mouth disease) is introduced along the border of two States, and there is average traffic among production sites in these and other neighboring States, the disease has the potential to spread to numerous States in a matter of days.

> WITHOUT NAIS: On day one of the response, animal health officials are unable to identify many of the potentially infected premises. Epidemiologists spend the day interviewing herd owners, veterinarians, county agents, and others to gather names and addresses of potential producers in the area. Investigators may actually need to drive up and down rural roads to look for animals and identify premises. Depending on available resources, this process takes several days, weeks, or even months to complete. With each day that passes, the disease spreads further, and increased numbers of animals/herds are exposed. As the number of exposed animals/herds increases, more producers are directly impacted by the outbreak. The cost of eradication efforts increases by hundreds of thousands of dollars each day; producers' loss of animals and their livelihoods would grow exponentially with each passing day.

> WITH NAIS: On day one of the response, animal health officials use the system's databases (with the initially infected premises as a starting point) to identify all potentially affected premises and exposed animals in the surrounding area. Epidemiologists are able to generate a map of this area and, within minutes, have a clear picture of the potential scope of the outbreak. That same day, they are able to contact the owners of the premises and begin taking steps to prevent the disease from spreading further. In addition, the successful integration of the private and State animal tracking databases provides information on animals that have moved from the infected zones. Again, for a highly contagious disease, this could involve several States. Being able to locate these premises is, likewise, imperative. Using the NAIS databases, animal health officials are able to complete this important task quickly and thoroughly.

As this example illustrates, by enabling rapid response, NAIS helps protect U.S. producers from the devastating losses that are often associated with a disease outbreak. USDA plans to have a cost-benefit analysis conducted that will help us more precisely forecast the potential economic effects of the NAIS. But we already know that, to best protect our Nation's producers from the devastating consequences of a disease event, it is critical that animal health officials have the capability to carry out their jobs as efficiently and effectively as possible. NAIS will help reduce the time required to locate infected animals and notify at-risk producers, thereby reducing the opportunities for exposing other susceptible animals and the costs of additional exposure. The more quickly we can identify infected animals and isolate a disease, the fewer farms quarantined, the fewer animals depopulated, the fewer livelihoods lost, and the less spent on eradication activities. The faster we can assure consumers and trading partners that our food supply is healthy and safe, the less economic impact the disease situation has on everyone—from producers, to U.S. taxpayers, to State and Federal agencies.

## ROLES AND RESPONSIBILITIES

In order to make the voluntary NAIS successful, it has been designed as a State-Federal-industry partnership.  The responsibility for implementing and administering NAIS is shared among numerous entities—State and Tribal governments, industry groups/private companies, and USDA.  Understanding the different roles of these groups will help producers identify the appropriate sources to contact for NAIS-related services and for answers to any questions that may arise as the system is implemented.

Below is a general overview of the various sectors' responsibilities:

### States/Tribes

- Maintain Premises Registration Systems;
- Identify and register premises within their geographic areas;
- Submit premises data to USDA's National Premises Information Repository;
- Approve tagging/identification sites and services (used by producers who cannot tag/identify own animals);
- Conduct extensive public outreach to keep producers informed about NAIS and encourage participation;
- Serve as primary point-of-contact for producers seeking guidance/clarification on NAIS requirements within their States or Tribes;
- Report shipment of animal identification number (AIN) devices to an authorized AIN Device Distribution Database; and,
- Conduct public outreach to keep producers informed about NAIS and encourage participation.

### Industry Groups/Private Industry
*Note:  This bulleted list refers to industry as a whole and **not** the responsibilities of individual producers.*
- Develop and maintain animal tracking databases (databases are also being developed by some States);
- Act as "authorized agents" to register premises for producers (only with permission from the producer);
- Develop and maintain AIN Device Distribution Databases (databases are also being developed by some States);
- Manufacture and distribute animal identification number (AIN) devices;
- Report shipment of animal identification number (AIN) devices to an authorized AIN Device Distribution Database; and,
- Conduct public outreach to keep producers informed about NAIS and encourage participation.

### Federal
- Develop and maintain the National Premises Information Repository and premises number allocator and provide the Standard Premises Registration System for States and Tribes;
- Establish minimum performance standards for official identification devices;
- Approve animal identification number (AIN) devices and AIN device manufacturers;
- Maintain the Animal Identification Number (AIN) Management System to support the allocation of AINs to manufacturers and recording of device types shipped (not to include the premises identification number to which the device was distributed);
- Provide the Animal Trace Processing System (ATPS), a communications system that will allow timely interaction with the multiple private and State animal tracking databases and AIN device distribution databases to address an animal disease event; and,

Part I:  Overview of NAIS

- Conduct public outreach to keep all interested parties informed about NAIS and ongoing progress in implementing the system.

# OUTSTANDING ISSUES AND THE ROLE OF THE SPECIES WORKING GROUPS

NAIS continues to evolve to meet producer demands, and participant input to the program is critical. As the NAIS has progressed, the needs and comments of many individuals have shaped its development. Unique needs and preferences must be considered and addressed to make the system work well for different parts of the animal industry and also for U.S. producers who raise many different species of animals in many different environments.

Some issues can only be addressed sequentially as the NAIS is developed and more fully implemented. The answers to some very important questions will depend on the choices not yet made by producers themselves. The answer to the very important question, "How much will this cost me?" depends, for example, on the choices a producer will make in selecting the type of identification device(s) he or she will use. Competitive forces in the free market most likely will be a primary driver in reducing producer costs.

The Species Working Groups represent a significant, first-tier level of those individuals who will help shape the answers to many of the remaining technical and procedural issues concerning NAIS. The groups' primary objective is to provide their species-specific knowledge and experience to address species-specific issues to further NAIS' development and implementation.

The working groups include representatives from various levels and segments of industry. Their input to NAIS' development is critical, and they contribute the species-specific, ground-level information that is necessary to create an effective system. NAIS working groups are focused on the production of cattle (beef and dairy), bison, poultry, swine, sheep, goats, deer and elk, equines, and alpacas and llamas. Interested individuals may contact the working group chairperson to learn more about becoming a member.

The recommendations developed by the various Species Working Groups are provided to the NAIS Subcommittee which serves under the Secretary's Advisory Committee on Foreign Animal and Poultry Diseases. The Subcommittee is comprised of State and industry stakeholders, with Federal staff providing program resources and administrative support.

In addition to the recommendations from the Species Working Groups, the Subcommittee also accepts recommendations from State and national organizations.

The NAIS Subcommittee reviews and consolidates recommendations it receives, and in turn, reports its findings to the Secretary's Advisory Committee on Foreign Animal and Poultry Diseases. This structure for gathering input and shaping decisions provides an excellent opportunity for industry issues—including those unique to producers—to be thoroughly discussed and to have a consensus position shared with USDA.

Comments concerning NAIS' development are valuable to guide efforts as the NAIS moves forward. We encourage producers to make suggestions about NAIS by contacting the working group(s) for the species

of animal(s) they raise.  The working group information is on the USDA/APHIS Animal Identification Web page (www.usda.gov/nais/).  To provide input to a species working group, click on the "Contact a Species Working Group" link, which is on the right side of the page under the heading "I Want To..".  More information is also available through the "Species Working Group" link, which is on the left side of the page under the heading "Browse by Subject."

Producers can submit comments via e-mail at animalidcomments@aphis.usda.gov.  Producers should include the species name and the term 'working group' in the subject line of the e-mail.  Comments can also be mailed directly to USDA.  The address is NAIS Program Staff, Animal and Plant Health Inspection Service, USDA, Unit 200, 4700 River Road, Riverdale, Maryland 20737.

In addition, there are animal health officials and APHIS representatives, Area Veterinarians in Charge (AVICs), in each State who can provide assistance.  The AVICs work through area offices to support and carry out APHIS-Veterinary Services activities at the State level.  For example, AVICs provide health certificate endorsement, supplies for disease control/eradication programs, export certifications, import inspections, and many other APHIS programs and services.

Producers are encouraged to contact the appropriate State animal health officials and AVIC if they have specific questions about NAIS.  An "AVIC Contact List" and "States, Territories, and Tribes Contact List" with telephone numbers and other contact information is included in the Appendix of this document.  AVIC information is also available on APHIS' Web site at www.aphis.usda.gov/vs/area_offices.htm.

*It is important for producers to know:*
- Comments to the Species Working Groups and to USDA concerning NAIS' development are still being accepted.
- The Species Working Groups' consensus recommendations are made available on USDA/APHIS' Animal Identification Web site at www.usda.gov/nais.

# PART II:  PREMISES REGISTRATION

This part of the document discusses:
- Background on Premises Registration
- Which Locations Should Be Registered
- Multiple Premises Numbers for the Same Owner
- The Premises Identification Numbering System
- Process for Collecting Premises Information
- Non-Producer Participants
- Protection of Information
- The Costs Associated with Premises Registration
- How to Register a Premises (process, contacts, etc.)

## BACKGROUND ON PREMISES REGISTRATION

Premises registration, the foundation of NAIS, is fundamental to containing animal diseases.  Knowing where animals are located and how to reach owners is the key to rapid, accurate, and cost-effective disease response.  By choosing to register their premises, producers become part of a national animal disease response network.  They join industry, State and Federal partners, and other producers in controlling and preventing the spread of animal disease.

Opening the lines of communication between producers and animal health officials is critical.  By voluntarily registering their premises, producers ensure that they will be notified quickly by animal health officials when a disease event might put their animals at risk.  They will then have the information they need—when they need it most—to take action and protect the health of their animals.  In addition, premises information can be used to define quickly which regions of our country are, and are not, affected by an outbreak—keeping markets open for unaffected producers and preventing unnecessary movement restrictions.

Premises registration also helps safeguard producers against a slow disease response.  When animal health officials know where at-risk premises and animals are, and have contact information for the owners, they can respond quickly and strategically to prevent disease spread.  The more quickly and effectively a disease is isolated, the less likely it is to spread to additional premises—which means fewer producers are impacted.

Animal owners can participate by registering their premises—a location where livestock or poultry are raised, held, or boarded—with their State, Tribal, or Territorial animal health authority.  During the registration process, owners provide basic contact information for their premises and obtain a unique Premises Identification Number for that location.

There are several key points about premises registration:

1.) Premises registration is free.
2.) The registration process is quick and simple—producers simply fill out a short form with their contact information.
3.) Individuals' private information and confidential business information is protected by Federal law from disclosure.

4.)   Registering a premises does not obligate a producer to participate in the other two components of
        NAIS.

# WHICH LOCATIONS SHOULD BE REGISTERED

For the purposes of NAIS, a "premises" is defined as "a unique and describable geographic location where activity affecting the health and/or traceability of animals may occur."  Such locations include farms, ranches, other production units, markets, abattoirs (slaughter facilities), rendering facilities, ports of entry, veterinary clinics/laboratories, exhibitions, and any other location where livestock are raised, held, or boarded.

The definition and examples listed here are general guidelines for premises.  Livestock management practices vary depending on a variety of factors.  We realize that, as a result, there is no "one size fits all" definition of a premises, and that some operations are difficult to categorize.  Producers should consult State and local animal health authorities in their area to determine how their premises fit into NAIS.  Officials at the local level will be better able to address variations in production systems and methods, such as how to distinguish between multiple production units within a premises, or how to identify open range and public grazing lands (see "Multiple Premises Numbers for the Same Owner" for further detail).

# MULTIPLE PREMISES NUMBERS FOR THE SAME OWNER

Livestock farming and ranching operations differ across the country in terms of geographic size, degree of animal movement, proximity to other operations, the number of livestock within the operations and within the area, and the interaction between operations.  Therefore, coming up with a "one size fits all" definition of a livestock premises is not possible.  In general, a premises is a location where livestock are raised, held, or boarded.  Knowledge of where these locations are during an animal health event is key to the timely containment of the disease.

As livestock owners register their premises, they should decide if their operation needs more than one premises identification number (PIN).  Some farms have only one location where livestock are held or raised, and a single PIN is needed.  Other operations have several locations where livestock can be found.  In this case, consultation between the owner and the State/Tribe animal health official may be needed to decide how many of the locations should be assigned a PIN.  This decision should be based on the following epidemiological considerations:

1.  *Permanence.*  Locations that have permanent livestock facilities such as pens, corrals, stables, sale rings, or buildings have a greater need for individual premises identification than locations where livestock are held on a temporary basis such as rented corn stubble fields, wheat pastures, etc.
2.  *Area livestock density.*  In areas where livestock are densely populated, it is important to identify a sufficient number of premises in order to establish the true epidemiologic picture of the area.
3.  *Animal movement between locations.*  If there is routine movement of livestock between multiple locations and the movement does not pose a risk to other operations through animal contact, there may be no epidemiologic advantage to giving each location a separate PIN.  On the other hand, locations that are handled separately with no animal movement between them could qualify for separate PINs.  Again, owners should feel free to consult with their State/Tribal animal health official in cases like this.
4.  *Geographic separation.*  The risk of exposure of other operations increases when the distance animals are moved from one location to the other increases.
5.  *Proximity to other livestock operations.*  If routine animal movements involve contact with other livestock along the movement route, or if the location has close contact with a neighboring operation, identification of that premises would be of particular importance to epidemiologists.

In disease outbreak situations, a location or herd identifier is assigned if the location does not already have one.  In such cases, the determination of having one or more premises assigned includes the following factors:

•  *Herd disease status.*  If the location has animals that are under quarantine, or are known to have tested positive for a disease of concern by Federal or State animal health officials, a separate identifier may be necessary.
•  *Area disease status.*  In the event of a disease outbreak, it may be necessary to identify each and every premises (regardless of size or permanence) within an affected zone.

Fortunately for producers, they do not have to make these determinations by themselves.  State/Tribe and Federal animal health officials are available to help producers register premises in accordance with State/Tribal guidance for establishing animal disease response programs.  These animal health officials have access to trained veterinary epidemiologists to assist in making these decisions.

NAIS is a voluntary program at the Federal level.  Registering at least one premises in a multiple location operation is certainly preferable to registering none.  As outreach and education efforts begin to explain

the need for more detail, additional premises can be added to an operation profile when the information is updated.  It is important for animal health officials and producers to have flexibility in determining what will work best for each individual livestock operation.

Voluntarily registering an operation with multiple locations and obtaining a PIN for each location does ***not*** mean that producers should report the routine movement of animals in and out of those locations as long as the movements are within the same livestock operation.  Certainly, producers could choose to report these movements.

## PREMISES IDENTIFICATION NUMBERING SYSTEM

A premises identification number (PIN) is a unique, 7-digit code that includes both letters and numbers.

**Example**:  A123R69

The owner of the premises, or a person designated by the owner of the premises, can register his/her location.  A premises identification number, or PIN, is then permanently assigned to that location associating it with the mailing address.  If there is no mailing address at the property, geographic coordinates—latitude and longitude—can be used instead to describe the location.  (This does **not** provide any satellite tracking capability of either animals or people living at the premises.)  Geographic coordinates can be determined by using driving directions from a point of reference with existing mapping program software.  Producers do not need to collect geographic coordinates.

Assigning premises numbers avoids having multiple numbers assigned to the same operation, regardless of species.  It is important to remember that the premises identification number (PIN) is assigned permanently to a geophysical location.  If an owner or entity sells his/her farm, the next operators of the premises use the original premises identification number that had been assigned to that location.  If the seller buys a new location to build a new operation that never had livestock, he/she would register that location and obtain a new premises identification number (PIN).

States and Tribes are responsible for collecting premises information from producers and registering locations in their geographic areas.  This information is entered into the Premises Registration System (a database) used by the State or Tribe and then passed electronically to USDA's Premises Identification Number Allocator.  Access to the system is safeguarded by using log-in procedures and requiring eAuthentication.  The PIN allocator validates the address/location of each premises and ensures that the address/location has no other premises number already on record.  The allocator issues a nationally unique premises identification number (PIN) to the address/location and returns the information to the Premises Registration System.  The State/Tribe then informs the premises owner of the official premises identification number (PIN) for his/her location.  Some States currently utilize an Internet option for registering one's premises, and in such cases, the premises identification number (PIN) is provided while online.

## PROCESS FOR COLLECTING PREMISES INFORMATION

Each State or Tribe adheres to the national data standards and guidelines for premises registration established by USDA.  The way premises information is collected and entered is at the discretion of the State or Tribe, and each may have its own additional information requirements for premises registration.

To meet USDA's data standards for premises registration, States/Tribes collect and maintain at a minimum the following pieces of information:

- premises identification number (PIN);
- name of entity;
- owner or appropriate contact person;
- street address, city, state, and zip or postal code (or latitude/longitude coordinates) of the premises;
- contact phone number;
- operation type;
- date activated, date retired, and the reason retired (to determine whether animals still exist at the location); and,
- alternative phone numbers.

To ensure animal health officials at the national level have the necessary contact information in case of a disease concern, States/Tribes forward a subset of information to USDA's National Premises Information Repository.  National animal health officials can then request and obtain this information quickly during a disease outbreak, helping them coordinate their response with the affected States/Tribes.

Again, USDA has established only minimum standards; each State/Tribe may have its own information requirements for premises registration in addition to the standard information USDA requests.

*Note:*  The concept of premises registration is not new.  For many years, numbers for herds, flocks, and locations have been used in Federal-State animal health programs.  In addition, different formats have been used by States for herd and/or location numbers.  Often, a single producer may be assigned many numbers for the same operation.  The establishment of PINs is needed to standardize the number and the information that pertains to the location where the animals are managed, as well as to avoid duplication of numbers for the same location.

# NON-PRODUCER PARTICIPANTS

Not all individuals or groups participating in NAIS are directly associated with a premises that manages or holds livestock.  The roles of these "non-producer participants" may include, among others, manufacturing and distributing official identification devices, submitting information to designated NAIS databases, or providing device/identification services.  (See "How to Obtain Identification Devices" in Part III for information on official identification device distributors.)

These individuals or companies obtain a non-producer participant number (NPN) instead of a premises identification number (PIN).  The NPN is obtained using the same procedures for registering premises. The difference is that NPNs are assigned to individuals, organizations, or entities, rather than the address/location of a premises.  If a non-producer participant moves to another location, including another State, the NPN will still remain with that entity.  The reason for assigning NPNs is to establish a record of each individual/company providing data to NAIS databases.  This better enables Federal and State officials to maintain proper data controls and integrity measures for NAIS information.

## PROTECTION OF IINFORMATION

Federal law protects individuals' private information and confidential business information from disclosure.  Through both intent and design, NAIS is limited in scope in terms of the type and quantity of information maintained by the Federal Government.  The system will hold and maintain only limited premises information.

USDA's National Premises Information Repository will contain the following pieces of information:

- Premises Identification Number (PIN);
- name of entity;
- owner or appropriate contact person;
- street address;
- city;
- State;
- zip or postal code;
- contact phone number;
- operation type (e.g, farm, ranch, market, packing plant, abattoir, boarding facility, rendering facility, port of entry, veterinary clinic, laboratory, exhibit, etc.);
- date activated in the system;
- date retired from the system; and,
- reason retired.

USDA and State animal health authorities need this basic information so that we can quickly locate premises at risk in the event of an animal disease emergency.

Beyond the premises registration system, USDA will not "own" any additional data on participants in the system.  If and when producers opt to participate in the voluntary animal identification numbering system or the tracking database, they will be working directly with State or private service providers.  If USDA needs animal movement and location information to respond to an animal health emergency, data will be requested from the private or State databases where it is held.  Federal law protects individuals' private information and confidential business information from public disclosure.

# COSTS ASSOCIATED WITH PREMISES REGISTRATION

Premises registration is free in all States/Tribes.  Because premises registration is carried out by individual States/Tribes, each may choose to keep premises registration free or not in their respective areas, based on local needs.  To date, all States/Tribes are registering premises at no charge.  As a result, there is no cost for producers to participate in the premises registration component of NAIS.  Producers should also be aware that registering a premises does not obligate the premises to participate in the other components of NAIS (i.e., voluntary animal identification and tracing).

# HOW TO REGISTER A PREMISES

The owner of the premises, person designated by the premises owner, or person responsible for the animals at the premises can register premises by filling out the appropriate premises registration form for his or her State/Tribe and sending it to the State/Tribe's animal health authority (e.g., State veterinarian). Many States offer producers the option of registering their premises online at the State agriculture department Web site.  Since up-to-date information is vital in responding to an animal health event, the person registering the premises is encouraged to keep the requested information current.

Premises registration forms are available on each State's department of agriculture Web site.  Forms can be downloaded from the Web sites and submitted to State animal health authorities via land mail or e-mail.  Producers may also contact their State or Tribal NAIS contact by mail or phone to request the appropriate forms (contact information is included in the Appendix under "States, Territories, and Tribes Contact List").

Most States provide step-by-step instructions for the premises registration process on their Web sites. State animal health authorities are also available to answer any questions producers may have about premises registration and/or the registration process.

Tribal members should contact their Tribe's designated liaison for more information and to obtain premises registration forms.

States and Tribes also have the option of allowing industry organizations or groups or other interested third parties to assist with collecting and entering premises data.  These groups act as "authorized agents" and, with the permission of the premises owner, are permitted to submit data to the State or Tribe's premises registration system on that person's behalf.  Several States are using authorized agents to help promote NAIS and offer producers another convenient option for registering their premises.  If producers are interested in working with an authorized agent, they should check with their State animal health authority to identify any opportunities in their area and obtain contact information.

As mentioned previously, a complete listing of each State/Tribe's contact information for premises registration is provided in the Appendix of this document.  This information can also be accessed on USDA/APHIS' Animal Identification Web site (www.usda.gov/nais/) by selecting the "Contact Us" drop-down menu at the top of the page and choosing "Directories."

**To view a sample premises registration form, please see page 63 in the Appendix of this document.**

# PART III:  ANIMAL IDENTIFICATION

This part of the document is separated into two sections.  The first section discusses:
- An Overview of Voluntary Animal Identification
- Individual Animal Identification
- Group/Lot Identification
- Animals Not Needing Identification Numbers

## AN OVERVIEW OF VOLUNTARY ANIMAL IDENTIFICATION [4]

Depending on their situation, producers may choose to participate in animal identification, the second component of voluntary NAIS.  Animal identification is now available for use with several species, including cattle/bison, poultry, swine, sheep, goats, cervids (deer and elk), equines (horses, mules, donkeys, burros), and camelids (llamas and alpacas).  The States and private industry continue working on animal identification so that it will eventually be an option for all species.

Animal identification, whether individual or group/lot, provides producers and owners with a uniform numbering system for identifying their animals.  It also links their livestock or poultry to a specific premises – a valuable tool for producers and owners whose animals go into commercial production or move frequently.

The need for, and method of, animal identification will vary depending on where and how animals are moved or "commingled."  Some animals may be identified individually; some may be identified as a group; and some animals would not be asked to be officially identified at all.  Each of these scenarios is discussed in more detail below.

Additionally, the method of identification or type of identification device varies among species.  For example, cattle are identified with a visual ear tag while horses, llamas, alpacas, and other species may be identified with an injectable transponder.  USDA has not designated any specific identification technologies beyond the minimum requirements for official identification that have been identified in the *Code of Federal Regulations*.  What works for one species may not work for another.  This is a decision best left to the producers themselves.  NAIS works best if there is active involvement and ongoing feedback from the States, industry, and producers.  USDA will continue to work with producers and animal owners to ensure that the system is easy to use and makes sense.

Under the voluntary NAIS, USDA recommends that animals moved from their current premises to other commercial production locations or premises like auctions/markets, feedlots, etc., be officially identified.  In situations where commingling of animals from multiple premises at a location takes place, it is important because it directly influences the potential impact of disease exposure and spread, thus determining whether and when an animal needs to be identified.  In general, the term "commingle" refers to events where animals are mixed or brought together with animals from other farms, ranches, or other production systems.

---

[4] Producers should check with their State animal health authority for existing animal identification requirements that are currently in place at the State level and are not affected by NAIS.

# INDIVIDUAL ANIMAL IDENTIFICATION

### Individual Animal Numbering Systems

The USDA has recognized official numbering systems for many years that continue to be official.  In other words, because NAIS is implemented for voluntary participation, no previously recognized official numbering system will be discontinued.

Official numbers for individual animal identification include:

- National Uniform Eartagging System (e.g., the traditional calfhood vaccinations device with nine characters—the two-character State abbreviation, three alpha characters, and four digits)
- Premises Identification Number with a unique herd management number (commonly used in the National Scrapie Eradication Program)
- Animal Identification Number (AIN)

The AIN, through an interim rule published in November 2004, was established as an official number that could be used for all disease programs as well as by industry for breed registry, performance recording programs, etc.

### Animal Identification Number (AIN)

USDA recommends individual identification with an Animal Identification Number (AIN) of those animals that move through the production chain as individuals and when there is an event that "triggers" the need for animal identification.

An animal identification number (AIN) is a unique, 15-digit number, where the first three numbers are the country code and the following 12 digits are the animal's unique identifying number.  The first three numbers of an animal identification number (AIN) issued in the United States will always be 840.  The AIN is imprinted on identification devices with a space between every 3rd digit to improve readability (the numbers are not stored in databases with the space).

   **Example**: 840 003 123 456 789

Other countries, through international standards, are assigned three-digit codes.  For example, Canada's identification numbers have 124 as the first three digits (Canada's country code) followed by 12 additional digits.  These numbering systems allow the national number to be unique worldwide.

The person responsible for the care of the animal chooses when to place the identification on the animal (when the AIN device is attached or adhered to the animal).  Some producers may want to attach identification devices shortly after birth; others may choose to attach a device later.  However, the animal should have identification attached before the animal leaves its current premises when the movement is defined as a "reportable movement."  Additional information on "reportable movements," or what types of movement should be reported, are discussed later in this document.

Producers who purchase animals and bring them into their operation will maintain the official identification already on the animal — no additional identification or change of identification of those animals should occur.  Likewise, imported animals will have a national number from the country in which the animal was born, and those animals will keep their original national number.

See the section on "Loss or Malfunctioning of Identification Devices" for instructions on how to re-identify animals if they lose their identification devices or if the device malfunctions.

# GROUP/LOT IDENTIFICATION

Animals that typically move through the production chain as a group of animals of the same species can be identified by Group/Lot Identification Numbers (GINs), rather than individual numbers.  This practice is most common in the poultry and pork industries.  However, group/lot identification may be an option for other species when they move through the production chain as a group.  The individual identification of such animals in the group or lot with a tag or other identification device is not necessary.  An animal removed from the group, however, should be identified individually if it will be making reportable movements.

The group identification number (GIN) is a 15-character number consisting of the 7-character Premises Identification Number; the date that the group or lot of animals was assembled; and a 2-digit number to reflect the count of groups assembled at the same premises on the same day (starting with 01).  The date format is mmddyy - for example 041406 for April 14, 2006.

      **Example:**  A23456710030204

In the example, this is the fourth group assembled at premise A234567 on October 3, 2002.

The person at the premises who is responsible for animals at that location assigns the group identification numbers (GINs).  Since the GIN is "self-generated" by the producer (not assigned by USDA) the GIN of each group is maintained at the premises by the producer in his or her management records.  The Species Working Groups will provide more recommendations on a species basis about how group/lot identification applies to each sector of their industry, and in particular how group movements should be maintained and reported.

# ANIMALS NOT NEEDING IDENTIFICATION NUMBERS

Some animals do not need to be identified under NAIS, specifically animals that never engage in a reportable movement, due to the way they are reared.  Such cases include:

- Animals that never leave the farm or are only moved directly to custom slaughter for personal consumption would not need to be identified in NAIS.  In such cases, these movements have little impact on the potential spread of disease and the traceability, if necessary, is adequate. (State requirements for custom slaughter may differ from this Federal guidance.)
- Animals that do not leave their birth premises for reportable movements and that die and are buried at their birth place would not need to be identified.

In such cases, an individual may choose to participate only in the premises registration portion of NAIS. Voluntarily registering premises does not automatically enroll an individual in the other components of NAIS.  USDA encourages all animal owners to register their premises, regardless of the number of animals present, because many animal diseases (such as avian influenza, foot-and-mouth disease, and vesicular stomatitis) can be spread whether an animal leaves its home premises or not.  Registering a premises ensures that animal owners will receive the information they need to protect their animals and their investment in the event of a disease outbreak.  Contact information provided during premises registration opens the lines of communication between animal owners and animal health officials, which is critical to effective and efficient disease response.

*Note*:  Animals that die on the premises and are taken to a rendering plant need to be identified to ensure there is a means of determining the location from which they were taken.  While an AIN device may be used to support this identification requirement, other means of identification are adequate and producers should discuss this with the representative of the rendering plant.

# PART III (CONTINUED):  ANIMAL IDENTIFICATION

The second section of Part III discusses:
- Options for Identification Devices
- Existing Animal Health Identification Systems
- Cost Considerations for Identification Devices
- USDA's Role in Authorizing Manufacturers and AIN Device Distribution Databases
- How to Obtain Identification Devices
- Applying Identification Devices
- Intentional Removal of Identification Devices
- Loss or Malfunctioning of Identification Devices

## OPTIONS FOR IDENTIFICATION DEVICES

At the Federal level, participation in NAIS is voluntary.  However, existing regulations in the *Code of Federal Regulations* (CFR) for certain diseases such as brucellosis and bovine tuberculosis and the interstate commerce of certain classes and ages of animals define requirements for animal identification, and in some cases, define the devices that can be used.  These include official ear tags, tattoos, and radio frequency identification devices (RFID).  Registered brands administered through recognized brand authorities are recognized as official identification within the States that have brand regulations, but are not considered official individual animal identification on the interstate certificates of veterinary inspection.

Brands were originally established, however, to support "proof of ownership," and they have frequently played an important role in tracing animals for disease purposes.  Brands and the brand infrastructure will continue to be a vital part of animal identification.  A Brand State Working Group was recently established to ensure that NAIS capitalizes on the merits of branding and the brand infrastructure as the program moves forward.

NAIS does not alter any regulations in the CFR or at the State level.  However, AIN tags used in NAIS are official identification devices and may be used to meet the needs for official identification that is regulated through the CFR or by the States.

USDA has not designated any specific identification technologies beyond the minimum requirements for official identification that have been identified in the CFR.  NAIS remains open with regard to the technology used to identify an animal and will not require any specific identification technology—such as RFID tags or injectable transponders.  NAIS works best if there is active involvement and feedback from the States, industry, and producers.

The Species Working Group recommendations[5] will contain other guidelines that further explain what animals should be identified, when, and what methods are recommended.  The Species Working Groups are working on an analysis of which identification devices and methods work best for their species and will help determine appropriate standards for identification devices and methods.

---

[5] The Species Working Groups' recommendations are made available on USDA/APHIS' Animal Identification Web site at www.usda.gov/nais.

Identification devices that use the animal identification number (AIN) in accordance with the CFR and NAIS criteria are also recognized as official for use in interstate commerce.

### AIN Devices

For livestock industries that generally use visual identification, such as cattle and sheep, animal identification number (AIN) tags are the accepted industry standard when unique individual animal identification is warranted. USDA, with industry input through the species working groups, has established standards for AIN tags (readability, durability, printing characteristics, etc.). Other animals—such as horses—that are not typically identified with eartags would not need to be identified with such devices.

### Supplemental Identification

Producers and owners of animals may choose to incorporate supplemental identification methods or technologies with the animal identification number (AIN) tag or device. If they do, the animal identification number (AIN) tag or device is the official identifier. For example, the cattle working group has recommended RFID eartags, which use radio frequency to convey information, as a preferred form of identification. RFID tags that meet the minimum visual characteristics, when so authorized, can be used as animal identification number (AIN) tags.

The flexibility of supplemental identification allows higher radio frequencies, biometrics (DNA, retinal imaging, etc.), and other technologies to be used with the animal identification number (AIN) tag or device. While visual identification eartags are the standard for certain species—cattle, for instance—different methods are used for other species. The Equine Species Working Group, for example, recommends a microchip implant. Other Species Working Groups continue to analyze the types of identification devices and methods that are best for their species and industry and will provide recommendations in that regard. In cases where group/lot identification is appropriate, no identification device is needed for individual animals that are managed and move together through the production chain as a group.

# EXISTING ANIMAL HEALTH IDENTIFICATION SYSTEMS

In addition to USDA's animal identification number (AIN) system, there are currently several other official numbering systems and several methods of identifying individual animals.  The goal, however, is to move to a single numbering system when practical and use standard identification methods that the Species Working Groups recommend as the most effective for their species.  Over time, the animal identification number (AIN) will become the standard national numbering system used for unique individual animal identification for certain species and/or methods of identification.

USDA is working to incorporate identification numbers and devices already in use for animal health programs.  Animals currently identified through official programs like the National Scrapie Eradication Program do not need to be re-identified for NAIS.  Use of the AIN has begun in the chronic wasting disease program and the tuberculosis program.  Eventually, the AIN numbering system will be made available for use with other disease programs, such as brucellosis.  Brands can also be of use and are considered official in brand law States.

# COST CONSIDERATIONS FOR IDENTIFICATION DEVICES

The cost of the AIN devices varies based on the type of identification device the producer chooses.  Such costs are determined by the species being identified and the intended use of the device for herd management.  For example, plastic eartags with a panel for writing or imprinting each animal's herd management number may cost in the neighborhood of $1 each, while some of the button-like radio frequency eartags are between $2 and $3.  Devices can come with a variety of services, and thus the person selecting the device will likely consider the options offered by each organization providing the animal identification number (AIN) device.

The administration of other devices, radio frequency injectable transponders for example, may typically be implanted by a veterinarian.  In such cases, the cost of these identification devices may include the service charge for implanting the transponder in the proper implant site.  Currently, such cost for implanting the transponder in horses is approximately $15 to $20 per horse and is also dependent on variation in travel cost of the veterinarian to the premises.  Individuals with the expertise to implant the transponders themselves would only pay for the cost of the transponder.

## USDA's Role in Authorizing Manufacturers and AIN Device Distribution Databases

Using the Web-based AIN Management System (AINMS), USDA allocates animal identification numbers (AINs) to manufacturers that are authorized by USDA to produce official identification devices or technologies.  The AIN device manufacturers are only permitted to use AINs allocated to them; this ensures that the uniqueness of the animal identification numbers is maintained.  All of the manufacturers have the responsibility for issuing AINs only on official devices.

AIN device manufacturers have representatives that provide AIN devices to producers and animal owners.  The AIN device manufacturers report the animal identification number imprinted or embedded on each device Product Code of each device to the AINMS.

The USDA will also authorize AIN Device Distribution Databases for the NAIS.  These databases, maintained by AIN device manufacturers, industry organizations, service providers, States, etc., will receive and maintain the record of distribution for AIN devices to a premises[6].  Animal health officials will only request access to the AIN device distribution records when there is an animal disease issue that warrants their use. This access will follow prescribed protocols used by the Animal Tracking Databases (see page 42).

---

[6] The AIN Device Distribution Databases are slated to become operational after April 2007.  Until these systems are operational, the AIN Management System will receive the distribution record of AIN devices (the record that indicates what AINs were on each AIN Device that went to each premises).

# HOW TO OBTAIN IDENTIFICATION DEVICES

Individuals who choose to participate in the voluntary NAIS and choose to use AIN tags/devices for their animals can obtain devices from a representative of authorized AIN device manufacturers, referred to as AIN device managers.  Here are the basic steps and requirements:

1. Make sure the premises where the animals are located is registered and has a premises identification number (PIN).  See this document's section on premises registration for details.

2. Contact an AIN manager who provides the AIN device(s) of your preference.  A list of authorized AIN identification devices, their manufacturers, and the species for which each is recommended is available through the AIN Management System Information Web page (http://animalid.aphis.usda.gov/nais/animal_id/ain_mngt_sys.shtml).  Contact the device manufacturer to obtain the contact information for manager(s) in your area[7].

3. Give your premises identification number (PIN) to the animal identification number (AIN) device manager.  The manager will validate the premises identification number (PIN), and the devices will be shipped or delivered to the premises.

In the future, animal identification number (AIN) devices may be available through farm supply centers that become AIN device managers.  Also, some devices, such as injectable transponders, may more commonly be available through veterinarians who are trained to apply the device.

---

IMPORTANT:  Producers should obtain devices only from representatives of authorized AIN device manufacturers.  This will ensure that they are getting USDA approved and official identification devices. In addition, the representatives of the AIN device manufacturer can provide information to the producers on the proper use of official animal identification devices.

Official AIN tags (eartags) contain the animal identification number (AIN), the U.S. Shield, and the words, "Unlawful To Remove." Additionally, the approved tag manufacturer has its trademark or logo imprinted or engraved on the tag. The Animal Identification Number is only allowed to be imprinted on official identification devices.

The U.S. Shield



---

[7]  Some States may require certain methods of identification.  Producers should check with their State animal health authority for such existing requirements.  These requirements are not affected by NAIS.

## APPLYING IDENTIFICATION DEVICES TO ANIMALS

For individuals who choose to participate in the voluntary NAIS, the person responsible for the care of the animal chooses when to place the identification on the animal.  However, the animal should have identification attached according to the instructions provided by the manufacturer of the device before leaving its current premises when the movement is reportable (see the section on animal movement). Animals are identified only once, not every time the animal is moved.  The animal identification number (AIN) device is to be maintained on the animal, and the AIN on the device is associated with the animal for the animal's entire life.

While many producers will tag or identify their animals, options are available for producers that do not have facilities to tag their own animals.  For example, if the animals cannot be tagged at their current premises, producers might elect to have their animals tagged at an auction market that provides tagging services when they are ready to market their animals.  In such cases, when the animals are unloaded, they will be tagged before they are commingled with animals from other premises.  In addition, in some areas, tagging services are also available.  Producers can hire an individual to come to their premises with portable gates and chutes and tag the animals there.  Some veterinarians may also offer tagging services for their clients when providing herd health services.  With input from States and industry, USDA is currently developing the approval process for tagging sites and service providers and will make this information available at a later date.

## Intentional Removal of Identification Devices

USDA has no plans to make participation in any component of NAIS mandatory.  However, as mentioned previously, there are existing regulations for certain diseases such as brucellosis and bovine tuberculosis in the *Code of Federal Regulations* (CFR) that require identification for interstate movement for some animals and, in some cases, define the devices that can be used.  Under § 71.22, intentional removal of or tampering with official identification devices is prohibited.  Specifically, it is unlawful to remove an official identification device or cause the removal of one unless the animal is terminated, except in cases when a device has become illegible or the device malfunctions.

# LOSS OR MALFUNCTIONING OF IDENTIFICATION DEVICES

USDA recognizes that identification devices might become separated from the animal or others might malfunction (radio frequency transponders).  For example, ear tags can be pulled off an animal due to various environmental factors where cattle are managed.  Animals that lose their original identification devices or animals on which the devices malfunction should be identified with new devices.  It is recommended that such animals be re-identified in as timely a manner as possible.  The owner should maintain a record of the animal that was re-identified and, if possible, cross-reference to the previous official number of the animal that was re-identified.  The Animal Tracking Databases will provide options for reporting the new number along with the animal's previous number.  If the owner or person responsible for the animal does not know that animal's original number, in particular with purchased animals, he/she should keep records of the fact that the animal was re-identified.  At a minimum, the owner or person responsible for the animal should maintain a record of all animals that were re-identified and any information about these animals.

Note:  Some breed registries provide options where animals are re-identified with "replacement" devices with the same animal identification number (AIN) that was first applied to the animal.  This practice helps maintain accurate records of offspring, performance, genetics, etc.  Such replacement devices, when administered through breed register programs and when meeting established safeguards, are also a viable option.

# PART IV:  ANIMAL TRACING

This part of the document is separated into two sections.  The first section discusses:
- An Overview of Animal Tracing
- Animal Tracking and Traceback Processing Systems
- Selecting an Animal Tracking Database
- Costs Associated with Animal Tracking Databases
- How the Systems Work When Responding to an Animal Disease

## AN OVERVIEW OF ANIMAL TRACING

The final component of voluntary NAIS, animal tracing, is under development by the States and the private sector.  Once this component is complete, it will offer an additional option for managing animals and protecting their health.

Producers will be able to choose an animal tracking database and report certain animal movements that might post a significant risk of disease transmission.  When linked with other NAIS information, animal tracing information will provide animal health officials with timely, accurate records that show where animals have been and what other animals have come into contact with them.  Animal tracing information also makes it easier for producers, States, industry, and USDA to determine the scope of an animal disease event and locate affected animals.

Private or State databases will house and maintain information regarding animal movements.  Federal and State animal health officials will request access to this information only if a disease event occurs.

# ANIMAL TRACKING AND TRACEBACK PROCESSING SYSTEMS

The voluntary animal tracing component of NAIS is a public/private partnership.  Both industry—through private systems—and States will operate and maintain AIN device distribution databases and animal tracking databases (ATDs), which will contain the animal location and movement records needed to help safeguard animal health.  On the Federal side, USDA will operate a portal system that will enable animal health officials to submit requests for information to the AIN device distribution databases and animal tracking databases (ATDs) when investigating an animal disease event.  This system is known as the Animal Trace Processing System (ATPS).  State and Federal animal health officials will use the System only in the following situations:

- An indication (suspect, presumptive positive, etc.) or confirmed positive test of a foreign animal disease;
- An animal disease emergency as determined by the Secretary of Agriculture and/or State Departments of Agriculture; or
- A need to conduct a traceback/traceforward to determine the origin of infection for a program disease (brucellosis, tuberculosis, etc.).

The technical requirements for the integration of private and State animal tracking databases (ATDs) with NAIS is being developed through the balance of 2006.  The completion of the Animal Trace Processing System (ATPS) and its full integration with the animal tracking databases (ATDs) is planned for early 2007.  Systems that meet these complete specifications will be defined as "NAIS Compliant Animal Tracking Databases" upon the signing of the agreement with the organization responsible for the information system.  This full integration should be complete in early 2007.

To ensure that USDA receives timely responses from the ATDs, the systems will be required to have an "up time" of 98 percent—an information technology standard.  As an additional safeguard, the ATDs will send an electronic "system on-line" message to the ATPS on a set time interval.  This will enable USDA to know the percentage of systems that are available at any time.  The time interval for receiving the "system on-line" message, as well as the other technical protocols, will be established during the interim development phase of the ATDs.

# SELECTING AN ANIMAL TRACKING DATABASE [8]

IMPORTANT:  Producers and other stakeholders may select the animal tracking database (ATD) they wish to use for reporting their animal movements.  A list of organizations and States that offer NAIS-compliant ATDs will be posted on the USDA/APHIS Animal Identification Web site once cooperative agreements have been signed.

All approved animal tracking databases (ATDs) must meet certain specifications.  The cooperative agreements between USDA and database operators will outline data elements, access privileges, and operating procedures, as well as stipulate how movement data will be archived and transferred to ensure uninterrupted flow of information in case the organization or company ceases business or elects to discontinue the operation of the animal tracking database (ATD).

If and when producers opt to participate in the tracking database, they will be working directly with the private company or State providing the ATD.  The information held in ATDs is within the control of private entity or State.  USDA will not hold and, therefore, cannot distribute this information.  If USDA needs animal movement and location information to respond to an animal disease issue, we will request the data from the private and State databases only for animals involved in the disease of concern.  Federal law protects individuals' private information and confidential business information from public disclosure.

Under NAIS, only minimum, standardized tracing information is necessary to participate in animal tracing:

- National premises identification number (PIN);
- Animal identification number (AIN);
- Date of the event; and
- The event itself (move-in or move-out).

Other animal-specific data (age, species, sex, etc.) that supports NAIS in traceback situations is also standardized, but are not necessary for participation.

---

[8] Producers should first check with their State animal health authority to see what animal tracking database (ATD) options are offered by their State.

## COSTS ASSOCIATED WITH ANIMAL TRACKING DATABASES

Databases will vary in regards to cost, the range of services offered, and the operational details (such as how to submit animal movement information).  Some producers may want to purchase optional services that are not available from all animal tracking database (ATD) providers; others may choose a database that handles only basic information.  For example, a database may cost more because it provides marketing information (i.e., carcass information, health records, expected progeny differences (EPDs), etc.).  States may also elect to provide an animal tracking database (ATD).

The cost of participating with an animal tracking database (ATD) will therefore depend somewhat on the producer's choice, and it is difficult to pinpoint the costs until the databases are more fully developed. We anticipate that numerous animal tracking databases (ATDs) will become available that offer a range of prices and services.  Competition among these databases will help keep costs down.

# HOW THE SYSTEMS WORK WHEN RESPONDING TO AN ANIMAL DISEASE

When animal health officials receive an indication (suspect, presumptive positive, etc.) or confirmation of a positive diagnosis of disease, the process to gather the necessary information is initiated.  This example provides a general explanation of how the private and State databases[9] participating in the NAIS are utilized.  The basic processes are similar for all diseases, but the request for information will vary based on the type of disease.  For example, the cohorts, or animals that were herdmates of the subject animal, at each location the positive animal was cared for must be located when contagious diseases (such as avian influenza, brucellosis, foot-and-mouth disease, tuberculosis, etc.) are involved.  In a BSE case, the birthplace is the most important location to trace, along with other animals within the same age group as the infected animal at the initial premises.

1.  The animal health official initiates the traceback process by logging onto the ATPS through secured and authorized access controls.  This official enters the information on the disease case-- for example, the subject animal's official identification number and, if known, the premises number of the animal's location.  Based on the type of disease, the animal health official will define what date ranges are to be included in the request for information.  These specifications define the "search criteria" that will allow the private and State databases to return the necessary information specific for this disease case.

2.  The ATPS sends an electronic message to each private and State database's electronic messaging system with the search criteria.

3.  Each private and State database automatically processes the request and returns a report to the ATPS within 15 – 30 minutes.  If records meeting the search criteria are found, the information will be contained in an encrypted (data protected) electronic record back to the ATPS.

4.  The ATPS receives and compiles the information from each private and State database.  In certain disease cases, additional requests to each ATD will be necessary.  For example, the cohort of the animal at Premises 1234XYZ, 840 123 456 789 012 moved to Premises ABC6789.  A second request for information for animals that came into contact with this cohort animal and all others found in the first request would be sent to each private and State database.  This process may need to be repeated numerous times to obtain all the necessary information.

5.  When the request for information has been completed, the AHO logs back on to the ATPS to obtain the report containing the necessary information for the traceback study.

6.  Animal health officials that have animals in their State related to the disease case are informed and provided with the information on premises and animals in their areas.

7.  These officials continue the contacts with producers that currently have or have had animals included in the disease investigation.

---

[9] Private and State databases, in the context of the NAIS User Guide, refers to the AIN Device Distribution Databases and Animal Tracking Databases participating in NAIS.

# PART IV (CONTINUED):  ANIMAL TRACING

The second section of Part IV discusses:
- The Goals of Tracing Animal Movements
- Reportable Animal Movements
- Additional Comment Regarding Reportable Animal Movements
- Non-Commercial Producer Guidance

## THE GOALS OF TRACKING ANIMAL MOVEMENTS

Since NAIS is concerned with animal health relative to animal diseases, those movements carrying a high risk of disease transmission will be the primary focus of tracing efforts.  In commerce and in the production chain, animals often move from one premises to another where they come into contact with animals that originated from other premises and move again from that point, often in different directions. This commingling and subsequent movement often presents situations where contagious diseases can spread easily and be carried across great distances.

USDA realizes that attempting to record all animal movements is not practical, and that is not the intent in NAIS.  Rather, the focus of NAIS is on the type of movement and its potential impact on spreading a disease.

There are a number of factors that can influence whether an animal movement activity may pose a disease risk or impact the spread of a disease.  Certainly, some events pose greater risk of disease transmission than others.  The number of animals, their source(s), the health status and certification of the animals, and the location of the event, for example, all influence the degree of disease risk in a given situation.  For example, taking your animal on a trail ride with a neighbor, animals accidentally wandering off a premises, or moving livestock from pasture to pasture within your operation would pose a relatively low risk or impact of spreading disease.  These types of movements are not the focus of the NAIS and, therefore are not reportable animal movement events.  While risk of exposure to a disease and its spread is certainly possible for any movement (including local county fairs, parades, etc.), because these events are more localized, they have less potential impact on the spread of a disease than events where animals travel greater distances.  From a disease standpoint, it would be unnecessary to report animal movements in such low-risk/impact situations. [10]

---

[10] Producers should check with their respective State and/or local animal health authority on existing requirements for animal movement reporting that are currently in place at that level and are not affected by NAIS.

# REPORTABLE ANIMAL MOVEMENTS

The NAIS Species Working Groups, in collaboration with animal health officials, are developing recommendations for the specific types of movement that pose the greatest potential to impact the spread of diseases for each species and should be reported to an animal tracking database.  The following chart provides a preliminary list of animal movement examples and the importance of reporting such events to an animal tracking database.  The intent of this chart is to establish guidelines for what types of movements should be reported to ensure an effective system evolves, while, at the same time, remaining practical for stakeholders to participate in.

Again, participation in NAIS—including the animal tracing component—is voluntary at the Federal level.  If producers choose to participate in the animal tracing component in the future, it will be an available option when they are ready.

| Animal Movement/Reporting Scenarios | | |
|---|---|---|
| **Type of Movement** | **Relative Reporting Importance** | **Explanation** |
| A private sale of an animal—for example, moving an animal from its birth premises to another premises operated by another person who frequently markets and moves other animals in and out of that premises | High | When an animal moves from its birth premises to another, the potential for disease spread warrants the reporting of the movement and provides an essential record to respond to a disease outbreak. |
| Selling animals through a public market or auction | High | Reporting the movement of animals that move through a market facility is important since animals come from numerous premises and the animal may also relocate to many different premises. |
| Participation of animals at regional or national exhibitions and/or sporting events | High | Large shows, particularly when animals come from long distances, are of merit for reporting those related movements.  Animal movements to events at a State level, and more so, regional and national events are of value to report. |
| Participation of animals at local exhibitions and/sporting events | Low | The probability of exposure to and spread of a disease at local fairs is a real possibility.  However, since the disease in such cases is more localized, the movement of animals to local fairs is not considered reportable movement.  Nevertheless, the use of health papers with premises registration, along with official individual animal identification, of some species is appropriate, warranted, and commonly practiced. |

| Animal Movement/Reporting Scenarios | | |
|---|---|---|
| Type of Movement | Relative Reporting Importance | Explanation |
| Moving an animal from its birth premises direct to custom butcher | Not applicable | If the animal is moving from its birthplace to custom slaughter for one's personal use, the animal movement does not need to be reported, since this type of movement poses minimal risk of disease exposure or spread (and the animal does not need to be identified with an AIN device).<br><br>Owners of the animals that intend to resell or distribute the products need to follow State regulations regarding such practices. |
| Participation in a local trail ride | Low | Local trail rides are not considered a necessary reportable movement.  While the exposure to disease and possibility of disease spread exist, the effect would be more local and thus have less impact. |
| Animals moved within the operation or premises—for example, from one pasture to another | Not Applicable | Animals that move within the same premises—for example, moving close-up bred heifers from the heifer lots to the free stall barn, or moving the cow herd from one pasture to another—do not need to be reported since these types of movements are considered within the operation management movements.  The entire operation is considered a single premises during a disease outbreak. |
| *All movements pose some risk related to exposure to or spread of disease.  The movements associated with the potential of having a "high" impact on the spread of a disease are considered "reportable movements" within the context of NAIS.  However, any movement may be reported if the producer/owner so desires.* | | |

Again, it must be noted that, if certain animal disease issues are present in a given geographic area, the reporting of animal movement becomes more critical and may vary during the period when greater monitoring of the disease is being administered by animal health officials.

The instructions on how to report animal movements will vary depending on the animal tracking database (ATD) chosen by the producer.  If producers elect to participate when the ATDs become operational, they are encourage to have reportable movements reported within 24 hours or by the close of the next business day.

IMPORTANT:  Producers should consult with State or local animal health officials when uncertain about the justification or need to report an intrastate animal movement.

## ADDITIONAL COMMENT REGARDING REPORTABLE ANIMAL MOVEMENTS

As noted earlier in this document, the Species Working Groups' recommendations are made available on USDA/APHIS' Animal Identification Web site at www.usda.gov/nais.

Stakeholder feedback has been a valuable tool throughout the development of NAIS.  Species Working Groups provide recommendations and reports to the NAIS Subcommittee—made up of industry, State, and Federal representatives.  The NAIS Subcommittee (1) provides overall program recommendations, based on the Species Working Group reports; (2) reviews/acts on the reports; and (3) reports to the Secretary's Advisory Committee on Foreign Animal and Poultry Diseases.  This structure helps ensure that stakeholder feedback is heard and considered throughout the development and implementation of the program.

## ADDITIONAL PRODUCER GUIDANCE

Animal diseases can affect producers with operations of all sizes.  Swiftly moving, highly contagious diseases such as highly pathogenic avian influenza and exotic Newcastle disease can harm producers, regardless of the number of animals they have.  Diseases can spread through a variety of sources — human contact, tainted food or water supplies, insects, airborne viruses, or migratory birds — and the number of animals, their source(s), the location of the event, and the health status and certification of animals all influence the potential for disease spread.  The spread of disease can affect all types and sizes of producer operations.

APPENDIX

# AVIC CONTACT LIST

**Alabama**
Dr. O. W. Hester
USDA, APHIS, VS
Beard Office Building (Packages)
1445 Federal Drive, Room 218
P.O. Box 70429 (Letters)
Montgomery, AL 36107
(334) 223-7141, 47, 48
Fax (334) 223-7352
Owen.Hester@usda.gov

**Alaska**
Dr. Gary L. Brickler
USDA, APHIS, VS
2604 12th Court, SW, Suite B
Olympia, WA 98502
(360) 753-9430
Fax (360) 753-9585
Gary.L.Brickler@usda.gov

**Arizona**
Dr. Hortentia Harris
USDA, APHIS, VS
1400 E. Southern Ave., Suite 245
Tempe, AZ 85282
(480) 491-1002
Fax (480) 491-1895
Hortentia.D.Harris@usda.gov

**Arkansas**
VACANT
USDA, APHIS, VS
1200 Cherry Brook Dr., Suite 300
Little Rock, AR 72211
(501) 224-9515
Fax (501) 225-5823
VSAR@usda.gov

**California**
Dr. Kevin P. Varner
USDA, APHIS, VS
10365 Old Placerville Road, Suite 210
Sacramento, CA 95827-2518
(916) 854-3950
Fax (916) 363-3919
VSCA@aphis.usda.gov

**Colorado**
Dr. Roger Perkins
USDA, APHIS, VS
755 Parfet Street, Suite 136
Lakewood, CO 80215
(303) 231-5385
Fax (303) 231-5390
Roger.Perkins@usda.gov

**Florida**
Dr. Robert E. Southall
USDA, APHIS, VS
7022 NW 10th Place
Gainesville, FL 32605-3147
(352) 333-3120
Fax (352) 333-6849
VSFL@aphis.usda.gov

**Georgia**
Dr. Edgardo Arza
USDA, APHIS, VS
1498 Klondike Rd., Suite 200
Conyers, GA 30094
(770) 922-7860
Fax (770) 483-9000
VSGA@aphis.usda.gov

**Hawaii**
Dr. Gary L. Brickler
USDA, APHIS, VS
2604 12th Court, SW, Suite B
Olympia, WA 98502
(360) 753-9430
Fax (360) 753-9585
Gary.L.Brickler@usda.gov

**Idaho**
Dr. Cynthia Gaborick
USDA, APHIS, VS
9158 West Black Eagle Drive
Boise, ID 83709
(208) 378-5631
Fax (208) 378-5637
Cynthia.M.Gaborick@usda.gov

USDA Area Veterinarians In Charge (AVIC) Contact List

**Illinois**
Dr. Lennis Knight
USDA, APHIS, VS
2815 Old Jacksonville Rd., Suite 104
Springfield, IL 62704
(217) 862-6689
Fax (217) 862-6695
Lennis.C.Knight@usda.gov

**Indiana**
Dr. Francisco Collazo Mattei
USDA, APHIS, VS
5685 Lafayette Road, Suite 400
Indianapolis, IN 46254-6158
(317) 290-3300
Fax (317) 290-3311
Francisco.Collazo-Mattei@usda.gov

**Iowa**
Dr. Kevin L. Petersburg
USDA, APHIS, VS
Federal Bldg., Rm. 891
210 Walnut Street
Des Moines, IA 50309
(515) 284-4140
Fax (515)284-4156
Kevin.L.Petersburg@usda.gov

**Kansas**
Dr. David F. Vogt
USDA, APHIS, VS
1947 NW Topeka Blvd., Suite F
Topeka, KS 66608
(785) 270- 1300
Fax (785) 235-1464
David.F.Vogt@usda.gov

**Kentucky**
Dr. Kathleen J. Burda
USDA, APHIS, VS
P.O. Box 399
Frankfort, KY 40602
(502) 227-9651
Fax (502) 223-7121
Kathleen.J.Burda@usda.gov

**Louisiana**
Dr. Joel Goldman
USDA, APHIS, VS
5825 Florida Blvd., Rm 1140
Baton Rouge, LA 70806-9985
(225) 389-0436
Fax (225) 389-0524
Joel.Goldman@usda.gov

**Maryland (DE, DC)**
Dr. Steven N. Finch
USDA, APHIS, VS
1598 Whitehall Road, Suite A
Annapolis, MD 21401
(410) 349-9708
Fax (301) 261-8113
Steven.N.Finch@usda.gov

**Massachusetts (CT, ME, NH, RI, VT)**
Dr. William G. Smith
USDA, APHIS, VS
160 Worcester-Providence Road
Sutton Square Plaza, Suite 20
Sutton, MA 01590-9998
(508) 865-1421, 22
Fax (508) 865-9317
William.G.Smith@usda.gov

**Michigan**
Dr. Reed Macarty
USDA, APHIS, VS
3001 Coolidge Road, Suite 325
East Lansing, MI 48823
(517) 324-5290
Fax (517) 324-5289
Reed.E.Macarty@usda.gov

**Minnesota**
Dr. Michael L. Stine
USDA, APHIS, VS
251 Starkey Street
Bolander Bldg., Suite 229
St. Paul, MN 55107
(651) 290-3691
Fax (651) 228-0654
Michael.L.Stine@usda.gov

**Mississippi**
Dr. Charles P. Nettles
USDA, APHIS, VS
345 Keyway Street
Flowood, MS 39232
(601) 965-4307
Fax (601) 965-5535
Charles.Nettles@usda.gov

**Missouri**
Dr. Robert L. Fischer
USDA, APHIS, VS
P.O. Box 104418
Jefferson City, MO 65110-4418
(573) 636-3116
Fax (573) 636-4384
Robert.L.Fischer@usda.gov

USDA Area Veterinarians In Charge (AVIC) Contact List

**Montana**
Dr. Paul Sciglibaglio
USDA, APHIS, VS
208 North Montana Ave., Suite 101
Helena, MT 59601-3837
(406) 449-2220
Fax (406) 449-5439
Paul.Sciglibaglio@usda.gov

**Nebraska**
Dr. Kathleen Akin
USDA, APHIS, VS
P.O. Box 81866
Lincoln, NE 68501
(402) 434-2300
Fax (402) 434-2330
Kathleen.J.Akin@usda.gov

**Nevada**
VACANT
USDA, APHIS, VS
10365 Old Placerville Road, Suite 210
Sacramento, CA 95827-2518
(916) 854-3950
Fax (916) 363-3919
VSCA@usda.gov

**New Jersey**
Dr. Jonathan Zack
USDA, APHIS, VS
Mercer Corporate Park
320 Corporate Blvd.
Robbinsville, NJ 08691-1598
(609) 259-8387
Fax (609) 259-2477
Jonathan.T.Zack@usda.gov

**New Mexico**
Dr. Michael T. Greenlee
USDA, APHIS, VS
6200 Jefferson Street, NE, Suite 117
Albuquerque, NM 87109
(505) 761-3160
Fax (505) 761-3176
Michael.T.Greenlee@usda.gov

**New York**
Dr. Roxanne Mullaney
USDA, APHIS, VS
500 New Karner Road
2nd Floor
Albany, NY 12205
(518) 869-9007
Fax (518) 869-6135
Roxanne.C.Mullaney@usda.gov

**New York Cont'd**
USDA-APHIS-VS
Dr. Khawaja Ahmad, Supervisory VMO
230-59 International Airport Center Blvd.
Suite 100, Room 101
Jamaica, NY 11413
(718) 553-1727
Fax (718) 553-7543

**North Carolina**
Dr. Eric S. Coleman
USDA, APHIS, VS
930 Main Campus Drive, Suite 200
Raleigh, NC 27606
(919) 855-7700
Fax (919) 855-7720
Eric.S.Coleman@usda.gov

**North Dakota**
Dr. Larry A. Schuler
USDA, APHIS, VS
3509 Miriam Ave., Suite B
Bismarck, ND 58501
(701) 250-4210
Fax (701) 250-4471
Larry.A.Schuler@usda.gov

**Ohio**
Dr. Susan Skorupski
USDA, APHIS, VS
12927 Stonecreek Drive
Pickerington, OH 43147
(614) 469-5602
Fax (614) 866-1086
Susan.Skorupski@usda.gov

**Oklahoma**
Dr. Burke L. Healey
USDA, APHIS, VS
4020 North Lincoln Blvd., Suite 101
Oklahoma City, OK 73105
(405) 427-9413
Fax (405) 427-9451
Burke.L.Healey@aphis.usda.gov

**Oregon**
Dr. Don Herriot
USDA, APHIS, VS
530 Center St., NE, Suite 335
Salem, OR 97301
(503) 399-5871
Fax (503) 399-5607
Don.E.Herriott@usda.gov

USDA Area Veterinarians In Charge (AVIC) Contact List

**Pennsylvania**
Dr. Gary Ross
USDA, APHIS, VS
2301 N. Cameron St., Rm. 412
Harrisburg, PA 17110
(717) 782-3442
Fax (717) 782-4098
Gary.Ross@aphis.usda.gov

**Puerto Rico (Virgin Islands)**
Dr. Miguel A. Borri-Diaz
USDA, APHIS, VS
IBM Building
654 Munoz Rivera Avenue, Suite 700
Hato Rey, PR 00918
(787) 766-6050
Fax (787) 766-5159
Miguel.A.Borri-Diaz@usda.gov

**South Carolina**
Dr. Delorias Lenard
USDA, APHIS, VS
9600 Two Notch Road, Suite 10
Columbia, SC 29229
(803) 788-1919
Fax (803) 788-2102
Delorias.M.Lenard@usda.gov

**South Dakota**
Dr. Lynn. A. Tesar
USDA, APHIS, VS
314 S. Henry, Suite 100
Pierre, SD 57501-0640
(605) 224-6186
Fax (605) 224-8451
Lynn.A.Tesar@usda.gov

**Tennessee**
Dr. Allen M. Knowles
USDA, APHIS, VS
P.O. Box 110950
Nashville, TN 37222
(615) 781-5310
Fax (615) 781-5309
Allen.M.Knowles@usda.gov

**Texas**
Dr. Paul O. Ugstad
USDA, APHIS, VS
Thornberry Bldg., Rm. 220
903 San Jacinto Blvd.
Austin, TX 78701
(512) 383-2400
Fax (512) 916-5197
VSTX@aphis.usda.gov

**Utah**
Dr. Robert A. DeCarolis
USDA, APHIS, VS
176 N. 2200 West, Suite 230
Airport Park, Bldg. #4
Salt Lake City, UT 84116
(801) 524-5010
Fax (801) 524-6898
VSUT@usda.gov

**Virginia**
Dr. Terry L. Taylor
USDA, APHIS, VS
Federal Building
400 North 8th Street, Room 726
Richmond, VA 23240
(804) 343-2560
Fax (804) 343-2599
Terry.L.Taylor@usda.gov

**Washington**
Dr. Gary L. Brickler
USDA, APHIS, VS
2604 12th Court, SW, Suite B
Olympia, WA 98502
(360) 753-9430
Fax (360) 753-9585
Gary.L.Brickler@usda.gov

**West Virginia**
Dr. Susan Skorupski
USDA, APHIS, VS
12927 Stonecreek Drive
Pickerington, OH 43147
(614) 469-5602
Fax (614) 866-1086
Susan.Skorupski@usda.gov

**Wisconsin**
Dr. Thomas J. Varty
USDA, APHIS, VS
6510 Schroeder Road, Suite 2
Madison, WI 53711
(608) 270-4000
Fax (608) 270-4001
Thomas.J.Varty@aphis.usda.gov

**Wyoming**
Dr. Bret A. Combs
USDA, APHIS, VS
5353 Yellowstone Road, Room 209
Cheyenne, WY 82009
(307) 772-2186
Fax (307) 772-2592
Bret.A.Combs@usda.gov

# STATES, TERRITORIES, AND TRIBES CONTACT LIST

*NOTE: The following contacts are up to date as of March 2007. Future updates will be provided as needed and posted to the USDA/APHIS Animal Identification Web site.*

## STATES

**Alabama**
Alabama Department of Agriculture & Industries
Contact: Dr. Tony Frazier (AL State Veterinarian/
Animal ID Coordinator), stvet@agi.state.al.us
Address: P.O. Box 3336
Montgomery, AL 36109-0336
Phone: (334) 240-7253 / FAX: (334) 240-7198
Email: animalid.premises@agi.alabama.gov
Web: www.agi.alabama.gov/state_veterinarian

**Alaska**
Alaska Department of Environmental Conservation
Division of Environmental Health
Contact: Minnie Keller (Animal ID Coordinator)
Address:5251 Hinkle Road
Anchorage, AK 99507
Phone: (907) 375-8215 / FAX: (907) 929-7335
Web: www.dec.state.ak.us/eh/vet/nais.htm

**Arizona**
Arizona Department of Agriculture
Contact: Jim Meggs (Project Coordinator)
jmeggs@azda.gov
Address: 1688 West Adams
Phoenix, AZ 85007
Phone: (602) 542-0943
Web: www.azda.gov/Main/animalID.htm

**Arkansas**
Arkansas Livestock & Poultry Commission
Contact: Phil Wyrick (Executive Director)
pwyrick@arlpc.org
Charles W. Gann (Animal ID Coordinator)
cwgann@arlpc.org
Address: #1 Natural Resources Drive
Little Rock, AR 72205
Phone: (501) 907-2400 / FAX: (501) 907-2425
Web: www.arlpc.org

**California**
California Department of Food and Agriculture
Animal Health Branch
Contact: Victor J. Velez, MS
pais@cdfa.ca.gov
Address: 1220 N Street, Room A-107
Sacramento, CA 95814
Phone: (916) 654-1264 / FAX: (916) 653-2215
Web: www.cdfa.ca.gov/pais

**Colorado**
Colorado Department of Agriculture
Animal Industry
Contact: John Heller (Animal ID Coordinator)
john.heller@ag.state.co.us
Address: 700 Kipling St., Suite 4000
Lakewood, CO 80215
Phone: (303) 239-4516 / FAX: (303) 239-4164
Web: www.COanimalid.org

**Connecticut**
Connecticut Department of Agriculture
Contact: Dr. Mary Lis (CT State Veterinarian/
Animal ID Coordinator), mary.lis@po.state.ct.us
Address: 165 Capitol Avenue, Room G-8A
Hartford, CT 06106
Phone: (860) 713-2505 / FAX: (860) 713-2515
Web: www.ct.gov/doag

**Delaware**
Delaware Department of Agriculture
Contact: Robert Moore, robert.moore@state.de.us
Address: 2320 South Dupont Highway
Dover, DE 19901
Phone: (302) 739-4811 / FAX: (302) 697-4451

**Florida**
Florida Department of Agriculture and
Consumer Services Division of Animal Industry
Contact: Dr. Dianne Kitchen, D.V.M., Ph.D.
(Veterinarian Manager, Bovine Programs)
kitched@doacs.state.fl.us
Address: 407 South Calhoun Street, Mail Stop M-7
Tallahassee, FL 32399-0800
Phone: (850) 410-0940 / FAX: (850) 410-0957
Web:www.doacs.state.fl.us/ai/adc/adc_nais.shtml
Registration Help Desk: animalid@doacs.state.fl.us

**Georgia**
Georgia Department of Agriculture
Contact: Dr. Lee M. Myers (GA State Veterinarian)
lmyers@agr.state.ga.us
Dr. Carter Black (Animal ID Coordinator)
cblack@agr.state.ga.us
Address: 19 MLK Jr. Drive, Atlanta, GA 30334
Phone: (404) 656-3671 / FAX: (404) 657-1357
Web: http://agr.georgia.gov/00/article/
0,2086,38902732_0_41051091,00.html

States, Territories, and Tribes Contact List

**Hawaii**
Hawaii Department of Agriculture
Animal Industry Division
Contact: Dr. James Foppoli (HI State Veterinarian)
james.m.foppoli@hawaii.gov
Dr. Raquel Wong (Vet. Medical Officer)
Raquel.L.Wong@hawaii.gov
Address: 99-941 Halawa Valley Street
Aiea, HI 96701
Phone: (808) 483-7103 / FAX: (808) 483-7110
Web: www.hawaiiag.org/hdoa/ai-hapis.htm

**Idaho**
Idaho Department of Agriculture
Contact: Linda Cope (Animal ID Integration Analyst)
lcope@idahoag.us
Address: 2270 Old Penitentiary Road
P.O. Box 790
Boise, ID 83701
Phone: (208) 332-8540 / FAX: (208) 334-4062
Web: http://IdahoID.us

**Illinois**
Illinois Department of Agriculture
Bureau of Animal Health
Contact: Jim Kunkle
Jim.kunkle@illinois.gov
Address: State Fairgrounds
P.O. Box 19281
Springfield, IL 62794
Phone: (217) 785-4740 / FAX: (217) 558-6033
Web: www.agr.state.il.us/premiseid

**Indiana**
Indiana State Board of Animal Health
Contact:  All Staff
Address: 805 Beachway Drive, Suite 500
Indianapolis, IN 46224
Phone: (317) 227-0300
Web: www.in.gov/boah/premiseid/

**Iowa**
Iowa Department of Agriculture and
Land Stewardship Animal Industry
Contact: Steve White (Animal ID Coordinator)
idals_id@idals.state.ia.us
Address: Wallace Building, 502 E. 9th St.
Des Moines, IA 50319
Phone: 1-888-778-7675 (toll free) / (515) 281-5305
FAX: (515) 281-4282
Web: www.agriculture.state.ia.us/premiseID.htm

**Kansas**
Kansas Animal Health Department
Contact: George Teagarden
(Livestock Commissioner)

gteagarden@kahd.ks.gov
Teresa Stephens (Animal ID Coordinator)
tstephens@kahd.ks.gov
Address: 708 S Jackson
Topeka, KS 66603-3714
Phone: (785) 296-2326 / FAX: (785) 296-175
Web: www.kansas.gov/kahd

**Kentucky**
Kentucky Department of Agriculture
Contact: Dr. Robert C. Stout (KY State Veterinarian)
robert.stout@ky.gov
Tim Turney (Director, Division of Producer Services)
tim.turney@ky.gov
Dana Jenkins (Asst., Division of Producer Services)
dana.jenkins@ky.gov
Address: 100 Fairoaks Lane, Suite 252
Frankfort, KY 40601
Phone: (502) 564-3956 / FAX: (502) 564-7852
Web: www.kyagr.com/statevet/nais/index.htm

**Louisiana**
Louisiana Department of Agriculture and Forestry
Office of Animal Health Services
Contact: Dr. M.A. Littlefield-Chabaud
(LA Asst. State Veterinarian)
PremiseID@ldaf.state.la.us
Address: 5825 Florida Blvd., P.O. Box 1951
Baton Rouge, LA 70806
Phone: (888) 773-6489 / FAX: (225) 925-4103
Web: www.ldaf.state.la.us/divisions/ahs/premises.asp

**Maine**
Maine Department of Agriculture
Division of Animal Health & Industry
Contact: Judy Perry (Animal ID Coordinator)
judy.h.perry@maine.gov
Phone: (207) 287-4507 / FAX: (207) 624-7548
Address: 28 State House Station
Augusta, ME 04333-0028
Web: www.maine.gov/agriculture/idme/

**Maryland**
Maryland Department of Agriculture
Contact: Dr. Thomas Jacobs (MD Asst. State
Veterinarian), jacobst@mda.state.md.us
Marilyn Bassford, bassfoml@mda.state.md.us
Address: 50 Harry S. Truman Parkway
Annapolis, MD 21401
Phone: (410) 841-5810 / FAX: (410) 841-5999
Web: www.mda.state.md.us/animal_health/
nais/index.php

**Massachusetts**
Massachusetts Department of Agricultural Resources
Contact:  Mike Cahill, michael.cahill@state.ma.us

Joao Tavares, joao.tavares@state.ma.us
Address: 251 Causeway St., 5th Floor
Boston, MA 02114
Web: http://www.mass.gov/agr/
animalhealth/nais/index.htm

**Michigan**
Michigan Department of Agriculture
Contact: Kevin Kirk (Special Asst. to the Director)
KirkK@michigan.gov
Address: P.O. Box 30017
Lansing, MI 48909
Phone: (517) 373-1077 / FAX: (517) 373-6015
Web: www.michigan.gov/mda/0,1607,7-125-
1568_2390_41314---,00.html

**Minnesota**
Minnesota Board of Animal Health
Contact: Ted Radintz (Animal Health Response
Outreach Coordinator), Ted. Radintz@state.mn.us
Address: 625 Robert Street North
St. Paul, MN 55155
Phone: (651) 201-6816 / FAX: (651) 296-7417
Web: www.bah.state.mn.us/index/nais/nais.htm

**Mississippi**
Mississippi Department of Agriculture
Contact: Dr. James Watson (MS State Veterinarian/
Animal ID Coordinator), jimw@mdac.state.ms.us
Address: 121 North Jefferson Street
Jackson, MS 39201
Phone: (601) 359-1170 / FAX: (601) 359-1177
Web: www.mbah.state.ms.us

**Missouri**
Missouri Department of Agriculture
Animal Health Division
Contact: Dr. Steven Goff (Deputy Division Director)
steve.goff@mda.mo.gov
Address: 1616 Missouri Blvd., P.O. Box 630
Jefferson City, MO 65102-0630
Phone: (573) 751-2540 / FAX: (573) 751-6919
Web: http://www.mda.mo.gov/animalID/index.html

**Montana**
Montana Department of Livestock
Contact: Dr. Jeanne Rankin (MT Acting State Vet.)
Ms. Bernice Rader (NAIS Contact)
Address: P.O. Box 202001
Helena, MT 59620-2001
Phone: (406) 444-2043 / FAX: (406) 444-1929
Web: www.discoveringmontana.com/liv/
animalhealth/NAIS/NAIS.asp

**Nebraska**

Nebraska Department of Agriculture
Bureau of Animal Industry
Contact: Dr. Dennis Hughes (NE State Veterinarian)
Steve Martin (Program Director)
Address: P.O. Box 94787
Lincoln, NE 68509-4787
Phone: (800) 572-2437
Email: helpdesk@agr.state.ne.us
Web: www.animalid.us

**Nevada**
Nevada Department of Agriculture
Contact: Holly Pecetti (Animal ID
Coordinator/Program Officer I)
hpecetti@agri.state.nv.us
Address: 350 Capitol Hill Ave.
Reno, NV 89502
Phone: (775) 688-1180 ext. 236
Web: http://agri.nv.gov/Animal2_NAIS.htm

**New Hampshire**
New Hampshire Department of Agriculture,
Markets & Food
Contact: All Staff
Address: P.O. Box 2042
Concord, NH 03302-2042
Phone: (603) 271-2404 / FAX: (603) 271-1109
Web: www.nh.gov/agric/divisions/animal_industry/
documents/NHVoluntaryNAISform.pdf

**New Jersey**
New Jersey Department of Agriculture
Division of Animal Health
Contact: Dr. Sebastian Reist, NJNAIS@ag.state.nj.us
Address: P.O. Box 330, Trenton, NJ 08625
Phone: (609) 292-3965
Web: www.state.nj.us/agriculture/divisions/
ah/prog/animalid.html

**New Mexico**
New Mexico Livestock Board
Contact: Dr. Dave Fly (NM State Veterinarian)
Dave.Fly@state.nm.us
Address: 300 San Mateo NE, Suite 1000
Albuquerque, NM 87108
Phone: (505) 841-6161 / FAX: (505) 841-6160
Web: www.livestocktrust.com

**New York**
State of New York Department of Agriculture
and Markets, Division of Animal Industry
Contact: Sarah Blood
Sarah.Blood@agmkt.state.ny.us
Address: 10B Airline Drive, Albany, NY 12235
Phone: (518) 457-3502 / FAX: (518) 485-7773
Web: www.agmkt.state.ny.us/AI/AIHome.html

States, Territories, and Tribes Contact List

**North Carolina**
North Carolina Department of Agriculture and
Consumer Services
Contact: Dr. Eileen Langdon, DVM
(NCFarm ID Director)
NCFarmID@ncmail.net
Address: NCDA&CS, Veterinary Division
1030 Mail Service Center
Raleigh, NC 27699-1030
Phone: (919) 715-2951 / FAX: (919) 733-6431
Web:www.NCFarmID.com

**North Dakota**
State Board of Animal Health
North Dakota Department of Agriculture
Contact: Dr. Susan Keller (ND State Veterinarian)
skeller@state.nd.us
Dr. Jim Clement (Animal ID Coordinator)
jclement@state.nd.us
Address: 600 E Boulevard, Dept. 602
Bismarck, ND 58505-0020
Phone: (701) 328-2655 / FAX: (701) 328-4567
Web: www.agdepartment.com/Programs/
Livestock/BOAH/BOAH.html

*For cattle, horses, and mules, producers can also
contact:*

North Dakota Stockmen's Association
Contact: Wade Moser, ndsa@ndstockmen.org
Address: 407 South 2nd Street
Bismarck, ND 58504
Phone: (701) 223-2522 / FAX: (701) 223-2587
Web: www.ndstockmen.org/

**Ohio**
Ohio Department of Agriculture,
Division of Animal Industry
Contact: Gary Wilson (Coordinator)
gwilson@mail.agri.state.oh.us
Address: 8995 East Main Street
Reynoldsburg, OH 43068
Phone: (614) 728-6220 / FAX: (614) 728-6310
Web: www.ohioanimalid.com
Help Desk: animalid@mail.agri.state.oh.us

**Oklahoma**
Oklahoma Department of Agriculture, Food
and Forestry
Contact: Brad Klaassen (Animal ID Coordinator)
Brad.Klaassen@oda.state.ok.us
Address: 2800 N. Lincoln Blvd.
Oklahoma City, OK 73152-8804
Phone: (405) 522-6138 / FAX: (405) 522-0756
Cell:  (405) 684-3821

Web: www.oda.state.ok.us/ais-naishome.htm
**Oregon**
Oregon Department of Agriculture
Contact: Dr. Don Hansen (OR State Veterinarian)
dhansen@oda.state.or.us
Gini Morgart (Office Manager)
gmorgart@oda.state.or.us
Address: 635 Capitol Street NE
Salem, OR 97301-2532
Phone: (503) 986-4680
Web: http://egov.oregon.gov/ODA/
AHID/animal_health/national_id.shtml

**Pennsylvania**
Pennsylvania Department of Agriculture
Contact: Ronald C. Miller
ronmiller@state.pa.us
Address: 2301 North Cameron Street, Rm. 408
Harrisburg, Pennsylvania 17110
Phone: (717) 772-2852 / FAX: (717) 787-1868
Web: www.animalhealth.state.pa.us

**Rhode Island**
Rhode Island Department of Environmental
Management Division of Agriculture
Contact: Dr. Peter Bellinsky (RI State Public Health
Veterinarian)
peter.belinsky@dem.ri.gov
Eugene Pepper
gpepper@dem.state.ri.us
Address: 235 Promenade Street, Room 370
Providence, RI 02908
Phone: (401) 222-2781 / FAX: (401) 222-6047

**South Carolina**
Animal Health Programs, Clemson University
Contact: Dr. Boyd H. Parr (Designated ID
Coordinator/Director, Animal Health Programs)
bparr@clemson.edu or idinfo@clemson.edu
Address: P.O. Box 102406
Columbia, SC 29224-2406
Phone: (803) 788-2260 ext. 231
FAX: (803) 736-0885
Web: www.clemson.edu/LPH/nais.htm

**South Dakota**
South Dakota Animal Industry Board
Contact: Dr. Sam Holland (South Dakota State
Veterinarian)
Dr. Susan Reenders (Animal ID Coordinator)
Address: 411 South Fort St., Pierre, SD 57501
Phone: (605) 773-3321
Web: www.state.sd.us/aib/Animal%20ID.htm

**Tennessee**
Tennessee Department of Agriculture

States, Territories, and Tribes Contact List

Ellington Agriculture Center
Contact: Dr. Ron Wilson (TN State Veterinarian)
**Tennessee Cont'd**
ron.wilson@state.tn.us
Dr. Charles Hatcher (Animal ID Coordinator)
charles.hatcher@state.tn.us
Jennifer Bowers (Secretary)
Address: 440 Hogan Road
Nashville, TN 37220
Phone: (615) 837-5183 (Dr. Hatcher)
(615) 837-5189 (Ms. Bowers)
FAX: (615) 837-5250
Web: www.state.tn.us/agriculture/tpis/

**Texas**
Texas Animal Health Commission
Contact: Dr. Bob Hillman (TX State Veterinarian)
bhillman@tahc.state.tx.us
Mr. Kenny Edgar (Animal ID Coordinator)
kedgar@tahc.state.tx.us
Address: P.O. Box 12966
Austin, TX 78711
Phone: (512) 719-0700 / FAX: (512) 719-0719
Email: comments@tahc.state.tx.us
Web: www.tahc.state.tx.us/animal_id/index.shtml

**Utah**
Utah Department of Agriculture and Food,
Livestock Identification Bureau
Contact: Terry Menlove (Bureau Chief, Livestock
Identification), tmenlove@utah.gov
Address: P.O. Box 146500
350 North Redwood Road
Salt Lake City, UT 84114-6500
Phone: (801) 538-7166 / FAX: (801) 538-7169
Web: http://ag.utah.gov/animind/Utah_NAIS.html

**Vermont**
Vermont Agency of Agriculture
Contact: Dr. Kerry A. Rood (VT State Veterinarian/
Animal ID Coordinator), drrood@agr.state.vt.us
Address: 116 State Street, Drawer 20
Montpelier, VT 05620
Phone: (802) 828-2421 / FAX: (802) 828-5983
Web: www.vermontagriculture.com/fscp/
animalHealth/prs/prs.html

**Virginia**
Virginia Department of Agriculture and
Consumer Services
Contact: Richard Odom
Animal ID Coordinator
Address: 102 Governor Street, Suite 146
Richmond, VA  23219
Phone: (804) 692-0600
Questions about Premises Registration:

Dawn Hunter
Animal ID Support Technician
Phone: 540-434-3917
Email: prem.id@vdacs.virginia.gov
Web: http://www.VAnimalID.info

**Washington**
Washington State Department of Agriculture
Contacts: Julie Broome, jbroome@agr.wa.gov
Phone: 360-725-5493 or 360-902-1836
Dr. Leonard Eldridge (WA State Veterinarian)
LEldridge@agr.wa.gov / Phone: (360) 902-1881
Web: http://agr.wa.gov/FoodAnimal/
Animal_Premise/default.htm

**West Virginia**
West Virginia Dept of Agriculture
Animal Health Division
Contact: Melissa Garrett (State Animal ID Coord.)
mgarrett@ag.state.wv.us
Dr. L. Joe Starcher (WV State Veterinarian)
jstarcher@ag.state.wv.us
Address: 1900 Kanawha Blvd. East
Charleston, WV 25305
Phone: (304) 558-2214 / (toll free) 1-866-844-2214
Web: www.wvagriculture.org/programs/Animal/
Animal%20ID.html%20

**Wisconsin**
Wisconsin Department of Agriculture, Trade and
Consumer Protection
Contact: Paul McGraw
paul.mcgraw@datcp.state.wi.us
Phone: (608) 224-4884
Susan Buroker
susan.buroker@datcp.state.wi.us
Phone: (608) 224-4740
Address: P.O. Box 8911, Madison, WI 53708
Web:www.datcp.state.wi.us/premises/index.jsp

**Wyoming**
Wyoming Livestock Board
Contact: Lee Romsa (Brand Commissioner)
lromsa@state.wy.us
Address: 2020 Carey Avenue, 4th Floor
Cheyenne, WY 82002
Phone: (307) 777-6443 / FAX: (307) 777-6561
Web: http://wlsb.state.wy.us/brands/Premises/

# TERRITORIES

**Puerto Rico**
Puerto Rico Department of Agriculture
Office of Veterinary Services

Veterinary Diagnostic Laboratory
Contact: Dr. Hector J. Diaz-Collazo
Hector.Diaz-Collazo/pr/aphis/usda@usda.gov
Address: P.O. Box 490
Bo. Higuillar, Dorado, PR 00646
Phone: (787) 796-1650 / FAX: (787) 392-3305
**Guam**
Guam Department of Agriculture
Address: 192 Dairy Road
Mangilao, Guam 96923
Phone: (671) 734-3942 / FAX: (671) 734-6569

# TRIBES

**Blackfeet Nation**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Crow Tribe**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Eastern Shoshone Tribe**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Fort Peck Assiniboine and Sioux Tribes**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Ft. Belknap Indian Community**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Hopi Tribe**
Contact: Priscilla Pavatea, Director
ppavatea@hopi.nsn.us
Address: Office of Range Management
P.O. Box 123
Kykotsmovi, AZ 86039
Phone: (928) 734-3701

Contact: Pam Komalestewa, Supervisor
pamlalokomalestewa@yahoo.com

Address: Hopi Veterinary Services
P.O Box 440
Polacca, AZ 86042
Phone: (928) 738-5251

**InterTribal Bison Cooperative**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Navaho Nation**
Navaho Nation Veterinary Staff
Contact: Program Veterinary Staff
glendadavis@navaho.org
scottbender@navaho.org
kellyupshaw@navaho.org
Address: P.O. Box 1450
Window Rock, AZ 86515
Phone: (928) 871-6615 / FAX: (928) 871-6679
Web: www.livestocktrust.com

**Northern Arapahoe Tribe**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Northern Cheyenne Tribe**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406-) 353-4653

**Osage Nation**
Contact: Diane Daniels (ddaniels@osagetribe.org)
Phone: (918) 287-5404

**Rosebud Sioux Tribe**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**San Carlos Apache Tribe**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Seminole Tribe**
Contact: Dr. Diane L. Kitchen, D.V.M., Ph.D.
Veterinarian Manager, Bovine Programs
kitched@doacs.state.fl.us
Address: Florida Department of Agriculture
and Consumer Services

States, Territories, and Tribes Contact List

Division of Animal Industry
407 South Calhoun Street, Mail Stop M-7
Tallahassee, FL 32399-0800
Phone: (850) 410-0940 / FAX: (850) 410-0957
Web:  www.doacs.state.fl.us/ai

**Shoshone-Paiute Tribes of Duck Valley**
Contact: Dr. Marilyn Simunich
msimunich@idahoag.us
Address: Idaho State Department of Agriculture
Division of Animal Industries
2270 Old Penitentiary Road
P.O. Box 790
Boise, ID 83701
Phone: (208) 332-8540 / FAX: (208) 334-4062

**Ute Tribe Agriculture Products, LLC**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

**Ute Mountain Tribe**
Web: www.livestocktrust.com

**Yomba Shoshone Tribe**
Contact: Juanita Cole (Jcole_59524@yahoo.com)
Address: Fort Belknap Indian Community
RR1 Box 66, Harlem, MT 59526
Phone: (406) 353-8333 / FAX: (406) 353-4653

Sample Premises Registration Form

**NAIS PREMISES REGISTRATION**
ND DEPARTMENT OF AGRICULTURE
STATE BOARD OF ANIMAL HEALTH
SFN 54250    (2-05)

600 E. Boulevard Ave, Dept 602
Bismarck, ND 58505-0020
(701) 328-2350
1-800-242-7535
FAX (701) 328-4567
Dr. Jim Clement - jcclement@state.nd.us
Becki Bass - rbass@state.nd.us

**For Official Use Only**
Account Number: _____
Premises Number: _____

**Premises or Business/Farm/Ranch Account Information**
This is the contact information for your livestock business entity. This may be different than the location where the animals are kept.

Business/Farm Name

Business/Farm Mailing Address

| City | State | Zip Code | County |
|---|---|---|---|

Business Telephone | Business Email

**Primary Contact:** First Name | Middle Name | Last Name

Telephone Number | Fax Number or Email

**Secondary Contact:** First Name | Middle Name | Last Name

Telephone Number | Fax Number or Email

Business Type - Optional (for indemnity purposes only)
☐ Individual ☐ Limited Liability Corporation ☐ Non-profit Organization
☐ Partnership ☐ Limited Liability Partnership ☐ Incorporated

Operation Type: (check all that apply)
☐ Producer Unit/Farm/Ranch ☐ Clinic ☐ Exhibition ☐ Quarantine Facility
☐ Market/Collection Point ☐ Port of Entry ☐ Tagging site ☐ Slaughter Plant
☐ Non-producer Participant ☐ Rendering ☐ Laboratory

Species at Premises (check all that apply)
☐ Cattle ☐ Bison ☐ Sheep ☐ Goats ☐ Emu ☐ Poultry
☐ Swine ☐ Horses ☐ Llama ☐ Deer & Elk ☐ Other

**Premises Information (if different than account information):**
Premises Name/Description: (Primary location where animals are housed. i.e. farm/ranch/headquarters, feedlot)

Premises Address

| City | State | Zip Code | County |
|---|---|---|---|

Legal Land Description: Township | Range | Section

Name | Telephone Number | Fax Number or Email

Comments:

Producer/Contact Signature | Date

# GLOSSARY

**Animal Identification Number (AIN):**  Ultimately, the Animal Identification Number will be the sole national numbering system for the official identification of individual animals in the United States. The format contains 15 digits: the first three are the country code (840 for the United States), and the following 12 digits are the animal's national number.

**AIN Management System:**  The AIN Management System (AINMS) is a Web-based system maintained by USDA/APHIS to maintain a record of authorized AIN devices and the allocation of AINs to manufacturers of AIN devices.

**AIN Device Distribution Database:**  Information systems, maintained by private entities and States, that will contain the records of what AINs are distributed to a premises.  AIN device distribution databases will be integrated with the NAIS through the Animal Trace Processing System (ATPS) to provide information to Animal Health Officials when responding to animal disease issues.

**AIN Device:**  Official, animal identification devices that have an AIN printed and/or encoded on them.

**AIN Device Manager:**  An entity that represents an AIN device manufacturer for the distribution of AIN devices. The AIN Device Manager agrees to validate the premises number of the receiving premises or non-producer participant and report the AINs they ship or deliver to an AIN Device Distribution Database.

**AIN Device Manufacturer:**  A company that is authorized by USDA/APHIS to receive AINs, produce AIN devices and agrees to report the distribution of AIN devices to the AINMS.

**Animal Trace Processing System (ATPS):**  Provides the technology solution to interact with multiple Animal Tracking Databases (ATDs). The ATPS provides the information technology platform for security, electronic data transfer, and auditing processes.

**Animal Tracking Database (ATD):**  Information systems, maintained by private entities or States, that will contain information related to the locations of a subject animal and the records of other animals that the subject animal came into contact with at each premises.  ATDs will be integrated with the NAIS through the Animal Trace Processing System (ATPS) to provide information to Animal Health Officials when responding to animal disease issues.

**Commingle:**  Refers to events where animals are mixed or brought together with animals from other farms, ranches, or other production systems.

**Country Code:**  A 3-digit numeric code representing the name of a country in accordance with ISO 3166.

**Emerging Diseases:**  From time to time, diseases or disease syndromes are identified by livestock producers, veterinarians, and researchers.  These diseases are not on the list of known foreign animal diseases.  They may be diseases that have been present in the United States but not previously considered to be economically significant, or they may be new diseases whose origin is not known.  Examples of emerging diseases include Porcine Respiratory and Reproductive Syndrome (PRRS), Chronic Wasting Disease (CWD), and Johne's Disease.

**Epidemiologic:**  Of or related to the study of the causes, distribution, and control of disease, as well as the factors controlling the presence or absence of a disease or pathogen.

**Group/Lot Identification Number (GIN):**  The number used to identify a unit of animals of the same species that is managed together throughout the pre-harvest production chain.  The GIN consists of a 7-

character Premises Identification Number, a 6-digit representation of the date that the group or lot of animals was assembled and 2-digits (1-99) to reflect the count of groups assembled at the same premises on the same day (MMDDYY01).

**Individual Animal Identification:**  A means of identification that differentiates one animal from another.  Official individual-animal-identification uses APHIS-approved protocols.

**Identification Methods:**  A means of identifying an animal, including ear tags, biometrics, brands and brand inspection records, breed registry certificates, etc.

**Interstate Movement:**  Movement that crosses State lines, regardless of ownership, at either shipping or receiving premises.

**Intrastate Movement:**  Movement within a State that does not meet criteria for being interstate commerce.

**ISO:**  International Organization for Standardization.

**National Premises Information Repository:**  The database maintained by APHIS that stores information from each premises Registration System.

**Non-producer Participant:**  A person or entity who engages in NAIS activity in a designated role/s where that role/s is not associated with a specific premises.  Typical roles include USAIN Manager, AIN Distributor, Animal Health Official, Brand Inspection Entity, Diagnostic Laboratory, etc.  Non-producer participants may provide data to the national identification database.

**Official Identification Devices and Methods:**  Means of officially (approved by the APHIS Administrator) identifying an animal, or group of animals, including, but not limited to official tags, tattoos, and registered brands when accompanied by a certificate of inspection from a recognized brand inspection authority.

**Officially Identified:**  When an official identification number is applied to an animal by means of an identification method or device approved by the APHIS Administrator for purposes related to official disease control programs or animal movements in intrastate, interstate, or international commerce.

**Premises:**  A physical location that represents a unique and describable geographic entity where activity affecting the health and/or traceability of animals may occur. In cases involving non-contiguous properties, the producer/owner should consult with his/her State Animal Health Official or Area Veterinarian in Charge to determine whether there is a need for one or multiple premises numbers.

**Premises Identification Number (PIN):**  A unique, 7-character identification code number assigned by a State or Federal animal health authority to a premises that is, in the judgment of the State or Federal animal health authority, a geographically distinct location from other livestock production units.  The premises identification number is assigned permanently to the geophysical location.

**Premises Number Allocator:**  The APHIS computer program that assigns PINs to a specific location through interfaces with Standardized or Compliant Premises Registration Systems.

**Premises Registration Systems:** The software programs or systems used by States and Tribes to register premises. Compliant premises registration systems meet NAIS data standards and communication security requirements. APHIS validates compliance or noncompliance.

**Radio Frequency Identification (RFID):** An identification device that utilizes radio frequency technology. The RFID device includes ear tags, bolus, implants (injections), and Tag attachments (transponders that work in concert with ear tags).

**Recognized Brand Authorities:** State brand inspection agencies or other brand inspection organizations authorized either by a State or the Grain Inspection, Packers and Stockyards Administration (USDA).

**Standardized Premises Registration System:** The Premises Registration System that APHIS makes available to all States and Tribes.

**Tagging Services:** Authorized tagging service providers are individuals who would come to the producers' premises to apply the AIN tags to the animals on behalf of the owners or persons having possession, care, or control of the animals, if the producers or owners prefer to have their animals tagged by someone else—in particular, if they do not have the capability of doing so themselves.

**Tagging Sites:** Tagging sites are authorized premises that would receive animals that were not identified with approved tags prior to leaving their premises, if the producer could not identify his/her animals. Individuals at the tagging site would apply the AIN tags to the animals on behalf of the owners or persons having possession, care, or control of the animals when the animals are brought to the site.

# A Business Plan to Advance Animal Disease Traceability

## Through the Harmonization of State, Federal, and Industry Programs and Convergence with the National Animal Identification System



# DRAFT
## December 12, 2007

USDA  **United States Department of Agriculture**
**Animal and Plant Health Inspection Service**

# Table of Contents

**1  Preface** ................................................................................. i

**2  Executive Summary** ....................................................... 1

**3  Background: Traceability and Key Resources** ............................. 5

    Introduction

    The Role of Traceability in Disease Control Programs

    The Current Challenge

    Resources

**4  Strategies to Advance Traceability** ................................. 11

    Achieving Necessary Participation

    Improving Disease Response Capabilities

    Strategy 1: Prioritize NAIS Implementation by Species/Sector

    Strategy 2: Harmonize Animal Identification Programs

    Strategy 3: Standardize Data Elements of Disease Programs to Ensure
        Compatibility

    Strategy 4: Integrate Automated Data Capture Technology with Disease
    Programs

    Strategy 5: Partner with States, Tribes and Territories

    Strategy 6: Collaborate with Industry

    Strategy 7: Advance Identification Technologies

    NAIS Communications and Outreach

**5  NAIS Budget Summaries and Plans** ................................. 41

    Summary of Funds and Obligations

    Utilization of Funds by Budget Category

    FY 07 Funds and Investments

    2008 Budget Plan

    Summary of Accomplishments

**6  Timelines and Outcomes** ................................................. 50

    Summary of Strategies and Actions

    Key Outcomes

    Critical Location Points

    Conclusion

**7  Appendixes** ................................................................... 57

    Appendix 1: APHIS-VS Animal Health Information Systems

    Appendix 2: Case Studies – Recent Animal Disease Investigations

    Appendix 3: NAIS Pilot Projects and Field Trials

    Appendix 4: Acronyms

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Preface

This report, *A Business Plan to Advance Animal Disease Traceability*, details recommended strategies and actions to enable existing State/Federal regulated and voluntary animal health programs, industry-administered animal health and marketing programs, and various animal identification techniques to work in harmony to enhance animal disease traceability.

USDA expanded its animal disease efforts in 2004[1] by developing and implementing the National Animal Identification System (NAIS); a voluntary program at the Federal level.  To ensure that NAIS participants and other interested stakeholders have access to pertinent information about the program, USDA has published a series of reports that provide participant guidance, technical standards, and implementation strategies.

**NAIS *User Guide***
The NAIS *User Guide,* first published in November 2006, provides guidance to producers and owners of animals as well as other sectors involved in the animal agricultural industry on how to participate in NAIS, and how participation will benefit them.  Part I of the *User Guide* provides a brief overview to familiarize producers with NAIS, its advantages and benefits, and other helpful information concerning its cooperative development and implementation.  In Parts II through IV, each of NAIS' components are discussed in greater detail, and "how to" information and resources are provided.  As the most up-to-date information guide on the program to date, the NAIS *User Guide* replaced all previously published program documents, including the *2005 Draft Strategic Plan* and *Draft Program Standards,* and the *2006 Implementation Strategies*.  Those documents provided the opportunity for the public to comment and offer feedback on the NAIS as USDA worked through many issues with industry and the States and Tribes.

*The following issues,* summarized below, are thoroughly discussed in the NAIS *User Guide* and will not be reviewed again in the Business Plan.  For ease of reference, the pages in the *User Guide* where each issue is discussed are noted below.

- *Voluntary participation*
  Participation in NAIS is voluntary at the Federal level.  NAIS provides the opportunity for producers that are not part of a disease program to freely participate in national animal health safeguarding efforts.  *(See page 3 of the User Guide)*

- *Confidentiality*
  Federal law protects individuals' private information and confidential business information from disclosure.  Through both intent and design, NAIS is limited in scope in terms of the type and quantity of information maintained by the Federal Government.  The system will hold and maintain only limited premises and animal identification number (AIN) device information.  *(See page ii in the User Guide)*

- *Animals officially identified to support  disease traceability efforts*

---

[1] U.S. animal health is protected by existing Federal and State regulations for disease surveillance, control, eradication, and response.  While the NAIS is a national system, it does not alter any regulations in the *Code of Federal Regulations* or any regulations that exist at the State level.  Rather, the NAIS enhances ongoing animal health protection efforts by offering national standards and increasing the level of participation beyond what is already required in existing disease programs.

USDA recommends that animals be officially identified if they are moved from their current premises to other commercial production locations, auctions/markets, feedlots, or any location where the commingling of animals from multiple premises takes place.  In these situations, the potential risk of disease exposure and spread increases, thus increasing the need for individual animal or group/lot animal identification.  *(See pages 21-24 in the User Guide)*  This business plan explains which species and sectors are prioritized for participation in NAIS to provide the greatest improvement in disease traceability.

- *Animal identification and USDA's technology neutral position*
  USDA has not designated any specific identification technologies beyond the minimum requirements for official identification that have been listed in the *Code of Federal Regulations*.  NAIS remains open with regard to the technology used to identify an animal and will not require any specific identification technology—such as radio frequency identification (RFID) tags or injectable transponders.  However, when a technology, such as RFID, is incorporated with an AIN device, International Organization for Standardization (ISO) standards, or their equivalent, are used to ensure the compatibility of the technology across multiple manufacturers.  *(See pages 25-26 in the User Guide)*

## NAIS *Program Standards and Technical Reference*

As a supplement to the *User Guide,* USDA also published the *Program Standards and Technical Reference* document that establishes data standards for NAIS.  Use of these standards by States, Tribes, industry organizations, identification device manufacturers, and other entities will ensure the system is effective.  Section I lists the data element formats for premises identification numbers, animal identification numbers, and group/lot identification numbers, which are needed to ensure compatibility across information systems.  Section II establishes standards for official identification devices that utilize the animal identification number.  Section III provides information on ISO standards that are utilized in NAIS.

Taken together, this suite of documents – the *Business Plan,* the *User Guide,* and the *Program Standards,* which are all available on the NAIS Web site – provides detailed information about the current status of NAIS, how to participate in the program, including the necessary technical details, and the future direction of program implementation.  NAIS will continue to evolve, based on feedback from participants and stakeholders, to ensure that the most practical and effective system is implemented.

# Executive Summary

Successful conclusion of an animal disease outbreak investigation is, in many cases, dependent on the ability to trace the disease to its source. Animal health officials require accurate and complete information to respond effectively to animal disease events and to successfully conduct disease surveillance programs. Rapid response minimizes the potential spread of contagious diseases, and lessens the detrimental effects of disease events. The United States Department of Agriculture's (USDA) emergency response capabilities can be improved through greater standardization of the data elements needed for animal disease control programs, as well as increased premises registration and animal identification.

**Key Objectives**
This report identifies significant opportunities and strategies for advancing the U.S. animal disease traceability infrastructure. Improvements will result from strategies that support the:
*   Utilization of data standards in disease programs to increase the compatibility of information systems,
*   Incorporation of data and animal identification standards by industry in producer-based programs, and
*   Integration of technologies to improve efficiency and accuracy of data collection.

USDA defines retrieval of traceback data within a 48-hour window as optimal for efficient, effective disease containment. Within this timeframe, animal health officials must have the data required to trace a disease back to its source and limit potential harm to animal agriculture, such as loss of producer income. The sooner reliable data is available, the sooner affected animals can be located, appropriate response measures can be established, and disease spread can be halted.

The National Animal Identification System (NAIS), developed in partnership with the animal agriculture production industry, State animal health authorities, and USDA, provides the common data standards required to close traceability gaps. Although the optimal 48-hour window remains the vision of NAIS and its long-term goal, the industry can make immediate progress towards meeting the needs of animal health officials, in addition to maintaining the confidence of consumers and trading partners.

The strategies discussed in this report support progress to the long-term goal of 48-hour traceback with continued focus on increasing the number of premises registered and, now, initiating efforts to increase the number of animals identified to the premises of origin. USDA is prioritizing its efforts by species/sectors where an increase in the traceability infrastructure can have the greatest return on investment. Traceability objectives, action timelines, and participation benchmarks are provided for the priority species.

Collaboration between the animal agriculture production industry, State animal health authorities, and USDA remains the catalyst for continued traceability progress. USDA's collaborators will be crucial to the success of the actions identified in this plan, as well as future strategies—including more detailed

*Draft:* A Business Plan To Advance Animal Disease Traceability

actions related to the collection of data on animal movements—as progress is made towards the long-term goal. Industry organizations and the NAIS Species Working Groups and Subcommittee will take an active role in the review of these strategies and provide feedback and additional recommendations as USDA moves forward to facilitate animal disease traceability.

This plan defines the following strategies to facilitate animal disease traceability in the United States:

## Strategy 1: Prioritize NAIS Implementation by Species/Sectors

The establishment of priorities among species and sectors within specific industries will ensure resources are applied where improvement in traceability is needed the most. This business plan first categorizes species based on existing tracing capabilities and the need for improvement. Tier 1 species include the primary commercial food animal industries – cattle, poultry (chickens and turkeys), swine, sheep, and goats. Additionally, horses that, when moved, require either a test for Equine Infectious Anemia or a health certificate, are also included in Tier 1. All other livestock and poultry are Tier 2. Additionally, sectors within the Tier 1 species have been prioritized for additional emphasis; for example, the beef and dairy breeding herds are the highest priorities within the cattle sector.

## Strategy 2: Harmonize Animal Identification Systems

Harmonizing animal identification systems will undoubtedly result in more cost-effective options that benefit producers while achieving increased animal disease traceability for the entire industry. Today, numerous existing disease control programs require and/or benefit from official animal identification. In addition, in the private sector, producers are seeking improved and flexible identification methods, and compatible processes and data standards that can be used for multiple purposes. The value of harmonizing animal identification in government and industry programs is more evident now than ever before and presents a clear opportunity to enhance traceability.

## Strategy 3: Standardize Data Elements of Disease Programs to Ensure Compatibility

USDA will take steps to standardize data elements in existing disease programs, including international/interstate commerce regulations. For example, incorporating a consistent data format that identifies premises importing and exporting livestock, locations participating in official disease control programs, and origin and destination premises listed on Interstate Certificates of Veterinary Inspection (ICVI) will greatly enhance animal disease tracing and emergency response capabilities.

## Strategy 4: Integrate Automated Data Capture Technologies with Disease Programs

USDA will take steps to integrate electronic data capture and reporting technologies into existing disease programs. By using NAIS-compliant identification devices that support automated data capture technology and integrating handheld computers/readers to replace paper-based forms, animal health officials will be able to electronically record and submit essential data to the USDA Animal Health and Surveillance Monitoring database and other appropriate animal health databases. The electronic collection of data will increase volume and quality, minimize data errors, and speed data entry into a searchable database.

**Strategy 5: Partner with States, Tribes, and Territories**

State animal health authorities play a critical role in advancing national animal disease traceability. Working in close partnership with State, Tribal, and Territorial officials, USDA will continue to facilitate the development of each State's disease traceability infrastructure. Each State's animal health official will administer and manage localized plans reflecting the animal health priorities in individual regions.

**Strategy 6: Collaborate with Industry**

Achieving traceability objectives requires a partnership between the production sector and animal health officials. Producer organizations, representing member interests, can accelerate the adoption of practices that advance traceability. USDA has entered into cooperative agreements with non-profit industry organizations to promote premises registration within various species groups. Collaboration with USDA accredited veterinarians will enable the delivery of accurate information to producers, as well as facilitate the adoption of animal identification data elements in everyday production management systems and disease program activities at the producer level. Additional partnership efforts with industry alliances, service providers, auction markets, feedlots, harvesting facilities, and other industry sectors are a priority for USDA.

**Strategy 7: Advance Identification Technologies**

Continued advancements in traceability require practical, affordable technology solutions that improve efficiency and accuracy of animal ID data collection. USDA will collaborate with stakeholders to facilitate the development of performance standards for ID devices and evaluate emerging technologies with emphasis on systems that can operate at the "speed of commerce."

## Communications and Outreach

Communications and outreach play an integral role in the effort to advance animal disease traceability. Producer and stakeholder education and outreach are vital to achieving successful levels of participation in NAIS, thereby advancing the traceability of livestock and poultry in the United States. USDA has developed and implemented multi-year, national outreach and education activities aimed at increasing producer awareness and understanding of NAIS and promoting producer participation in premises registration. In partnership with States and industry, USDA will continue to build and maintain a variety of stakeholder, media, legislative, and public relationships to increase understanding, dispel misinformation, promote producer participation in NAIS, and, ultimately, achieve the long-term 48-hour objective.

## Outcomes and Timelines

Significant progress will result from the planned strategies and actions detailed in this business plan. As noted previously, because the need to advance traceability differs among the various species and sectors, it is important for USDA to establish clear priorities as it proceeds with NAIS. Targeted timelines for the key strategies and actions are summarized on Section 5 to guide the implementation of these priorities.

At this time, the cattle industry has the greatest need to advance traceability. The outcomes described in this plan represent a huge incremental step in

advancing traceability for this large and diverse industry.  Benchmarks to gauge progress towards the ultimate 48-hour traceability goal will be used to ensure success. For the cattle industry, the key benchmark is achieving identification of 70 percent of the cattle breeding herd by the end of 2009, specifically those animals that will move from their birth premises, to ensure they are traceable to their premises of origin.  Traceability objectives for other species are also defined in this section.

## Conclusion

The most efficient, cost-effective approach for advancing the country's traceability infrastructure is to capitalize on existing resources—mainly, animal health programs and personnel, as well as animal disease information databases. These resources represent an available capability and key opportunity to optimize traceability.  Accordingly, they will play a significant role in USDA's efforts to strengthen the U.S. animal health traceability system.

Opportunities to facilitate animal disease traceability will continue to evolve as these strategies are successfully implemented.  Additionally, industries will face new animal health demands as the animal agriculture industry changes. Therefore, the strategies will continue to be evaluated and adjusted to ensure that USDA continues to advance towards the optimum goal of a 48-hour traceback in as timely and efficient a manner as possible.

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Background: Traceability and Key Resources

## Introduction

The main goal of an animal disease traceback system is to provide information regarding the source and extent of disease infection—which is key to protecting U.S. animal health and marketability. In the field of animal health, traceability is defined as the ability to document all relevant elements needed to determine the life movement history of an animal. This is accomplished by uniquely identifying animals, either individually or by group/lot, and recording their movements within the production chain.

## The Role of Traceability in Disease Control Programs

Disease control programs depend on the successful implementation of each step in the illustration below. Traceability is an essential component of any disease control effort.



For many years, animal identification and traceability have played a critical role in USDA animal health programs—from vaccination eartags within the brucellosis eradication program, to the use of approved identification devices within the national scrapie and tuberculosis eradication programs. Animal identification and traceability are key to:

- Managing disease outbreaks;
- Monitoring official vaccination programs;
- Documenting affected and unaffected regions of a country or State for zoning and compartmentalization necessary for maintaining trade;

*Draft:* A Business Plan To Advance Animal Disease Traceability

- ▪ Providing timely animal movement information, when needed; and
- ▪ Establishing effective animal health inspection and certification programs.

In most cases, animal health officials have used animal identification and traceback within programs in response to existing or threatening outbreaks of specific diseases. Successful examples of this approach include the Cooperative State/Federal Brucellosis Eradication Program (cattle), the Pseudorabies Eradication Program (swine), and the National Scrapie Eradication Program (sheep/goats). Disease surveillance, eradication, and control programs such as these have achieved significant success over the years in reducing animal disease in the United States.

## The Current Challenge

The success of existing disease surveillance, eradication, and control programs, however, has led to a paradox in the field of animal health. As diseases have been eliminated, participation in active disease programs has lapsed—causing the traceability infrastructure in our country to be less effective than it once was. In the past, when livestock diseases (e.g., brucellosis, tuberculosis) were widespread, cattle herds and other animals were commonly tested and vaccinated. The animals were officially identified as part of this process, and their movements were recorded in government systems. As a result, the cattle industry had a high level of traceability.

This level of identification not only supported the needs of specific disease programs, but also provided traceability for foreign animal disease investigations and other disease control efforts. Today, most States are free of tuberculosis, brucellosis, and other significant livestock diseases. With the decreasing need to regularly test and vaccinate animals for these diseases, there has been a drastic reduction in the number of officially identified animals.

In addition to reduced participation, the current structure poses a second challenge: it is based on animal identification and data collection that is focused on individual objectives (i.e., specific disease eradication programs, interstate commerce, breed registries, and age/source verification). These separate programs use distinct herd and flock identification protocols that are not based on common data standards, and do not use integrated data systems. Because the data systems from separate programs cannot "talk" to each other, an animal could be identified multiple times yet still not be fully traceable. For example, if an animal is only identified as part of the brucellosis eradication program, it is difficult to trace that animal in the event of bovine tuberculosis infection.

This lack of standardization of data elements and integration within U.S. animal health data systems is the most significant challenge today in conducting successful animal traceback and controlling animal disease. To overcome this challenge, common data elements and modern technology must be applied so that separate databases can communicate with each other. This will enable animal health officials to access accurate and complete traceback information which is maintained by multiple sources. When an outbreak occurs, animal health officials must identify the specific animals involved or exposed— including where they have been, when they were there, and in some cases, why they were there. Obtaining this information quickly significantly reduces the scope and magnitude of an animal disease investigation and minimizes the time and costs involved in these efforts.

**Prior to NAIS**

When a herd is tested for brucellosis, the event is recorded in the brucellosis section of the Animal Health and Surveillance Management system. The data entry clerk, before entering the data, first searches for the herd to determine if it has already been entered into the system. If the herd cannot be found, a new record for that herd is created that includes all the contact information and descriptive data that is needed. The problem is that the Generic Database does not have a built-in mechanism to prevent more than one herd record to be created for a single location. Thus, if the clerk does not do a thorough and exhaustive search, duplicate records might exist.

As another example, the Smith Farm (purely fictitious) located at 123 Somewhere Lane, Anywhere, Kansas, could be listed as Smith Farm, Smith and Sons, Ltd., S and S Farms, etc. A record also might be created once for the brucellosis program, again for the tuberculosis program, and yet again for the scrapie program. Some States are better about entering duplicates, but there have been many cases where a given address is associated with five or six different records that were found only after time-consuming database searches.

Duplicative records can cause delays as State animal health officials attempt to determine the number and location of premises potentially affected in an outbreak or which animals were commingled at a given premises. Elimination of duplicative records is essential to ensure that both State animal health officials and others involved in disease programs have access to accurate information without additional waste of time and personnel resources.

## Resources

NAIS was designed by industry representatives and State and Federal animal health officials to complement the numerous USDA Animal and Plant Health Inspection Service (APHIS) Veterinary Services (VS) programs and databases already in place to protect animal health and respond to disease. NAIS, which is voluntary at the Federal level, enables producers to participate in animal health safeguarding efforts that use identification methods and data standards that work in harmony with all programs. Using data standards for animal identification, location, and animal movement information systems that also can be used for management, marketing, and animal health purposes for all animal and livestock species will improve the quality of the information as well as provide the most cost-effective solutions. USDA-APHIS is focused specifically on animal health programs—NAIS provides the common link between existing disease control programs and databases. This approach conserves time, money, and effort by using systems and data already in place.

A brief description of existing animal health resources is provided below.

### Animal Health Programs and Personnel

APHIS-VS protects and improves the health, quality, and marketability of the Nation's animals, animal products, and veterinary biologics by preventing, controlling, and/or eliminating animal diseases, and monitoring and promoting animal health and productivity.

Current examples of APHIS-VS APHIS disease eradication programs include, among others, cooperative State-Federal efforts for:

- Brucellosis in cattle, bison, and swine;
- Tuberculosis in cattle and cervids;
- Scrapie in sheep and goats; and
- Pseudorabies in swine.

APHIS-VS also has control and certification programs to address chronic wasting disease in cervids; Johne's disease in cattle; and trichinae in swine. Ongoing surveillance programs include bovine spongiform encephalopathy (BSE), infectious salmon anemia, classical swine fever, and avian influenza.

Disease control and eradication measures include:
- Quarantines to stop the movement of possibly infected or exposed animals;
- Testing and examination to detect infection;
- Depopulation of infected and sometimes exposed animals to prevent further disease spread;
- Treatment to eliminate parasites;
- Vaccination; and
- Cleaning and disinfection of contaminated premises.

APHIS-VS animal health programs are carried out by a field force of approximately 250 veterinarians and 360 lay inspectors working out of Area Offices (usually located in State capitals). The Plum Island Animal Disease Center, New York, and APHIS' National Veterinary Services Laboratories at Ames, Iowa, provide laboratory support for these programs.

State animal health authorities are responsible for animal disease issues at the State level, the administration of interstate certificates of veterinary inspection, assisting with the delivery of the Federal programs, and overseeing State-specific disease control activities and regulations.

Accredited veterinarians are private veterinarians authorized by USDA-APHIS to perform official regulatory functions on behalf of the department. Accredited veterinarians are the first line of surveillance for reportable domestic and foreign animal diseases. They assist with interstate and international movement of animals and animal products, ensure national uniformity of regulatory programs, and are key participants in State-Federal-industry Cooperative programs.

Currently, 15,000 of the more than 60,000 accredited veterinarians in the United States are involved in large animal practices. In both 2005 and 2006, accredited veterinarians tested more than 600,000 cows and heifers for brucellosis, vaccinated in excess of 4 million calves against brucellosis, and conducted over 1 million tests for tuberculosis.

## Animal Disease Information Databases

A highly reliable, complete, cost-effective information system is key to the success of animal health programs. The APHIS-VS Animal Health Information System (described in the table below) has evolved over time using distinct herd and flock identification protocols. NAIS now provides a "standardized source" for key data elements. This standardization enables the various animal health databases to communicate with one another by using the same fundamental epidemiological information regarding animal(s), place, event, and time across multiple programs and systems.

Databases are not new to USDA animal health programs. The following databases and information systems were in place prior to NAIS and continue to provide critical infrastructure that supports APHIS-VS animal disease programs.

*Draft:* A Business Plan To Advance Animal Disease Traceability

These systems now use the National Premises Information Repository (NPIR) and the Animal Identification Number Management System (AINMS) to obtain "centralized" and standardized premises and animal identification information. In the future, these databases will be integrated with the Animal Trace Processing System (ATPS), which enables animal health officials to obtain necessary information from all systems when responding to a disease event.

| Database | Purpose | Dates | NAIS Link |
|---|---|---|---|
| Animal Health and Surveillance Management (AHSM) | Maintains test and/or vaccination data from herds and flocks in disease programs such as brucellosis, tuberculosis, pseudorabies, etc. | 1977 (initially known as the Animal Disease Generic Database) | NPIR AINMS ATPS[1] |
| Veterinary Services Process Streamlining (VSPS) | Administration of permits and certificates for import/export, interstate commerce, and veterinary accreditation | 1996 | NPIR AINMS ATPS[1] |
| Emergency Management Response System (EMRS) | Records information resulting from all foreign animal disease investigations and provides incident management | 2002 | NPIR AINMS ATPS[1] |
| [1] The ATPS will be integrated with these databases in the future as the ATDs come on-line. | | | |

NAIS was developed to provide the data formats and system functionality needed to link APHIS-VS databases, and those maintained separately by the States and private sector. NAIS is comprised of three elements:

- **Premises Registration.** Registration of locations that manage livestock or poultry (farms, feedlots, veterinary clinics, and livestock markets) in a system that prevents the assignment of more than one identifier to a given location;
- **Animal Identification.** Officially identifying animals (either individually or as groups) using an approved method prior to their commingling with animals from other premises and
- **Animal Tracing.** Recording animal movements from one premises to another in private and State animal tracking databases (ATD) using standard data fields and data transfer.

**NAIS Participation**

NAIS also provides the opportunity for producers that are not part of an animal disease program to participate in national animal health safeguarding efforts. NAIS is voluntary at the Federal level, and the program has been structured as a Federal-State-industry partnership. Responsibility for implementing NAIS is shared among numerous entities — State and Tribal governments, industry groups/private companies, and USDA.

Through NAIS, States, Tribes, and Territories use established standards to register premises within respective geographic regions and maintain Premises Registration Systems. Industry organizations and States provide the ATDs that maintain animal movement records.

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Databases | Purpose | Date Deployed |
|---|---|---|
| Standardized and Compliant Premises Registration Systems (SPRS and CPRS) | Administration of premises registration by States, Tribes, and Territories. | 2005 |
| National Premises Information Repository (NPIR) | Maintains record of all premises identification numbers allocated and premises information submitted by the SPRS and CPRS. | 2005 |
| Animal Trace Processing System (ATPS) | Provides communication capabilities with animal tracking databases (ATDS) and all APHIS-VS Animal Health information systems during a disease investigation. | 2007 |
| Animal Tracking Databases (ATD) | Maintains animal movement records. | 2007 |

The USDA provides the Animal Trace Processing System (ATPS) that allows State and Federal animal health officials to have a single point of access to the information needed to conduct an investigation.  The following diagram illustrates one of the most significant outcomes of NAIS — the capability for databases to "talk" when information is needed to support responses to animal disease events.



Authorized access of Federal and State animal health officials to the ATPS is initiated when:
- An indication (suspect, presumptive positive, etc.) or confirmed positive test of a foreign animal disease;
- An animal disease emergency as determined by the Secretary of Agriculture and/or State departments of agriculture; or
- A need to conduct a traceback/traceforward to determine the origin of infection for a program disease (brucellosis, tuberculosis, etc.)

# Strategies for Advancing Traceability

USDA's overall objective is to establish an animal tracing infrastructure that will retrieve traceback data within 48 hours of a disease detection.  For efficient, effective disease containment, animal health officials need the data required to trace a disease back to its source and limit potential harm to animal agriculture. The speed with which one can access critical animal location and movement information, subsequently referred to as "traceback data," determines the timeliness—and effectiveness—of the disease control and containment effort. USDA defines the retrieval of traceback data within 48 hours as optimal for effective disease containment.

USDA will work toward this long-term objective by implementing immediate, short-term strategies, as outlined in this business plan.  Through the strategies, it is USDA's goal to facilitate increased participation in NAIS, bolster the existing animal disease response network, reduce the amount of time required to conduct and complete a disease investigation, and continue to build critical Federal-State-industry partnerships necessary for animal disease control and eradication success.

While the development of the complete traceability infrastructure is complex and will take significant time and resources, USDA is committed to achieving incremental and timely progress by increasing the number of premises registered and animals identified at their premises of origin.  In doing so, USDA will:

- Achieve necessary levels of participation (referred to as "critical mass"); and
- Significantly improve disease response capabilities.

These practices complement the overall traceability objective for all species while providing a practical and effective approach to advance traceability specifically within those sectors designated as high priority.

## Achieving Necessary Participation

### "Critical Mass"

The seven strategies discussed below are designed to increase participation in NAIS in order to achieve a "critical mass" level of participation.  This is a performance measure to gauge the progress being made towards obtaining the participation levels necessary to achieve the optimum traceability goal.  It is an interim measurement to support incremental advancement specifically in the cattle industry where significant improvement is necessary.

In order to achieve critical mass, USDA estimates that 70 percent of the animals in a specific species/sector need to be identified and traceable to their premises of origin.  This 70 percent level was derived by:

- Reviewing epidemiological reports from the past 5 years involving a variety of animal diseases and species;
- Reviewing published scientific literature regarding animal disease traceability;
- Using a land-grant-university-developed animal disease traceability computer model;

*Draft:* A Business Plan To Advance Animal Disease Traceability

- Assessing USDA National Agricultural Statistics Service (NASS) data involving all reported species and industries relative to animal numbers and operations;
- Reviewing best available participation data in present animal disease control and eradication programs; and
- Projecting a practical and achievable level needed to facilitate animal disease traceability among all species/sectors/livestock industries as the next logical step.

The strategies below are designed to offer short-term advances in the number of animals and premises officially identified, while increasing the quantity and quality of traceback data that could be used to respond to a disease event.

**Critical Mass—An Interim Performance Benchmark**
The 70 percent critical mass estimate will serve as a benchmark for advancing animal disease traceability through 2009.  For the cattle industry—the priority of this business plan—achieving 70 percent will significantly improve the quantity of traceability information.  As the program advances and more information is available, this estimate will be reevaluated.  The results of the benefit cost analysis will also provide valuable information to further define the level of participation needed.  In late 2008, minimum and long-term participation levels will be established based on a balance of economic risk and the cost necessary to achieve the next level of traceability.

# Improving Disease Response Capabilities

## The "Bookend" Approach

Current animal identification systems generally provide enough information to allow an animal health official to immediately trace most livestock back to the previous owner's premises, and eventually back to other premises, including the premises of origin (birth), when necessary.  Knowing where an infected animal has been and what other animals may have been exposed is necessary to ensure rapid and effective disease containment.  The challenge is that when you have only the last premises from which to initiate a traceback, the process is often time-consuming and labor-intensive.  Having another reference point from which to work, such as the birth premises, can greatly accelerate the process by allowing the animal health official to simultaneously trace the animal's movement back from the last premises and forward from the premises of origin.  This is commonly referred to as the "bookend" approach.

Today, many disease investigations are conducted using only the information available on the backtag collected at slaughter which allows the animal health official to determine the last production premises of the animal.  These investigations often involve testing hundreds of animals in an attempt to determine the scope of a disease outbreak and to locate potentially affected and exposed animals.  The longer an investigation takes, the greater the chance for significant production losses, increased testing costs, restriction of interstate and international animal movement, and, unfortunately, further spread of the disease.  By using the "bookend" approach, the result will be an immediate improvement in the way animal disease investigations are currently conducted.  Producers can further enhance the traceability of animals by maintaining herd records that contain the official identification numbers and the dates and destination information of the animals that permanently leave their premises.  As NAIS implementation proceeds, the animal movement information within the

"bookends" will be added to the system, further increasing the efficiency and effectiveness of animal disease investigations as the long-term goal of 48-hour traceback information is achieved.

The goal of this plan is to significantly increase the number of animals identified at their birth premises, specifically for those species that will benefit most from this practice (cattle, sheep and goats). Being able to conduct a disease investigation from two points of reference, preferably from opposite end points in time, significantly increases an animal health official's ability to more quickly trace a disease of concern.

**A "Bookend" Scenario**

Cow "A" has been diagnosed with bovine tuberculosis at slaughter plant "X." Because cow "A" had a NAIS-compliant RFID eartag applied at the premises of origin, the State animal health official is able to initiate both a traceback from the previous premises and a trace forward from the premises of birth. NAIS will provide immediate information regarding the animal's premises of origin. Without official identification, determining the origin of the animals could take weeks. By knowing where the animal's movements began and ended, the animal health official is able to review sales receipts and other producer records and talk to previous owners to more accurately and efficiently determine where cow "A" has been and what other animals might have been exposed.

**Herd records are critical.** Producers can greatly enhance disease traces of animals to other premises by maintaining an accurate record of the official animal identification number, the date moved from premises, and the destination of each animal they sell and/or move to another premises (another producer's premises, market, feedlot, slaughter plant, etc.).

*Draft:* A Business Plan To Advance Animal Disease Traceability

---

## Strategy 1: Prioritize NAIS Implementation by Species/Sectors

### Targeted Species

Animal diseases are not always species-specific; therefore, the traceability plan includes all livestock and poultry species. However, the need to advance tracing capabilities for certain species is greater than others. To address these differences, while also considering the economic merit (sales and revenues) of each species or sector to U.S. agriculture, each species/commercial sector has been designated as either Tier 1 or Tier 2. Tier 1 species/sectors include the primary food animal species/sectors: (1) beef and dairy cattle, (2) swine, (3) poultry (chickens and turkey), and (4) the sheep and goat industry. Additionally, horses that, when moved, require either a test for Equine Infectious Anemia or a health certificate, are also included in Tier 1. All other livestock and poultry are designated as Tier 2.

While animal disease traceability is necessary for all species, this business plan will focus on Tier 1 species.

### Species/Sector Prioritization

The information and infrastructure needed to achieve USDA's long-term goal of 48-hour traceback can vary significantly by species, and for sectors within species. Variations in the management and marketing structure of each species sector, including degree of vertical integration, can complicate progress towards achieving this goal as well. Prioritization of species/sectors will ensure resources are applied where traceability advances are of the highest importance and that will offer the greatest return on investment.

### Method for Determining Priorities

In 2007, USDA conducted a qualitative assessment to determine which species/sectors would benefit most from increased use of premises identification, individual animal or group/lot identification, and the reporting of specific animal movements in regards to controlling and eradicating animal disease. USDA examined the following key factors and their role in advancing traceability:

1. Disease characteristics/issues
   - Risk of contracting diseases of concern (both foreign and domestic)
   - Interaction with other species and/or wildlife and the potential of disease spread to other species or sectors
   - Potential impact on human health
   - Rate and scope of disease spread
   - Degree of animal movements and commingling
   - Existence of an ongoing Federal/State disease surveillance/control/eradication program
   - Cost of indemnifications
   - Historical costs of controlling or eradicating diseases

2. Animal identification
   - Need for individual or group lot identification
   - Current use, if any, of individual or group lot identification methods

*Draft:* A Business Plan To Advance Animal Disease Traceability

3. Disease tracing requirements/capabilities
   ▪ Level of tracing (traceback or traceforward) necessary to control or eradicate diseases of concern (trace to last premises, to birth place, etc.)
   ▪ Ability of industry to provide critical animal location and movement information to USDA within 48 hours of a disease detection

4. Demographic information
   ▪ Economic value of industry
   ▪ Size of industry (number of animals)
   ▪ Degree of vertical integration
   ▪ Vulnerability to intentional attack

## Definition of Priority Designations

Based on the results of the assessment, each species was assigned a designation of low, medium, or high priority. The designation of "Low," "Medium," and "High" priority reflects the emphasis each species and each sector will be given in the implementation of the strategies and actions of this report.

▪ The "High" priority designation indicates those species/sectors that currently have the most need to improve traceability infrastructure relative to the risk and impact of disease spread. For example, a "high-priority" species sector could benefit by shortening the timeframe it currently takes to conduct a traceback investigation. In another high-priority species sector, the risk and associated impact of a potential disease outbreak warrants stronger, more comprehensive traceback capabilities.

▪ The "Medium" priority designation is used for species/sectors that have adequate animal tracing systems in place, but still have significant opportunities for improvement in their traceability levels.

▪ A "Low" priority designation means that the species/sector either already has high levels of traceability or has lesser disease concerns that would be of economic significance. Therefore, the return on investing additional resources could provide minor benefits from improvements in the U.S. animal health traceability infrastructure.

## Priority Designations

The species were prioritized as follows:

| Low | Medium | High |
|---|---|---|
| Ovine (Sheep)<br>Aquatics[1] | Porcine (Swine)<br>Equine (Horses)[2]<br>Poultry (Chickens and Turkeys)<br>Cervid[1] (Deer and Elk)<br>Caprine (Goats) | Bovine (Cattle) |

[1] Tier-2 species that are part of the existing APHIS-VS animal health programs.
[2] Horses that, when moved, require either a test for equine infectious anemia or a health certificate, are designated Tier 1 and Medium priority among Tier 1 species.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Sector within Species Priority Designations

Most species have a few distinct sectors that might differ significantly in their structure and traceability needs. To ensure proper attention is given to those sectors that have the most to gain, each was categorized separately on the "High" to "Low" scales to reflect sector priorities within the species. These sector ratings are illustrated in the following profiles.

## Sector Profiles and Opportunities

The population estimates provided in the following charts were obtained, for the most part, from the National Agricultural Statistics Service's (NASS) *2002 Census of Agriculture* report and, when available, from the July 2007 *NASS* commodity reports.

## Cattle

### Industry Size

As of July 2007, it has been estimated that there are over 104 million cattle located on more than 1 million premises.

| Cattle Populations | |
|---|---:|
| **Beef Cattle**[1] | |
| Cows | 33,350,000 |
| Replacements | 4,700,000 |
| Other Heifers | 8,000,000 |
| Steers > 500 lbs. | 14,900,000 |
| Bulls > 500 lbs. | 2,100,000 |
| Calves < 500 lbs. | 28,700,000 |
| **Total** | 91,750,000 |
| **Dairy Cattle**[1] | |
| Cows | 9,150,000 |
| Replacements | 3,900,000 |
| **Total** | 13,050,000 |
| **Total Cattle** | **104,800,000** |
| **Premises**[2] | |
| Beef Operations (>1 cow) | 762,880 |
| Dairy Operations | 75,140 |
| Feedlots (>1,000 head) | 2,165 |
| Feedlots (<1,000 head) | 86,000 |
| Other Cattle Operations | 120,355 |
| **Total** | **1,046,540** |

[1] *Cattle,* USDA National Agricultural Statistics Service, July 2007.
[2] *Cattle,* USDA National Agricultural Statistics Service, 2006.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Sector Priorities

The cattle sectors overall could benefit significantly from advancing traceability. In particular, the breeding populations are designated as the highest priority, due to their longer lifespan and subsequent likelihood to occupy multiple premises throughout their lifetimes.

| Bovine | Sector Rank | | |
|---|---|---|---|
| Sector | Low | Medium | High |
| Bison[1] | ■ | | |
| Beef – Cow/Calf | | | ■ |
| Beef – Feeder Cattle[2] | | ■ | |
| Dairy – Cows/Bred Heifers | | | ■ |
| Dairy – Replacements | | | ■ |

[1] While bison are noted as a low priority in the business plan, due to the smaller size of the animal population, USDA recognizes the importance of this species for brucellosis eradication efforts, especially in the Greater Yellowstone Area (GYA).  The GYA is one of the last known niduses of brucellosis in the country.  Abundant wildlife populations and the potential for wildlife to contact or commingle with livestock are concerns.  The presence of brucellosis in free-ranging bison and elk in the GYA threatens the brucellosis status of the surrounding States and the health of their livestock herds and continues to be a challenge in the final eradication of brucellosis from the United States.  Eliminating brucellosis in the GYA is of critical importance to achieving the ultimate, shared goal of eradicating the disease throughout the United States.  USDA continues its multi-agency cooperative effort toward the development of brucellosis elimination and risk management plans for the GYA.

[2] Feeder, Stocker and Fed Cattle

# Beef Cattle

## Industry Structure

Independent operations dominate the U.S. beef industry, and, while it is not as vertically integrated as other industries, retained ownership of calves beyond weaning has increased.  The beef industry has several distinct sectors, including cow/calf operations, stocker/backgrounder, feedlots, and harvesting facilities.  Often, information on cattle is not seamlessly passed from one sector to another, at least not on an individual animal basis.  Accordingly, the ability to trace an animal through all production segments is not consistent.

## Tracing Capabilities

According to the 1997 USDA-APHIS National Animal Health Monitoring System (NAHMS) Beef Study, approximately 50 percent of the beef producers did not use any form of individual identification on cows and heifers.  However, nearly 65 percent of the cows and calves have some form of individual identification.  A high percentage (approximately 75 percent) of feedlot and stocker cattle are unofficially identified upon entry for recordkeeping and management purposes.  Frequently, however, identification from the birth place is removed upon the animal's arrival at the feedlot or stocker operation.  To ensure proper surveillance and response to a contagious disease, animal health officials often find it necessary to test more herds than would be necessary if animal identification was at a higher level.  Additionally, the time required to complete disease traceback is greatly extended as the percent of unidentified animals increase.

*Draft:* A Business Plan To Advance Animal Disease Traceability

### Opportunities to Advance Traceability

Significant potential exists to enhance the tracing capability for U.S. beef herds by focusing on efforts to increase unique identification of beef cattle. Verification programs (source, age, process, etc.) are becoming more common and are increasing the value of animal identification and other information specific to each animal. More fed cattle are identified with RFID tags so their history can be tracked for ownership, genetics, post-weaning performance, health status and carcass composition and quality. While a small percent of breeding heifers are officially identified, a significant number of them are identified through the calfhood vaccinations program. Animal health officials, as a rule, can successfully trace many beef cattle from the slaughter plant to the feedlot. However, the ability to trace individual animals from the feedlot to origin of birth is often limited.

**Disease Surveillance Data**

**Situation:** Evaluation and review of USDA adult bovine surveillance data acquired from September 2006 through April 2007 indicate that of 21,893 samples obtained, only 6,203 (28 percent) possessed an official, unique USDA silver tag or USDA orange brucellosis vaccination tag. An additional 17 percent of this sample population possessed a unique backtag number. Combined, less than half of adult cattle (45 percent) can be associated with any USDA official identification system.

**Impact:** Breeding cattle herds in the United States, which are important to multiple cattle disease surveillance programs, are often lacking unique individual identification. The ability to associate official identification with various points in time, and gain useful information in conducting a traceback, is substantially hampered by this lack of animal identification.

## Dairy Cattle

### Industry Structure

Like the beef industry, the U.S. dairy industry is not vertically integrated. Herd sizes have increased significantly over the past decades due to the now common practice of raising heifer replacements on farms and ranches separate from milking facilities.

### Tracing Capabilities

Approximately half of the 69,000 U.S. dairy herds are identified through the industry's milk recording program, the Dairy Herd Improvement Association (DHIA). Producers who participate in DHIA identify each cow for performance recording, and many contribute to generic summarization. DHIA, for the most part, has used the National Uniform Eartagging System for official identification purposes. Breed registries also provide valuable identification and such records are sometimes used to enhance disease traceback efforts. Holsteins currently represent about 95 percent of the dairy herd, 15 percent of which are registered.

### Opportunities to Advance Traceability

By using the standardized PIN in the administration of the National Uniform Eartagging System, a significant number of dairy cattle would be identified to their birth premises. Additionally, the use of NAIS-compliant animal identification numbers for breed registration purposes would increase the number of calves identified and traceable to their birth premises.

Increasingly, dairies are using RFID eartags for management and recordkeeping purposes. Establishing the NAIS "840" numbering system as the official

*Draft:* A Business Plan To Advance Animal Disease Traceability

numbering system for RFID eartags and phasing out the recognition of other numbering systems over time will increase the widespread use of NAIS-compliant tags for day-to-day management purposes.

**National Bovine Tuberculosis Statistics**
**Situation:** From October 1, 2003, through March 17, 2007, 156 positive cases of bovine tuberculosis were identified in the United States. Of those cases, 11 percent of the animals had no identification whatsoever, and 83 percent of the positive cases did not have official USDA individual identification present.

**Impact:** USDA and State investigative teams spend substantially more time and money in conducting tracebacks, including an expanded scope of an investigation to identify suspect and exposed animals. According to disease traceback close-out summaries, the average time spent conducting a traceback for the most recent 27 bovine tuberculosis investigations was 199 days; 125 days for the last 4 investigations.

**Recommended Actions – Cattle[2]**

- Collaborate with industry organizations, including veterinarians, to increase the awareness of animal disease traceability issues and to advance premises registrations of cattle operations and official identification at point of origin;
- Integrate NAIS-compliant RFID tags in the brucellosis calfhood vaccination/testing program and bovine tuberculosis testing;
- Utilize the standardized Premises Identification Number (PIN) in the administration of all animal disease programs;
- Establish regulations to require the recording of PINs for the destination of all imported cattle and the last premises of cattle that are exported;
- Use the standardized PIN on Interstate Certificates of Veterinary Inspection (ICVI) to record origin and destination premises of cattle; and
- Integrate the use of AIN devices with the "840" number with industry programs, marketing alliances, verification programs, breed registries, and performance recording.

---

[2] For each sector, USDA has identified a number of actions that will help capitalize on the available opportunities to advance traceability. These actions are explained more fully in the remaining "strategies" sections of this document.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Swine

### Industry Size

As of September 2007, estimates indicate that there are more than 65,000 swine operations in the United States caring for nearly 65 million pigs.

| Swine Populations | |
|---|---|
| **Hogs and Pigs[1]** | |
| All Breeding | 6,145,000 |
| All Market | 58,503,000 |
| **Total** | 64,648,000 |
| **Premises[2]** | |
| Operations with Hogs | 65,540 |

[1] *Hogs and Pigs,* USDA National Agricultural Statistics Service, September 2007.
[2] *Hogs and Pigs,* USDA National Agricultural Statistics Service, 2006.

### Industry Structure

While most U.S. swine operations (34,900 out of 65,540 premises in 2006) have 100 or fewer pigs in inventory,[3] the vast majority of pigs are produced on a small number of operations. In 2006, roughly 30 percent of all hogs marketed were produced by companies that have vertically integrated production and slaughter/processing enterprises. Approximately 60 percent of all hogs marketed in 2006 were transferred from producer to packer using some sort of contractual marketing agreement[4].

### Tracing Capabilities

Slaughter plants maintain records regarding the number, date, and supplier for pigs received, permitting traceability to the previous production phase. Commercially integrated businesses are able, with varying degrees of specificity, to trace groups of animals through each segment of the production chain (nucleus, multiplier, production, farrowing, and wean-to-finish operations) for animal disease control purposes. Records are maintained for weaned, finished, or culled pigs regarding movement dates, number moved, as well as where they were moved to and from (specific to both geographic location and building).

[3] United States Department of Agriculture, "Farms, Land in Farms and Livestock Operations – 2006 Summary," National Agricultural Statistics Service, Report Sp Sy 4 (07), Washington, DC. February 2007.
[4] Meyer, Steve R. Personal communication of analyses using data from USDA Agricultural Marketing Service's Mandatory Price Reporting system.

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Swine | Sector Rank | | |
|---|---|---|---|
| Sector | Low | Medium | High |
| Commercial Operations | | ■ | |
| Sows/Boars | | ■ | |
| Transitional | | ■ | |
| Show Pigs | | | ■ |
| Food Waste Feeding Operations | | | ■ |

## Opportunities to Advance Traceability

The Group/Lot numbering system included in NAIS fits well with production management practices used in the swine industry. The Group/Lot Identification Number (GIN) incorporates the PIN and the date the group was assembled, providing valuable traceability information simply by examining each GIN itself. Having this information recorded in producer and packer records and readily available for animal health officials to use during disease traces significantly increase traceability. Although it might take some time to achieve full participation of all pork producers, given the structure of the industry in which the majority of hogs are produced on a small number of operations, increasing the participation of the producers who raise most of the pigs is achievable in the short term.

## Recommended Actions

- Provide staff and cooperative agreement funds to the National Pork Board to achieve a high level of premises registrations of swine operations; and
- Apply premises identification number tags to sows and boars as a means of official identification prior to their entry into the harvest chain to enhance traceability.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Poultry

### Industry Size

It is estimated that there are more than 1.8 billion chickens and 93 million turkeys on approximately 162,000 locations.

| Chicken and Turkey Populations[1] | |
|---|---:|
| **Chickens** | |
| • Broilers | 1,389,279,000 |
| • Layers | 334,435,000 |
| • Pullets | 94,882,000 |
| **Total** | 1,818,597,000 |
| **Turkeys** | |
| • Turkeys | 93,028,000 |
| **Total** (Chickens and Turkeys) | 1,911,625,000 |
| **Premises** | |
| Chickens | 146,200 |
| Turkeys | 16,600 |
| **Total** | 162,800 |

[1] *Census of Agriculture,* USDA National Agricultural Statistics Service, 2002.

### Industry Structure

The majority of chickens and turkeys marketed in this country are part of a highly integrated production chain led by commercial interests.

### Tracing Capabilities

The commercial poultry industry currently is able to trace groups of animals through all aspects of the production chain (nucleus, multiplier, breeder, hatchery, grower, and layer operations), for either animal disease control purposes. Records are maintained by the industry regarding specific dates that eggs, chicks, pullets, spent breeders, or layers are moved, the number moved, where they were moved from, and, specifically, where they were moved to, i.e., the incubator, building, or slaughter plant level.

| Poultry | Sector Rank | | |
|---|---|---|---|
| **Sector** | **Low** | **Medium** | **High** |
| Chickens | | | |
|     Multipliers | | ■ | |
|     Broilers | | | ■ |
|     Layers | | ■ | |
| Turkeys | | | ■ |

*Draft:* A Business Plan To Advance Animal Disease Traceability

### Opportunities to Advance Traceability

The National Poultry Improvement Plan (NPIP) is a cooperative industry-State-Federal program through which new technology can be effectively applied to improve poultry and poultry products. Regulations regarding NPIP, developed jointly by industry members and State and Federal officials, establish standards for the evaluation of poultry breeding stock and hatchery products, and the elimination of hatchery-disseminated diseases. Over 95 percent of the commercial poultry industry participates in NPIP. As a result, the industry is able to provide highly complete premises information when a disease is detected. This government-industry collaborative effort supports a high degree of traceability in the commercial poultry industry.

### Recommended Actions

- Establish policy and procedures to ensure the timely availability of premises information from industry-maintained systems;
- Work with industry to integrate industry systems that maintain commercial poultry location with the premises registration systems;
- Work with the Subcommittee on Tracking and Accountability of the Committee on Live Bird Markets (part of the NPIP H5/H7 Low Pathogenic Avian Influenza Program) to determine how best to locate and obtain non-commercial poultry premises information in a disease emergency; and
- Continue ongoing education and outreach to owners of backyard flocks, free range birds, game birds, etc., through the Biosecurity for Birds campaign, including integration of information about traceability and the NAIS in outreach and education materials.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Sheep and Goats

### Industry Size

As of July 2007, there were an estimated 7.7 million sheep on approximately 69,000 premises and 3.6 million goats on more than 91,000 premises.

| Sheep and Goat Populations | |
| --- | --- |
| **Sheep[1]** | |
| Market Sheep and Lambs | 3,120,000 |
| Breeding Sheep and Lambs | 4,610,000 |
| **Total** | 7,730,000 |
| **Goats[1]** | |
| Angora | 260,000 |
| Dairy Goats | 335,000 |
| Meat Goats | 3,000,000 |
| **Total** | 3,595.000 |
| **Premises** | |
| Sheep and Lamb Operations[2] | 69,090 |
| Goats[3] | 91,462 |

[1] *Sheep and Goats,* USDA National Agricultural Statistics Service, July 2007.
[2] *Sheep and Goats,* USDA National Agricultural Statistics Service, 2006.
[3] *Census of Agriculture,* USDA National Agricultural Statistics Service, 2002.

### Industry Structure

The U.S. sheep and goat industry is composed primarily of independent producers and is not vertically integrated.

### Tracing Capabilities

Most sheep and goats can be traced back to the flock of origin due in large part to industry participation in the National Scrapie Eradication Program (NSEP). An estimated 95 percent of sheep flocks, 52 percent of goat herds, and 130,000 sheep and goat premises are listed in the scrapie database. Of these, 78 percent have requested official NSEP eartags. NSEP works with industry to provide traceability for breeding sheep and cull sheep as well as many breeding goats.

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Caprine and Ovine | Sector Rank | | |
|---|---|---|---|
| Sector | Low | Medium | High |
| Dairy Goats | | ■ | |
| Meat Goats | ■ | | |
| Exotic Goats | ■ | | |
| Purebred Sheep | | ■ | |
| Commercial Sheep | ■ | | |

## Opportunities to Advance Traceability

Regulation modifications and increased emphasis on enforcement could bring an estimated 90 percent of the sheep and goat industries into 90 percent compliance with NSEP requirements.

## Recommended Actions

- Work with industry to achieve the cross-referencing of Flock ID numbers with standardized premises identification numbers;
- Support efforts to increase compliance for existing animal identification requirements; and
- Work with industry to develop a long-term plan to ensure the animal identification infrastructure is maintained, following scrapie eradication.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Equine

### Industry Size

June 2007 estimates indicate that there are approximately 5.8 million horses on 570,000 premises. The horse industry has a significant number of horses that are individually identified. Based on breed registry statistics, it is estimated that this number may be as high as 50 percent of the 5.8 million horses.

### Industry Structure

Among livestock, horses are unique in that they live longer, are generally more valuable, are transported interstate and internationally more often, and are imported and exported on a regular basis. Many horses are routinely identified for breed registries, horse identification services, or to ensure the integrity of the racing and wagering industry. The traceability of horses for disease control purposes is considered critical by the horse industry. Existing identification programs can be utilized to support disease traceability efforts. The sport/competition horses are identified through two major categories, with the following subgroups:

- *Race Horses* identified through the breed registry mandatory identification programs; Jockey Club, United States Trotting Association and American Quarter Horse Association
- *Show Horses* identified through the new mandatory United States Equestrian Federation Horses Identification Program

### Tracing Capabilities

Of the 5.8 million horses in the United States, approximately 2.2 million are tested annually for equine infectious anemia (EIA) using the Coggins test. There are numerous equine breed registries that record individual animal identification and location-related information. However, availability of registry information for traceback purposes is variable. Because a given equine premises can board many different breeds of registered horses, utilized in a variety of different disciplines, a single premises might be registered with multiple organizations, with the resulting address redundancy complicating premises identification.

This traceability plan focuses on those horses that move to other premises and are commingled with horses from other premises, in particular at races, shows and sales, and exhibitions where horses move from across a State and/or multiple States. The Equine Species Working Group recommends that the population of horses that, when moved, require a certificate of veterinary inspection (CVI) or EIA test be considered a priority in the business plan. The significant revenues to animal agriculture from these horses and the frequent, sometimes continuous, movements of these horses to events, warrant their designation as a high-priority sector.

| Equine | Sector Rank | | |
|---|---|---|---|
| **Sector** | **Low** | **Medium** | **High** |
| Horses that require a CVI or EIA test | | | ■ |
| Horses that do not require a CVI or EIA test | ■ | | |

### Opportunities to Advance Traceability

Coggins testing is a prerequisite for all interstate movement (State requirement), and in some States, for intrastate movement as well. Efforts are underway to develop a USDA national State-Federal cooperative program for the control of

*Draft:* A Business Plan To Advance Animal Disease Traceability

EIA that would establish national EIA (Coggins) testing requirements for (a) interstate movement and (b) change of ownership. Horses must be identified (description/drawing, digital photograph, electronic implant) on the requisite Coggins test-related paperwork. Overall, establishing regulations to require premises registration in association with Coggins testing would substantively increase the number of both premises registered and horses identified. When horses move interstate to attend shows or exhibitions, registration is required upon entry. Accordingly, event officials are able to track horses moving intrastate or interstate (via interstate passport) to the farm of origin. Concurrently, animal health officials are able to track to the premises of origin and destination via ICVI for horses moving interstate. Though impossible to quantify nationally, experience has shown that the number of Coggins tests performed annually increased three-fold following implementation of a "change-of-ownership" testing requirement in Texas.

The NAIS Equine Species Working Group has recommended the use of ISO-compliant injectable transponders for horse identification.

### Recommended Actions

- Integrate the standardized PIN on Coggins test-related paperwork;
- Implement the recording of PINs for the destination of all imported horses and the last premises of exported horses;
- Use PINs for both premises of origin and destination on ICVIs;
- Collaborate equine organizations to integrate the utilization of the AIN "840" identification devices;
- Expand the utilization of electronic ICVI; and
- Provide communication standards to support industry efforts to integrate automated data capture technologies at equine events and establish necessary interfaces with APHIS-VS information systems.

# Strategy 2: Harmonize Animal Identification Programs

As mentioned previously, there are now numerous government and industry programs in place—both in the United States and abroad—that use animal identification. Animal identification can be used for management purposes, marketing opportunities, and disease control. The functions and activities it supports are rapidly expanding. As the uses for animal identification continue to grow, the demand for improved, streamlined animal identification systems and technology also is increasing.

With NAIS, USDA is committed to the development of a flexible identification system that—while meeting the primary needs of animal disease traceability—can be used by the industry for other valuable opportunities. USDA will work with other Federal, State, industry, and international partners to ensure the availability of improved identification methods and compatible processes and data standards that can be used for multiple purposes. Available opportunities for improvement and harmonization, both domestic and international, are discussed below in greater detail.

## Domestic Programs

### Breed Registries and Performance Recording Programs

Breed registry and performance recording programs present a significant opportunity to advance traceability if current identification approaches adopt the common data standards proposed in this plan. Registered and seedstock programs that provide most of the genetic base for the livestock industry require official and accurate identification. In some species, a single numbering system and identification method is preferred, while in others a combination of identifiers is used. Breed registries may use additional techniques such as DNA or tattoos to supplement national standards.

As noted in the dairy cattle profile, the standardized use of the PIN through the administration of the National Uniform Eartagging System in Dairy Herd Improvement Association (DHIA) would bring significant benefits to the industry. Specifically, this practice would result in having the majority of animals in DHIA identified to the birth premises or, at minimum, to the premises where the animal was first officially identified. Likewise, the use of the AIN in the breed registries of all species would help unify identification methods across many sectors of the industry.

### Industry Alliances

Participation in marketing alliances is growing rapidly. Animal identification helps document the information necessary for age, source, and process-verified animals. As a higher percentage of cattle producers participate in such programs, the opportunities to capitalize on standardized and compatible systems increase.

Harmonization activities will emphasize collaboration among industry stakeholders. In addition, State and Federal animal health officials will work on shared identification issues. RFID technology, for example, has been highly utilized in marketing alliances for several years. The incorporation of the RFID AIN "840" tag into these programs will increase tracing capabilities with minimal, if any, additional effort or requirements of the industry.

### Agricultural Marketing Service (AMS)

Many USDA-AMS verification programs require animal identification. Individual identification is required for USDA Process Verified Programs and USDA Quality

System Assessment (QSA) Programs to verify the animal's age. The AMS "Program Compliant" eartag is a one-time use, tamper-evident tag, which contains a non-repeatable, unique number.

APHIS will work with AMS to coordinate definitions of identification requirements to provide solutions that comply with both agencies' requirements. Additionally, AMS is considering how best to incorporate the PIN standard when a location identifier is needed to support their programs.

## International Collaboration

Although USDA will not select or require the use of specific technology for use with NAIS, we recognize the importance of having a basic level of harmonization for animal identification. Such basic technology requirements ensure, among other things, that other countries recognize the identification technologies and/or devices used with NAIS. Accordingly, the standardization of animal identification with trading partners—specifically Canada and Mexico, due to the high degree of integration with the U.S. herd—is imperative to support trade.

The North American Animal Health Committee and the Emergency Management Working Group have established an Animal Identification Subcommittee to consider animal identification issues and to ensure development of a compatible system. Review of and potential standards for data elements and animal identification technologies are the primary focus. USDA also supports the use of technology standards published by the International Organization for Standardization (ISO); these standards are most important when species, such as horses, move internationally. The appropriate Species Working Groups will provide recommendations on identification and technology standards to support international movements of key animals.

### World Trade

USDA actively supports the work of the World Organization for Animal Health (OIE) to develop science-based international standards for the safe trade of animals and animal products. OIE is developing generic standards with basic criteria for use when its 169 member countries are establishing or improving their animal identification programs. While animal identification programs can and should be designed and developed with all pertinent stakeholders, the OIE states that veterinary authorities in each country should provide oversight.

OIE requirements for identification in exported animals and animal products are being established and added to the *Terrestrial Animal Health Code* (Code) chapters for each of OIE's listed diseases. In addition, the OIE will continue its work on the development of specific guidelines for animal identification and traceability. The Terrestrial Animal Health Standards Commission has issued draft guidelines and asked for comments from member countries.

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Strategy 3: Standardize Data Elements of Disease Programs to Ensure Compatibility

USDA will take steps to standardize data elements in existing disease programs, including international/interstate commerce regulations. First, USDA will proceed with finalizing the NAIS data elements in the *Code of Federal Regulations* (CFR). The utilization of the data elements then can be fully practiced in the administration of disease programs. For example, national data elements that identify premises importing and exporting livestock, locations participating in official disease control programs, and origin and destination premises listed on ICVIs will greatly enhance existing animal disease tracing and emergency response capabilities.

## Establishing National Data Elements

### Premises Identification Number (PIN)

Use of a single premises numbering system in all animal health data systems is essential for standardizing information and enhancing existing disease tracing and emergency response capabilities. Since 2004, USDA has been working to establish the NAIS PIN as the standard format for location identifiers.

#### Premises Identification Number
A PIN is a unique, seven-digit code that includes both letters and numbers (e.g., A123R69). This format was developed for NAIS through discussions with industry and producer representatives. In addition to this PIN format, the *Code of Federal Regulations* (CFR) continues to recognize previous premises numbering systems; for example, Iowa may use IA12345 as valid premises identification. While the State herd numbering system has been used for many years, problems occur when duplicate numbers are assigned to the same location. At this time, more than 400,000 PINs using the new NAIS format have been issued.

USDA published an interim rule on November 8, 2004, in the *Federal Register* (Docket No. 04-05201 Livestock Identification; Use of Alternative Numbering Systems), recognizing the Premises Identification Number (PIN), the Animal Identification Number (AIN), and the Group/Lot Identification Number (GIN) as additional official numbering systems. The alpha characters USA and the numeric code assigned to the identification device manufacturer by the International Committee on Animal Recording also were recognized in order to avoid placing an excessive burden on producers who were already using those numbering systems for identifying their animals.

The final rule, which adopted the interim rule with several changes, was published on July 18, 2007 (Docket No. 04-052-2 Livestock Identification; Use of Alternative Number Systems), taking into account all public comments received during the comment period (which ended on January 7, 2005).

A proposed rule will detail the process for phasing out one of the commonly used premises numbering systems, the State postal code prefix followed by a number.

### Animal Identification Number (AIN)—"840" Number

Identification requirements have been established for a number of existing USDA animal disease control programs, specific species, and classes of animals moving in interstate commerce. Currently, AIN devices can be used to meet the official

*Draft:* A Business Plan To Advance Animal Disease Traceability

identification requirements for all animal disease programs regulated through the CFR or by the States.

**Animal Identification Number**
The AIN contains 15 digits, with the first three being the country code. The country code for the United States is "840."

A proposed rule will detail a transition process to official use of the 840 AIN and termination of the official recognition of the USA and manufacturer-coded prefixes. The proposed rule will define a systematic process to avoid conflicts with existing tag inventories and will avoid the need to retag animals currently identified with the devices being removed from the definition of official identification. The industry will have the opportunity to comment on the proposed rule prior to its finalization and implementation.

This rule will enhance traceability because distribution records for AIN devices are required and are then automatically linked to the standardized PIN. This provides critical and timely information to animal health officials when conducting a disease investigation.

## Utilizing Data Elements with Disease Programs

The convergence of national data elements with disease programs will increase traceability through the following actions.

- **PIN requirement for import/export protocols.**
  APHIS is considering a regulation to require a PIN for livestock import and export movements. Utilizing the PIN for the destination premises importing livestock and the shipping facility exporting livestock will provide more complete and standardized information, thereby enhancing regulations that are already in place. Guidelines and/or regulations for the use of the PIN in health certificates and permits will be a top APHIS priority. As with producers or animal owners who register their premises in order to receive a NAIS-compliant PIN, owners of shipping facilities or other domestic exporters would register their premises, as would owners of the premises receiving imported livestock.

- **PIN use in all official disease control programs and for emergency response.**
  Using the PIN as the standard location identifier in all official disease control programs and during emergency response activities ensures the evolution of a compatible system for locating livestock production and holding premises.

  Disease programs currently use herd and flock identification protocols that vary across programs and are not based on the standardized PIN location identifier. A key first step in increasing traceability is to use the PIN format when recording locations that participate in existing disease programs and related activities. This approach will "jump start" the integration of NAIS data elements into disease programs.

  The assignment of a standardized PIN location identifier is of significant importance in all disease programs and will be used in the administration of Federal disease control programs:
  - Bovine Tuberculosis
  - Brucellosis

*Draft:* A Business Plan To Advance Animal Disease Traceability

- Pseudorabies
- Scrapie
- Chronic wasting disease

Use of a standardized PIN location identifier during an emergency response to an animal disease event or outbreak is also essential to ensure that data in the Emergency Management Response System is standardized and that system is compatible with other databases in the APHIS-VS animal health information system.

- **PIN use on Interstate Certificates of Veterinary Inspection (ICVIs).** The option to use the PIN for origin and destination premises on ICVIs administered by States will provide more precise location information on the animals' planned movement. Accordingly, this option will greatly improve the value of existing documentation certificates already used for interstate commerce.

### Historic and Current Location Identifiers for Federal Disease Programs

Disease programs such as the brucellosis program and the bovine tuberculosis program, have historically assigned location identification numbers when program activities (e.g., vaccination, herd tests, etc.) occurred on those premises. Prior to the development of NAIS and its National Premises Information Repository, each State generated numbers in State-specific formats (commonly known as State herd numbers) and recorded the data in the Animal Health and Surveillance Management System (AHSM) (formerly known as the Generic Database). As part of the APHIS-VS animal health information system, AHSM stored data for use by State and Federal animal health officials during disease investigations, however, use of the State herd numbering system has been problematic since duplicate numbers were often assigned to the same location, if more than one program activity occurred. Use of a standardized data format for location identifiers is essential to enhance the ability of animal health officials to access necessary data, especially in time-sensitive situations such as a disease traceback. Standardized data formats will allow all of the databases in the APHIS-VS animal health information system to communicate quickly and accurately.

The development of NAIS has provided the opportunity to establish a standardized data format for location identifiers. The premises identification number (PIN) format is a unique, 7-digit code that includes both letters and numbers; for example, A123R69. As a standard operating procedure, disease programs will continue to assign location identifiers as before, however, all States will now use the PIN format, rather than State herd numbers. For instance, when a producer elects to participate in a disease program (e.g., brucellosis vaccination in a Class-Free State) or is part of a disease investigation, a standardized, 7-digit PIN will be assigned to that premises, rather than a State herd number. The NAIS premises number allocator will assign the PIN, and the data will be stored in the National Premises Information Repository within NAIS.

# Strategy 4: Integrate Automated Data-Capture Technologies with Disease Programs

Aligned with improving government performance as outlined in the President's Management Agenda of FY 2002, these advancements are consistent with the goal of expanded electronic government. This migration from paper-based animal health data collection systems to electronic-based systems is part of an Agency-wide eGov initiative to meet this goal and is congruous with the requirements of the Government Paperwork Elimination Act.

USDA will take steps to integrate electronic data-capture and reporting technologies into existing disease programs. By using NAIS-compliant RFID devices and integrating handheld computers/readers to replace paper-based forms, animal health officials will be able to electronically record and submit essential data to the USDA Animal Health and Surveillance Monitoring database and other appropriate animal health databases. Where NAIS-compliant RFID devices are not used, but other official identification devices are, provisions will be made to record the identification information and electronically assist in submitting the information to appropriate animal health databases as well. The electronic collection of data will increase volume and quality, minimize data errors, and speed data entry into a searchable database.

USDA and States have begun to incorporate electronic data capture and reporting into existing programs and information systems. This effort in mobile information management systems (MIMS) for field collection of animal identification data, whether chute-side with producers or at surveillance points such as harvest facilities or livestock markets, is continuing to expand because of need and success. Examples include the electronic bovine tuberculosis testing system, electronic brucellosis system for vaccination and testing, electronic ICVI, and the scrapie handheld system.

## Electronic Bovine Tuberculosis Testing System

For fiscal years 2005 and 2006, over 7,000 herds and over 250,000 cattle were tested for bovine tuberculosis in Michigan alone. Each animal was required to be individually identified and the number recorded on official tuberculosis test records. For those animals previously identified with visual-only devices, each animal had to be head-restrained and the number accurately recorded from its eartag, sometimes requiring extra effort to clean the tag of debris to be readable. APHIS-VS has developed automated systems based upon readily available and price-conscious technology such as RFID for use by Federal and State animal health officials to assist with tuberculosis testing. In the current bovine tuberculosis investigation in the State of New Mexico, in 1 day, over 1,300 animals were test evaluated for the disease, identification and complete test form data was recorded, and the data was transmitted to animal health databases without ever using a pencil or pen. This tuberculosis control and eradication effort has served as a model for the development of other animal health automated data capture systems. The accuracy and efficiency of the data collection, and the seamless interaction with appropriate animal health databases, provides critical traceability information now available from APHIS-VS animal health program databases.

## Electronic Brucellosis System—Vaccination and Testing

Approximately 4 million beef and dairy heifers are vaccinated annually for brucellosis. In addition, for surveillance purposes, about 4 million slaughtered cattle, 3 million livestock market cattle, and 1 million cattle on farms are tested for brucellosis. In all cases, with the exception of slaughter surveillance, the

animals are individually identified using official identification. More specifically, vaccinated animals are permanently identified with an ear tattoo and by placing an official vaccination tag in the right ear. The orange brucellosis vaccination tag has been used, over many years, to easily identify vaccinates. Industry and animal health officials value the orange brucellosis vaccination tag because its high visibility means that the animals do not have to be handled to determine whether they have been vaccinated. The official vaccination eartags follow the format of the nine-character National Uniform Eartagging System, starting with the State prefix (two alpha characters).

With over 12 million annual observations possible through the brucellosis vaccination and testing program for cattle, automated data capture systems to upload this information into APHIS-VS animal health databases are integral for enhancing traceability information. AIN eartags that incorporate RFID technology meet the requirements for official identification of brucellosis vaccinated or tested animals. If an AIN tag is used as the official identifier, the complete AIN must be recorded on the official vaccination or official testing form. As currently proposed and in development, the automated data capture system will integrate radio frequency technology with recording the identity of heifers as they are vaccinated or for animals being tested. Handheld scanners will capture the AIN electronically. In addition, the associated information currently collected on the forms, along with the PIN, would also be recorded electronically, and then collectively the information will be automatically entered into the APHIS-VS Animal Health and Surveillance Management System (AHSM) database. This effort will provide the essential epidemiological information of animal identification, place, event, and point in time necessary for traceability.

## Electronic Interstate Certificate of Veterinary Inspection (ICVI)

Commonly known as health certificates, ICVIs are required for transporting livestock and poultry across State boundaries. A copy of the document must accompany each shipment. For interstate purposes, this document is intended to inform the State of origination and the State of destination of animals officially identified that have been inspected by an accredited veterinarian and meet specific animal disease requirements for movement eligibility. Many times, the certificate of veterinary inspection is linked to other APHIS-VS animal health programs such as brucellosis vaccination and testing, tuberculosis testing, and equine infectious anemia testing (EIA testing commonly known as Coggins testing), among others. It also can link to various veterinary diagnostic laboratories. As a result, this document provides useful epidemiological information needed in a traceback disease investigation. To facilitate timely transfer of this information document, APHIS-VS has developed an electronic form of this document referred to as an Electronic Certificate of Veterinary Inspection (eCVI).

In the development of the eCVI, NAIS data standards regarding animal identification and premises identification have been incorporated. This standardization is essential since this document links to multiple APHIS-VS animal health databases. The ability to communicate with multiple databases is important for timely retrieval of traceability information. This standardization is even more important with the continued evolution and development of the eCVI since it applies to all livestock and poultry species in documenting eligibility for movement of animals and animal products, not just a program disease associated with a particular species or livestock industry. Accredited veterinarians in 15 States currently use the eCVI, having officially identified over 850,000 animals in the past 18 months. In that same timeframe, there has been a nine-fold increase in the number of accredited veterinarians using the system on a monthly basis. The eCVI has the capability of accepting 900 unique individual identification

numbers electronically per form. With new improvements yet to be deployed, and planned for early 2008, it is expected that this source of valuable and integrated traceability information associated with APHIS-VS animal health programs will increase exponentially.

Electronic international health certificates also are being planned for development. The importance of electronic access to traceability information associated with all import and export animals uniquely identified, along with associated premises identification numbers of destination and origination points, will be instrumental not only in global trade, but for disease response purposes as well.

## Scrapie Handheld System

Electronic test charts for scrapie susceptibility genotyping are created in the field using official "840" RFID identification eartags, RFID readers, and tablet personal computers. The electronic charts are then routed to the Animal Health and Surveillance Management (AHSM) System database and transmitted electronically to a contract laboratory for association with sample testing. The results are then returned electronically to AHSM. The electronic collection of data in the field minimizes transcription errors and ensures the timely entry of test results into the database.

The National Scrapie Eradication Program also uses official RFID eartags to identify scrapie-exposed animals. A software program is being developed to capture these identification numbers using a mobile system similar to the one used to upload test charts into AHSM. As a result, traceability information associated with animals at increased risk will be readily available.

# Strategy 5: Partner with States, Tribes, and Territories

Successful animal disease control programs are a result of well-established partnerships among Federal and State animal health authorities, accredited veterinarians, and many other resources throughout the industries.

## State-Based Priorities and Traceability Plans

State/Tribal/Territorial animal health authorities play a critical role in advancing national animal disease traceability.  NAIS is a national effort and has Federal accountability, but it is administered by States, Tribes, and Territories at the local level.  Working in close partnership with State, Tribal, and Territorial animal health officials, USDA will continue to support the advancement of each State/Tribe/Territory's disease traceability infrastructure.  Each State/Tribe/Territory will administer and manage localized plans reflecting the animal health priorities in individual regions.

## Cooperative Agreements

APHIS-VS provides Federal support for NAIS implementation activities and infrastructure within each State, Tribe, or Territory through a Federal funding instrument referred to as a cooperative agreement.  This differs from a grant in that grant recipients follow Federal guidelines but are more independent in using the funds.  With a cooperative agreement, both parties contribute to the successful completion of the project as outlined in the application and mutually agreed-upon work plan.  Cooperative agreement awards require quarterly reporting and engagement of Federal oversight in the successful completion of the goals, objectives, and description of efforts outlined in the work plan.  Beginning with fiscal year 2008, this draft business plan will uniquely serve as a blueprint for the development of work plans associated with NAIS implementation cooperative agreement funding.

The overall goal for NAIS implementation cooperative agreement funding will be to advance animal disease traceability.  This business plan will provide uniform guidelines for all applicants in prioritizing goals, objectives, and strategies in developing their cooperative agreement work plans.  Each State, Tribe, or Territory will be required to evaluate, describe, and identify animal disease traceability risks within their boundaries.  Priorities of industry, species, or sectors will be aligned with the priorities outlined in this business plan. Work plans will describe how each applicant will reduce those risks and advance animal disease traceability within their State, Tribe, or Territory.  Because States, Tribes, and Territories have made varying progress to date regarding NAIS implementation, this approach will allow each applicant the flexibility needed to advance animal disease traceability appropriate for their State, Tribe, or Territory. This approach builds upon previously funded efforts while recognizing that the lack of NAIS participation and the failure to use NAIS data standards are also traceability "risks." Approaches to reduce those traceability risks will be projected through 2011, partitioning progress goals for each year using the same strategies.  By allowing States, Tribes, and Territories to define their needs and tailor their NAIS implementation work plans in concert with this overall Federal business plan, the monitoring of performance measures and the integration of budget with that performance will be more uniformly applied to all applicants regarding Federal accountability needs.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Strategy 6: Collaborate with Industry

Active involvement and support from producer organizations and other key figures in the animal agriculture community are essential to establish a successful NAIS and advance national animal disease traceability. These groups provide a direct link to producers, offering an invaluable resource to communicate clearly about NAIS and secure the level of participation needed to make it fully functional for all industry sectors. To meet this end, USDA will pursue a variety of avenues to strengthen partnerships with industry and solicit direct feedback from producers and other key industry stakeholders as NAIS is developed.

### NAIS Subcommittee and Species Working Groups

As NAIS implementation has progressed, the needs and comments of many individuals have shaped the system's development. Unique needs and preferences must be considered and addressed to make the system work well for different parts of the animal industry and also for U.S. producers who raise many different species of animals in many different environments.

Some issues can only be addressed sequentially as NAIS is developed and more fully implemented. The Species Working Groups represent a significant, first-tier level of those individuals who will help shape the answers to many of the remaining technical and procedural issues concerning NAIS. The groups' primary objective is to provide their species-specific knowledge and experience to address species-specific issues and further NAIS' development and implementation.

The working groups include representatives from various levels and segments of industry. Their input to NAIS' development is critical, and they contribute the species-specific, ground-level information that is necessary to create an effective system. NAIS working groups are focused on the production of cattle (beef and dairy), bison, poultry, swine, sheep, goats, deer and elk, equines, and alpacas and llamas.

The recommendations developed by the various Species Working Groups are provided to the NAIS Subcommittee, which is aligned with the Secretary's Advisory Committee on Foreign Animal and Poultry Diseases (SACFAPD). The Subcommittee is comprised of State and industry stakeholders, with Federal staff providing program resources and administrative support. Two members of the SACFAPD generally serve on the NAIS Subcommittee as well. In addition to the recommendations from the Species Working Groups, the Subcommittee also accepts recommendations from State and national organizations.

The NAIS Subcommittee reviews and consolidates recommendations it receives and, in turn, reports its findings to the SACFAPD. This structure for gathering input and shaping decisions provides an excellent opportunity for industry issues – including those unique to producers – to be thoroughly discussed and to have a consensus position shared with USDA.

The Species Working Groups continue to meet and facilitate discussion on issues and solutions relative to the advancement of traceability. In developing this business plan, USDA carefully considered many of the groups' recommendations over the past several years, and this input was incorporated into the strategies described here. As USDA continues to move forward, the Species Working Groups will continue to evaluate the strategies in use, offer input, and identify new strategies needed as the action items are successfully put in place.

## Support Industry Leadership Efforts

Achieving traceability objectives requires a partnership between the production sector and animal health officials. Partnering with industry organizations enhances communication efforts as producers receive information directly from the organizations they know and respect. USDA, through cooperative agreements with industry non-profit organizations, is supporting outreach efforts and the registration of premises. The organizations, with producers' consent, assist with the completion of the premises registration form and provide it to the appropriate State animal health authority's office for processing.

APHIS has signed cooperative agreements with several organizations, including:
- National Pork Board
- United States Animal Identification Organization
- National FFA Organization
- National Milk Producers Federation for IDairy
- American Angus Association
- American Sheep Industry
- Humane Farm Animal Care
- National Cattlemen's Foundation

Additional agreements are being reviewed at this time.

Through the efforts of these organizations, a significant number of new premises are slated to be registered. The actual processing and administration of the registrations will remain the responsibility of each State, Tribal, or Territorial animal health official.

Additional partnership efforts with industry alliances, service providers, auction markets, feedlots, harvesting facilities, and other industry sectors are a priority for USDA.

## Practitioners/Accredited Veterinarians

Veterinarians are often the most utilized source of information by producers. As "on-farm/ranch" experts, they are conduits for information and serve as first responders to disease outbreaks. USDA has established an outreach program specific to accredited veterinarians. This collaboration with USDA accredited veterinarians with large animal clinics and practices will enable the delivery of accurate information on the NAIS to producers, breeders, and animal owners who have a business need to protect the health of their animals. The knowledge of veterinarians will enhance the adoption of NAIS data standards in everyday management and disease program activities at the producer level.

In addition, USDA is developing a NAIS training module for use in the veterinary accreditation process. USDA is also including information about NAIS in all disease related training modules, as traceability is an integral component of all programs.

## Markets/Auctions

In order for NAIS to enable effective traceback in the timeliest manner possible, it is necessary to record animal identification at critical location points, such as markets/auction barns where commingling occurs. Likewise, USDA must identify practical methods to cost-effectively record animal identification numbers at the "speed of commerce" at these locations. With these goals in mind, USDA continues to work with market groups to address concerns related to (1) the

ability of current technology to meet the needs of all livestock markets, in particular the high volume markets; (2) the cost of the infrastructure; and (3) potential responsibility for tagging animals on arrival, because the additional handling will increase "shrink" (weight loss), requiring additional labor and administration.

Kansas State University recently released a report, available online, that outlines information about costs, opportunities, and recommendations for the implementation of NAIS in Kansas auction markets. This report is one example of the progress made and USDA's renewed focus and efforts to address issues for this important segment of industry.

## Harvesting Facilities

As USDA progresses towards enhanced, effective animal traceability, it is fundamental not only to know the premises of origin of animals for certain species, but also to know which animals have been terminated or removed from the population. This "bookend" approach of knowing an origination and a termination point improves USDA's ability to determine other animal locations when conducting an animal disease traceback investigation. Establishing a practical and effective process for harvest facilities to report termination records of animals that are officially identified (either individually or by group/lot) is critical. Knowing which animals have been removed from a population allows animal health officials to focus on those animals that might need to be included in a disease trace.

An ongoing NAIS-funded project, coordinated by Colorado State University, is designed to gather input from beef, lamb, and pork processing plants and renderers concerning implementation of NAIS within those industries. Outcomes will include recommendations about how the packing and rendering industries might contribute to the needs of NAIS. These recommendations also will address issues of interest, including: (1) the potential complications associated with the use of injectable transponders for individual animal identification; (2) responsibility of removing those devices to avoid product contamination; (3) how to possibly deal with group/lot identification alternatives; and (4) the impact of data collection infrastructure on the speed of commerce.

## Brand States

Fifteen States have brand inspection programs with either full or partial State participation. With the initiation of premises registration in late summer of 2004, many brand programs assisted NAIS implementation with promoting premises registration, and continue to do so. By virtue of their proximity to producers, brand inspection personnel have been able to provide valuable feedback regarding implementation efforts.

After 2 years of work in promoting NAIS and observing NAIS implementation progress, brand inspection personnel requested an opportunity to assess mutual opportunities with NAIS staff in October 2006. A Brand State Working Group was organized to specifically define and demonstrate how official brands can best be used to support the objectives of NAIS and offer the results for consideration and inclusion in NAIS plans. The working group also is exploring cooperative efforts that might be of merit to the brand system as well. USDA has received valuable feedback so far and will continue working closely with brand States on NAIS issues. USDA remains committed to ensuring that NAIS capitalizes on the merits of branding and the brand systems infrastructure as the program moves forward. Brands and the brand infrastructure will continue to be a vital part of animal identification.

# Strategy 7: Advance Identification Technologies

Continued advancement in traceability requires practical and affordable technological capabilities that increase the efficient and accurate collection of animal identification information. To be successful, the data collection infrastructure must operate at the "speed of commerce" and in a multitude of different environments, including harvesting facilities.

## Performance Standards

Although USDA has adopted a technology-neutral position, APHIS recognizes that performance standards are necessary to ensure device compatibility across multiple platforms. Examples include ISO 11784 and 11785 for the Radio Frequency Identification of Animals. Detailed and measurable performance standards for these technologies must be clearly defined and established through stakeholder consensus. This approach can ensure successful use of technologies beyond NAIS, including management and marketing opportunities.

The American Society for Testing and Materials (ASTM) International Committee F10 on Livestock, Meat and Poultry Evaluation Systems is organizing a task force of interested stakeholders to establish RFID performance standards. Eventually, these additional performance standards and testing protocols will be used to develop and approve NAIS-compliant devices.

## Advancing Technologies

The animal health traceability infrastructure will continue to improve as market-ready technology for animal identification systems evolves. Field trials to assist industry in the evaluation of such technologies will be administered through specific NAIS-structured cooperative agreements. USDA remains cognizant that animal identification and traceability needs must not interfere with the speed of commerce. By continuing to monitor current technology standards with an eye to emerging technologies, it is expected that over time the collection of necessary traceability information will become seamless and routine. Issues of backward or multi-frequency compatibility, cost, and niche applications are also important. By continuing to participate in stakeholder meetings of standardization interests, future solutions can be achieved.

*Draft:* A Business Plan To Advance Animal Disease Traceability

# NAIS Communications and Outreach

Producer and stakeholder education and outreach are vital to achieve successful levels of participation in NAIS.  USDA is currently implementing ongoing national outreach and education aimed at:

- Increasing producer awareness and understanding of NAIS; and
- Promoting producer participation in premises registration – the foundation of NAIS.

### Overview

USDA initiated comprehensive outreach and education activities in July 2004.  Initially, USDA focused on increasing producer awareness of NAIS and encouraged producers to seek information from their State animal health officials and from USDA's NAIS Web site.

In May 2006, USDA expanded the communications effort, emphasizing the importance of premises registration and offering practical information to producers about how to participate in NAIS.  Central to the 2006 effort was the integration and coordination of outreach activities with State NAIS Administrators through the NAIS Community Outreach Partner (COP) program.  This program was designed to support State NAIS Administrators in their efforts to increase premises registration by:

- Providing educational and outreach materials that States can use in local outreach efforts, decreasing the costs of developing State-specific materials;
- Providing Administrators with training to hone communications skills;
- Ensuring the development and delivery of consistent information throughout all levels of the program;
- Allowing for the dissemination of timely and accurate information to stakeholders; and
- Providing ongoing opportunities to exchange best practices among State participants.

### Continuation Plan

Today, the outreach and education campaign remains focused on:

- Increasing premises registration totals (in line with stated USDA objectives);
- Promoting producer participation in all three components of NAIS – premises registration, animal identification, and animal tracing; and
- Returning the national debate on NAIS to animal health and emergency disease response.

### Communications Plan and Campaign Implementation

Current NAIS information materials focus on premises registration and include both general and species-specific brochures, and topic-specific factsheets.  Partner-oriented materials include customizable PowerPoint presentations and other internal and external collateral to support partner efforts.  These materials were tailored to appropriate stakeholder groups, including minority and underserved producer communities.

In the coming year, USDA will develop additional materials that focus on the importance of improving animal disease traceability.  These materials will be tailored to appropriate stakeholder groups, including minority and underserved producer communities, as well as accredited veterinarians.  Emphasis will be placed on developing messages and materials that stress producers' ability to tailor their participation in NAIS to meet their needs.

*Draft:* A Business Plan To Advance Animal Disease Traceability

USDA will continue to work closely with States to provide cost-effective materials and to distribute consistent information.

**COP Events**
In October 2006, USDA hosted a two-day COP meeting for State NAIS Administrators. The purpose of the meeting was to equip attendees with, and train them in the effective use of, NAIS outreach materials. USDA officials provided program updates and sessions included case studies from State outreach efforts.

USDA plans to host another two-day COP event in early 2008. This event will allow partners to share best practices, network, receive tools and training to enhance their outreach efforts, and learn about current national NAIS operational and communication activities.

**Partnership Development**
USDA will continue to develop and nurture partnerships with appropriate State, Federal, and industry stakeholders. In 2006, USDA and the Cooperative State Research, Education, and Extension Service (CSREES) developed and distributed tools to Extension educators to help them more effectively educate and inform people about NAIS in local communities nationwide. USDA will work to maintain this partnership and build upon a partnership with 4-H. USDA will continue to develop tools and design materials for partners' use.

USDA will also continue to collaborate with those nonprofit industry organizations that have received cooperative agreement funds to promote premises registration.

**Web Site Enhancement**
Recent enhancements include incorporating updated program messaging, revamping the document library, adding disease information, and improving navigation. Moving forward, the site will be further enhanced to serve the goals and objectives of the communications effort with traceability messaging. The Web site is a critical communications tool and will continue to be a central source of current, accurate information.

USDA recently launched a Partner collaboration site that provides Community Outreach Partners with a secure online location to exchange comments and recommendations, access documents and outreach materials, view and post announcements, and post and view events on a common calendar. This "one-stop-shop" resource will ensure information is accessible in real time, that messages and themes are consistent between regions, and that feedback can be given and received at multiple levels.

**Veterinary Outreach**
Producers rely on veterinarians for expert information on a wide range of topics. USDA is developing materials for distribution to USDA accredited veterinarians, especially practitioners who treat beef and dairy cattle. The materials will update these veterinarians about NAIS and the status of the program, and encourage practitioners to educate clients about the benefits of NAIS.

**Future Communications**
USDA will take steps to identify and meet information needs as the strategies and actions described in this business plan are put into practice. The adoption of national data standards, for example, will involve communications to animal health officials at the Federal and State levels, as well as veterinarians and industry stakeholders. Moving forward, USDA will use targeted communications to support animal disease traceability objectives.

*Draft:* A Business Plan To Advance Animal Disease Traceability

# NAIS Budget Summaries and Plans

## Summary of Funds and Obligations

### Available funds

From FY 2004 through FY 2007, $118,050,000 has been made available to USDA-APHIS to implement NAIS.

- FY 04 funding: $18.8 million from Commodity Credit Corporation (CCC) funds for implementation of NAIS.
- FY 05 Consolidated Appropriations Act included approximately $33 million in the Animal Health Monitoring and Surveillance line item to continue into the second phase of implementation of NAIS.
- FY 06 Agriculture Appropriations Act included approximately $33 million in the Animal Health Monitoring and Surveillance line item.
- FY 07 Agriculture Appropriations Act included approximately $33 million in the Animal Health Monitoring and Surveillance line item.

Congress has stipulated that obligational authority for appropriated NAIS funding shall remain available until expended.  For this reason, APHIS and its State cooperators have been able to spend conservatively as the implementation plan has developed.  APHIS has been able to carry funds forward from FY 05 into FY 06 and from FY 06 into FY 07.

| Funding Availability | | | | | |
|---|---|---|---|---|---|
| | CCC Funds | 2005 Approp. | 2006 Approp. | 2007 Est. | Total |
| Total Availability | $18,793 | $33,197 | $33,007 | $33,053 | $118,050 |

## NAIS Budgets

The NAIS budgets are categorized in four primary activities:

- Information Technology
- Cooperative Agreements
- Communications and Outreach
- Program Management:  Headquarters, Field Staff, materials, and overhead (assessments/overhead)

*Draft:* A Business Plan To Advance Animal Disease Traceability

The following charts summarize planned budgets for funds available to date and present actual obligations.

| Planned Obligations | | | | | | |
|---|---|---|---|---|---|---|
| | CCC Funds | 2005 Approp. | 2006 Approp. | 2007 Approp. | Total | % of Budget Plan |
| IT Development, Maintenance, and Ops | $2,009 | $6,858 | $7,733 | $5,224 | $21,824 | 18.5% |
| Cooperative Agreements | $14,357 | $17,050 | $13,882 | $15,067 | $60,355 | 51.1% |
| Communications and Outreach | $2,137 | $3,474 | $1,940 | $1,940 | $9,491 | 8.0% |
| Program Management | $290 | $5,815 | $9,452 | $10,822 | $26,379 | 22.3% |
| Total | $18,793 | $33,197 | $33,007 | $33,053 | $118,050 | |

## Obligations

As of August 30, 2007, approximately $102 million has been obligated to support the development and implementation of NAIS. A summary of accomplishments resulting from these investments is provided in this chapter.

| Actual Obligations as of the End of September 2007 | | | | | | |
|---|---|---|---|---|---|---|
| | CCC Funds | 2005 Approp. | 2006 Approp. | 2007 Current | Total | % of Budget Plan |
| IT Development, Maintenance, and Ops | $1,829 | $4,140 | $2,466 | $6,260 | $14,695 | 14.4% |
| Cooperative Agreements | $13,666 | $12,936 | $5,231 | $20,311 | $52,144 | 51.2% |
| Communications and Outreach | $2,134 | $2,557 | $2,422 | $2,951 | $10,064 | 9.9% |
| Program Management | $357 | $3,948 | $6,424 | $14,264 | $24,994 | 24.5% |
| Total | $17,987 | $23,581 | $16,543 | $43,786 | $101,896 | |

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Utilization of Funds by Budget Category

## Information Technology

USDA has utilized approximately 15 percent of the NAIS funds for the development of high caliber information systems.  The program objectives have been implemented in three phases to meet the needs of each NAIS component. Listed below each phase are the applications developed, maintained, and supported, relative to that phase:

- **Phase 1: Premises identification and registration**
  - Standard Premises Registration System
  - Premises Identification Number Allocator
  - Data Management Center

- **Phase 2: Animal identification**
  - Animal Identification Number Management System

- **Phase 3: Animal tracing**
  - Animal Trace Processing System

Appendix 1 provides an overview of each NAIS system component and its interaction with other systems that support State and Federal animal health programs.

Eighty percent of the IT funds have been used to support premises registration, 14 percent for animal identification, and 6 percent for the tracing component, which includes interacting with the State and private Animal Tracking Databases.

## Cooperative Agreements

### Cooperative Agreements with States, Tribes, and Territories

Similar to other APHIS-VS disease programs and activities, NAIS is carried out at the local level with the assistance of States, Tribes, and Territories through cooperative agreements.  A significant portion of NAIS funding (51 percent) has been used to administer and deliver the program through these cooperative agreements.  These funds provide resources to conduct education and outreach efforts.  Funds also have been used to administer premises registration activities and to hire Animal Identification Administrators/Coordinators.  Cooperative agreement funds also have supported selected pilot projects to explore innovative methods of premises registration, animal identification, and animal tracing.

The initial projects funded by CCC supported 40 States to initiate outreach and premises registrations.  Sixteen agreements utilized approximately $7 million to support pilot projects.  The outcomes of these pilot projects are summarized in the document "Appendix 3" and the report is posted on the NAIS Web site.  An additional $3 million was made available to support field trials and research in late 2005.

In FY 05 through FY 07, an additional $33 million in appropriations have been obligated to State, Tribe, and Territory cooperative agreements to support the implementation of NAIS.  As of early October 2007 over 419,722 premises had been registered.  The NAIS Web site is updated weekly with premises registration statistics by State.

*Draft:* A Business Plan To Advance Animal Disease Traceability

**Cooperative Agreements with Non-Profit Industry Organizations**

In early 2007, USDA entered into several cooperative agreements with non-profit industry organizations that wished to partner with USDA and the States. These cooperative agreements will support the efforts of those organizations to promote NAIS and, specifically, increase participation in premises registration – the foundation of NAIS. Approximately $9 million has been allocated to support these important collaborative efforts.

## Program Management

Program management carried out by APHIS Veterinary Services and assessments (departmental and agency) account for 10.2 percent and 14.3 percent, respectively. Program management includes headquarter staff and travel and support of field staff through the regional offices.

## FY07 Funds and Investments

APHIS had approximately $59.1 million available in FY 07 (includes $33 million in new funding and approximately $26.1 million in carryover funding). APHIS developed the following plan to utilize the funds to support the following activities:

- $7.9M IT Development, Maintenance and Operations
- $36.6M Cooperative Agreements and Integration with Disease Programs
    - $14.5M – State/Tribe Cooperative Agreements
    - $2.1M – Field Trials (continuation of agreements)
    - $9.8M – Industry Premises Registration
    - $9M – Integration of NAIS with Disease Programs
    - $1.2M – Other
- $3.1M Outreach and Education
- $11.5M Field, Headquarters Staff, and Assessments/Overhead

As of September 30, 2007, APHIS has $5.3 million in non-committed carry-over funds (summarized in the following chart).

| Summary of Carry-Over Fund Commitments | |
|---|---|
| **Non-Obligated Balance** | **$16,154** |
| **Committed Investments** | |
| Industry Cooperative Agreements | $4,747 |
| 1890's and Hispanic Outreach Agreements | $1,800 |
| Integration of NAIS in MI TB eradication | $50 |
| Ohio Depart of Ag (Ultra Band RFID Frequency Field Trial) | $398 |
| AIN RFID Tags for Disease Programs | $2,280 |
| Development and Implementation of Electronic Brucellosis system | $1,500 |
| **Total Commitments** | **$10,775** |
| **Balance** | **$5,379** |

*Draft:* A Business Plan To Advance Animal Disease Traceability

## FY 08 Budget Plan

In preparing the implementation plan, APHIS assumed that the budget for the voluntary NAIS will remain at $33 million annually. The planned utilization of funds by category is outlined in the following chart:

| Information Technology | |
|---|---|
| Equipment | $490,000 |
| Software | $425,000 |
| Services | $672,000 |
| Support Services | $3,096,000 |
| Personnel | $831,300 |
| **Subtotal** | **$5,514,300** |
| **Cooperative Agreements** | |
| State/Tribe Implementation CAs | |
| Eastern Region | $5,200,000 |
| Western Region | $9,200,000 |
| Integration with Disease Programs & Industry | $1,400,000 |
| **Subtotal** | **$15,800,000** |
| **Outreach** | |
| Legislative and Public Affairs Communication Activities | $1,200,000 |
| **Subtotal** | **$1,200,000** |
| **Headquarters, Field, Assessments** | |
| HQ | $1,000,000 |
| Regions and Field | $2,500,000 |
| Assessments/Overhead | $7,038,300 |
| **Subtotal** | **$10,538,300** |
| **Total** | **$33,052,600** |

## Budget Plans — Future Years

The budgets for future years will be determined as strategies are implemented and as benchmarks are achieved. The outcomes from the NAIS benefit cost analysis — currently being conducted by Kansas State University in consortium with several other universities — will also be considered prior to the development of future years budgets. The results of the benefit cost analysis will provide valuable information to USDA that will be used to further determine the needs of the program and to achieve the traceability goals.

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Summary of Accomplishments

### NAIS Activity Summary by Component

| Activity | Results/Status (October 1, 2007) |
|---|---|
| Premises Registration | 419,722 registered premises (approx 30% of premises)[1] |
| Animal Identification | 5 Approved AIN Device Manufacturers |
| | 8 Approved AIN Devices |
| | 4.5 million tags shipped |
| | ▪ 1.84 million AIN tags |
| | ▪ 2.67 million scrapie program tags |
| Animal Tracing | 14 Organizations with Interim ATDs |
| | 16 Organizations (including some of the Interim ATDs) participating in Implementation Phase |

[1] The National Agriculture Statistics Service (NASS) estimates 1.4 million livestock farms in the United States (premises more than $1,000 in annual income.  Premises with more than one species are counted one time).

### Summary of NAIS Key Accomplishments

| Date | Activity | Comments |
|---|---|---|
| **Publications of Guidelines and Revisions to the Code of Federal Regulations** | | |
| November 2004 | Publication of interim rule to establish the Premises Identification Number, Animal Identification Number and Group/Lot Identification Number as official numbering systems. | Final rule published July 2007. |
| May 2005 | Published the NAIS Draft Strategic Plan | Stakeholders provided feedback, including comments on participation requirements. |
| May 2005 | Published the NAIS Draft Program Standards for the administration of all components of the NAIS. | These initial program standards remain the catalyst to achieve a uniform system nationwide and, on occasion, are added to. |
| August 2005 | APHIS annouced privatization of the animal tracing component and later held a public meeting to discuss options and ideas for establising animal tracking systems. | |
| March 2006 | Publication of guidance document for the administration of AIN devices – "Administration of Official Identification Devices with the Animal Identification Number." | The AIN Management System currently stores the distribution records for over 1.8 million AIN tags and 2.7 million scrapie tags. |
| April 2006 | Formulated the structure of State and Private Animal Tracking Databases (ATDs) to maintain animal movement records, and the Animal Trace Processing System (ATPS) to communicate with the ATDs. | The process for establishing compliant ATDs achieved in mid-2007. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Date | Activity | Comments |
|------|----------|----------|
| November 22, 2006 | Published Draft *User Guide*. | Guide replaced previous NAIS documents to clarify NAIS as a voluntary program at the Federal level. Continues to be a guidance document for producers. Version 2.0 to be published in January 2008. |
| February 1, 2007 | Posted the NAIS Program Standards and Technical References on the NAIS web site. | Update to the initial standards published May 2005. |
| February 1, 2007 | Published the ATD Technical Specifications. | Resulted from industry cooperation through the Interim Development Phase of the ATDs. |
| February 2, 2007 | Posted the Request for Proposals (RFP) for Cooperative Agreements with industry to support premises registration. | Resulted in 7 cooperative agreements with industry to support premises registration activities. |
| October 15, 2007 | Posted an update to the NAIS Program Standards and Technical Specifications | Inlcudes eartag specifications for sows and boars that resulted through collaboration with the swine industry. |
| **Program Development and Implementation** | | |
| June 16, 2004 | Initial Cooperative Agreements (from CCC funds) awarded to States and Tribes for the implementation of premises registration and various field trial projects. | See Appendix 3 for a summary of outcomes. The full report of the 16 pilot projects is posted on the NAIS Web site. |
| June 25, 2004 | Selected the premises registration system developed by the Wisconsin Livestock Identification Consortium as the application software to make available to States and Tribes, referred to as the Standardized Premises Registration System (SPRS). | SPRS currently used by 41 States, 12 Tribes, and 2 Territories. |
| July 23, 2004 | Deployed the Standardized Premises Registration System and trained the first State (Illinois). | Onsite training provided to an additional 40 States through August 2005. |
| September 1, 2004 | Approved the first Compliant Premises Registration System (CPRS). | 9 States use 4 CPRS to register premises. |
| August 2005 | Premises registration systems operational in 50 States. | |
| October 1, 2005 | Deployment of AIN tags for animal disease programs (scrapie, bovine tuberculosis, chronic wasting disease). | |
| July 24, 2006 | APHIS authorized first AIN tags from two manufacturers for general use in the NAIS. | 5 AIN device manufacturers now provide 8 approved identification devices with the AIN. |
| July 27, 2006 | USDA entered into first interim cooperative agreements with ATDs that met the minimum technical standards. | Worked through January 2007 with 14 interim ATDs to collaborate on the development of the technical specifications of the ATPS. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Date | Activity | Comments |
|------|----------|----------|
| October 31, 2006 | Launched the NAIS Community Outreach Program for State and industry representatives. | Provided State and industry partners outreach tools to promote premises registration. |
| December 2006 | Implemented Tribal Premises Registration System. | 10 Tribes trained and operational on Tribal Premises Registration System. |
| January 30, 2007 | Achieved the benchmark of 25 percent of national total of premises registered. | |
| March 17, 2007 | Deployed the Animal Trace Processing System in a production environment to support the implementation phase of the ATDs. | Achieved the objective of having all components of NAIS operational. |
| August 14, 2007 | Signed a cooperative agreement with Kansas State University to lead a university consortium to conduct a Benefit Cost Analysis on the NAIS. | Final report expected July/August 2008. |
| August 2007 | Approved the 8th AIN device for individual animal identification, including two ISO compliant injectable transponders. | Equine Species Working Group recommended ISO compliant RFID injectable transponders for standarization of ID methods. |
| October 2, 2007 | Signed 6th Cooperative Agreement with industry organizations to work with States to advance premises registration | Established Industry Cooperator Working Group with participating organizations. |
| **Communications/Outreach Accomplishments** | | |
| October 31- November 1, 2006 | Community Outreach Event | State NAIS Administrators and Federal AICs participated in national meeting to discuss NAIS communications and outreach, share best practices, learn communications skills. Radio tour involving attendees reached a potential audience of 34 million listeners. |
| November 2006 | NAIS "Take The First Step" print materials | Producer-oriented brochures and factsheets provided to States for use in local outreach. To date, 143,000 hard copies and 100 CDs distributed, and 17,000 documents downloaded from Web site. |
| November 8, 2006 | NAIS Web site re-launch | Enhanced Web site with improved navigation and new content launched for public use. |
| December 2006 - present | Community Outreach Monthly Conference Calls (ongoing) | Monthly informational calls open to State and Federal NAIS stakeholders initiated for purposes of communicating policy updates, sharing best practices. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Date | Activity | Comments |
|---|---|---|
| December 2006-March 2007 | NAIS Advertising Campaign | Print advertising appeared in national trade publications, reaching a total audience of 600,000 with NAIS information. |
| March 2007 | Extension Educators Toolkit | Partnership with Cooperative State Research, Education and Extension Service (CSREES) established to provide Extension educators with NAIS program and educational tools. |
| August 2007 | Industry Cooperators Working Group | Established a forum for sharing information with industry cooperative agreement recipients. Regular meetings and reporting are used to communicate developments and ensure accountability. |

***Draft:*** A Business Plan To Advance Animal Disease Traceability

# Timelines and Outcomes

As noted in this report, advancing traceability is achieved through the implementation of several key strategies and numerous actions. These actions will be implemented in accordance with defined target dates to reflect the prioritization given to each species and with a primary objective of strengthening existing programs. This approach effectively uses existing infrastructure and provides more cost-effective solutions. The strategies are defined in the following chart, along with timelines for many of the established actions.

## Summary of Strategies and Actions



| Timelines and Species Most Affected | | Beef | Dairy | Horses[2] | Poultry | Sheep | Goats | Swine |
|---|---|---|---|---|---|---|---|---|
| ■ High Priority  ■ Medium Priority  ■ Low Priority | | | | | | | | |
| | Action Target Date | Species Most Affected By Action | | | | | | |
| **1. Prioritize NAIS Implementation by Species/Sectors** | | | | | | | | |
| Establish Tier 1 and Tier 2 Species | Dec. 2007 | • | • | • | • | • | • | • |
| Prioritize sectors within each species | Dec. 2007 | • | • | • | • | • | • | • |
| Finalize species/sector traceability short-term objectives and strategies | Dec. 2007 | • | • | • | • | • | • | • |
| **2. Harmonize Animal Identification Programs** | | | | | | | | |
| Domestic Programs: Standardize ID requirements across Federal, State, and Industry Programs and Initiatives | | | | | | | | |
| ▪ Breed Registries and Performance Recording Programs | | | | | | | | |
| o Breed Registries – Initiate use of AIN in breed registry programs | March 2008 | • | • | • | | • | • | |
| o Dairy Industry – Incorporate PIN in Dairy Herd Improvement Association's administration of the National Uniform Eartagging Numbering system | March 2009 | • | • | • | | • | • | |
| ▪ Industry Alliances | March 2008 | • | • | | | | | |
| ▪ AMS – Define and utilize NAIS standards applicable to QSA programs | Oct. 2008 | • | • | | | | | |
| International | | | | | | | | |
| ▪ Unify import/export animal identfication standards and criteria | March 2009 | • | • | • | | | | |
| **3. Standardize Data Elements of Disease Programs To Ensure Compatibility** | | | | | | | | |
| Establish Uniform Data Elements | | | | | | | | |

---

[2] Horses that, when moved, require an EIA test or a health certificate.

*Draft:* A Business Plan To Advance Animal Disease Traceability

---

## Timelines and Species Most Affected

■ High Priority    ■ Medium Priority    ■ Low Priority

| | Action Target Date | Beef | Dairy | Horses[2] | Poultry | Sheep | Goats | Swine |
|---|---|---|---|---|---|---|---|---|
| | | | | Species Most Affected By Action | | | | |
| ▪ Establish the 7-character premises identification number (PIN) as the national location identifier standard (Proposed Rule) | Feb. 2008 | ● | ● | ● | ● | ● | ● | ● |
| ▪ Establish the "840" AIN as the single version for the Animal Identification Numbering system (Proposed Rule) | Feb. 2008 | ● | ● | ● | ● | ● | ● | ● |
| Utilization of Standards with Disease Programs | | | | | | | | |
| ▪ Consider proposed rule for using the PIN for all premises importing and exporting livestock | Sept. 2008 | ● | ● | ● | ● | ● | ● | ● |
| ▪ Establish procedures for using PIN for all Federal animal health programs and foreign animal disease outbreaks | Oct. 2008 | ● | ● | ● | ● | ● | ● | ● |
| ▪ Establish procedures to facilitate the use of the PIN for origin and destination premises on the ICVI | Jan. 2009 | ● | ● | ● | ● | ● | ● | ● |
| **4. Integrate Automated Data Capture Technologies with Disease Programs** | | | | | | | | |
| Develop and implement electronic data collections systems for disease programs | | | | | | | | |
| ▪ Develop and implement Electronic Bangs Vaccination and Testing Systems | July 2008 | ● | ● | | | ● | | |
| ▪ Develop and implement expanded use of the use of the electronic TB Testing System | Jan. 2008 | ● | ● | | | ● | | |
| ▪ Develop and implement the eICVI nationwide | Oct. 2008 | ● | ● | ● | | | | |
| **5. Partner with States, Tribes, and Territories** | | | | | | | | |
| Ulize the Traceability Business Plan as a blueprint to support work plans for FY08 cooperative agreements with States, Tribes, and Territories. | Jan. 2008 | ● | ● | ● | ● | ● | ● | ● |
| ▪ Continue to provide performance based cooperative agreements with States and adjust the FY 08 criteria to allow flexiblity in advancing traceability priorities at the State/regional level. | Jan. 2008 | ● | ● | ● | ● | ● | ● | ● |
| **6. Collaborate with Industry** | | | | | | | | |
| NAIS Subcommittee and Species Working Groups | | | | | | | | |
| ▪ Receive updated reports from species working groups | Aug. 2008 | ● | ● | ● | ● | ● | ● | ● |
| ▪ Consolidate report from NAIS Subcommittee | Oct. 2008 | ● | ● | ● | ● | ● | ● | ● |
| Support Industry Leadership Efforts | | | | | | | | |
| ▪ Establish premises registration cooperative agreements with non-profit industry organizations | July 07 – Dec. 08 | ● | ● | ● | ● | ● | ● | ● |
| Accredited Veterinarians | | | | | | | | |
| ▪ Develop and implement communication program | Oct. 2007 | ● | ● | ● | ● | ● | ● | ● |
| ▪ Provide large-animal veterinary accreditation training module | March 2008 | ● | ● | ● | ● | ● | ● | ● |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Timelines and Species Most Affected | | Beef | Dairy | Horses[2] | Poultry | Sheep | Goats | Swine |
|---|---|---|---|---|---|---|---|---|
| ■ High Priority   ■ Medium Priority   ■ Low Priority | | | | | | | | |
| | Action Target Date | Species Most Affected By Action | | | | | | |
| **Markets/Auction Barns** | | | | | | | | |
| ▪ Evaluate and define opportunities to register market locations | July 2008 | • | • | | | • | • | |
| ▪ Work with market/auction barn managers to address concerns associated with the collection of animal identification at markets | Ongoing | • | • | | | • | • | |
| **Harvest Facilities** | | | | | | | | |
| ▪ Receive and consider recommendations from Packer/Render WG | Nov. 2007 | • | • | | | • | • | • |
| ▪ Define strategies for collecting animal termination records | July 2008 | • | • | | | • | • | • |
| **Brand Inspection States** | | | | | | | | |
| ▪ Support Brand State WG efforts to define options for establishing interoperability between brand systems and animal disease programs | March 2007 – Nov 2007 | • | • | | | | | |
| ▪ Receive and consider recommendations from Brand State WG | Jan. 2008 | • | • | | | | | |
| **7. Advancement of Identification Technologies** | | | | | | | | |
| **Performance Standards** | | | | | | | | |
| ▪ Establish performance standards for RFID animal identification devices through a stakeholder effort facilitated by ASTM (Draft) | Dec. 2008 | • | • | | | | | |
| **Emerging technologies** | | | | | | | | |
| ▪ Evaluate advancing technologies to improve collection of animal identification in various environments  ▪ Establish a process to facilitate the transition to market-ready, evolving technologies | Dec. 2008 | • | • | • | | • | • | • |

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Key Outcomes

The resulting outcomes will provide increased tracing capability. Examples from the "case studies" and ongoing desk top exercises will be used to monitor progress being made towards the following desired outcomes. The table below identifies traceability objectives, key benchmarks, and target dates for meeting those objectives by species/sector.

| Species / Sector | Traceability Objectives and Target Dates | | Key Benchmarks[5] |
|---|---|---|---|
| **Cattle**<br>Beef and Dairy Breeding Herds | Ability to identify 70% of breeding animals to their premises of origin. | Dec. 2009 | Beef: Obtain premises registration of operations that account for 70% of the beef population.<br>Dairy: Obtain >95% premises registration of the State-licensed dairies. Obtain >90% of heifer raising operations. |
| **Horses*** | Ability to identify 90% of horses that move to events (sport, race, sales, exhibitions) to their premises (base farm or stable operation). | Jan. 2009 | Implementation of the 840 AIN RFID technology by all industry organizations that provide services to horse owners/breeders. |
| **Goats** | Ability to identify and determine the birth premises for 90% of the breeding animals within 48 hours of a disease event. | Dec. 2009 | Achieve 90% of the producers assigned a flock identification number through the scrapie eradication program with all flock numbers cross-referenced with a standardized PIN. |
| **Poultry**<br>Commercial Poultry Industry | Ability to have access to 98% of the commercial poultry premises information in a defined zone of a disease event in less that 48 hours of detection. | March 2008 | Through cooperative efforts with the National Poultry Improvement Plan, ensure that near 100% of commercial premises locations are recorded and the data is readily available. |
| **Sheep**<br>Breeding Flocks | Ability to identify and determine the birth premises for 90% of the breeding animals within 48 hours of a disease event. | Dec. 2009 | Achieve 90% of the producers assigned a flock identification number through the scrapie eradication program with all flock numbers cross-referenced with a standardized PIN. |
| **Swine**<br>Commercial Swine | Ability to identify and determine the last production premises for 90% of the market swine within 48 hours of a disease event. | March 2009 | Achieve 100% registration of commercial swine premises by late 2008 through the leadership of the National Pork Board. |
| * While not a specific sector, horses that require an EIA test and/or health papers are the focus of the traceability plan. As referenced in the NAIS *User Guide*, horses that travel greater distances to participate in events and that commingle with other horses are a higher priority. | | | |

---

[5] All percentages listed as key benchmarks are provided as an estimate to help gauge forward progress toward improved traceability. These levels are not intended to serve as scientifically validated values that represent exact levels of identification needed to achieve optimum traceability.

Achieving optimal traceability will be most challenging for the cattle industry. The outcomes noted above for the cattle industry represent a huge incremental step in advancing traceability for this large and very diverse industry.  The infrastructure resulting from these strategies will enable the cattle industry to make continued progress towards the ultimate 48-hour traceability goal.

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Critical Location Points

Locations that facilitate the marketing of animals, including ports of entry and other import/export facilities, and harvest facilities are critical to successful animal disease traceability. Therefore, high participation in the premises registration component for these locations is a focus of the traceability business plan. Existing disease control programs and industry-specific initiatives can be leveraged more effectively to improve overall traceability as these locations obtain the standardized PIN to support the recording of animal movements.

The following table lists several of the critical location points that are a priority for premises registration. As noted, a high level of premises registration is targeted for these locations.

| Type of Location | Total Estimate | Goal | Date | Comments |
|---|---|---|---|---|
| **Exhibitions and Sporting Venues** | | | | |
| County and State Fairs, Racetracks | 2750 | >90% | Sept. 2009 | State, Regional, and National exhibitions |
| **Import/Export Facilities** | | | | |
| Import Quarantine Stations | 3 | 100% | July 2008 | Air and Sea |
| Export Inspection Facilities | 30 | 100% | Oct. 2008 | |
| Ports of Entry | 65 | 100% | Jan. 2008 | 35—Canada & Mexico, 27—Limited Ports |
| **Markets & Dealers** | | | | |
| Public Auctions (Federal Licensed) | 1400 | 70% | Oct. 2009 | |
| Dealers with Facilities | 1988 | 70% | Oct. 2009 | |
| **Harvest Facilities** | | | | |
| Renderers (3D/4D Plants) | 155 | 100% | July 2008 | |
| Slaughter Plants | | | | |
| • Federal Inspected | 826 | 100% | July 2008 | |
| • Non-Federal Inspected | 2116 | >90% | Jan. 2009 | |
| **Semen Collection and Embryo Transfer Facilities** | | | | |
| Commercial Units | 22 | 100% | Oct. 2008 | |
| Custom Collection | 12 | 100% | Jan. 2009 | |
| **Veterinary Clinics** (Large Animal Practices that receive livestock) | 8000 | >90% | Oct. 2008 | It is estimated that approximately two-thirds of large-animal veterinarians have clinics that receive animals |
| **Licensed Food Waste Swine Feeding Operations** | 880 | 100% | Oct. 2008 | |

## Conclusion

The vision and long-term goal for NAIS is 48-hour animal disease traceability. The ability of each industry segment to achieve this goal is dependent upon its complexity and specific factors—for example, the size, diversity, disease status, and management systems involved.  The allocation of resources as outlined in this business plan provides direction and focus as to where the greatest value for the advancement of traceability will result.

Industries will face new animal health demands as the animal agriculture industry changes and as new disease concerns arise.  Technology advancements also will impact how livestock are managed, providing improved means of administering animal disease programs.  Therefore, strategies to advance traceability will continue to be evaluated and adjusted to ensure that continued progress is made toward achieving the optimum goal of 48-hour traceback—in a timely, cost-effective, and efficient manner.

# Appendix 1

## APHIS-VS Animal Health Information Systems

### Animal Health and Surveillance Management (AHSM)

**Description and Use**

The AHSM is the data management system for the following APHIS-VS disease surveillance, eradication, and control programs:  brucellosis, tuberculosis, pseudorabies, Johne's, classical swine fever, avian influenza, chronic wasting disease, bovine spongiform encephalopathy, and scrapie.  The AHSM is made available for States to utilize, and all States are using the AHSM for at least one program.

All program-required testing, inspection and certification data can be stored in the AHSM. Investigation data of infected animals and herds/flocks, related to the specified programs, also are managed in the AHSM.  The AHSM has three modules (program and surveillance management, subject management, and incident/case management) and several tools or integrated processes (mobile computing applications, mapping, laboratory sample submission, and national reporting).

The AHSM is the fourth generation information system developed for the information management of these programs; APHIS-VS is currently transitioning from the third generation information system ("Generic Data Base") to AHSM.  Brucellosis, tuberculosis, pseudorabies, and Johne's have not yet been redeveloped in the AHSM.  The first-generation system was deployed in the late 1970s.

The AHSM can be used for summary data management and reporting or full detail data and program management.  The system users are primarily APHIS-VS and State cooperators.  The system is used at the local level for operational program management and reporting, at the regional level for regional program management, and at the national level for program evaluation and analysis.

**Size**

The AHSM has multiple State data schemas (configurations), each storing data for up to 10 programs; program data as far back as 1977 reside in this system.  There are millions of records stored in this system.

### Emergency Management Response System (EMRS)

**Description and Use**

The EMRS is used for recording all foreign animal disease investigations and incident management.  The EMRS also is used in disease outbreak situations, such as the exotic Newcastle disease (END) outbreak in 2003-2004.  The EMRS will be the data management system if highly pathogenic avian influenza (HPAI H5N1) enters the United States.  The EMRS has three modules (administration, investigation, tasking).  The administration module includes deployment, check-in, check-out, and equipment tracking functions.  The investigation module manages all aspects of an outbreak, including premises assessment and status, depopulation, cleaning and disinfection, appraisal, and indemnity.  Several tools and processes, such as mapping and laboratory submission also are included in the EMRS.

*Draft:* A Business Plan To Advance Animal Disease Traceability

System users are primarily APHIS-VS and State animal health officials; other users include other agency staffs assigned to an incident. The system provides full incident management functionality and is used for reporting to international animal health organizations.

The EMRS is a first-generation information system, initially deployed in 2002. An integration of EMRS and USDA's Resource Ordering and Status System is in the analysis phase. Additional integration/data sharing with other Federal emergency response systems is being explored.

### Size

The EMRS stores all data related to foreign animal disease investigations; there are several hundred investigations per year. The database created during the END outbreak in 2003-2004 contains about 90,000 premises records and 225,000 investigation records.

## Veterinary Services Process Streamlining (VSPS)

### Description and Use

The VSPS is the data management system for APHIS-VS' import, export, and interstate movement certificates, and veterinary accreditation programs. All program-required movement certificate and permitting data can be stored in the VSPS. The VSPS has five modules (Import Tracking, Export Health Certification, e-Interstate, e-Veterinary Accreditation, Humane Transport), and an e-movement submodule for the export of poultry and hatching eggs. The VSPS integrates with the User Fee System for billing services.

The VSPS is a second-generation information system developed to manage federally regulated animal and animal product movement. APHIS-VS currently is transitioning from the first-generation system to VSPS. Import Tracking and Export Health Certification has not yet been redeveloped in the VSPS information system. The first-generation system was deployed in the early 1990s. The integration of VSPS and the International Trade Data System is in the analysis phase.

The VSPS is used for all international movement certificates and accredited veterinarian programs and can be used for interstate movement certificates as well. All federally regulated international animal and animal product movements are stored in the VSPS. The system users are primarily APHIS-VS (all modules), accredited veterinarians (e-Veterinary Accreditation and e-Interstate modules), State animal health officials (e-Interstate) and import/export brokers (Import Tracking and Export Health Certification). The data stored in the VSPS are used for program management, infected animal investigations, risk analysis, and various reports to other Federal agencies and industry groups.

### Size

The VSPS stores all import and export data of APHIS-VS-regulated species and commodities since 1996, which accounts for hundreds of thousands of movement records that represent millions of animal movements. The e-Veterinary Accreditation module manages records for approximately 60,000 private veterinarians who have been accredited for Federal work.

## National Animal Identification System (NAIS)

USDA has developed premises registration systems, including the Standardized Premises Registration System (SPRS), the National Premises Information Repository (NPIR), and the Premises Number Allocator. In addition, APHIS has

evaluated Compliant Premises Registration Systems using standardized interfaces that are maintained and operated entirely at the discretion of the State using such systems. To support the animal identification component, USDA has developed the Animal Identification Number Management System (AINMS) to record the allocation of AINs to a premises.

Animal movement records will be maintained in private and State Animal Tracking Databases (ATD). USDA-APHIS developed the Animal Trace Processing System (ATPS) that animal health officials will use when initiating a response to an animal health event.

The AHSM, EMRS, and VSPS are currently integrated with the NAIS, or are in the process of being integrated.

## National Premises Information Repository (NPIR)

### Description and Use

USDA-APHIS maintains the NPIR, which became operational in mid-2004. The NPIR centralizes the data elements received from the States' premises registration systems. This enables all APHIS-VS systems to efficiently and effectively integrate with one "master" data set when animal health officials need to use premises information. Each day, information from each State premises registration system is updated to the NPIR.

A real-time subset of all Premises Registration Systems is necessary to support other systems in the NAIS as well as APHIS-VS' other animal health systems. For example, when a premises identification number (PIN) is received from an Animal Tracking Database as a result of a disease investigation query, the contact information and other pertinent premises information is instantly available from NPIR. The NPIR also supports the allocation of animal identification numbers (AIN) to a premises by providing AIN tag managers and resellers the ability to verify that a producer has a valid PIN before distributing AINs to that producer (a valid PIN is a perquisite of using AIN tags).

Statistics (total premises registered, premises registration by State, etc.) on premises registration also are being generated from the NPIR.

### Size

States have registered approximately 420,000 premises of the estimated 1.4 million national premises. For each record (premises registered), 12 data elements are stored on the NPIR.

## Standardized Premises Registration System (SPRS)

### Description and Use

The SPRS is a Web-based application that allows States and Tribes to register a location and assign it a nationally unique identification number or Premises Identification Number (PIN). The SPRS interfaces with the National Premises Information Repository (NPIR) through the Premises Number Allocator (Allocator) using Application Program Interface calls. Premises data in the SPRS is accessible only to the State or Tribe that registers that location. A subset of that data is stored in the NPIR to ensure that each location registered is assigned a unique identification number.

The SPRS is the most mature NAIS application. As it continues to be enhanced, an increasing amount of pressure is applied to the system. For example, the user base for this component of the NAIS continues to grow. Almost daily, more and more users are employing the system, which requires an increase in the hours

*Draft:* A Business Plan To Advance Animal Disease Traceability

supported and the number of integrated locations.  The original SPRS was adapted from an existing custom software package designed and developed for use in a single State through a federally funded cooperative agreement with the Wisconsin Livestock Identification Consortium. Modifications to the database were necessary to accommodate the use of the software in over 40 States plus multiple Territories and Tribal Nations.  The modifications have not been made in a consolidated fashion.  In 2008, the back end data structure and service layer will be rewritten to bring it into the same Java 2 Enterprise Edition architecture as the other Java applications owned and operated by APHIS-VS.  This will improve performance, reliability, and data structures for the SPRS.

The SPRS is provided at no direct cost to each State and Tribe wishing to use it. States can utilize this application to support varying requirements to support premises registration in their respective States while meeting the standards established for national compatibility.

### Size

USDA-APHIS provides the SPRS to approximately 40 States, numerous Tribes, and 2 Territories.  Assuming 80 percent of the records from the NPIR will be on the SPRS when full participation is achieved, the projected total of records is expected to be approximately 1 million records.

## Compliant Premises Registration System (CPRS)

### Description and Use

The CPRSs are premises registration systems that are maintained entirely by the State, including development and operational cost.  The established data standards are used for premises registration, thus the systems are compatible with the national standards. Additionally, the CPRSs are interfaced with the Premises Number Allocator and submit data to the NPIR.

## Animal Identification Number Management System (AINMS)

### Description and Use

AINMS is a Web-based application used to record the allocation of Animal Identification Numbers (AINs) to approved AIN device manufacturers.

AIN device manufacturers, managers, and resellers must access AINMS through USDA's eAuthentication system.  The eAuthentication is an identity verification system used to grant access to multiple USDA online applications.

The AINMS was developed to record the distribution information from manufacturers, managers, and resellers (1) when an AIN was allocated to a manufacturer, (2) when an AIN was imprinted on a device/tag, (3) when the AIN device/tag was shipped to a reseller or manager, and (4) when and where the AIN device/tag was shipped to a producer.

### Size

The number of AINs allocated as of August 1, 2007, was approximately 2 million. In the future, if all new animals were to be individually identified and tagged, approximately 35 million AINs would be allocated per year.

## Animal Trace Processing System (ATPS)

### Description and Use

USDA-APHIS, through an interim/development phase, developed the ATPS that animal health officials will use when initiating a response to an animal health

event. The system puts in place the communication and messaging process between the private and State ATDs and the ATPS to ensure the animal movement information is provided to the animal health official in a timely manner. However, State and Federal animal health officials will not have direct access to the systems, thus maintaining a clear disconnect to government access to the data.

The ATPS provides the information technology platform for security, electronic data transfer, and auditing processes. Additionally, the ATPS integrates other relevant data from the animal health databases managed by APHIS-VS.

The ATPS uses a service-oriented architecture using Web services to provide the communication methods with the private and State databases. A monitoring and auditing application will look at daily communications to determine, for example, if a system or systems are not responding. The monitoring and auditing application will then notify support personnel. The application also will monitor to ensure that only authorized users are accessing the system.

The ATPS will enable Federal and State animal health officials to submit requests for information to the ATDs when investigating an animal disease event in the following situations:

- An indication (suspect, presumptive positive, etc.) or confirmed positive test of a foreign animal disease;
- An animal disease emergency as determined by the Secretary of Agriculture and/or State Departments of Agriculture; or
- A need to conduct a traceback/traceforward to determine the origin of infection for a program disease (brucellosis, tuberculosis, etc.).

USDA deployed the ATPS in March 2007 and is working with private and State ATDs in the implementation phase.

## Animal Tracking Databases (ATDS)

### Description and Use

ATDs are external to USDA's information system architecture since animal movement records are maintained in private and State ATDs, allowing animal movement records to be stored in systems outside the federal government. The organization may use systems that maintain animal movement for purposes other than supporting NAIS. In such cases, users of those systems may vary. Specific to the animal movement data for NAIS, the ATPS communicates with the ATDs through a messaging architecture. Thus, there are no direct State or Federal users on those systems. Rather, the animal health officials have access to the ATPS, and the ATDs provide the information to that system.

Producers who utilize ATDs have the option of preventing certain information about their animals, including animal movement information, from being provided to USDA. In essence, these producers could impose confidentiality restrictions on their information contained in private ATDs.

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Appendix 2

## Case Studies — Recent Animal Disease Investigations

### Cattle

| Bovine Spongiform Encephalopathy (BSE) | |
|---|---|
| **2003** | |
| Incident: | The first diagnosis of BSE, a foreign animal disease, in the United States occurred on December 23, 2003. |
| Investigative Summary: | The case originated from a cow from Canada that was imported into the United States as part of a shipment of 81 cows. Of the 81 animals imported, only 29 could be definitively identified and located using producer and available animal movement records, leaving 52 animals unaccountable. 255 animals from 10 different herds were destroyed as a result of the traceback investigation. The duration of the investigation was 46 days. |
| Impact: | Foreign beef trade was halted immediately. Projected losses to the beef industry range from $2 billion to $4 billion. Beef trade volume in 2007 still has not been restored to pre-BSE levels. |
| **2005** | |
| Incident: | Confirmed positive of a previously inconclusive BSE sample from a 12-year-old cow in Texas was made on June 24, 2005. |
| Investigative Summary: | Of the 200 cows associated with the index herd, 56 of those animals were untraceable. The total investigation involved 1,919 animals from 8 different herds. The duration of the investigation was 61 days. |
| Impact: | Continued drain on beef export potential. |
| **2006** | |
| Incident: | Confirmed positive of a previously inconclusive BSE sample from a 10-year-old cow in Alabama was made on March 15, 2006. |
| Investigative Summary: | The positive cow had no tattoo, no eartag, and no brand. Thirty-seven farms were investigated (involving the use of DNA), to potentially identify a herd of origin. The investigation took 48 days to complete. A source herd was never identified due to the lack of individual identification and associated records of animal movement. |
| Impact: | Inability to demonstrate to global trading partners our capability of providing traceback information. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Bovine Tuberculosis | |
|---|---|
| **2004** | |
| Incident: | Tuberculosis outbreak in California dairies from May 2002 through June 2004. |
| Investigative Summary: | The original herd involved 3,500 milking cows, of which 38 head were culture-positive.  The animals originated from five additional States beyond California.  The animals were depopulated in November 2002.  A second herd involved 1,989 dairy cows diagnosed with tuberculosis on October 16, 2002; depopulated in March 2003.  The animals were sourced from 33 States beyond California.  The third herd involved 408 animals with a diagnosis of 17 positives in December 2002 that were depopulated in April 2003.  Source animals came from 22 States beyond California.  A fourth tuberculosis investigation in 2004 involved a dairy backgrounding facility that extended to additional facilities in Arizona, Iowa, Kansas, New Mexico, and Wisconsin. |
| Impact: | In total, 875,616 dairy animals from 687 herds—including all dairies in Tulare, Kings, and Fresno counties—had to be tested for tuberculosis.  Approximately 13,000 animals were sacrificed to contain the disease.  Quarantine of the second dairy herd cost the individual owner $70,000 per month alone in lost income.  It is well documented that tuberculosis is a disease of national scope.  Movements across State lines should require additional testing requirements along with official individual identification. |
| **2005-Present** | |
| Incident: | Using slaughter surveillance from adult cow processing in Wisconsin, the index herd diagnosed with bovine tuberculosis was identified in February 2005.  Traceback to Minnesota was confirmed using animal identification combined with DNA analysis taken from a backtag sample.  Since then, seven herds have been identified as infected with tuberculosis, and additional testing and monitoring continue in the eradication effort. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Investigative Summary: | The index herd was established in 1972, representing 33 years of effort.  In total, 585 head of commercial and registered cattle were depopulated, finding up to 25 suspect and positive animals.  Four fenceline herds existed, and traces went to seven additional States.  A second, 100-year-old neighboring family farm was depopulated of 352 cattle, finding lesioned 12- to 14-year-old cows along with a 5-year-old purchased bull with lesions.  The purchased bull had previously crossed the fence to access heifers of the index herd.  Herd 3 was a family farm of 307 beef cattle. Herd 4 was depopulated of 200 cows exposed from commingling. Herd 5 possessed an infected 10 year-old cow along with visible lesions in 2 10-month-old bull calves and involved a commingled herd of 600 head owned by 3 different owners from Minnesota and South Dakota. Herd 6 was a small family farm of 36 head of commingled cattle. Herd 7 represented both dairy and beef cattle using purchased bulls.  Five lesioned deer were detected, all within 5 miles of the index herd. |
|---|---|
| Impact: | Chronic diseases of concern such as tuberculosis can be difficult to investigate and eradicate without maintaining long-standing records of animal movement activity.  Accurate information regarding animal movement activity is key to determining the spread of disease.  Without it, investigations can be prolonged, resulting in additional potential exposures and costs.  In this Minnesota situation alone, $3.9 million has been paid in indemnity and USDA has incurred costs exceeding $5 million for investigation and heightened surveillance.  Costs to producers for testing that is not yet complete is currently close to $1 million and over 3,500 animals have been depopulated.  This Minnesota occurrence also clearly demonstrates that small family farms are potentially as susceptible to disease outbreaks as are larger farms. |
| **2007** | |
| Incident: | Tuberculosis was diagnosed in a large dairy herd of approximately 11,000 head housed on 2 locations in New Mexico. |
| Investigative Summary: | In an ongoing investigation of just over 10 weeks in duration, epidemiologists have determined that 453 traces were necessary to trace the disease.  As of October 17, 2007, 96 traces remain to be completed.  In total, 20,150 animals have been tested for the disease in 16 New Mexico herds.  NAIS-approved RFID eartags are being used for unique individual identification of all animals in each of the 16 herds being evaluated.  Additionally, mobile information management systems (MIMS) devices are being used to record and capture identification information electronically. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Impact: | $35 million of Federal funding was allocated for indemnification to eradicate this outbreak of bovine tuberculosis. Sheer size of the infected herd and potentially exposed herds has required teams of 14 State and Federal personnel rotating every 3 weeks to investigate the disease. Use of RFID and mobile information management systems technologies in this effort has increased the accuracy of recording test information as electronic capture of identification information can be easily reconciled and transferred to official test forms. Animals can be electronically identified when loaded to accurately populate restricted movement permits and indemnity forms. More animals can be tested and accurately recorded expediting the investigation effort. Additionally, animal safety and human safety in managing the animals are enhanced with electronic identification. |
|---------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Bovine Brucellosis | |
|---|---|
| **2007** | |
| Incident: | On May 9, 2007, the APHIS-VS National Veterinary Services Laboratories confirmed a positive finding for bovine brucellosis associated with a beef cow from Montana. The positive animal was from a herd of 200 head that was assembled in November, 2005 from a source herd in Wyoming. |
| Investigative Summary: | The index cow was associated in the movement of animals from the source herd. The cow aborted in December 2005 and again late in 2006. The positive sample was not taken to diagnose the abortion, but was part of a routine disease testing requirement for a potential out-of-state buyer, even though the State of Montana was a brucellosis-free State. In total, 396 head from the index herd were depopulated. Tracebacks as well as traceforwards involved approximately 900 animals. Sixteen States were involved in this investigation. |
| Impact: | Montana relies primarily on brand laws to trace cattle. The lack of unique individual animal identification complicated the investigation. In one situation, two heifers, identified only by brand, could have moved to six different locations. The lack of unique individual identification meant that six locations had to be involved in testing rather than one or two. Another situation involved moving two animals that were purchased and mixed with 60 head. The additional 60 head had to be traced rather than just the two in question due to the lack of unique individual animal identification. As many as six different brands were identified on a single cow. In reviewing the records, none of the brands are were connected with points in time. As of October 17, 2007, 157 days had elapsed in this continuing investigation. There are 15 animal movement events that are still outstanding and may never be definitively traced due to a lack of unique individual animal identification. This investigation clearly indicates the significant number of animals that can move in, move out, and be commingled from one herd in less than 2 years' time. The lack of animal movement information has prolonged the time and cost of the disease investigation. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

## Swine

| Porcine Pseudorabies | |
| --- | --- |
| **2007** | |
| Incident: | Outbreak in Wisconsin in April 2007 |
| Investigative Summary: | The outbreak involved high biosecurity risk swine facilities.  The owner did not have written records, relying only on memory as to distribution of potentially infected animals.  At least 20 other owners received animals from the index herd; several did not possess a premises identification number in a State with mandatory premises registration.  Index herd owner had loaned a boar to a facility that additionally houses "Eurasian" or wild boar animals.  When returned, the animal was positive for pseudorabies.  The original animals were obtained 6-10 years ago. |
| Impact: | Wisconsin is a significant pork-producing State, and its status regarding pseudorabies eradication was jeopardized.  Loss of status would require additional testing requirements in addition to lost marketing opportunities.  Transitional swine facilities, those that maintain domestic swine with direct or indirect exposure to free-roaming swine populations, increase the risk of disease transmission as well as status of State disease programs, affecting all commercial swine facilities. |

## Poultry

| Exotic Newcastle Disease (END) | |
| --- | --- |
| **2002-2003** | |
| Incident: | Outbreak of exotic Newcastle disease, a foreign animal disease of poultry, in California from September 2002 until September 2003. |
| Investigative Summary: | A small animal veterinarian in Los Angeles county submitted a sample from dead birds in a flock of backyard game fowl.  END was confirmed on October 1, 2002.  Disease spread occurred in exhibition and cockfighting flocks; eventually, positive cases also occurred in commercial facilities.  Nineteen counties were quarantined in California, Nevada, Arizona, New Mexico, and Texas.  Nearly 4.5 million birds from over 2,700 infected premises were sacrificed to contain the disease; a second strain of the disease also was diagnosed in western Texas.  More than 85,000 premises maintaining susceptible bird populations were identified during this investigation.  Up to 1,600 personnel were deployed for 350 days to respond to the outbreak.  Because a majority of at-risk birds were raised in cluttered and dense environments, the detection, depopulation, cleaning, and disinfection efforts were extremely resource intensive.  Ninety-six percent of all operations investigated were backyard premises. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

| Impact: | Fifty-seven countries and Guam imposed some form of trade restriction against poultry exports from the United States, with an estimated $395 million loss in direct and indirect trade. Federal dollars allocated to the eradication effort were estimated at $138.9 million. |
|---|---|

### Low Pathogenic Avian Influenza (LPAI)

**2007**

| Incident: | On July 7, 2007, APHIS-VS National Veterinary Services Laboratories confirmed low pathogenic avian influenza in a commercial turkey farm. The sample was taken as part of an active pre-harvest serology surveillance component of the National Poultry Improvement Plan's (NPIP) U.S. Avian Influenza Clean Program. The turkeys did not demonstrate any clinical signs of sickness or disease. |
|---|---|
| Investigative Summary: | The total number of turkeys on the farm was 54,000. All of the birds were depopulated and composted on the farm. Enhanced surveillance was implemented in a 17-county Shenandoah Valley poultry producing region. There were 5 commercial flocks within 2 miles of the index flock; 42 commercial flocks within 6.2 miles; 32 high-risk contacts identified; and 34 backyard clocks within 6 miles. From July 7, 2007, through August 19, 2007, 16,793 samples were subsequently tested and determined to be negative. |
| Impact: | On July 7, 2007, all public sales, shows, and exhibitions of live poultry throughout the State of Virginia were cancelled. Land application of poultry litter, manure, or bedding in the 17 affected counties was prohibited. Both bans were in effect through July 30, 2007. Poultry imports from Virginia were immediately banned in China, Cuba, Japan, the Philippines, Russia, Taiwan, and Hong Kong. Poultry imports from the entire United States were banned immediately by India and Indonesia. Some product shipped after June 20, 2007, was destroyed and some countries did not restore trade until October 12, 2007. The proximity of several susceptible flocks, both commercial and backyard, to the index flock in this case exhibits the importance of premises identification for contacting premises owners and implementing effective and efficient disease-control procedures for maintaining markets and minimizing disease impacts. |

## Equine

| Equine Viral Arteritis (EVA) | |
|---|---|
| **2006** | |
| Incident: | Outbreak of EVA on New Mexico equine breeding facility in June 2006. |
| Investigative Summary: | With up to 50 percent of early term abortions in broodmares, the index farm in New Mexico initially evaluated 26 blood samples for the presence of the virus; 24 were positive.  Additionally, breeding stallions were positive for the virus.  Within a short time, all 200 plus broodmares and all 4 stallions were positive for viral antibodies.  Due to the interstate movement of resident animals, return movement of broodmares brought to the facility for breeding, and the transport of fresh and frozen semen, 18 additional States were involved in the disease investigation.  Sixty-nine direct exposures were identified, with 69.5 percent associated with mares inseminated with shipped semen and 29 percent associated with mares and foals that had visited the index premises during the timeframe in question.  In one destination State alone, over 591 horses from 21 different premises were quarantined. |
| Impact: | Multiple owners from several States were severely restricted in their ability to manage their equine operations.  More importantly, the rapid spread of the virus to many States substantially increased the risk of the disease status nationally in an extremely short period of time.  The use of assisted reproductive technologies, and the associated transport of semen and embryos, also was demonstrated in this case to increase the risk of animal disease transmission. |

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Appendix 3

## NAIS Pilot Projects and Field Trials

Sixteen pilot projects were supported by Federal Commodity Credit Corporation (CCC) funds from the initial National Animal Identification System (NAIS) implementation effort in fiscal year (FY) 2004. Collectively, the 16 initial projects represented the first stage of the NAIS pilot project program. This program supports the States and Tribes, who play a lead role in the administration of NAIS and in carrying out field trials and research projects that resolve questions and concerns about NAIS processes, technologies, and costs. Approximately $6.6 million was spent to carry out these projects, representing slightly more than 50 percent of funds made available for NAIS through the CCC in FY 2004. This figure accounts for less than 6 percent of the total NAIS funding ($118 million) USDA has received for NAIS to date.

The results of these projects have significant merit with regard to NAIS implementation. Most importantly, the projects showed that animal identification and tracing can be implemented successfully in a production environment. The projects gave stakeholders "hands-on" experience using identification technologies and, as a result, delivered practical solutions for routine use. In fact, many of the projects tested the technology in real-world scenarios, integrating animal identification and movement reporting into everyday commerce. These efforts have provided critical information and, in some cases, documented data about the day-to-day use of animal identification and tracing technology.

For example, the project results demonstrate successful advancements in automated data capture, which is essential for animal identification and tracing to function effectively in commercial production environments. Demonstrations conducted early on in the projects produced only 50-60 percent read rates (percent of animals whose identification code was recorded) when using low-frequency RFID. Project coordinators identified a variety of issues that affect the effectiveness of tags and scanners (data capture) in real-world scenarios. These include the read range of the scanner, the readability of tags, the location where the scanning takes place, and any interference from existing structures and other factors. After studying these issues and identifying practical solutions, many of the final project summaries now report read rates of 90-99 percent. This drastic improvement was a direct result of the continued evaluation, as well as trial and error, that occurred throughout the pilot projects. The initial pilot projects produced a number of valuable lessons learned and other key findings. An overview of these results is provided below.

Key lessons learned are provided in the following section. The full report is posted on the NAIS Web site.

### Lessons Learned

- *The retention rate of RFID button-button tags is significantly higher than anticipated.* In the Southwest pilot project, a producer with 6,000 tagged animals reported a retention rate of nearly 100 percent, compared with a 96-98 percent rate for visual tags. Other participating producers found similarly high retention rates with properly-placed RFID tags.

- *The use of RFID at the auction market can reduce the need to restrain animals when recording their individual ID numbers.* The Minnesota

*Draft:* A Business Plan To Advance Animal Disease Traceability

project concluded that RFID technology in this environment can actually improve animal and human safety.

- *Using the group/lot method of animal identification can significantly reduce a major barrier for producers to participate in NAIS.* In the Northwest region, groups of animals are often moved and managed together in situations where uniquely identifying them is virtually impossible without causing a serious and often detrimental change in the way business is conducted. The Northwest pilot project found that group/lot animal identification mirrors the natural flow of commerce in this region. The project concluded that group/lot identification is an important option for western cattle operations, but also acknowledged that individual identification is necessary if animals are commingled with cattle from other premises.

- *RFID technology is not a "plug-and-play" application and must be customized to individual locations—the needs of which vary tremendously.* In the Texas pilot project, the sites chosen for testing were often ill-suited for immediate installation of equipment and required a time-intensive process of site surveys and collaboration with facility owners to prevent any interference with the natural flow of commerce. Several facilities in the Southwest pilot project also required modifications (i.e., retrofitting existing facilities) to resolve interference problems with the panel readers. Overall, the majority of projects reported that the RFID/reader technology required careful setup, calibration, modification, and use.

- *Proper tag application and placement has a direct and significant impact on the retention and readability of the tags.* The Kentucky pilot project shows that RFID eartag application and placement alone can account for as much as 40 percent of the variation in read rates and retention.

- *In certain environments, the automated recording of animals' identification as they are loaded onto and off-loaded from trucks is critical for successful animal tracing.* While RFID technology is promising to achieve this goal, the Kansas pilot project found that improvements and advancements in the technology are still needed to make the "on-board" RFID systems more rugged. The project found that the available hardware/software needs to be refined to require less human intervention. In addition, it is important for service providers to be fully integrated (share information across systems), to ensure that checks and balances can be programmed as needed in the transportation environment.

- *Animal identification number (AIN) radio frequency (RF) eartags used for NAIS also can support value-added opportunities.* Florida's pilot project demonstrated the market-driven benefits of electronic animal identification and tracing. In one segment of the project, 6,500 individually identified cattle qualified as source-verified beef and yielded monetary premiums (totaling $56,000) during an industry-sponsored heifer sale. In another segment of the project, the Seminole Tribe also realized market-driven benefits when calves with electronic identification garnered premium amounts in a video auction sale.

- *Information collection for NAIS can be achieved effectively through programs in which producers are already engaged for management and/or marketing.* For example, the Pennsylvania project built upon the existing infrastructure of the national Dairy Herd Improvement (DHI) program. The DHI system proved to be an effective partner in collecting data for NAIS data collection, and did so in a producer-friendly manner

*Draft:* A Business Plan To Advance Animal Disease Traceability

by using systems already in place and utilized by many producers. The Northwest pilot project also found that producers are most eager to participate in animal identification and tracing when existing systems are utilized for data collection.

- *Producers' access to technology—or lack thereof—is a key factor impacting participation in animal identification and tracing systems.* The Southeastern Network pilot project found that only approximately 15 percent of producers involved in the project had internet access and used e-mail. The Northwest pilot project also found that many producers do not have convenient access to technology, or were not comfortable using the technology. Results from both projects highlight the need for non-electronic data collection methods requiring minimal action on the part of producers.

- *Buy-in for animal identification and tracing must extend beyond producers to include others involved in the production chain.* In several projects, data collection was hindered because individuals in key industry segments (i.e., auction markets, slaughter facilities, and commercial transporters) lacked understanding of the technology and basic procedures involved with animal identification and tracing systems. During the Minnesota pilot project, the participating slaughter facility did not report equipment failures to State officials or manufacturers because the problems did not interfere with the facility's own operations. Such results demonstrate that outreach, education, and market incentives will be especially important within these groups to achieve the animal tracing goals of NAIS.

- *The cost-effectiveness of LF-RFID must be evaluated according to species.* The Montana pilot project found that individually identifying all animals in a sheep production system would be too expensive unless it created value-added benefits. A subsequent project is being conducted now to evaluate the potential use of group/lot ID systems within sheep marketing channels.

- *Participants at all levels of production need to be well-informed about basic procedural matters related to animal identification.* The North Dakota CalfAID project found that facility owners were often unaware of the purpose of the project's RFID tags. As a result of the common practice at feedlots and other such facilities to remove all eartags from animals upon arrival, the potential outcomes of the project were lost. It will be especially important to educate the entire industry about animal identification practices to prevent the removal of official identification devices.

- *Workable options are available for producers who want to identify their animals electronically without the added expense of reader equipment.* Producers in the Northwest pilot project found value in using "matched set pairs" of eartags. A group/lot visual tag was used for day-to-day management purposes and then matched with an individual RFID tag number—without the use of an RFID reader or software—when the animal moved off the premises. The project also determined that this method can work well with other related management and marketing programs, such as process-, age-, and source-verification.

- *The level of training received by equipment operators directly impacts data collection and, ultimately, the system's success.* In the Oklahoma project, employees at most locations were either unprepared or unwilling to properly operate computer equipment, resulting in poor data capture rates. However, the South Dakota project reported that equipment performance improved with operator training and

*Draft:* A Business Plan To Advance Animal Disease Traceability

experience.  In fact, all facilities in this project experienced improved read rates as employees became more familiar with the equipment.

▪ *The use of electronic identification allows for more accurate and efficient recordkeeping*.  During the Southwest pilot project, many producers who were exposed to RFID technology for the first time reported a significant reduction in data entry errors.  It also was reported that the use of the technology enhanced business practices and, as a result, reduced labor costs.

▪ *Calves can be tagged successfully with RFID devices at a very young age*.  In the Tri-National project (Arizona), dairy calves from 3 to 5 days old were tagged upon arrival at a participating calf ranch and then shipped to a feedlot at 6 to 8 weeks of age.  The project reported acceptable tag retention rates.

▪ *Effective, producer-focused outreach and education is critical to the success of an animal identification system*.  The Texas pilot project reported that the biggest challenge in implementing animal identification was not the technology itself, but rather the attitudes among livestock owners towards the technology.  State and industry outreach efforts were able to address many common misconceptions about the capabilities of RFID technology and to foster participation in the project.  Explaining the need for and value of animal identification, with a specific focus on how identification devices can add value to livestock, was particularly effective in garnering producer support.

*Draft:* A Business Plan To Advance Animal Disease Traceability

# Appendix 4

## Acronyms

AHO – Animal Health Official
AHSM – Animal Health Surveillance and Management
AINMS – Animal Identification Number Management System
AIN – Animal Identification Number
AMS – Agricultural Marketing Service
APHIS – Animal and Plant Health Inspection Service
ASTM – American Society for Testing and Materials
ATD – Animal Tracking Database
ATPS – Animal Trace Processing System
CA – Cooperative Agreement
CCC – Commodity Credit Corporation
CFR – Code of Federal Regulations
COP – Community Outreach Program
CPRS – Compliant Premises Registration System
CSREES – Cooperative State Research, Education, and Extension Service
CWD – Chronic Wasting Disease
DHIA – Dairy Herd Improvement Association
eCVI – Electronic Certificates of Veterinary Inspection
EIA – Equine Infectious Anemia
EMRS – Emergency Management Response System
FFA – National FFA Organization
FY – Fiscal Year
GIN – Group/Lot Identification Number
HQ – Headquarters
ICVI – Interstate Certificates of Veterinary Inspection
ISO – International Organization for Standardization
IT – Information Technology
NAHMS – National Animal Health Monitoring and Surveillance
NAIS – National Animal Identification System
NASS – National Agricultural Statistics Service
NPIP – National Poultry Improvement Plan
NPIR – National Premises Information Repository
NSEP – National Scrapie Eradication Program
NVSL – National Veterinary Services Laboratories
OIE – World Organization for Animal Health
PIN – Premises Identification Number
QSA – Quality System Assessment
RFID – Radio Frequency Identification
SPRS – Standardized Premises Registration System
TB - Tuberculosis
USDA – United States Department of Agriculture
VS – Veterinary Services
VSPS – Veterinary Services Process Streamlining
WG – Working Group

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program.  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720–2600 (voice and TDD).  To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250–9410, or call (800) 795–3272 (voice) or (202) 720–6382 (TDD).  USDA is an equal opportunity provider and employer.

# National Animal Identification System (NAIS)

### Strategies for the Implementation of NAIS

#### April 2006

## INTRODUCTION AND EXECUTIVE SUMMARY

As part of its ongoing efforts to safeguard U.S. animal health, the U.S. Department of Agriculture (USDA) initiated the implementation of a National Animal Identification System (NAIS) in 2004. The NAIS is a cooperative State-Federal-industry program administered by USDA's Animal and Plant Health Inspection Service (APHIS). The main objective is to develop and implement a comprehensive information system, which will support ongoing animal disease programs and enable State and Federal animal health officials to respond rapidly and effectively to animal health emergencies such as foreign animal disease outbreaks or emerging domestic diseases. Some components of the NAIS are already operational and available for producer participation; the final component will be operational in early 2007.

The ultimate long-term goal of the NAIS is to provide State and Federal officials with the capability to identify all animals and premises that have had direct contact with a disease of concern within 48 hours after discovery.

The NAIS is a voluntary program. Producers and other stakeholders can now participate in the program to test the system and offer feedback to help ensure that practical solutions evolve. The NAIS establishes standards for producers to identify their animals and to report animal movements that will support the needs of animal health officials to track animals for the purposes of managing animal diseases. Animal movement information will be maintained by the industry and will provide the traceback and trace forward information for animal health officials while, at the same time, maintaining other information the industry deems necessary for marketing purposes.

The NAIS is being established through a phased-in approach by implementing these key components:

- Premises Identification
- Animal Identification
- Animal Tracking

Premises registration, the foundation of NAIS, is critical to rapidly detecting and evaluating the scope of animal disease outbreaks and improving emergency response efficiency. The availability of nationwide premises registration data provides for a more timely gathering of information to help manage animal diseases and saves manpower, time, and logistical support. Fifty States, five Tribes, and two Territories, as of March 2006, registered 235,000 premises accounting for approximately 10 percent of the national total.

Animal identification will streamline emergency response efforts and enhance existing disease surveillance, control, and eradication programs. Identifying each animal, with a unique identifier, at its birthplace and linking that identifier to the premises of origin gives animal health officials a "starting point" for epidemiologic investigations. Group/lot identification also provides equivalent capabilities for species that typically move through the production chain as a group of animals. Without that starting point, weeks and, too often, months of manual tracebacks are required to determine the source of the disease.

Animal tracking databases that maintain the movement records of animals will be owned and managed by the industry and States. These information systems will provide the locations of a subject animal and the records of other animals that the subject animal came into contact with at each premises. The data collection infrastructure is a major element of the animal tracking component. The completeness of animal movement records will directly affect the effectiveness of the response to a detected disease and the reliability for achieving the long-term 48-hour traceback/trace forward goal.

*NAIS Implementation Strategies*

**IMPLEMENTATION PLANS**

**Immediate Participation Milestones**

Much of the NAIS, from a systems perspective, is operational; remaining systems elements soon will be. The following are key NAIS milestones:

- June 2004:     Cooperative agreements established with the States and Tribes
- August 2005:  Premises registration systems operational in 50 States and 2 Territories
- March 2006:   Individual animal identification begins
- June 2006:     Cooperative Agreements (CA) with Private/State Animal Tracking Databases (ATDs)
- Early 2007:    Private/State ATDs operational

Premises registration, the foundation of the system, has been implemented in all 50 States and 2 Territories. Several Tribes are also registering their premises. An enhancement to the Standardized Premises Registration System will be deployed mid-year 2006 that will provide the opportunity for more Tribes to administer premises registration activity on their reservations.

The animal identification phase is being implemented in March 2006. The animal identification number (AIN) will be authorized for use on AIN tags to support individual animal identification. The use of the Group/Lot identification number is also a viable option when animals move through the production chain as a group or lot of animals.

The next phase of NAIS implementation relates to animal tracking. To facilitate the integration of private and State animal tracking databases with the NAIS, APHIS has developed, as part of the implementation process, a metadata portal that will allow interested organizations to participate in early 2006. APHIS' Veterinary Services (VS) has initiated the design of the metadata portal, referred to as the Animal Trace Processing System (ATPS); its design, development, and testing of the system will continue throughout 2006, with deployment anticipated in early 2007. APHIS will enter into a CA with organizations that have databases that meet the ATD requirements and that wish to participate in the advancement of the private and State ATDs with the NAIS. By April 2006, APHIS will publish (on its webpage) information on how organizations can enter into a CA. Producers may participate in this industry-administered component in the very near future.

APHIS will work with stakeholders throughout 2006 to develop the complete requirements for the integration of private and State animal tracking databases with the NAIS. It is anticipated that the requirements for compliance will be completed by late 2006, and the actual integration of such systems with the ATPS is targeted for early 2007.

**Achieving a Successful Level of Participation**

Producers and affected industry segments will need to participate in NAIS for it to be successful in supporting the animal disease management programs. Market demands (age, source and process verification, traceability, etc.) are becoming of greater importance for certain species and could become a primary "driver" for achieving a successful level of participation in the NAIS. Allowing market forces and industry needs to drive producer participation in the NAIS is preferable to mandatory Federal regulations.

As more producers participate in the system, and as the number of animals registered in the system increases, our ability to track animals will increase as well. The system will require a high degree of producer participation in order to achieve its goal of 48-hour traceability. The animal movement information maintained by the industry will provide the traceback and trace forward information for animal health officials.

Measurable benchmarks of participation rates for key program activities are defined with timelines necessary to reach full participation by the target dates. Participation levels will be evaluated and studies will be conducted to determine factors affecting participation.

---

**NAIS Implementation Strategies**

---

<u>Contingency Plan</u>

This *NAIS* implementation strategy provides the opportunity for the stakeholders to take a proactive approach to achieve full industry participation in the NAIS. If the marketplace, along with State and Federal identification programs, does not provide adequate incentives for achieving complete participation, USDA may be required to implement regulations. USDA will evaluate whether the participation levels are increasing at rates that will achieve full participation by 2009. Based on that analysis, USDA will determine if the market-driven incentives, along with industry "buy-in" for improved animal disease programs, is resulting in adequate participation and growth rates for NAIS to be successful by the established target dates. If participation rates are not adequate, the development of regulations through normal rulemaking procedures will be considered to require participation in certain aspects of the program. The public would have the opportunity to comment on any proposed regulations.

**Summary of Operational Milestones and Participation Benchmarks**

The following summarizes APHIS estimates of the key operational milestones and benchmarks for participation. The chart illustrates the timelines for the implementation plan for the NAIS.

<u>Operational Milestones:</u>

| | |
|---|---|
| August 2005: | Achieved Operational Premises Registration Systems |
| March 2006: | AIN Management System Operational |
| June 2006: | Cooperative Agreements with Private/State ATDs |
| February 2007: | Private and State ATDs and ATPS Operational |

<u>Benchmarks for Progress</u>:

| | |
|---|---|
| January 2007: | 25% of premises registered |
| January 2008: | 70% of premises registered |
| | 40% of animals identified |
| January 2009: | 100% of premises registered |
| | 100% of "new" animals identified |
| | 60% of animal <1 year of age have complete movement data |

These benchmarks are participation levels APHIS believes are necessary for the industry, State, and Federal partnership to successfully achieve the goals and objectives of NAIS.

# NAIS Implementation Timelines



## *NAIS Implementation Strategies*

**Benchmarks for Progress**

The following charts reflect participation levels that USDA believes necessary to meet full participation in the NAIS to achieve the 48-hour traceback goal. While outreach and promotional efforts do encourage greater levels of participation in the NAIS, it is acknowledged that market incentives will be required to achieve these participation levels.

**1. Premises Registration**

It is APHIS' estimate that 2 million premises exist in the United States that need to be registered by 2009. This includes all locations that manage and/or hold livestock and poultry. As of March 2006, over 235,000 premises have been registered and it is projected that 475,000 premises will be registered by year's end. The plan reflects annual registration rates to achieve 2 million premises registered by January 2009.

### Benchmarks[1] for Premises Registration

Total Premises Estimate: **2,000,000**

| Year | % Reg./Yr. | Annual Registrations | Date | Accumulative Total | |
|------|------------|----------------------|------|--------------------|---|
| < 2006 | | 175,000 | | | |
| 2006 | | | Jan-06 | 175,000 | 9% |
| | 15% | 300,000 | Jul-06 | 325,000 | 16% |
| 2007 | | | Jan-07 | 475,000 | 24% |
| | 50% | 1,000,000 | Jul-07 | 975,000 | 49% |
| 2008 | | | Jan-08 | 1,475,000 | 74% |
| | 25% | 500,000 | Jul-08 | 1,725,000 | 86% |
| 2009 | | 25,000 | Jan-09 | 2,000,000 | 100% |

(Annual Goal | Timelines Projections)

[1] Benchmarks for achieving full participation by 2009



Benchmarks for Premises Registration
(Accumulative)

**2. Animal Identification**

Two types or levels of animal identification are necessary to support animal disease management programs: individual animal and "group/lot" identification. Individual animals may be identified in the NAIS by means of the AIN.

Group/Lot identification is accomplished through the use of a Group/Lot Identification Number (GIN). The GIN is created by the producer using the premises identification number of the location where the animals are found and the date the group or lot was created.

- **Allocation of AINs**

The AINs are allocated to companies that manufacture and/or provide official identification devices or technologies. Other individuals and organizations may perform roles that support the distribution of official identification devices to producers. The complete and accurate recording of the AINs distributed and assigned to each premises is imperative.

The allocation of AINs to a premises, in most cases, provides the point of origin of the animal, and therefore is another activity that warrants the establishment of goals. It is assumed that producers will apply AIN devices to their animals as the devices are purchased. The cattle industry represents the species with the largest population with approximately 33 million calves born each year. Other species groups that will identify animals individually (primarily sheep, goats, deer, and elk) with visual AIN tags account for another 7 million animals. A benchmark of 40 million AIN tags distributed to premises in the calendar year of 2009 has been established. This benchmark reflects having all new animals officially identified that are born in 2009. The following provides benchmarks in the distribution of AIN tags to achieve the 2009 goal.

### Benchmarks[1] for AIN Distribution to Premises

**Total Annual New Born Animals Estimate:   40,000,000**

| Year | Annual Goal | | Timelines Projections | |
|---|---|---|---|---|
| | % New Animals ID'd | New Animals ID'd Annually[2] | Date | Accumulative Total |
| < 2006 | | 0 | | |
| | | | Jan-06 | 0 |
| 2006 | 5% | 2,000,000 | Jul-06 | 1,000,000 |
| | | | Jan-07 | 2,000,000 |
| 2007 | 35% | 14,000,000 | Jul-07 | 9,000,000 |
| | | | Jan-08 | 16,000,000 |
| 2008 | 60% | 24,000,000 | Jul-08 | 28,000,000 |
| | | | Jan-09 | 40,000,000 |
| 2009 | 100% | 40,000,000 | | |

[1] Benchmarks for achieving full participation by 2009

[2] Animals identified as individuals (not Group/Lot ID)

**NAIS Implementation Strategies**





## NAIS Implementation Strategies

- **Termination Records**

The collection of termination records can provide another critical piece of information. Determining the number of animals with AINs at termination will help determine the rate at which the AIN devices are maintained on the animals and confirm the number of animals actually identified with an AIN. Approximately 35,000,000 cattle are harvested each year. The measure for this activity will be specific to the cattle industry and the benchmarks are provided in the following chart reflecting the goal of having all cattle identified at harvest with an AIN.

### Benchmarks[1] for Animals ID'd with AINs at Termination

**Total Annual Animal Slaughtered Projection: 35,000,000**

| Year | Annual Goal | | Timelines Projections | |
|------|---|---|---|---|
| | % New Animals ID'd | New Animals ID'd Annually [2] | Date | Accumulative Total |
| < 2006 | | 0 | | |
| | | | Jan-06 | 0 |
| 2006 | 2% | 700,000 | Jul-06 | 350,000 |
| | | | Jan-07 | 700,000 |
| 2007 | 20% | 7,000,000 | Jul-07 | 4,200,000 |
| | | | Jan-08 | 7,700,000 |
| 2008 | 50% | 17,500,000 | Jul-08 | 16,450,000 |
| | | | Jan-09 | 25,200,000 |
| 2009 | 80% | 28,000,000 | | |

[1] Benchmarks for advancing participation

[2] Animals Identified with the AIN



Benchmarks for advancing participation

Page 7

*NAIS Implementation Strategies*



## 3. Animal Tracking

To achieve high reliability with the 48-hour traceback goal, a high percentage of animal movement records need to be collected and available electronically. The ATPS will be in development in 2006 and will be used to evaluate the completeness of animal movement records.

- **Animal Movement Records**

Random audits will be conducted on animals terminated to determine the number of animals with AINs that have full traceability.

### Benchmarks[1] for Animals with Complete Movement Records

Total Annual New Born Animals Estimate:  40,000,000

| | Annual | | Timeline Projections | |
|---|---|---|---|---|
| Year | % New Animals with Complete Records | New Animals with Complete Records Annually[2] | Date | Accumulative Total |
| < 2006 | | 0 | | |
| | | | Jan-06 | 0 |
| 2006 | 5% | 2,000,000 | Jul-06 | 1,000,000 |
| | | | Jan-07 | 2,000,000 |
| 2007 | 15% | 6,000,000 | Jul-07 | 5,000,000 |
| | | | Jan-08 | 8,000,000 |
| 2008 | 35% | 14,000,000 | Jul-08 | 15,000,000 |
| | | | Jan-09 | 22,000,000 |
| 2009 | 60% | 24,000,000 | | |

[1] Benchmarks for advancing participation
[2] Animals identified as individuals

Page 8

_NAIS Implementation Strategies_





IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

## ORDER

AND NOW this _____ day of June 2008, it is hereby ORDERED that plaintiff Mary-Louse Zanoni's motion for temporary restraining order is GRANTED.  The United States Department of Agriculture and its components are hereby ENJOINED from "conversion" of the National Premises Information Repository (NPIR) into a Privacy Act system of records.   IT IS FURTHER ORDERED that the 17,000 pages of NPIR records the United States Department of Agriculture printed out in Oct/./Nov. 2007 be delivered into the custody of the Court within 5 days of the date of this order.

_____
                                                                          J.