IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. 08-939 (EGS) |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | (Combined motion for summary judgment |
| | § | and response in opposition to plaintiff's |
| | § | motion for summary judgment due July 21, |
| Defendant. | § | 2008) |

**MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff Mary-Louse Zanoni by and through counsel, pursuant to Fed. R. Civ. P. 56, and respectfully moves this Court for summary judgment on her claims for declaratory and injunctive relief. There are no material issues of fact in dispute and Ms. Zanoni is entitled to judgment as a matter of law.

In support of her Motion, plaintiff relies on the following:

(A)    Plaintiff's Verified Complaint.

(B)    Affidavit of Dr. R. M. Thornsberry, attached to Plaintiff's Motion for a Temporary Restraining Order as Exhibit 1.

(C)    Affidavit of Ray Hill, attached to Plaintiff's Motion for a Temporary Restraining Order as Exhibit 2.

(D)    National Animal Information System Draft Strategic Plan 2005-2009, attached to Plaintiff's Motion for a Temporary Restraining Order as Exhibit 3.

(E)    National Animal Identification System A User Guide November 2006, attached to Plaintiff's Motion for a Temporary Restraining Order as Exhibit 4.

(F)    Business Plan - Draft December 12, 2007, attached to Plaintiff's Motion for a Temporary Restraining Order as Exhibit 5.

(G)    NAIS Strategies for Implementation, attached to Plaintiff's Motion for a Temporary Restraining Order as Exhibit 6.

(H)    Affidavit of Mary Zanoni attached hereto as Exhibit 7;

(I)    Affidavit of Jack Kittredge attached hereto as Exhibit 8;

(J)    Affidavit of Peter Hardin attached hereto as Exhibit 9;

(K)    National Animal Identification System Draft Program Standards April 25, 2005, attached hereto as Exhibit 10;

(L)    CV of Mary Zanoni attached hereto as Exhibit 11;

(M)    "Exported-Fueled National Animal ID Program Raises Many Farmer Objections,"  *The New Farm*, April 13, 2006, attached hereto as Exhibit 12;

(N)    "Pa. a Step Closer to Premise ID Program," *Lancaster Farming*, September 25, 2004, attached hereto as Exhibit 13;

(O)    USDA/APHIS   Veterinary   Services   Initial   Announcement   of
Cooperative Agreements for FY 2007, attached hereto as Exhibit
14;

(P)    NCDA&CS Hay Alert, attached hereto as Exhibit 15;

(Q)    New York and Pennsylvania premises registration forms, attached
hereto as Exhibit 16;

(R)    USDA letter dated June 19, 2008 and redacted records, attached
hereto as Exhibit 17;

(S)    Plaintiff's Separate Statement of Material Facts filed herewith;

(T)    Plaintiff's Statement of Points and Authorities filed herewith.

WHEREFORE, plaintiff respectfully requests that this Honorable Court
grant her Motion for Summary Judgment.

CLYMER AND MUSSER, P.C.

Respectfully submitted,


_s/Leonard G. Brown, III_____
LEONARD G. BROWN, III
Pennsylvania Bar No. 83207
DDC Bar No. PA0025
408 West Chestnut St.
Lancaster, PA 17603
(717) 299-7101
(717) 299-5115—facsimile

ATTORNEYS FOR PLAINTIFF

Dated: July 2, 2008

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the foregoing document pursuant to the electronic case filing system of the District Court for the District of Columbia upon the following individual(s):

JAMES D. TODD, JR., Sr Counsel
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue N.W.
Washington, DC 20530
(202) 514-3378
(202) 616-8470 (fax)
james.todd@usdoj.gov

**CLYMER & MUSSER, P.C.**

By:        _s/*Leonard G. Brown, III*_____
           Leonard G. Brown, III, Esquire
           Attorney for Plaintiff
           408 West Chestnut Street
           Lancaster, PA 17603
           (717) 299-7101

Dated: July 2, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI,<br>　　　　Plaintiff, | §<br>§<br>§ | |
| 　　　　vs. | §<br>§<br>§ | CIVIL ACTION NO. 08-939 (EGS) |
| | §<br>§ | (Combined motion for summary judgment |
| UNITED STATES DEPARTMENT OF<br>AGRICULTURE,<br>　　　　Defendant. | §<br>§<br>§ | and response in opposition to plaintiff's<br>motion for summary judgment due July 21,<br>2008) |

## SEPARATE STATEMENT OF MATERIAL FACTS AS PER LR 56.1

1.　　Plaintiff Mary-Louise Zanoni is a freelance agricultural journalist residing in

the Town of Russell, St. Lawrence County, New York; she is a citizen of the

United States.  (Compl. ¶¶ 3, 68.)[1]

2.　　Plaintiff Mary-Louise Zanoni regularly writes for The Milkweed, a dairy-

industry monthly.  (Hardin Aff. ¶¶ 3-6, attached as Ex. 9 to Pl.'s Mot.

Summ. J.; Zanoni Aff. ¶¶ 4-7, attached as Ex. 7 to Pl.'s Mot. Summ. J.)

3.　　Plaintiff Mary-Louise Zanoni has followed the development of defendant

United States Department of Agriculture's ("USDA's") National Animal

Identification System ("NAIS") since 2005 and often has been cited and

quoted as an authority on NAIS in major media. (Compl. ¶ 5.)

4.　　Plaintiff Mary-Louise Zanoni, because of her background as a lawyer, has

an interest in, and ability to examine, how USDA's implementation of NAIS

may and may not conform to USDA's obligations under Federal law.

---

[1] Plaintiff filed a verified complaint pursuant to 28 U.S.C. § 1746 and relies on the facts alleged
therein in support of this motion.

(Zanoni Aff. ¶¶ 3, 9-12, attached as Ex. 7 to Pl.'s Mot. Summ. J.;  Exh 11 to Pl.'s Mot. Summ. J.)

5.    Defendant United States Department of Agriculture ("USDA") is a department of the Executive Branch of the government of the United States. USDA is an "agency" within the meaning of 5 U.S.C. §§ 551(1), 552(f), and 552a(a).  The Animal and Plant Health Inspection Service ("APHIS") is a component agency of defendant USDA.  (Compl. ¶ 4.)

6.    Defendant USDA began compiling the National Premises Identification Repository ("NPIR") in 2004.  (*A Business Plan to Advance Animal Disease Traceability, Draft December 12, 2007* at p. 61, attached as Exhibit 5 to Pl.'s Mot. T.R.O.; Compl., ¶ 48).  The Standardized Premises Registration System is as old as, or older than, the NPIR.  (*Id.* pp. 61-62.)  The Animal Identification Number Management System has been in existence since before August 1, 2007.  (*Id.* p. 62.)  USDA deployed the Animal Trace Processing System in March 2007.  (*Id.* p. 63.)

7.    In April 2005, with the release of the National Animal Identification System (NAIS) Draft Strategic Plan and Draft Program Standards, USDA/APHIS revealed that it planned to mandate 100% government registration of "premises" for every property and every person owning any livestock; 100% individual animal ID, primarily with RFID tags and microchips; and 100% reporting, to private fee-based databases, of all changes in status and changes in location of all livestock.  (*NAIS Draft Strategic Plan* at p. 2 attached as exhibit 3 to Pls.' Mot. T.R.O.; Compl. ¶ 21.)

8.      The premises registration and animal ID were to be completely mandatory by January 2008, and the animal tracking was to be completely mandatory by January 2009.  (*NAIS Draft Strategic Plan* at p. 2 attached as exhibit 3 to Pls.' Mot. T.R.O; Compl. ¶ 23.)

9.      Defendant USDA's establishment, implementation, and administration of NAIS is a matter of public concern.  (Compl. ¶¶ 5, 8; Hardin Aff. ¶¶ 5, 7, attached as Ex. 9 to Pl.'s Mot. Summ. J.;; Zanoni Aff.  ¶¶ 8, 12-17, attached as Ex. 7 to Pl.'s Mot. Summ. J.)

10.     The National Premises Information Repository (NPIR) is a "phone book" of livestock-related "premises" registered with NAIS, consisting of only 6 items for each "premises": name of entity, name of contact person, address, telephone number, alternate telephone number, type of operation (e.g., auction house, veterinary clinic, farm, feedlot).  (*NAIS Draft Program Standards* at p. 10; Zanoni Aff. ¶¶ 11-12, attached as Ex. 7 to Pl.'s Mot. Summ. J.;; Ex. 16 to Pl.'s Mot. Summ. J.)

11.     No financial information of any individuals, farmers, animal owners, or farms is contained in the NPIR.  (*Id.*)

12.     Since 2005, USDA has vacillated between plans for a "mandatory" NAIS and plans for a "voluntary" NAIS.  (*NAIS Draft Strategic Plan* at p. 10 attached as exhibit 3 to Pls.' Mot. T.R.O.; *A Business Plan to Advance Animal Disease Traceability, Draft December 12, 2007* at p. i., attached as Exhibit 5 to Pls. Mot. T.R.O.)

13.  The USDA has assigned Premises Identification Numbers to farmers without their knowledge and without their permission.  (Aff. Hill ¶¶ 4-6, attached as Ex. 2 to Pl.'s Mot. TRO; Aff. Thornsberry ¶¶ 8-10, attached as Ex. 1 to Pl.'s Mot. TRO; Aff. Kittredge ¶¶ 9-12, attached as Ex. 8 to Pl.'s Mot. Summ. J.)

14.  Plaintiff, Mary-Louise Zanoni, has been seeking access to USDA's NPIR records since October 2007.  (Compl. ¶ 35).

15.  Ms. Zanoni wishes to use the NPIR records to investigate the scope of the widely reported problems of animal owners placed in the "voluntary" NPIR without their knowledge or against their will.  (Compl. ¶¶ 9-11; Zanoni Aff. ¶¶ 8-9, attached as Ex. 7 to Pl.'s Mot. Summ. J.)

16.  With the information from the NPIR, Ms. Zanoni will be able to examine how USDA is compiling and maintaining its NAIS data collection and whether USDA's actions conform to its public statements and to legal requirements. (*Id.*)

17.  Ms. Zanoni writes an article on NAIS for The Milkweed every other month and plans a series of articles, from July 2008 through July 2009, to examine how USDA is operating its NAIS databases, including the NPIR, SPRS, AINMS, and ATPS.  (Compl. ¶¶ 9-11; Zanoni Aff. ¶ 7, attached as Ex. 7 to Pl.'s Mot. Summ. J.; Hardin Aff. ¶¶ 4-8, attached as Ex. 9 to Pl.'s Mot. Summ. J.)

18.  By letter dated October 24, 2007, Ms. Zanoni requested pursuant to FOIA, copies of the following agency records:

    a.  All records of registered premises contained in the National Premises Information Repository, which we understand to be maintained at the

APHIS facilities at Fort Collins, Colorado, and which, according to the APHIS website for the National Animal Identification System, http://animalid.aphis.usda.gov/nais/index.shtml, contained, as of October 15, 2007, the records of 421,217 registered premises. We understand that according to APHIS, http://animalid.aphis.usda.gov/nais/faq/faq.shtml#Q6, the record of each registered premises typically consists of basic contact information, i.e., name of the entity, name of a contact person, address, telephone number, operation type, and alternative telephone number.

 b. The number of requests to be removed from the premises database that APHIS has received from owners/managers of registered premises; and

 c. The number of premises that actually have been removed from the database.

(Exhibit A attached to Pls.' Compl.)

19. Ms. Zanoni's FOIA Request was sent to FOIA Officer Leisa Banks by facsimile and certified mail at USDA's Animal & Plant Health Inspection Service on October 24, 2007. (*Id.*)

20. Ms. Banks received the letter by certified mail on October 26, 2007. (Exhibit B attached to Pls.' Compl.)

21. By letter dated October 30, 2007, USDA/APHIS FOIA Program Specialist Robbie Perry acknowledged receipt of Ms. Zanoni's request and informed Ms. Zanoni's counsel that the requested records were located outside of the office and that a search could not be done within 30 days; but Mr. Perry assured that the request would be processed "as soon as possible." (Exhibit C attached to Pls.' Compl.)

22.  No appeal rights were communicated by Mr. Perry in his October 30, 2007 letter.  He did however, invite questions about discussing the time frame for the request.  (*Id.*)

23.  On November 16, 2007, counsel for Ms. Zanoni contacted Mr. Perry to discuss the FOIA request and the status of processing.  (Compl. ¶43.)  Mr. Perry stated that some 17,000 pages of printed NPIR records had been sent to his office in APHIS's efforts to process Ms. Zanoni's FOIA request.  (*Id.*)  Mr. Perry indicated that these paper records were present in his office and that he was about to begin processing and sending groups of 200 records at a time to Ms. Zanoni's counsel in fulfillment of Ms. Zanoni's FOIA request.  (Compl. ¶43).

24.  No records were received from Mr. Perry.  (Compl. ¶44).  By letter dated December 13, 2007, Garfield Daley, the Acting Director, USDA/APHIS Freedom of Information & Privacy Act Staff, denied in total Ms. Zanoni's FOIA request.  (Exhibit D attached to Pls.' Compl.)  Mr. Daley based the denial only on FOIA Exemption 6, 5 U.S.C. § 552(b)(6), claiming that the NAIS information is "personal in nature."  (*Id.*)

25.  Mr. Daley waived any fees for Ms. Zanoni's FOIA request.  (*Id.*)

26.  By letter dated December 21, 2007, Ms. Zanoni appealed the agency's initial determination denying her request to Cindy J. Smith, the Administrator of USDA's Animal and Plant Health Inspection Service.  (Exhibit E attached to Pls.' Compl.)  The first class mail letter was received by Ms. Smith on December 26, 2007.  (*Id.*)

27.  Neither Ms. Smith nor any other official from the USDA responded to Ms.

     Zanoni's appeal in any way and the 20 days to do so have long passed.

     (Compl. ¶ 44).

28.  The USDA failed to make a "determination" on the merits of Ms. Zanoni's

     FOIA appeal within 20 working days of receipt.  (Compl. ¶ 45).

29.  The USDA failed to "immediately notify the person making such request of

     the provisions for judicial review of that determination."  (*Id.*).

30.  Ms. Zanoni has exhausted her administrative remedies with the USDA.

     (Compl. ¶¶ 36-46).

31.  On April 30, 2008, USDA/APHIS published a notice in the Federal Register

     announcing USDA/APHIS's intention to declare the NPIR, and other NAIS

     databases, to be systems of records covered by the Privacy Act, effective

     June 9, 2008.  (73 FR 23412-14; Compl. ¶ 47.)

32.  The four data collections mentioned in USDA's Privacy Act conversion notice

     are the NPIR (USDA's "phone book" of livestock owner contact information),

     the Standardized Premises Registration System (SPRS) (a database used by

     states to feed information into the NPIR), the Animal Identification Number

     Management System (AINMS) (a USDA system assigning unique individual

     animal identification numbers), and the Animal Trace Processing System

     (ATPS) (USDA's metadata system for interfacing with private animal tracking

     databases). (73 FR 23412-14).

33.  Farmers have been placed in the NPIR by datamining from other UDA

     records and by state agriculture departments, working under agreements

with USDA; the states datamine their own records from livestock

information collections, at the suggestion and with the cooperation of USDA,

often without any prior notice to or consent from the farmers.  (Aff. Kittredge

¶¶ 9-12 attached to Pls.' Mot. Summ. J.; Compl. ¶11; Zanoni Aff. ¶¶ 13-17,

attached as Ex. 7 to Pl.'s Mot. Summ. J.;   Exhibits 12-15 to Pl.'s Mot.

Summ. J.)  The states are motivated by funds provided by the USDA under

cooperative agreements, and USDA encourages – indeed, requires – rapid

expansion of each state's number of premises submitted to NPIR, as a

condition of full payment of the funds. (*Id.*)

34.    Prior to being placed in the NPIR, farmers were not provided the notice

required under the Privacy Act, 5 U.S.C. § 552a(e)(3), explaining, <u>inter</u> <u>alia</u>,

the legal authority by which USDA was placing them into the NPIR and

what uses would be made of the information placed into the NPIR.  (Hill Aff.

¶ 17, attached as Ex. 2 Pl.'s Mot. TRO; NAIS User Guide 2006 at p. 63,

attached as Exhibit 4 to Pls.' Mot. T.R.O.; Kittredge Aff. ¶ 17, attached as

Ex. 8 to Pl.'s Mot. Summ. J.;   Ex. 16 to Pl.'s Mot. Summ. J. )

35.    In the course of congressional consideration of a new Farm Bill, on May 13,

2008, a Conference Report for the bill was filed.  The Conference Report

contained a completely new provision, unrelated to earlier versions of the

legislation, purporting to prohibit USDA from disclosing "information

provided by an agricultural producer or owner of agricultural land

concerning the agricultural operation, farming or conservation practices, or

the land itself, in order to participate in programs of the Department."  P.L.

110-234, 112 Stat. 923, § 1619(b)(2)(A); later re-enactment at P.L. 110-246, 122 Stat. 1651, § 1619(b)(2)(A).

36.   Section 1619(b) was never publicly discussed before enactment, and is not mentioned in the Conference Committee's Statement of Managers.  (Compl. ¶ 57.)

37.   The Conference Report was passed by the House on May 14, 2008 and by the Senate on May 15, 2008.  (Compl. ¶ 58.)

38.   On May 20, 2008 a Farm Bill was presented to the President, but this was a different bill than the bill passed by the House and Senate on May 14 and 15, respectively.  (Compl. ¶ 59.)

39.   An entire title of the Farm Bill, Title III, although it had been duly adopted by both chambers, had been omitted from the bill presented to the President.  (Compl. ¶ 59.)

40.   On May 21, 2008, the President vetoed the bill presented to him and returned it to the House of Representatives.  (Compl., ¶ 60.)

41.   The House of Representatives passed a materially different bill (without any Title III) on May 21, 2008 to override the President's veto.  The Senate also passed the different bill on May 22, 2008.  Thus, Congress purported to override a Presidential veto by knowingly passing a materially different bill than the original bill that had been passed by the House and Senate.  (See Compl., ¶¶ 61-62.)

42.   On May 22, 2008, a second Farm Bill containing the missing Title III, H.R. 6124, was passed by the House of Representatives and later passed by the

Senate on June 5, 2008.  (P.L. 110-246.)  H.R. 6124 was presented to the President on June 5, 2008.  (*See id.*)  The President vetoed the bill on June 18, 2008 and both houses of Congress overrode the veto on the same day. (P.L. 110-246, 122 Stat. 1651.)

43. On June 9, 2008, with the agreement of the parties, the Court entered a scheduling order requiring defendant USDA to produce to Ms. Zanoni, by June 24, 2008, the records sought in the second and third items of her original FOIA request, namely, ""[t]he number of requests to be removed from the premises database that APHIS has received from owners/managers of registered premises" and "[t]he number of premises that actually have been removed from the database."  (Docket no. 7.)

44. Although USDA calls its June 19, 2008 response to the June 9, 2008 order an "interim response" to Ms. Zanoni's agency appeal of December 2007, USDA in fact never replied to Ms. Zanoni's agency appeal.  (Compl. ¶¶ 42-45 & Exh. D; Zanoni Aff. ¶ 18, attached as Ex. 7 to Pl.'s Mot. Summ. J.;  Ex. 17 to Pl.'s Mot. Summ. J.)

45. Defendant USDA's June 19, 2008 response to the Court's order of June 9, 2008 is incomplete and insufficient.  The records provided by USDA begin on Nov. 30, 2006 and end on October 9, 2007, with no explanation of why records for the six-month period of October 2007 to June 2008 are missing. Further, it appears that the records were removed from a "contact" list, but any date for their removal from the "NPIR (Premises)" list is either missing or

redacted.  Records dated from Nov. 30, 2006 through May 29, 2007 give no

indication of whether they were the subject of requests to be removed.  (Id.)

Respectfully Submitted,

CLYMER AND MUSSER, P.C.


*/s/ Leonard G. Brown, III*
Leonard G. Brown, III
Pennsylvania Bar No. 83207
DDC Bar No. PA0025
408 West Chestnut St.
Lancaster, PA 17603
(717) 299-7101
(717) 299-5115 – facsimile

Dated: July 2, 2008

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that I have this day served a true and correct copy of the foregoing document pursuant to the electronic case filing system of the District Court for the District of Columbia on the following individual(s):

JAMES D. TODD, JR., Sr Counsel
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue N.W.
Washington, DC 20530
(202) 514-3378
(202) 616-8470 (fax)
james.todd@usdoj.gov

**CLYMER & MUSSER, P.C.**

By:          _s/*Leonard G. Brown, III*_____
             Leonard G. Brown, III, Esquire
             Attorney for Plaintiff
             408 West Chestnut Street
             Lancaster, PA 17603
             (717) 299-7101

Dated: July 2, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 08-939 (EGS) |
| | § | |
| | § | (Combined motion for summary judgment |
| UNITED STATES DEPARTMENT OF | § | and response in opposition to plaintiff's |
| AGRICULTURE, | § | motion for summary judgment due July 21, |
| Defendant. | § | 2008) |

**Plaintiff's Statement of Points and Authorities in Support of Plaintiff's Motion For Summary Judgment**

## Table of Contents

Table of Contents ............................................................................ i

Table of Authorities ....................................................................... iii

I.       INTRODUCTION .......................................................... 1

II.      FACTS.......................................................................... 5

III.     ARGUMENT ............................................................... 13

  A.   Introduction .............................................................. 13

  C.   FOIA Exemption 6 Does Not Apply to the NPIR "Phone Book" Records ................................................................... 15

  D.   Section 1619 of the Food, Conservation, and Energy Act of 2008 Does Not Apply to Plaintiff's FOIA Request; Section 1619 Applies Only to Information On Specific Crops, Acreage, or Irrigation Practices; Section 1619 Is Not Retroactive; and Section 1619 Did Not Become Effective Until June 18, 2008 ................................... 24

    1.  Section 1619 is not retroactive .............................. 24

    2.  Section 1619 by its terms does not apply to plaintiff's FOIA request....................................................................... 26

E.    Defendant USDA Violates the Plain Terms of the Privacy Act by Attempting to Convert the NPIR and Other Longstanding NAIS Systems into a "Privacy Act System of Records." .......................... 28

IV.     CONCLUSION ................................................................................ 39

## Table of Authorities

**Cases**

Amalgamated Transit Union v. Skinner, 894 F.2d 1362 (D.C. Cir. 1990)........ 31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ..................................... 14

Bowen v. Georgetown Univ. Hospital, 488 U.S. 204 (1988) ............................ 24

Carter v. Department of Commerce, 830 F.2d 388 (D.C. Cir. 1987)................ 20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .................................................. 14

Center for Public Integrity v. Federal Communications Comm'n, 505 F. Supp.
    2d 106 (D.D.C. 2007)................................................................................... 17

City of Klamath Falls v. Babbitt, 947 F. Supp. 1 (D.D.C. 1996) ...................... 33

Clarke v. Securities Indus. Ass'n, 479 U.S. 388 (1987) ................................... 31

Clinton v. City of New York, 524 U.S. 417 (1998)............................................ 23

Consumers' Checkbook v. Department of Health & Human Services, 502 F.
    Supp. 2d 79 (D.D.C. 2007) ......................................................................... 21

Department of Air Force v. Rose, 425 U.S. 352 (1976) ............................. 15, 20

Department of Justice v. Tax Analysts, 492 U.S. 136 (1989)......................... 14

Department of State v. Ray, 502 U.S. 164 (1991)........................................... 14

* Department of State v. Washington Post Co., 456 U.S. 595 (1982)..... 16, 17, 27

Doe v. Chao, 540 U.S. 614 (2004)............................................................. 29, 30

Environmental Protection Agency v. Mink, 410 U.S. 73 (1973)...................... 14

Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006)....................................... 24

Fortson v. Harvey, 407 F. Supp. 2d 13 (D.D.C. 2005) ............................... 19, 20

Gordon v. FBI, 388 F. Supp. 2d 1028 (N.D. Cal. 2005) ............................ 18, 22

* Hertzberg v. Veneman, 273 F. Supp. 67 2d (D.D.C. 2003) ................. 18, 20, 21

INS v. Chadha, 462 U.S. 919 (1983). ............................................................... 23

Judicial Watch, Inc. v. Department of the Army, 402 F. Supp. 2d 241 (D.D.C. 2005) ............................................................................................. 17

Judicial Watch, Inc. v. Food & Drug Administration, 449 F.3d 141 (D.C. Cir. 2006) ................................................................................................... 18

Landgraf v. USI Film Products, 511 U.S. 244 (1994) ...................................... 24

* Leadership Conference on Civil Rights v. Gonzales, 421 F. Supp. 2d 104 (D.D.C. 2006) ............................................................................... 17, 19, 22

Lee v. Geren, 480 F. Supp. 2d 198 (D.D.C. 2007) .......................................... 30

Lewis v. Faulkner, 689 F.2d 100 (7th Cir. 1982) ............................................ 14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ................................. 30, 32

Lujan v. National Wildlife Federation, 497 U.S. 871 (1990) ........................... 30

McCready v. Nicholson, 465 F.3d 1 (DDC 2006). ........................................... 29

* Multi Ag Media LLC v. Department of Agriculture, 515 F.3d 1224 (D.C. Cir. 2008) .................................................................................................. passim

National Archives & Records Admin. v. Favish, 541 U.S. 157 (2004).............. 15

National Ass'n of Home Builders v. Norton, 309 F.3d 26 (D.C. Cir. 2002)....... 16

National Ass'n of Retired Federal Employees v. Horner, 879 F.2d 873 (D.C. Cir. 1989) ................................................................................................. 16, 18

Natl. Assoc. of Federal Employees v. Horner, 879 F.2d 873 (D.C. Cir. 1989) .. 21

Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992) .................................................. 14

News-Press v. Department of Homeland Security, 489 F.3d 1173 (11th Cir 2007) .................................................................................................... 31

* News-Press v. Department of Homeland Security, 489 F.3d 1173 (11th Cir. 2007) ............................................................................................ 16, 21, 22

NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214 (1978) ............................. 15

Pansy v. Borough of Stroudsburg, 23 F.3d 772 (3d Cir. 1994) ....................... 32

Penny Saver Publications, Inc. v. Hazel Crest, 905 F.2d 150 (7th Cir. 1990) .. 33

<u>Pharmaceutical Research and Mfrs. of America v. Thompson</u>, 259 F. Supp. 2d 39 (D.D.C. 2003) ................................................................................. 30, 33

<u>Pitt News v. Fisher</u>, 215 F.3d 354 (3d Cir. 2000) ............................................. 32

<u>Qualcomm Inc. v. FCC</u>, 181 F.3d 1370 (D.C. Cir. 1999) .................................. 25

<u>Quinn v. Stone</u>, 978 F.2d 126 (3rd Cir 1993) ................................................... 31

<u>Sussman v. United States Marshals Service</u>, 494 F.3d 1106 (D.C. Cir. 2007). 32

<u>Tao v. Freeh</u>, 27 F.3d 635 (D.C. Cir. 1994) ...................................................... 14

<u>Vymetalik v. FBI</u>, 785 F.2d 1090 (D.C. Cir. 1986) ........................................... 35

<u>Washington Post Co. v. Department of Agriculture</u>, 943 F. Supp. 31 (1996) ... 22

<u>Washington Post Co. v. Department of Agriculture</u>, 943 F. Supp. 31 (D.D.C. 1996) ............................................................................................... 18, 19

<u>Washington Post Co. v. Department of Health and Human Services</u>, 690 F.2d 252 (D.C. Cir. 1982) ................................................................................ 14

<u>Wood v. Federal Bureau of Investigation</u>, 432 F.3d 78 (2d Cir. 2005) ............. 18

**Statutes**

3 Pa. Cons. Stat. Ann. § 2010.2 ...................................................................... 26

5 U.S.C. § 552 ........................................................................................ passim

5 U.S.C. §§ 552a ..................................................................................... passim

73 Federal Register 23412-14 ................................................................... 31, 33

Ala. Code 1975 § 2-3A-2 ................................................................................ 27

Animal Health Protection Act of 2002, Pub. L. No. 107-171, 116 Stat. 494 (May 13, 2002) ................................................................................................ 35

Food, Conservation, and Energy Act of 2008, P.L. 110-234, 112 Stat. 923 ..... 10

P.L. 110-234, 112 Stat. 923, § 1619 ........................................................ passim

V.T.C.A., Agriculture Code § 251.002(1), ....................................................... 26

**Constitutional Provisions**

United States Constitution, Article I, § 7 ........................................................ 11

## I.    INTRODUCTION

Defendant USDA has been compiling record systems for its National Animal Identification System (NAIS) for over four years.  One such system is the National Premises Information Repository (NPIR), which, according to USDA, is a "phone book" of livestock-related "premises" registered with NAIS, consisting of only 6 items for each "premises":  name of entity, name of contact person, address, telephone number, alternate telephone number, and generic type of operation (e.g., auction, veterinary clinic, farm, feedlot).  USDA presently takes an official position that NAIS is "voluntary," but many farmers and animal owners report that they have been placed in the NPIR without their consent and against their will.

States under contract with USDA to supply required quotas of NPIR premises registrations have employed, with USDA's knowledge and approval, tactics that many farmers and animal owners view as coercive.  These tactics include data mining of older, unrelated programs to achieve the desired numbers of registrations; submissions of livestock-owner data to USDA with no prior notification to the owner, as a result of routine disease testing or vaccinations or issuance of routine health certificates; and making NAIS premises registration compulsory to receive emergency livestock feed supplies in severe drought areas.  There are also numerous reports of animal owners encountering bureaucratic hurdles which make it difficult or impossible for the owners to get their information removed from the supposedly "voluntary" NPIR.

Plaintiff, agricultural journalist Mary-Louise Zanoni, has been seeking access to USDA's NPIR records since October 2007. Ms. Zanoni plans to use the records to investigate the scope of the widely reported problems of animal owners placed in the "voluntary" NPIR without their knowledge or against their will. Ms. Zanoni should have received records from the NPIR in November 2007, over six months ago. Defendant USDA's front-line FOIA officer did not perceive any elements needing redaction in the basic name-address-phone number contents of the NPIR. And rightly so, since such information is not even arguably within the Exemption 6 claim subsequently made by USDA a month later, in USDA's written denial of Ms. Zanoni's request.

NAIS, and the contents of the NPIR and related NAIS databases, are issues of the utmost public importance. USDA's NAIS has met with strenuous opposition from family farmers, noncommercial livestock and horse owners, sustainable-farming and consumer-advocacy groups. There are many indications that tens of thousands, perhaps hundreds of thousands, of unwilling Americans have been placed in this "voluntary" database. USDA's implementation of NAIS is a classic instance of the need for media and citizen scrutiny of government programs that the Freedom of Information Act (FOIA) is designed to provide.

On April 30, 2008, USDA published a notice in the Federal Register of its intent to convert four longstanding NAIS databases into a Privacy Act system of

records, effective June 9, 2008.[1]  USDA's after-the-fact attempt to apply the Privacy Act to NAIS data collections it has been compiling for over four years, violates at least 5 of the Privacy Act's explicit protections:  (1) a statutory requirement for the data collection; (2) public notice; (3) oversight by Congress and the Office of Management and Budget; (4) collection of information directly from affected individuals; and (5) notice to individuals of the authority for, and uses of, the data collected.

Ms. Zanoni's ability to investigate USDA's implementation of NAIS is adversely affected by such a conversion because it makes access to NAIS records significantly more difficult, further delays such access, and in some instances will frustrate timely access altogether.  Ms. Zanoni and her editor, Peter Louis Hardin of *The Milkweed*, have concrete plans for a series of articles to be published from July 2008 through at least July 2009, examining defendant USDA's misleading and possibly illegal tactics for constructing its NAIS databases.  Ms. Zanoni's access to the NAIS data collections serves the basic purposes of the Privacy Act, namely, assuring that Federal agencies properly collect, maintain, and disseminate information on individuals, because Ms. Zanoni will use the NAIS information to shine a light on USDA's tactics and conformity <u>vel</u> <u>non</u> to Federal law, in the past, present and immediate future pursuit of NAIS implementation.

---

[1]  The four data collections mentioned in USDA's Privacy Act conversion notice are the NPIR (USDA's "phone book" of livestock owner contact information), the Standardized Premises Registration System (SPRS) (a database used by states to feed information into the NPIR), the Animal Identification Number Management System (AINMS) (a USDA system assigning unique individual animal identification numbers), and the Animal Trace Processing System (ATPS) (USDA's metadata system for interfacing with private animal tracking databases).

Defendant USDA's recalcitrance in responding to Ms. Zanoni's straightforward FOIA request once again has been demonstrated in its insufficient response to the Court's order of June 9, 2008, which directed USDA to provide by June 24, 2008 "[t]he number of requests to be removed from the premises database" and "[t]he number of premises that actually have been removed from the database." USDA's response dated June 19, 2008 makes no reference to the order but instead mischaracterizes its production of data as an "interim response" to Ms. Zanoni's agency appeal of December 2007. The records provided by USDA begin on Nov. 30, 2006 and end on October 9, 2007, with no explanation of why records for the six-month period of October 2007 up to the June 9, 2008 order are missing. Further, USDA's confusing documentation indicates that the records were removed from a "contact" list, but any date for their removal from the "NPIR (Premises)" list is redacted – unless, perhaps, these records never were removed from the NPIR premises list.

Ms. Zanoni seeks summary judgment on her claims that she is entitled to all the NPIR records requested under FOIA and that USDA cannot convert its four existing NAIS databases into a Privacy Act system of records. She seeks an order (1) directing USDA to produce all NPIR records compiled from the creation of the NPIR in 2004 through the date of the order, in paper[2] and

---

[2] USDA had already prepared some 17,000 pages of printed NPIR records for disclosure to Ms. Zanoni in October and November 2007, before denying her request in December 2007. These printed records should be disclosed to Ms. Zanoni.

compact disk formats,[3] and declaring that USDA cannot impose fees for this production of records;[4] (2) declaring that USDA's attempted "conversion" of the NPIR, SPRS, AINMS, and ATPS into a Privacy Act system of records is in violation of the Privacy Act, 5 U.S.C. §§ 552a(e)(1), (e)(2), (e)(3), (e)(4), and (r), and permanently enjoining USDA from converting its pre-existing NPIR, SPRS, AINMS, and ATPS databases into a Privacy Act system of records; and (3) directing USDA to correct its incomplete and unclear response to the Court's order of June 9, 2008.[5]

## II.    FACTS

Defendant USDA began compiling the NPIR in 2004.  (USDA/APHIS NAIS Draft Business Plan,[6] Dec. 12, 2007, p. 61; Compl., ¶ 48.)  At that time, the public was largely unaware that USDA had been planning, since December 2003, to create a massive new Federal program to register all persons owning livestock (including, <u>inter alia</u>, cattle, horses, sheep, goats, pigs, llamas, deer, chickens, ducks, pigeons, and turkeys, whether kept for commercial or private

---

[3]  FOIA 5 U.S.C. § 552(a)(3)(B) requires agencies to "provide the record in any form or format requested by the person. . . ."  Ms. Zanoni's original FOIA request specified that the records should be supplied "on a computer disk or disks."  (Compl., Exh. A, p. 2.)  Ms. Zanoni's agency appeal reiterated the request that the records be provided on computer disk.  (Compl., Exh. D, p. 1.)

[4]  USDA's December 13, 2007 letter denying Ms. Zanoni's FOIA request waived any USDA claim for fees.  Ms. Zanoni is entitled to a fee waiver under 5 U.S.C. § 552(4)(A)(iii) because disclosure is in the public interest, since it will "contribute significantly to public understanding of the operations or activities of the government."

[5]  Specifically, the correction would entail (a) supplying entries in the third and fourth columns for records dated 11/30/2006 through 5/29/2007; (b) supplying entries in the 13th column ("Removed from NPIR (Premises) Date") for all records; (c) supplying all records (complete with the foregoing entries) for the period of 10/9/2007 to the date of the order; and (d) supplying a statement by a responsible APHIS official as to the <u>number</u> of requests to be removed from the database that APHIS has received up to the date of the order, and the <u>number</u> of premises that actually have been removed from the database.

[6]  The Draft Strategic Plan, NAIS User Guide, Draft Business Plan and NAIS Strategies for Implementation are attached to plaintiff's motion for injunctive relief as Exhibits 3, 4, 5, and 6, respectively.

purposes), to mandate Federal identification and registration of nearly all individual animals, and to track all births, sales, movements, and deaths of the animals. (Compl., ¶¶ 8, 19-22.) Not until April 2005, with the release of the NAIS Draft Strategic Plan and Draft Program Standards, did USDA/APHIS reveal that it planned to mandate 100% government registration of "premises" for every property and every person owning any livestock; 100% individual animal ID, primarily with Radio Frequency Identification Device (RFID) tags and microchips;[7] and 100% reporting, to private fee-based databases, of all changes in status and changes in location of all livestock. The premises registration and animal ID were to be completely mandatory by January 2008, and the animal tracking was to be completely mandatory by January 2009. (Compl., ¶¶ 21-23.)

Once aware of this massive plan, grassroots groups of livestock owners mobilized to defeat efforts by certain states, which were working in conjunction with USDA, to establish the mandatory premises ID component of NAIS. (Compare NAIS Draft Strategic Plan 2005 p.1 attached to Pl.'s Mot. TRO as Ex. 3, to USDA/APHIS NAIS User Guide, Nov. 22, 2006, Preface, attached to Pl.'s Mot. TRO as Ex. 4.; Aff. Kittredge ¶¶ 11-16 attached to Pl.'s Mot. Summ. J. as Ex. 8) Defendant USDA was surprised and unsettled by the anger and resistance of livestock owners. (*See id.*) During most of 2006 USDA restructured its approach to NAIS (with the assistance of public-relations experts who, for example, secretly monitored 93 websites and blogs of citizen

---

[7] USDA has given an exemption to massive industrial confinement livestock operations from this ID requirement and from the reporting requirement. (Compl., ¶ 24.)

groups opposed to NAIS) and in late 2006, USDA announced that NAIS would "remain voluntary at the Federal level." (USDA/APHIS NAIS User Guide, Nov. 22, 2006, p. 4, attached to Pl.'s Mot. TRO as Ex. 4; Compl., ¶¶ 24-31.)

However, in practice, very little about USDA's NAIS is "voluntary" for the farmers and animal owners targeted by USDA-funded and quota-driven state and private-entity efforts to maximize NAIS participation.   (Cooperative Agreements, attached to Pl.'s Mot. Summ. J. as Ex. 14) By mid-2006 accounts began to surface of livestock owners who had been put into the USDA/APHIS National Premises Information Repository without their knowledge.   (Aff. Kittredge ¶¶ 11-16, attached to Pl.'s Mot. Summ. J. as Ex. 8; Aff. Zanoni ¶¶ 14-16, attached to Pl.'s Mot. Summ. J. as Ex. 7).  The frequency and number of these complaints increased throughout 2006 and 2007.  (Id.)  Livestock owners were finding themselves involuntarily placed in the "voluntary" NPIR through commonplace transactions such as renewals of brand registrations and routine livestock health testing or vaccinations.  (Id.)  Some USDA-funded state NAIS efforts went so far as to force farmers in severe drought regions to "volunteer" for NAIS premises ID as a condition of receiving government-subsidized emergency hay supplies. (Compl., ¶¶ 31-32; R. M. Thornsberry Aff., attached to Pl.'s Mot. Inj. Relief as Ex. 1; R. Hill Aff., attached to Pl.'s Mot. Inj. Relief as Ex. 2; North Carolina Hay Alert, Ex.. 15 to Pl.'s Mot. for Summ. J.).

Plaintiff Mary-Louise Zanoni has been writing about NAIS issues for agricultural publications for several years, and she has heard the growing chorus of complaints from farmers about USDA's novel (and suspect) ways of

capturing information for the NPIR.  (Aff. Zanoni ¶¶ 4-8, attached to Pl.'s Mot.

Summ. J. as Ex. 7; Compl. ¶¶ 5-10)  Knowing that only an examination of the

NPIR database could reveal the extent to which unwilling and unknowing

farmers had been placed in NAIS, in the fall of 2007 Ms. Zanoni retained

counsel to pursue a FOIA request for the NPIR records.  (Compl. ¶¶ 5-10).  The

NPIR data, according to defendant USDA/APHIS, contains only an entity name,

contact person's name, address, telephone number, and generic operation type.

(USDA/APHIS 2005 Draft Program Standards, p. 11., Ex. 10 Pl.'s Mot. Summ.

J.)  Ms. Zanoni requested three well-defined items:

> 1.   All records of registered premises contained in the National
> Premises Information Repository, which we understand . . . consists
> of basic contact information, i.e., name of the entity, name of a
> contact person, address, telephone number, operation type, and
> alternative telephone number.
>
> 2.  The number of requests to be removed from the premises database
> that APHIS has received from owners/managers of registered
> premises; and
>
> 3.  The number of premises that actually have been removed from the
> database.

Compl., ¶ 35 & Ex. A.

Ms. Zanoni plans to use these records to examine how extensively USDA

has placed animal owners into the NPIR without their knowledge, and whether

USDA honors the requests of animal owners to be removed from the NPIR.  (Aff.

Zanoni ¶ 7, attached to Pl.'s Mot. Summ. J. as Ex. 7; Aff. Hardin ¶ 4-6,

attached to Pl.'s Mot. Summ. J. as Ex. 9).  Should Ms. Zanoni receive the NPIR

information, she will, for example, ask sustainable-agriculture organizations to

have their members contact her for verification of whether they appear in the

database.  Should she find in the database persons who have contacted her in the past about NAIS, she will find out whether they know that they are in the NPIR.  (Aff. Zanoni ¶ 9, attached to Pl.'s Mot. Summ. J. as Ex. 7).  Where appropriate, she may ask sustainable-agriculture organizations if they will give her temporary access to their membership lists so she can search for persons who may appear in the NPIR without their knowledge.  (Id.)  To perform such verifications, Ms. Zanoni must have sufficient information from the NPIR to confirm the identity and location of the farmers and animal owners.  (Id.)

Ms. Zanoni's original FOIA request was sent to USDA/APHIS on October 24, 2007.  (Compl., ¶¶ 42-44 & Exhibits. A-D )  At first, a USDA/APHIS FOIA officer indicated that NAIS staff had supplied him with 17,000 pages of printed NPIR records, and that he would review the documents and send 200 pages at a time to Ms. Zanoni's counsel.  (Id.)  However, shortly thereafter, Ms. Zanoni received from USDA/APHIS a complete denial of her FOIA request, purportedly on the basis of FOIA Exemption 6, which exempts from disclosure only "personnel and medical and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). Ms. Zanoni sent an appeal of the FOIA denial to USDA/APHIS on December 21, 2007, but USDA/APHIS never responded to her appeal.  (Compl., ¶¶ 42-44 & Exhibits. A-D.)[8]

---

[8]  As explained below, in response to the Court's order of June 9, 2008, defendant USDA provided an incomplete and inadequate response to items 2 and 3 of Ms. Zanoni's original FOIA request.  USDA inaccurately styles this incomplete disclosure as an "interim response" to Ms. Zanoni's agency appeal; however, it is clear that USDA would not have responded to Ms. Zanoni's agency appeal absent the filing of this action and the Court's order.

On April 30, 2008, USDA/APHIS published a notice in the Federal Register announcing that the NPIR (and several other existing NAIS databases) would become subject to the Privacy Act, effective June 9, 2008. (73 FR 23412-14.) Given that USDA has been compiling the NAIS databases for over four years, the Privacy Act notice of conversion of the records is in clear violation of the Privacy Act, 5 U.S.C. §§ 552a(e)(1), (e)(2), (e)(3), (e)(4), and (r). Those provisions, respectively, limit agency collections of information to those required by statute; generally require obtaining the information directly from the affected individuals; require written notice to be given at the time of collection, specifying the statutory authority therefore and the uses to be made of the information; require Federal Register notice at the establishment of the records collection; and require the agency to give advance notice of the system to Congress and the Office of Management and Budget. (See Zanoni Aff., ¶ 17; Ex.. 16 to Pl.'s Mot. for S.J.)

In the course of congressional consideration of a new Farm Bill,[9] on May 13, 2008 a Conference Report for the bill was filed. The Conference Report contained a completely new provision, not appearing in any earlier versions of the legislation, prohibiting USDA from disclosing "information provided by an agricultural producer or owner of agricultural land concerning the agricultural operation, farming or conservation practices, or the land itself, in order to participate in programs of the Department." P.L. 110-234, 112 Stat. 923, §

---

[9] First enacted as the Food, Conservation, and Energy Act of 2008, P.L. 110-234, 112 Stat. 923; and due to irregularities in the initial enactment, re-enacted as P.L. 110-246, 122 Stat. 1651.

1619(b)(2)(A); P.L. 110-246, 122 Stat. 1651, § 1619(b)(2)(A).  Section 1619(b) was placed in the Commodities Title despite having no relation to commodities programs and was placed under the inapposite heading of "Information Gathering."  Section 1619(b) was never publicly discussed before enactment and is not mentioned in the Conference Committee's Statement of Managers. The Conference Report was passed by the House on May 14, 2008 and by the Senate on May 15, 2008.

On May 20, 2008 a Farm Bill was presented to the President, but this was a different bill than that passed by the House and Senate on May 14 and 15, respectively.  The entire Title III, comprising 35 pages of the Conference Report and covering all foreign food aid, agricultural export programs, and trade issues concerning softwood lumber, although it had been duly adopted by both chambers, was omitted from the bill presented to the President.

On May 21, 2008, the President vetoed the bill and returned it to the House of Representatives.  By this time Congress was fully aware that the bill presented to the President was not the same bill that had been passed by both chambers.  Nonetheless, faced with deadlines of a Memorial Day recess and the looming expiration (on May 23, 2008) of a temporary extension of the 2002 Farm Bill, the House of Representatives chose to pass this materially different bill (without any Title III) on May 21, 2008 to override the President's veto. The Senate also passed the different bill on May 22, 2008.  (See Compl., ¶¶ 59-62.) Congress considered passing a stand-alone Title III as a separate bill to remedy the errors in the enactment of Pub L. No. 110-234, but instead passed a new,

differently numbered, complete bill, H.R. 6124, which was vetoed by the President and passed on override votes by the House and Senate on June 18, 2008. The new bill provided that it would be effective "on the earlier of – (1) the date of enactment of this Act; or (2) the date of enactment of [H.R. 2419]." Pub. L. No. 110-246, § 4. Since H.R. 2419 was never validly enacted because its attempted enactment violated the Presentment Clause of the United States Constitution, Article I, § 7, and the doctrine of separation of powers, H.R. 6124 was effective on its own date of enactment, i.e., June 18, 2008. Thus, Section 1619(b) of the 2008 Farm Bill was not effective until June 18, 2008.

On June 9, 2008, by agreement of the parties herein, the Court entered an order requiring defendant USDA to produce by June 24, 2008, the records sought in the second and third items of Ms. Zanoni's original FOIA request, namely, "[t]he number of requests to be removed from the premises database that APHIS has received from owners/managers of registered premises" and "[t]he number of premises that actually have been removed from the database." (Docket no. 7.) In response to the order, defendant USDA/APHIS has chosen to make only a partial and obfuscating disclosure. In its response dated June 19, 2008, USDA makes no reference to the order but instead mischaracterizes its insufficient production as an "interim response" to Ms. Zanoni's agency appeal of December 2007. The records provided by USDA begin on Nov. 30, 2006 and end on October 9, 2007, with no explanation of why records for the six-month period of October 2007 to June 9, 2008 are missing. Further, it appears that the records were removed from a "contact" list, but any date for

their removal from the "NPIR (Premises)" list is redacted or nonexistent. USDA would have to demonstrate that the records in question had been removed from the "NPIR Premises" list to comply with the Court's order directing the limited production.

## III.    ARGUMENT

### A.    Introduction

Plaintiff is entitled to summary judgment on her FOIA claim because the NPIR records – limited to entity name, contact person, address, phone numbers and generic type of operation – without any other connection to personal or financial information – are not subject to FOIA Exemption 6. This conclusion is not altered by the belated enactment of Section 1619(b)(2)(A) of the Food, Conservation, and Energy Act of 2008, which prohibits only the disclosure of information "provided by an agricultural producer or owner of agricultural land concerning the agricultural operation [further defined as "the production and marketing of agricultural commodities and livestock"], farming or conservation practices, or the land itself." The NPIR contains no information about farming practices, acreage farmed, size or amount of farm assets, or any other information arguably within Section 1619(b)(2)(A). The contents of the NPIR are a matter of public controversy precisely because much of the premises information was not "provided by an agricultural producer or owner of agricultural land," as required for protection under Section 1619(b)(2)(A); rather, much of the data was placed into the NPIR without the knowledge or consent of the farmer and/or landowner. Further, Section 1619 did not

become effective until June 18, 2008, is not retroactive, and therefore does not apply to Ms. Zanoni's FOIA request.

Plaintiff is also entitled to summary judgment on her Privacy Act claim. The Privacy Act provides that an agency can only collect records when required to do so by statute; must publish a Federal Register notice upon establishment of the system; must report the new system to Congress and the Office of Management and Budget; must ordinarily gather records directly from subject individuals; and must give those individuals written notice of the authority for and uses of the records. USDA has not complied with any of those requirements of the Privacy Act for its NAIS data collections.

### B.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). While the movant may bear the initial burden of demonstrating the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994), the party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[A]ny factual assertions in the movant's affidavits will be accepted . . . as being true unless [the opposing party] submits his own affidavits or other documentary evidence contradicting the assertion." Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA places squarely on the agency the burden of demonstrating that withheld records are within a specific exemption.  5 U.S.C. § 552(a)(4)(A)(vii)(B). An agency, if claiming that records are exempt, must overcome FOIA's "strong presumption in favor of disclosure." Department of State v. Ray, 502 U.S. 164, 173 (1991).  "[U]nder Exemption 6, the presumption in favor of disclosure is as strong as . . . anywhere in the Act." Washington Post Co. v. Department of Health and Human Services, 690 F.2d 252, 261 (D.C. Cir. 1982).

### C.    *FOIA Exemption 6 Does Not Apply to the NPIR "Phone Book" Records*

"Without question, the [Freedom of Information] Act is broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." Environmental Protection Agency v. Mink, 410 U.S. 73, 80 (1973).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978).  "FOIA is often explained as a means for citizens to know 'what the Government is up to.'  This phrase should not be dismissed as a convenient formalism.  It defines a structural necessity in a real democracy." National Archives & Records Admin. v. Favish, 541 U.S. 157, 171-72 (2004) (citation omitted).

FOIA is structured as a basic requirement for broad disclosure in 5 U.S.C. § 552(a), with nine circumscribed exemptions set forth in 5 U.S.C. §

552(b).  "FOIA's basic purpose reflects 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' "  Multi Ag Media LLC v. Department of Agriculture, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (quoting Department of Air Force v. Rose, 425 U.S. 352, 360–61 (1976)).

FOIA's "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act" and the exemptions therefore "must be narrowly construed."  Rose, 425 U.S. at 361.  The Supreme Court has "repeatedly stated that the policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly."  Id. at 366 (quotation marks and citations omitted).

The only FOIA exemption at issue here is Exemption 6, allowing an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  "[T]here is nothing about invoking Exemption 6 that lightens the agency's burden.  In fact, 'under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act.' "  Multi Ag Media, 515 F.3d at 1227 (quoting National Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002)).

There are four elements in the judicial analysis of Exemption 6.  First, the court must determine whether the records are "similar files" under 5 U.S.C. § 552(b)(6).  Department of State v. Washington Post Co., 456 U.S. 595, 600-602 (1982); Multi Ag Media, 515 F.3d at 1227-28; News-Press v. Department of

<u>Homeland Security</u>, 489 F.3d 1173, 1198-99 (11th Cir. 2007).  Second, even if the requested records are "similar files," would disclosure constitute a "clearly unwarranted invasion of personal privacy" within the meaning of Section 552(b)(6)?  <u>Washington Post Co.</u>, 456 U.S. at 602; <u>Multi Ag Media</u>, 515 F.3d at 1227-28.  Third, even if the records are "similar files" and an "unwarranted invasion of personal privacy" may be at stake, is the privacy interest substantial, <u>i.e.</u>, greater than <u>de</u> <u>minimis</u>?  If not, the records must be disclosed.  <u>National Ass'n of Retired Federal Employees v. Horner</u>, 879 F.2d 873, 874 (D.C. Cir. 1989).  Fourth, even if the privacy interest is substantial, a strong public interest in disclosure can outweigh the privacy interest and compel disclosure.  <u>Multi Ag Media</u>, 515 F.3d at 1230; <u>National Ass'n of Home Builders v. Norton</u>, 309 F.3d at 35.

The NPIR records fail every one of the four tests.

First, the bare-bones NPIR "phone book" information – name of entity, contact person, address, telephone numbers, and generic operation type – is not even the sort of "detailed" information that would constitute "similar files" within the meaning of 5 U.S.C. § 552(b)(6).  The term "similar files" includes any "'detailed Government records on an individual which can be identified as applying to that individual.' "  <u>Washington Post Co.</u>, 456 U.S. at 600, 602 (quoting H.R. Rep. No. 1497, 89th Cong., 2nd Sess., 11 (1966)) (emphasis added).  Some discussions of Exemption 6 truncate the foregoing statement, omitting "detailed," and argue that "similar files" include "any 'government records on an individual which can be identified as applying to that

individual.'" <u>Judicial Watch, Inc. v. Department of the Army</u>, 402 F. Supp. 2d

241, 250 (D.D.C. 2005) (quoting <u>Washington Post</u>, <u>supra</u>); <u>Center for Public

Integrity v. Federal Communications Comm'n</u>, 505 F. Supp. 2d 106, 112

(D.D.C. 2007).

Nonetheless, the Supreme Court's emphasis on "detailed" government

records was deliberate, because elsewhere in <u>Washington Post</u>, the Court gave

as examples of records entitled to Exemption 6, "[i]nformation such as place of

birth, date of birth, date of marriage, employment history and comparable data

. . . ." <u>Id.</u> at 600.  Such information is indisputably more "detailed" than basic

contact information.  Thus, there is <u>some</u> information so basic and unadorned,

that it does not even meet the broad definition of "similar files" under

Exemption 6.  Indeed, in <u>Leadership Conference on Civil Rights v. Gonzales</u>,

421 F. Supp. 2d 104 (D.D.C. 2006), the court held that the names and

telephone numbers of Department of Justice paralegals who monitored

compliance with the Voting Rights Act were not "similar files" within the

meaning of 5 U.S.C. § 552(b)(6).  The names and phone numbers had to be

disclosed in response to a FOIA request by a civil rights organization.

Similarly, in <u>Gordon v. FBI</u>, 388 F. Supp. 2d 1028 (N.D. Cal. 2005), names

alone, even if in a context indicating government employment, were found not

to be "similar files" within the meaning of FOIA Exemption 6.[10]  <u>See also</u> <u>People</u>

---

[10]  Generally, the withholding of names is proper under Exemption 6 only in instances
involving, e.g., law enforcement personnel or personnel working on confidential or sensitive
assignments, who might be exposed to harm from the revelation of their identities.  <u>See</u>, <u>e.g.</u>,
<u>Wood v. Federal Bureau of Investigation</u>, 432 F.3d 78 (2d Cir. 2005); <u>Judicial Watch, Inc. v.
Food & Drug Administration</u>, 449 F.3d 141 (D.C. Cir. 2006).  In the rare cases involving
contexts other than law enforcement where lists of names and addresses were not disclosed,

for the American Way v. National Park Service, 503 F. Supp. 2d 284, 306 (D.D.C. 2007) (a disclosure of "mere identity . . . does not raise the kind of privacy concerns protected by Exemption 6").

Recent cases often have denied Exemption 6 protection to bare identifying or contact information. See Hertzberg v. Veneman, 273 F. Supp. 67 2d (D.D.C. 2003) ("The interest of an individual in avoiding the unlimited disclosure of his or her name and home address 'is not enough to satisfy the requirements of Exemption 6 . . . .' ", quoting Washington Post Co. v. Department of Agriculture, 943 F. Supp. 31, 35 (D.D.C. 1996)).  In fact, agencies willingly have handed over names, or names and addresses, even while claiming that other, more sensitive information was protected by Exemption 6.  In Multi Ag Media, 515 F.3d 1224, USDA freely had released names and addresses of subsidy and benefit recipients, even though the agency asserted Exemption 6 protection for information concerning particular crops, acreage planted, and irrigation or conservation practices.  (See Multi AG Media LLC v. Dep't of Agric., 2006 U.S. Dist. LEXIS 55170, 6 (D.D.C. Aug. 9, 2006) ("USDA has released 57 fields – including the names and addresses of the program recipients.")  In Fortson v. Harvey, 407 F. Supp. 2d 13 (D.D.C. 2005), the Department of the Army willingly had released the names of witnesses interviewed concerning an equal-opportunity complaint, even though

---

there was either a complete lack of public interest in disclosure; or presence on the lists revealed sensitive financial information.  See Minnis v. Department of Agriculture, 737 F.2d 784 (9th Cir. 1984) (requester's only interest in obtaining list was to advertise his business); National Ass'n of Retired Federal Employees v. Horner, 879 F.2d 873 (D.C. Cir. 1989) (presence on list revealed financial status of individuals).

the agency attempted (unsuccessfully) to withhold the witnesses' statements under Exemption 6.

In the present case, the NPIR records simply do not contain any "details" about the entities or persons listed.  (Aff. Zanoni ¶¶ 11-12, attached to Pl.'s Mot. Summ. J. as Ex. 7; Ex. 12 to Pl.'s Mot. Summ. J.)  Thus, the NPIR information is comparable to the names and phone numbers held not to be "similar files" in <u>Leadership Conference</u>, 421 F. Supp. 2d 104, or to the names and addresses USDA willingly had disclosed in <u>Multi Ag Media</u>.  The NPIR information reveals nothing about the farming practices, size of operations, or possible financial status of livestock owners.  The entities or persons listed in the NPIR can be anything from a family with a single goat or horse, to a large broiler house or hog farm – the identifying details are absent from the NPIR, which now contains over 460,000 records.  "[I]t is precisely because the list is so large and the information so generic that the individual privacy interests are so small." <u>Washington Post Co. v. Department of Agriculture</u>, 943 F. Supp. 31 (D.D.C. 1996).  Indeed, a livestock owner's appearance in the NPIR, in light of the numerous reports of farmers placed in the database without their knowledge, does not even tell us if the livestock owner ever applied for a NAIS premises ID.

If the NPIR records do not even meet the definition of "similar records" because they are bare contact information, then <u>a</u> <u>fortiori</u> none of the other three considerations under Exemption 6 would bar disclosure.  Disclosure of a list of names, addresses and telephone numbers is not a "clearly unwarranted

invasion of personal privacy" within the meaning of 5 U.S.C. § 552(b)(6), insofar as people do not generally consider contact information to be particularly "private." Speculation that disclosure might lead to unwanted mail or telephone calls does not constitute a "clearly unwarranted invasion of personal privacy." "Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities." Department of Air Force v. Rose, 425 U.S. at 380 n.19. " '[W]ithholding information merely to prevent speculative harm' is contrary to FOIA's pro-disclosure policy." Fortson v. Harvey, 407 F. Supp. 2d at 17 (quoting Carter v. Department of Commerce, 830 F.2d 388, 391 (D.C. Cir. 1987)). The fact that disclosure might permit attempts to contact the individuals "is hardly significant . . . . [T]he persons contacted could simply decline to talk . . . ." Hertzberg v. Veneman, 273 F. Supp. 2d at 86. If disclosure leads to unwanted media attention, "individuals are under no obligation to speak to reporters, and on balance, the modest annoyance of a 'no comment' is simply the price we pay for living in a society marked by freedom of information laws [and] freedom of the press . . . ." News-Press, 489 F.3d at 1203.[11]

If mere contact information can raise any question of a "privacy interest," surely the interest is de minimis. The release of Medicare claims information that might permit calculation of the partial business income for physicians has been found to implicate only "minimal privacy interests." Consumers'

---

[11] Indeed, publicly-available collections of information on farms are commonplace. For example, the consumer advocacy group Food & Water Watch maintains an online map of Concentrated Animal Feeding Operations, based on information derived from USDA's 2002 Census of Agriculture; see www.factoryfarmsmap.org.

Checkbook v. Department of Health & Human Services, 502 F. Supp. 2d 79, 85 (D.D.C. 2007).  The interests of persons interviewed as witnesses to wildfires in nondisclosure of their names, addresses, and telephone numbers has been found to be de minimis.  Hertzberg, 273 F. Supp. 2d at 86.  In the present case, the NPIR data is the same as the contact information found to be de minimis in Hertzberg.  The NPIR information cannot, even by association or inference, reveal anything about financial or personal characteristics of the entities or persons listed.  Since records must be disclosed under FOIA whenever a privacy interest is merely de minimis, National Assoc. of Retired Federal Employees v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989), USDA must disclose the bare-bones NPIR contact information to Ms. Zanoni.

Finally, when the NPIR "phone book" information is subjected to the fourth element of Exemption 6 analysis, namely, a weighing of the public interest in disclosure against any privacy interest, the public interest unquestionably prevails.  USDA's NAIS program has been plagued by public opposition and internal disorganization from its inception.  (Aff. Hardin ¶¶ 5, 7, Ex. 9 Pl.'s Mot. Summ. J.; Aff. Zanoni ¶¶ 11-16, Ex. 7 Pl.'s Mot. Summ. J.; Aff. Kittredge ¶¶ 9-16, Ex. 8 Pl.'s Mot. Summ. J.; Aff. Thornsberry, ¶¶ 7-10, Ex. 1 to Pl.'s Mot. TRO.  )There have been pervasive reports of animal owners placed in the "voluntary" NPIR without their knowledge or consent.  (See id.)  The only way to shed light on USDA's operation of NAIS and the NPIR is to obtain sufficient information to compare the NPIR listings with the basic contact

information of persons who have never "volunteered" for the NPIR or who have requested removal. (Aff. Zanoni ¶¶ 6-9, Ex. 7 Pl.'s Mot. Summ. J.)

The significant public interest in monitoring elections for compliance with the Voting Rights Act dictated the disclosure of names and telephone numbers of Department of Justice personnel in <u>Leadership Conference on Civil Rights</u>, 421 F. Supp. 2d 104. The erroneous placement of innocent citizens on "no-fly" lists created a strong public interest supporting disclosure of the names of participants in government meetings addressing the problem. <u>Gordon v. FBI</u>, 388 F. Supp. 2d 1028. Public allegations of fraud and conflict of interest in USDA subsidy programs created a substantial public interest supporting disclosure of names, addresses, and subsidy amounts. <u>Washington Post Co. v. Department of Agriculture</u>, 943 F. Supp. 31 (1996). In <u>News-Press v. Department of Homeland Security</u>, 489 F.3d at 1178, disclosure of addresses was found to be appropriate even though the information could be linked to quite personal details of disaster relief applications, because of great public interest in scrutiny of FEMA's management of disaster response. In the present case, disclosure of the NPIR "phone book" information, information that most people would not even consider particularly private, will serve a very significant public interest in shedding light on USDA's management of the NAIS program, a program that is, in the words of former Agriculture Secretary Johanns, a "massive project" unprecedented in American agriculture.

**D.    Section 1619 of the Food, Conservation, and Energy Act of 2008 Does Not Apply to Plaintiff's FOIA Request; Section 1619 Applies Only to Information On Specific Crops, Acreage, or Irrigation Practices; Section 1619 Is Not Retroactive; and Section 1619 Did Not Become Effective Until June 18, 2008**

Section 1619 of the Food, Conservation, and Energy Act of 2008 prohibits the Department of Agriculture from disclosing certain information "concerning [an] agricultural operation." Pub. L. No. 110-246, 122 Stat. 1651, § 1619(b)(2)(A).  Section 1619 became law on June 18, 2008 and is not retroactive; therefore, it does not apply to Ms. Zanoni's FOIA request.[12]  Even if Section 1619 were retroactive, it would be inapplicable to Ms. Zanoni's request because its plain terms do not apply to the NPIR records.

### 1.    Section 1619 is not retroactive

At the time Ms. Zanoni submitted her FOIA request in October 2007, and through the entire statutory period allowed for USDA/APHIS to respond to her initial request and to her appeal, neither Section 1619, nor any similar provision, was in effect to limit disclosure of information concerning agricultural operations.  "Statutes are disfavored as retroactive when their application 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to

---

[12]  See discussion supra, p. 11, on the effective date of Section 1619.  It did not become effective on May 22, 2008, the date when Congress completed the override votes resulting in the purported Public Law No. 110-234, because Public Law 110-234 was never validly enacted. Public Law 110-234 resulted from a highly irregular process that violated the Presentment Clause, U.S. Const. Art. III, § 7, and the doctrine of separation of powers.  Congress simply cannot send to the President a materially different bill than that passed by both houses and then purport to override a veto by "re-passing" the materially different bill that never had been passed in the first place.  Clinton v. City of New York, 524 U.S. 417 (1998); INS v. Chadha, 462 U.S. 919 (1983).  See also discussion at Memorandum in Supp. of Pl.'s Mot. for Inj. Relief, Docket No. 2-2, pp. 28-34.

transactions already completed.' " <u>Fernandez-Vargas v. Gonzales</u>, 548 U.S. 30, 37 (2006) (quoting <u>Landgraf v. USI Film Products</u>, 511 U.S. 244, 280 (1994)). Indeed, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." <u>Bowen v. Georgetown Univ. Hospital</u>, 488 U.S. 204, 208 (1988). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." <u>Landgraf</u>, 511 U.S. at 265. The legislative response to political pressures "poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." <u>Id.</u> at 266.

The first inquiry is to determine whether Congress has clearly expressed the intent that a statute be retroactive. <u>Landgraf</u> at 264, 268 ("a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness.") The Food, Conservation, and Energy Act of 2008 does not demonstrate any clear, or oblique, intent by Congress that Section 1619 be retroactive. To the contrary, Section 4 of the Act makes the statute effective on the date of enactment.

Where Congress has failed to expressly prescribe a statute's reach, the "court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to

transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." Landgraf, 511 U.S. at 280.

When Ms. Zanoni submitted her FOIA request in October 2007, she had a statutory right under 5 U.S.C. § 552 to the information requested. By the time the statutory period for USDA to respond had expired in December 2007, or at the latest by the time USDA's statutory limit for responding to her appeal expired in January 2008, Ms. Zanoni had a matured right to receive the NPIR records. USDA had no valid statutory basis for withholding the records. "As Landgraf and similar authority make clear, absent an express statement that a statute will apply to events preceding its enactment, it may not be interpreted to impair rights a party possessed when Congress acted." Qualcomm Inc. v. FCC, 181 F.3d 1370, 1378 (D.C. Cir. 1999) (statute extinguishing FCC's authority to grant certain preferences did not extinguish pre-existing entitlement to preference). Since Ms. Zanoni possessed a statutory right to receive the NPIR records when Section 1619 was enacted, and since Public Law 110-246 contained no express statement that it would apply to events preceding its enactment, under Landgraf, Section 1619 simply does not apply to Ms. Zanoni's FOIA request.

**2.    Section 1619 by its terms does not apply to plaintiff's FOIA request.**

Even assuming that Section 1619 is retroactive, it does not apply to the information requested by Ms. Zanoni. Section 1619 prohibits USDA from disclosing information "concerning [an] agricultural operation." Pub. L. No.

110-246, 122 Stat. 1651, § 1619(b)(2)(A).  Section 1619 defines "agricultural operation" as "the production and marketing of agricultural commodities and livestock."  Id., § 1619(b)(1).  While there is a complete absence of legislative history for Section 1619, it appears the provision may have been designed to limit the effect of the Court of Appeals' decision in Multi Ag Media LLC v. Department of Agriculture, 515 F.3d 1224.  In Multi Ag Media, the problematic information involved, e.g., types of crops, acreage planted, or irrigation practices.  If Section 1619 was meant to limit Multi Ag Media, those are the types of information that Section 1619 would be intended to protect from disclosure.

General contact information does not fall within the "agricultural operation" data protected under Section 1619 because such information does not affect "production and marketing."  Pub. L. No. 110-246, 122 Stat. 1651, § 1619(b)(1).  "Operation," "production" and "marketing" all imply limitations on disclosing information about the commercial activities or trade secrets used in agriculture, not limitations on passive, static contact information.  By analogy, Texas law defines "agricultural operation" with reference to a list of "activities." V.T.C.A., Agriculture Code § 251.002(1).  Pennsylvania law defines "agricultural operation" as "[t]he management and use of farming resources for the production of crops, livestock or poultry."  3 Pa. Cons. Stat. Ann. § 2010.2 (West Supp. 2005).  Again, farming activities, not names and addresses, define an "agricultural operation."  Alabama law defines "agricultural operation" as "[f]arming, ranching, the production . . . processing, storing, manufacturing,

marketing, distribution or exporting of agricultural commodities." Ala. Code 1975 § 2-3A-2. These analogies establish that an "agricultural operation" consists of agricultural *activities*, essentially like the "production and marketing" of Section 1619.

The policy behind Exemption 6 discussed in <u>Multi Ag Media</u> "was to protect *individuals* from the injury and embarrassment that can result from the unnecessary disclosure of *personal* information." <u>Id.</u>, 515 F.3d at 1228 (quoting <u>Washington Post Co.</u>, 456 U.S. at 599). The same interest in protecting individuals from injury and embarrassment may well have motivated the new disclosure prohibitions of Section 1619. In contrast, disclosure of the general "phone book" and contact information of the NPIR would not injure or embarrass anyone, so there would be no purpose in prohibiting the disclosure of such benign information.

**E.    *Defendant USDA Violates the Plain Terms of the Privacy Act by Attempting to Convert the NPIR and Other Longstanding NAIS Systems into a "Privacy Act System of Records."***

The Privacy Act, 5 U.S.C. § 552a, protects individuals' rights concerning "the collection, maintenance, use, and dissemination" of their information by Federal agencies. Pub. L. No. 93-579, § 2(a)(1), 88 Stat. 1896 (1974). Key Privacy Act provisions protect individuals' information by: (1) limiting agency information collection to that **required** by statute, 5 U.S.C. § 552a(e)(1); (2) requiring publication in the Federal Register upon **establishment** of a Privacy Act system of records, § 552a(e)(4); (3) mandating **advance notice** to Congress and to the Office of Management and Budget of **proposed new** Privacy Act

systems of records, § 552a(r); (4) collecting Privacy Act records "to the greatest extent practicable" **directly** from the individual,  § 552a(e)(2); and (5) providing **written notice** to affected individuals of the legal authority for collection, and the potential uses, of the information, § 552a(e)(3).  USDA's attempt to subject records systems (some over four years old) to the Privacy Act long after the systems were created violates all five of the foregoing provisions of the Privacy Act.

Ms. Zanoni seeks the NPIR database under FOIA, and seeks permanently to enjoin USDA's Privacy Act "conversion" of the four NAIS data systems, because she wishes to investigate and expose to public view USDA's improper treatment of individuals' information.  Ms. Zanoni plans a series of articles in *The Milkweed* examining how USDA has placed individuals in the NAIS system without their knowledge and against their will, and how USDA has placed continual roadblocks in the path of individuals requesting removal of their data from the "voluntary" system.  (Aff. Zanoni ¶¶ 6-9 Aff, Ex. 7 Pl.'s Mot. Summ. J.; Aff. Hardin ¶¶ 4-7, Ex. 9 Pl.'s Mot. Summ. J.)  Indeed, Ms. Zanoni's article for July 2008 will discuss the implications of the limited NPIR data released by USDA in response to the Court's order of June 9, 2008.  Ms. Zanoni will also examine how USDA's design of NAIS may violate many provisions of Federal law, including the Privacy Act.

Besides rapidly expanding NAIS premises identification in the NPIR through unauthorized data mining, USDA also is aggressively pursuing NAIS individual animal identification and animal tracking.  Ms. Zanoni will

investigate those aspects of NAIS as well as the NPIR in articles planned for September 2008 through July 2009, and these investigations will require access to information concerning and stored in USDA's other NAIS data collections.

Under the Privacy Act, 5 U.S.C. § 552a(g)(1)(D), "[w]henever any agency . . . fails to comply with any other provisions of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."  An "individual" is "a citizen of the United States" or resident alien.  5 U.S.C. § 552a(a)(2).  The right of action created under § 552a(g)(1)(D) is distinct from, and in addition to, causes of action created under §§ 552a(g)(1)(A), (g)(1)(B), and (g)(1)(C) for agency failures to amend records, to give access to records, and to maintain accurate and complete records.[13]

The Supreme Court has indicated that, whereas the typical Privacy Act § 552a(g)(1)(D) claim requests monetary damages, equitable relief is also proper for (g)(1)(D) claims and by analogy would be governed by standards of the Administrative Procedure Act, 5 U.S.C. § 706.  Doe v. Chao, 540 U.S. 614, 619 n.1 (2004); see also McCready v. Nicholson, 465 F.3d 1, 10 n.5, 20 (D.C. Cir. 2006).  Unlike § 552a(g)(1)(D) damages claims, (g)(1)(D) claims for equitable

---

[13]  This claim under § 552a(g)(1)(D), challenging defendant's violations of the Privacy Act in the manner of establishing a new Privacy Act system of records, does not require any exhaustion of administrative remedies.  McCready v. Nicholson, 465 F.3d 1, 15 (D.C. Cir. 2006).

relief would not require any showing that agency action is intentional or willful. McCready, 465 F.3d at 10 n.5; see also Lee v. Geren, 480 F. Supp. 2d 198, 209 n.5 (D.D.C. 2007). The Supreme Court has equated the "adverse effect" supporting a claim under § 552a(g)(1)(D) with the basic requirements for Article III constitutional standing: "the reference in § 552a(g)(1)(D) to 'adverse effect' acts as a term of art identifying a potential plaintiff who satisfies the injury-in-fact and causation requirements of Article III standing . . . ." Doe v. Chao, 540 U.S. at 624.

Article III standing involves three elements: an "injury in fact" that is concrete and particularized, as well as actual or imminent; a causal connection between the injury and the conduct complained of; and a likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The "imminence" element of injury-in-fact is "a somewhat elastic concept." Id. at 564 n.2. In addition, in the analogous context of "adverse effect" under the Administrative Procedure Act, 5 U.S.C. § 702, the Supreme Court has held that a plaintiff must meet the prudential standing requirement of being within the "zone of interests" protected by the statute which provides the basis of the claim. Lujan v. National Wildlife Federation, 497 U.S. 871, 883 (1990). The "zone of interests test is not meant to be 'especially demanding'." Pharmaceutical Research and Mfrs. of America v. Thompson, 259 F. Supp. 2d 39, 55 (D.D.C. 2003). A plaintiff will be found to be within the relevant statutory "zone of interests" so long as the plaintiff's interests are not "so marginally related to or inconsistent with the purposes

implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." <u>Amalgamated Transit Union v. Skinner</u>, 894 F.2d 1362, 1366 (D.C. Cir. 1990) (quoting <u>Clarke v. Securities Indus. Ass'n</u>, 479 U.S. 388, 399 (1987)).

Ms. Zanoni, a citizen of the United States, is an "individual" with standing to challenge, under 5 U.S.C. § 552a(g)(1)(D), defendant USDA's purported conversion of several NAIS databases into "Privacy Act systems of records." 73 Federal Register 23412-14. The purported "conversion" will have an adverse effect on Ms. Zanoni in that, if the NPIR and other long-existing NAIS databases are made subject to the Privacy Act, this status will burden, delay, and in many instances entirely frustrate her timely access to records needed to examine USDA's past, present, and planned management of NAIS. Whereas plaintiff's access to records of contact information may be supported under FOIA, access to the same type of information would be greatly complicated and placed in doubt by the completion of USDA's after-the-fact attempt to designate the NPIR and related systems as "Privacy Act" records. <u>See</u>, <u>e.g.</u>, <u>Quinn v. Stone</u>, 978 F.2d 126 (3rd Cir 1993) (addresses may be protected by the Privacy Act); <u>see also</u> <u>News-Press v. Department of Homeland Security</u>, 489 F.3d 1173, 1189-90 (11th Cir 2007) (defendant agency claimed it could not disclose certain records in response to a FOIA request because records were protected under Privacy Act). Further impediments to access raised by the Privacy Act include the fact that 5 U.S.C. § 552a(d)(1) gives individuals access only to their own records, and not information about them

in other records; and that the Privacy Act potentially prohibits release of a record to an individual if the record also contains information about another individual who has not consented to disclosure.  <u>Sussman v. United States Marshals Service</u>, 494 F.3d 1106, 1121 (D.C. Cir. 2007).[14]

Plaintiff herein easily meets the undemanding requirements of Article III and prudential standing.  As to imminence of harm, Ms. Zanoni has concrete plans for a series of articles to be published in The Milkweed from July 2008 to at least July 2009, examining USDA's uses and apparent misuses of its NPIR and other NAIS data collections.  She thus satisfies the elastic "imminence" requirement, unlike the plaintiffs in <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 563-65, whose members had only vague "some day" intentions of visiting the environmentally threatened locations there at issue.  News media representatives seeking access to information, or challenging burdens on their continued ability to disseminate information, typically are found to have Article III standing.  <u>See</u>, <u>e.g.</u>, <u>Pitt News v. Fisher</u>, 215 F.3d 354 (3d Cir. 2000) (student newspaper had standing to challenge state law prohibiting alcoholic-beverage advertising); <u>Pansy v. Borough of Stroudsburg</u>, 23 F.3d 772 (3d Cir. 1994) (newspapers had standing to intervene in civil rights action to challenge confidentiality order); <u>Penny Saver Publications, Inc. v. Hazel Crest</u>, 905 F.2d

---

[14]  <u>Sussman</u> found, in the context of challenges to improper disclosure of records under subsection (b) of the Privacy Act, that only the person whose records are disclosed should be permitted to bring a § 552a(g)(1)(D) claim.  494 F.3d at 1123.  The present case is distinguishable in that it does not present any claim related to "disclosure" under § 552a(b).  Rather, the claims herein are based upon violations of proper publication and notice under §§ 552a(e) and (r).  Those provisions, unlike the § 552a(b) provisions, do not protect only persons who have been the subject of improper disclosure, but rather, are designed to protect much more broadly against agency circumvention of the basic legal prerequisites to collecting information on citizens.

150 (7th Cir. 1990) (newspaper had standing to challenge village ordinance that allegedly damaged business relationship with advertisers).

In relation to the prudential standing "zone of interests" analysis, Ms. Zanoni's challenge to USDA's illegitimate attempt to place long-existing records under the Privacy Act is well within the "zone of interests" of the statute.  The Privacy Act protects the proper collection and dissemination of information about individuals by Federal agencies.  Ms. Zanoni seeks both to make available information needed to shine a light on USDA's questionable actions, and to vindicate the ultimate protection of privacy by exposing USDA's violations of the privacy rights of persons wrongfully placed into its NAIS data collections.  Plaintiffs with a more tenuous nexus to the applicable "zone of interests" routinely are found to have standing.  See, e.g., Pharmaceutical Research and Mfrs. of America, 259 F. Supp. 2d 39 (drug manufacturers within "zone of interests" of statute regulating Medicaid drug payments; statute primarily protects Medicaid beneficiaries, but drug manufacturers will "police" limitations on beneficiaries' rights); City of Klamath Falls v. Babbitt, 947 F. Supp. 1 (D.D.C. 1996) (city had standing to challenge river's status under National Wild and Scenic Rivers Act; while city's objective was to build hydroelectric plant, city claimed this would be "ecological benefit" to river and therefore was within "zone of interests" of environmental statute).

USDA/APHIS issued its "Notice of a proposed new system of records" for the "APHIS National Animal Identification System (NAIS)" on April 30, 2008. (73 Federal Register 23412-14.)  In the Notice, APHIS defines the NAIS system

as: "the Standardized Premises Registration System (SPRS), the National Premises Information Repository (NPIR), the Animal Identification Number Management System (AINMS), and the Animal Trace Processing System (ATPS)." (Id. at 23412.)[15]

Measuring from the establishment of each of these databases or systems, the NPIR is about four years old; the SPRS is somewhat older; the AINMS is well over a year old; and the ATPS is about fourteen months old. The Business Plan (p. 61) states that the NPIR (APHIS's own database of all registered livestock premises in the country) "became operational in mid-2004." The SPRS "is the most mature NAIS application." Due to obsolescence, sections of the SPRS "will be rewritten" in 2008. (Business Plan, pp. 61-62.) The AINMS had allocated some 2 million individual animal ID numbers by August 1, 2007, and thus was established before that date. (Business Plan, p. 62.) Lastly, APHIS states that "USDA deployed the ATPS in March 2007." (Id., p. 63.)

It is clear that all the systems of records mentioned in the April 30, 2008 Privacy Act notice existed long before the notice was issued. In particular, the NPIR and SPRS databases, containing names, addresses, and contact information for a total of over 460,000 livestock owners, have been in existence for four years or more.

---

[15] These record systems are described in the USDA/APHIS December 2007 Draft Business Plan for NAIS. The NPIR is the USDA/APHIS "phone book" listing of livestock-owner contacts; the SPRS is a similar database used by states to feed premises information into the NPIR. The AINMS is a system assuring the unique assignment of individual animal identification numbers. The ATPS is USDA's metadata system for interfacing with private animal tracking databases to gather a history of movements and owners for a particular animal or group of animals.

USDA's attempt suddenly to claim that these NAIS records are covered by the Privacy Act, many years after the compilation of the record systems began, violates both the letter and the spirit of the Privacy Act. The Privacy Act is intended to provide individuals with more control over gathering, dissemination, and accuracy of information about themselves contained in government files. See Vymetalik v. FBI, 785 F.2d 1090, 1092 (D.C. Cir. 1986). Contrary to those purposes, USDA has compiled the NAIS records with disregard for the privacy of many of the individuals included in the system.[16]

Section 552a(e)(1) of the Privacy Act requires an agency to limit Privacy Act data to the information necessary for a purpose "required to be accomplished by statute." Defendant USDA claims that the statutory authority for NAIS lies in the Animal Health Protection Act of 2002, Pub. L. No. 107-171, 116 Stat. 494 (May 13, 2002) ("AHPA"). The overall statutory authority itself is doubtful – despite the existence of the AHPA, during 2004-2007, numerous bills have been introduced in Congress specifically to authorize NAIS. See, e.g., H.R. 2301, 110th Cong., 1st Sess., introduced May 14, 2007. But even leaving aside the general question of statutory authorization for NAIS, more specifically, in relation to Privacy Act § 552a(e)(1), the AHPA patently fails to "require" USDA to construct the NPIR or other NAIS data collections. The AHPA, as codified at 7 U.S.C. §§ 8301-8320, makes no mention whatsoever of a

---

[16] It may be that USDA could, in theory, create some systems of records for NAIS that would be covered by the Privacy Act if it had adequate statutory authority. However, consistent with the terms of the Privacy Act, this could never be accomplished by "converting" the present NPIR and other NAIS systems. Rather, USDA must dismantle the present systems because they violate numerous provisions of the Privacy Act. If ever given proper statutory authority, USDA would have to construct its NAIS data systems in conformity to the demands of the Privacy Act from the outset.

National Animal Identification System.  Rather, the AHPA concentrates upon the "importation," "exportation," and some "interstate movement" of livestock. AHPA §§ 8303-8305.  The only mention anywhere in the AHPA of anything resembling a database occurs in Section 8320(b), which authorizes APHIS to "implement a central automated recordkeeping system to provide for the reliable tracking of the status of animal and plant shipments, including those shipments on hold at ports of entry or customs."  Thus, even leaving aside the question of whether the AHPA is adequate statutory authority for NAIS as a whole, the AHPA certainly does not, within the meaning of Privacy Act § 552a(e)(1), "require" USDA to compile the NPIR or any other NAIS database.

When an agency wants to create a system of records covered by the Privacy Act, it must publish the required Federal Register notice "upon **_establishment_** or revision" of the system.  5 U.S.C. § 552a(e)(4) (emphasis added).[17]  USDA failed to publish the required notice at the "establishment" of the NPIR, SPRS, AINMS, or ATPS and cannot do it years after the fact.

Several other requirements of the Privacy Act also demonstrate that USDA/APHIS cannot use a Privacy Act notice to convert pre-existing systems of records.  Under Privacy Act § 552a(r), an agency must report all new Privacy Act systems to the House Committee on Oversight and Government Reform and the Senate Committee on Homeland Security and Governmental Affairs, and to the Office of Management and Budget.  This reporting is intended "to

---

[17]  "Revision" of a system of records in this context would mean, e.g., a change in uses of the records, or a new use in a matching system.  USDA cannot credibly claim that its attempt to convert record systems not covered by the Privacy Act into records covered by the Privacy Act, is in itself a "revision" within the meaning of Section 552a(e)(4).

permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r). Reporting to Congress and OMB over four years after the establishment of the NPIR and SPRS defeats this statutory requirement of legislative and OMB oversight. Privacy Act § 552a(e)(2) requires collecting the record system's information "to the greatest extent practicable directly from the subject individual." Many of the records in the NPIR were not collected from individual livestock owners, but instead were dumped into the NPIR (with no prior notice to, or consent from, the persons affected) from states' pre-existing databases for records of brands, calfhood vaccination programs, Coggins testing for horses, etc. (See Hill Aff.; Thornsberry Aff.; Zanoni Aff., ¶¶ 13-15; Exhibits. 13, 14 to Pl.'s Mot. for S.J.) Because NAIS is unpopular with livestock owners, it is improbable that USDA/APHIS could have collected over 460,000 records in the NPIR without such circumventing of the Privacy Act requirement to obtain records directly from individuals. Importantly, Privacy Act § 552a(e)(3) requires an agency to give written notice to individuals of the legal authority for the record system, and of the uses to be made of the information. USDA/APHIS has been collecting NPIR/SPRS information for over four years without giving such Privacy Act notices to affected individuals. (Kittredge Aff.; Zanoni Aff., ¶¶ 13, 14, 17; Exhibits. 13, 14, 16 to Pl.'s Mot. for S.J.)

For all the foregoing reasons, USDA/APHIS's Privacy Act notice of April 30, 2008, 73 Federal Register 23412ff, violates the terms of the Privacy Act and USDA must not be permitted to convert the pre-existing NAIS records into a

purported Privacy Act system of records. USDA's tactic of building a system of records for over four years and only now trying to place the system under the Privacy Act is an illegal evasion of the very Privacy Act requirements – clear statutory authorization, prior Federal Register notice, reporting to Congress and OMB for scrutiny of the need for and protections of the system, collecting records from the individuals affected, and giving written Privacy Act notices to the individuals – that might have allowed Congress or affected citizens to demand significant changes in, or even the abandonment of, USDA's massive, intrusive, and ill-conceived National Animal Identification System.

## IV.    CONCLUSION

Ms. Zanoni is entitled to disclosure of defendant USDA's NPIR because the records are limited to bare contact information not protected by FOIA Exemption 6. Access to these records to examine the magnitude of USDA's placement of unknowing and unwilling persons into the "voluntary" NPIR is of the utmost public importance. USDA also has attempted to circumvent the requirements of the Privacy Act by collecting NAIS records for over 4 years and now suddenly "converting" them into Privacy Act records. This "conversion" is yet another interference with Ms. Zanoni's concrete plans to examine USDA's dealings with its NAIS records in a series of articles to be published from July

2008 through July 2009.  USDA's violation of the Privacy Act is yet another serious flaw in the implementation of NAIS and should be stopped.

CLYMER AND MUSSER, P.C.

Respectfully submitted,


_s/ *Leonard G. Brown, III*_____
LEONARD G. BROWN, III
Pennsylvania Bar No. 83207
DDC Bar No.: PA0025
408 West Chestnut St.
Lancaster, PA 17603
(717) 299-7101
(717) 299-5115—facsimile

ATTORNEYS FOR PLAINTIFF

Dated: July 2, 2008

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a true and correct copy of the foregoing document pursuant to the electronic case filing system of the District Court for the District of Columbia on the following individual(s):

JAMES D. TODD, JR., Sr Counsel
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue N.W.
Washington, DC 20530
(202) 514-3378
(202) 616-8470 (fax)
james.todd@usdoj.gov

**CLYMER & MUSSER, P.C.**

By:          _s/*Leonard G. Brown, III*_____
             Leonard G. Brown, III, Esquire
             Attorney for Plaintiff
             408 West Chestnut Street
             Lancaster, PA 17603
             (717) 299-7101

Dated: July 2, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. . 08-939 (EGS) |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

AND NOW this _____ day of _____ 2008, upon consideration of the parties' cross motions for summary judgment, the court hereby finds that USDA's attempted "conversion" of the NPIR, SPRS, AINMS, and ATPS into a Privacy Act system of records is in violation of the Privacy Act, 5 U.S.C. §§ 552a(e)(1), (e)(2), (e)(3), (e)(4), and (r).  It is hereby ORDERED that plaintiff Mary-Louse Zanoni's motion for summary judgment is GRANTED.  The United States Department of Agriculture and its components are hereby PERMANENTLY ENJOINED from "conversion" of the National Premises Identification Repository (NPIR), the Standardized Premises Registration System (SPRS), the Animal Identification Number Management System, and the Animal Trace Processing System into a Privacy Act system of records.  IT IS FURTHER ORDERED that the United States Department of Agriculture shall immediately process the requested records in their entirety and within 10 days

of the date of this order produce all NPIR records compiled from the creation of the NPIR in 2004 through the date of this order, in paper and compact disk formats, and USDA shall correct its incomplete and unclear response to the Court's order of June 9, 2008, by supplying entries in the third and fourth columns for records dated 11/30/2006 through 5/29/2007; supplying entries in the 13th column ("Removed from NPIR (Premises) Date") for all records; (c) supplying all records (complete with the foregoing entries) for the period of 10/9/2007 to the date of the order; and (d) supplying a statement by a responsible APHIS official as to the <u>number</u> of requests to be removed from the database that APHIS has received up to the date of the order, and the <u>number</u> of premises that actually have been removed from the database.

_____
EMMET G. SULLIVAN, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. 08-939 (EGS) |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

**AFFIDAVIT OF MARY-LOUISE ZANONI**

I, Mary-Louise Zanoni, hereby swear and depose as follows:

1.   I make this declaration pursuant to 28 U.S.C. § 1746 upon my personal knowledge of the facts.  I am over the age of 18 and am competent to testify to the facts stated herein.

2.   I am a citizen of the United States and a resident of the State of New York.

3.   I am the plaintiff in this action and I have worked as a freelance writer on agricultural subjects since 2005.

4.   I am also a member of the bar of New York and of New Jersey and worked as a lawyer in private and public sector positions from 1987 through 2000.  A copy of my curriculum vitae is attached to Plaintiff's Motion for Summary Judgment as Exhibit 11.

1

5.      I presently have a regular, recurring writing assignment for The
        Milkweed, a dairy industry monthly published and edited by
        Peter Louis Hardin.  My articles in The Milkweed cover topics
        related to the National Animal Identification System ("NAIS") of
        defendant United States Department of Agriculture ("USDA").

6.      I seek access to USDA's National Premises Information
        Repository records to investigate the scope of the widely
        reported problems of animal owners placed in the "voluntary"
        NPIR without their knowledge or against their will, and to
        determine whether USDA honors the requests of animal owners
        who have asked to be removed from the NPIR.  Since the late
        summer of 2006, I frequently have been contacted by animal
        owners who have discovered that they are registered in the NPIR
        even though they have done nothing to sign up for NAIS
        premises registration.  I also have read media accounts of such
        involuntary placement in the NPIR and have heard animal
        owners complain of such involuntary placement at public
        meetings.

7.      I plan to write a series of articles for The Milkweed to be
        published in alternate months from July 2008 through at least
        July 2009, examining defendant USDA's methods for
        constructing its NAIS databases in the face of strong opposition
        from farmers and animal owners.

8.    My ability to investigate USDA's implementation of NAIS and its construction of the NAIS databases will be adversely affected if USDA is permitted to convert its existing NAIS databases into a Privacy Act system of records.  As seen in USDA's dealings with my FOIA request, the agency is likely to take advantage of every opportunity to delay access to NAIS record collections.  Such a conversion makes access to NAIS records significantly more difficult, further delays such access, and in some instances will frustrate timely access altogether.  If access is delayed long enough, in effect it will be too late for the information to be used to correct or influence the improper and possibly unlawful government actions pursued by defendant USDA to implement NAIS by circumventing farmers' widespread resistance to the program.

9.    In relation to the NPIR information presently sought under FOIA, should the records be disclosed, I will seek to identify persons who have been placed in the database without their permission and to verify whether persons who have requested to be removed from the database actually have been removed.  For example, I will ask sustainable-agriculture organizations to have their members contact me for verification of whether they appear in the database.  I will search the database for any records of persons who have contacted me in the past with

concerns about involuntary placement in the NPIR.  To perform

such identifications and verifications, I must have access to

sufficient information from the NPIR to confirm the identity and

location of the farmers and animal owners.

10. Since USDA's first publication of its Draft Program Standards

for NAIS, which I originally downloaded from USDA's Animal

and Plant Health Inspection Service ("APHIS") website in April

2005, I have been aware that according to USDA, the NPIR

consists of 6 items for each registered premises:  name of entity,

name of contact person, address, telephone number, alternate

telephone number, and generic type of operation.  (Draft

Program Standards, as downloaded April 2005, p. 11 attached

to Plaintiff's Motion for Summary Judgment as Exhibit 10.)

11. As quoted in an April 2006 article in The Rodale Institute's New

Farm, USDA/APHIS public affairs specialist Dore Mobley said of

the information collected in the NPIR for NAIS premises

registration, "It's the same information as is in the phone book."

("Export-Fueled National Animal ID Program Raises Many

Farmer Objections," The New Farm, April 13, 2006, attached to

Plaintiff's Motion for Summary Judgment as Exhibit 12.)

12. On October 25, 2007 I attended a presentation on NAIS for

farmers and livestock owners, held in Little Falls, New York and

sponsored by the New York Department of Agriculture and

Markets.  Principal presenters at the meeting were Joseph

Pericozzi, the USDA/APHIS Animal Identification Coordinator

for New York State, and Sarah Blood-Szentmiklosy, the animal

identification coordinator for the New York Department of

Agriculture and Markets.  Mr. Pericozzi, by way of assuring

animal owners that NAIS premises identification did not require

the submission of any sensitive information, stated that the

NPIR information was "nothing more than what you could

Google."

13.    Also at the foregoing meeting, Ms. Blood-Szentmiklosy admitted

that New York had placed livestock owners in NAIS without any

prior notification to the livestock owners, by taking data from

calfhood vaccination programs and submitting it to the NPIR.

14.    According to an article in Lancaster Farming, September 25,

2004, the Pennsylvania Department of Agriculture's Bureau of

Animal Health was placing Pennsylvania livestock owners into

USDA's premises database and having USDA assign premises

identification numbers to the owners by data mining

Pennsylvania's records of animal health programs:  "The

Bureau of Animal Health will register farms that have

participated in a disease regulatory program."  ("Pa. a Step

Closer to Premise ID Program," Lancaster Farming, p. A1, Sept.

25, 2004, attached to Plaintiff's Motion for Summary Judgment as Exhibit 13.)

15.    To facilitate the distribution of Federal NAIS funding to the states, each fall USDA/APHIS publishes an announcement of the availability of cooperative agreement funding for NAIS. According to the announcement of funding for fiscal year 2007, dated Nov. 22, 2006, USDA/APHIS was aware that states were data mining existing state programs without prior notice to or consent from livestock owners, and placing the animal owners' information into the NPIR: "This 'pulling' of data from existing databases . . . seems to be . . . cost effective [but] States must carefully consider whether this type of data integration to register livestock premises under NAIS would be interpreted as 'voluntary' and if this would create any problems for premises registration in the long term." (USDA/APHIS Veterinary Services Initial Announcement of Cooperative Agreements for FY 2007, attached to Plaintiff's Motion for Summary Judgment as Exhibit 14, at p. 12.)

16.    In late 2007 I began to receive reports from farmers in North Carolina, which had suffered a severe drought during most of 2007, that the state was compelling farmers to register for a NAIS premises ID as a condition of receiving state-provided emergency drought-relief hay for their animals.  A North

Carolina Department of Agriculture and Consumer Services "Hay Alert" about the drought-relief program, which I downloaded from the NCDA&CS website on June 27, 2008, clearly states that farmers must register for a "Premises Identification Number" before they can receive drought-relief hay.  (NCDA&CS Hay Alert, attached to Plaintiff's Motion for Summary Judgment as Exhibit 15.)

17.    On June 27, 2008 I visited the USDA/APHIS NAIS web pages at http://animalid.aphis.usda.gov/nais.  If visitors to this page wish to complete a premises registration, USDA/APHIS offers links to state sites where premises registration forms are made available.  I followed the USDA/APHIS links to the premises registration sites for New York and Pennsylvania and downloaded those states' premises registration forms.  Nowhere on the New York or Pennsylvania premises registration forms is there any notice meeting the requirements of the Privacy Act, 5 U.S.C. § 552a(e)(3).  (New York and Pennsylvania premises registration forms, attached to Plaintiff's Motion for Summary Judgment as Exhibit 16.)

18.    On June 9, 2008, this Court issued an order requiring, <u>inter alia</u>, defendant USDA to provide by June 24, 2008 "[t]he number of requests to be removed from the premises database" and "[t]he number of premises that actually have been removed

7

from the database." USDA's response dated June 19, 2008 is partial, misleading, and insufficient. USDA makes no reference to the Court's order but instead mischaracterizes its production of data as an "interim response" to my agency appeal of December 2007. The records provided by USDA begin on Nov. 30, 2006 and end on October 9, 2007, with no explanation of why records for the six-month period of October 2007 up to the June 9, 2008 order are missing. Further, USDA's confusing documentation indicates that the records were removed from a "contact" list, but any date for their removal from the "NPIR (Premises)" list is redacted or nonexistent. Records dated from Nov. 30, 2006 through May 29, 2007 give no indication of whether they were the subject of requests to be removed. (USDA letter dated June 19, 2008 and redacted records, attached to Plaintiff's Motion for Summary Judgment as Exhibit 17.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 1, 2008

Mary-Louise Zanoni

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. 08-939 (EGS) |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

**AFFIDAVIT OF JACK KITTREDGE**

I, Jack Kittredge, hereby swear and depose as follows:

1.    I make this declaration pursuant to 28 U.S.C. § 1746 upon my
personal knowledge of the facts.  I am over the age of 18 and am
competent to testify to the facts stated herein.

2.    I am a citizen of the United States and a resident of the
Commonwealth of Massachusetts.

3.    I own and operate Many Hands Organic Farm in Barre,
Massachusetts.

4.    I am a staff member of the Northeast Organic Farming
Association/Massachusetts Chapter, Inc. and editor of *The Natural
Farmer.*

5.     The Northeast Organic Farming Association consists of farmers in
       New York, New Jersey, Massachusetts, Vermont, Rhode Island,
       Connecticut and New Hampshire.

6.     As a consequence of my experience with farming, I have had the
       opportunity on numerous occasions to testify before the legislature
       of Massachusetts on farming-related issues.

7.     Massachusetts conducts an annual "livestock census" of the
       livestock within the state.

8.     There is an animal officer in each township who annually reports
       the number of farms in the township holding livestock to the
       Massachusetts Department of Agricultural Resources (MDAR).

9.     In 2006, to fulfill MDAR's obligations to sign up animal owners for
       premises identification numbers under a United States
       Department of Agriculture (USDA) National Animal Identification
       System (NAIS) cooperative agreement, MDAR began to upload its
       animal census data to the National Premises Information
       Repository (NPIR) and have the Massachusetts animal owners
       automatically assigned premises identification numbers (IDs).  The
       animal owners were not notified of this upload until after the fact.

10.    MDAR uploaded over a thousand records to USDA but many of the
       records were rejected as non-conforming and less than 500 were
       accepted.

11.   Many animal owners complained about the upload of their property information to the USDA.

12.   In August 2006 the Commissioner of MDAR participated in a panel presentation on NAIS at the Northeast Organic Farming Association Summer Conference and he announced at that time that MDAR was suspending its uploads.

13.   In fall 2006 and the spring and summer of 2007, the Northeast Organic Farming Association/Massachusetts Chapter Inc. conducted some 30-40 meetings throughout the state to educate farmers about NAIS.

14.   In November 2007, Massachusetts livestock owners began receiving a MDAR form letter telling them that MDAR was about to upload its entire collection of animal census information to the NPIR unless the farmer/animal owner "opted out."

15.   Many farmers refused to respond to this November 2007 letter because they feared that by responding they would allow MDAR to verify the information it possessed.

16.   A bill had been introduced in early 2007 to prevent MDAR from taking USDA funding to promote premises identification.  The bill seemed to have considerable support among legislators but the fall 2007 upload by MDAR essentially rendered the potential legislation moot, thus defeating the grassroots attempt to secure legislative relief from NAIS premises identification.

17.    Neither USDA nor MDAR provided any statement to

farmers/animal owners in either 2006 or 2007 advising farmers of

the legal authority for the records system or what uses would be

made of the information.

I declare under penalty of perjury that the foregoing is true and

correct.

Executed on _June 24, 2008_       _____s/*Jack Kittredge*_____
                                              Jack Kittredge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY-LOUISE ZANONI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. 08-939 (EGS) |
| UNITED STATES DEPARTMENT OF | § | |
| AGRICULTURE, | § | |
| | § | |
| Defendant. | § | |

**AFFIDAVIT OF PETER LOUIS HARDIN**

I, Peter Louis Hardin, hereby swear and depose as follows:

1.    I make this declaration pursuant to 28 U.S.C. § 1746 upon my personal knowledge of the facts. I am over the age of 18 and am competent to testify to the facts stated herein.

2.    I am a citizen of the United States and a resident of the State of Wisconsin.

3.    I work as the editor and publisher of *The Milkweed*, a publication I founded in 1979. *The Milkweed* is a monthly dairy marketing and information report for dairy producers and personnel. *The Milkweed* specializes in original reporting, analysis and investigative reporting.

1

4.    In Dec 2007 I called Mary-Louise Zanoni and asked her to write for *The Milkweed* on National Animal Identification (NAIS) issues on a regular basis.

5.    The NAIS is of utmost concern to the 6,500 – 7,000 subscribers of *The Milkweed*, most of whom are dairy producers.

6.    Ms. Zanoni is regarded as very knowledgeable in the area of NAIS and has written extensively about the system and its implementation.

7.    NAIS is a matter of great concern especially in the dairy industry as well as among livestock farmers and ranchers.  Many farmers are fearful that they have been included in the NAIS system against their will and fear the additional steps that USDA will take in implementing the NAIS plan, to include the use radio frequency identification devices (RFID) for their animals and forcing them to pay transaction fees to private entities for monitoring movement of the animals

8.    Ms. Zanoni agreed to write an article on NAIS developments every other month.  Her articles have been published in the January, March, and May 2008 issues of *The Milkweed* and another article is scheduled to be published in July 2008.

9.    Ms. Zanoni is paid for each article *The Milkweed* publishes.

10.    *The Milkweed* has repeatedly shed light on various financial scandals and inappropriate private and public activity involving

milk processors, the large co-ops, and agriculture. Among the major scandals are:

a. Failure by major dairy cooperatives to legally report weekly prices for sales of nonfat dry milk to USDA's National Agricultural Statistics Service. In March 2008, USDA's Office of Inspector General issued a study of the matter, which fully credited *The Milkweed* with exposing the illegality.

b. Repeated antitrust violations by dairy cooperatives and milk processors that resulted in a two-year investigation by the Antitrust Division of the U.S. Department of Justice and roughly 18 state Attorneys General offices. In late August 2006, this investigation concluded with recommended indictments against Dairy Farmers of America and Dean Foods, respectively the nation's largest milk producers cooperative and the nation's largest fluid milk processor.

c. Failure by USDA to implement Section 608(c)18 of the enabling legislation for federal milk orders, that mandates USDA to factor-in regional costs of production in the agency's milk pricing program. (This matter is unresolved.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___JULY 1, 2008___    _Peter Louis Hardin_

Peter Louis Hardin

3



**United States
Department of
Agriculture**

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

# National Animal Identification System (NAIS)

*"Draft Program Standards"*

*A Discussion Document*

**April 25, 2005**

*While the NAIS is now voluntary, stakeholders recognize that participation by the entire industry will be necessary to achieve a highly successful animal traceback/trace forward system to support animal disease management programs. This document, with industry input, reflects USDA's view on how the NAIS could work if mandatory requirements are established in the future. Public comment and ongoing dialogue with the industry will provide invaluable feedback to the continued development of the NAIS.*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................................1

**PART I – NAIS DATA STANDARDS FOR KEY COMPONENTS** ................................................3

   I. A. DATA ELEMENTS AND NUMBERING SYSTEMS .......................................................................3
      *I. A. 1. Premises* .....................................................................................................................3
      *I. A. 2. Nonproducer Participants* ..........................................................................................4
      *I. A. 3. Animal Identification* ..................................................................................................5
   I. B. INFORMATION SYSTEM .............................................................................................................8
      *I. B. 1. National Premises System* ..........................................................................................8
      *I. B. 2. National Animal Identification and Tracking System* ................................................11

**PART II – HOW THE SYSTEM WOULD WORK** ........................................................................17

   II. A. ROLES AND RESPONSIBILITIES ............................................................................................17
      *II. A. 1. USDA/APHIS, States and Tribes* ..............................................................................17
      *II. A. 2. Other Stakeholders* ...................................................................................................17
   II. B. ILLUSTRATIONS AND EXPLANATIONS OF BASIC PROCESSES ...............................................22
      *II. B. 1. Premises Registration* ...............................................................................................22
      *II. B. 2. Animal Identification and Tracking* ..........................................................................23
   II. C. IDENTIFICATION AND REPORTING REQUIREMENTS FOR EXPORTED AND IMPORTED ANIMALS .......................26
      *II. C. 1. Identification and Reporting Requirements for Exportation of Individual Animals* ...........26
      *II. C. 2. Identification and Reporting Requirements for Importation of Individual Animals* ...........26

**PART III. SPECIES-SPECIFIC PROCEDURES AND REQUIREMENTS** ................................27

   III. A. CATTLE .................................................................................................................................27
      *III. A. 1 Individual Identification Methods for Cattle* .............................................................27

**PART IV – TRANSITIONING TO THE NAIS** ............................................................................29

   IV. A. TRANSITION OF OFFICIAL ANIMAL NUMBERING SYSTEMS ..................................................29
   IV. B. STATE STATUS DESIGNATION ...............................................................................................29

    **APPENDIX A – DEFINITIONS** .............................................................................................32

# INTRODUCTION

Protecting American animal agriculture by safeguarding animal health is vital to the well-being of all U.S. citizens. Healthy and protected agriculture promotes human health; provides wholesome, reliable, and secure food resources; mitigates national economic threats; and enhances a sustainable environment. An efficient and effective animal identification program is essential to achieving this goal.

As part of its ongoing efforts to safeguard animal health, the United States Department of Agriculture (USDA) initiated the implementation of a National Animal Identification System (NAIS) in 2004. The NAIS is the cooperative State-Federal-industry program administered by USDA's Animal and Plant Health Inspection Service (APHIS) for the purpose of tracking all animal movements from birth to slaughter as part of the USDA's National Animal Health Monitoring and Surveillance Program. A main objective of the cooperative NAIS program is to develop and implement a comprehensive national animal tracking system which will enable State and Federal animal health officials to identify both domestic and foreign animal diseases on a real-time basis with the ability to track all exposed and infected animals within 48 hours of initial presumptive positive diagnosis. Another major purpose of the NAIS is to enable State and Federal animal health officials to promptly ascertain animal health status for the purpose of issuing both intrastate and interstate animal health movement certificates.

The NAIS is being developed for use with animals that will benefit from a system that facilitates rapid tracing in the event of a disease concern. Currently, working groups are developing plans for camelids (llamas and alpacas), cattle and bison, cervids (deer and elk), equine, goats, poultry, sheep, and swine.

The ultimate goal of NAIS is to have the capability to identify all animals and premises that had direct contact with a foreign animal disease (FAD) or disease of concern within 48 hours after discovery.

The NAIS is now voluntary, so producers and other stakeholders can participate in the design, development, and testing of the system to ensure that practical solutions evolve. However, to achieve the goal of 48-hour tracebacks, all producers and affected industry segments would have to participate eventually, and there has been support from industry for making the system mandatory. We envision the system becoming mandatory by January 2009. This document presents the USDA's current view of how the NAIS would work when fully implemented. Certain provisions included here may differ from what is currently authorized in the regulations. The development of this document was facilitated by significant industry feedback; however, the document was prepared by USDA, which is responsible for its content. The posting of this document on the Web is intended to provide an opportunity for all stakeholders to offer additional comments and suggestions. Other species-specific information is pending.

The NAIS would be established over time through the integration of these key components:

**Premises Identification**

An animal's birthplace and all movements are essential facts in tracking animals. Therefore, identifying premises (locations that manage or hold animals) would be the starting point of the NAIS. Each premises would be identified with a unique seven-character identifier, which would be known as a premises identification number (PIN).

**Animal Identification**

To track animals as they move from premises to premises, there would also have to be a standard way to identify them. Animals would be identified either individually with a unique animal identification number (AIN) or, if they are managed and moved through the production chain as a group, with a group/lot identification number (GIN).

**Animal Tracking**

As animals move from one premises to another, a few basic pieces of information would be reported to a National Animal Records Repository: the AIN or GIN, the PIN of the receiving location, and the date of the animal or animals' arrival. The ability to achieve the 48-hour traceback objective would be directly affected by the percentage of animal movements that are recordable. Collecting animal movement information would be possibly the most challenging component of the NAIS.

These components are discussed in greater detail in subsequent sections of this document.



# PART I – NAIS DATA STANDARDS FOR KEY COMPONENTS

## I. A. DATA ELEMENTS AND NUMBERING SYSTEMS

To achieve the NAIS' 48-hour traceback objective, the movement of individual animals or "units of animals" would have to be recorded. Standards for certain data elements are essential for the implementation of a successful information system in which data would be shared among States, the Federal government, and certified commercial service providers. Key data elements in the NAIS would include numbering systems for the identification of premises, nonproducer participants (individuals or entities that are not associated with a particular premises but participate in the NAIS by providing products or services or submitting data), individual animals, and groups or lots of animals. Specifications for these key data elements are summarized in the chart below.

| Key Data Element Standards | | | | |
|---|---|---|---|---|
| **Data Element** | **Field Structure** | **Type** | **Example** | **Comments** |
| Premises Identification Number | 7 | Alphanumeric | A123R69 | Right-most character is a check digit[1] based on ISO 7064, Mod 37, 36 |
| Nonproducer Participant Number | 7 | Alphanumeric | H892345 | Same numbering system as Premises Identification Number |
| Animal Identification Number | 15 Total | | | |
| | 3 | Numeric | First | Three digits are the country code (840 = USA) based on ISO 3166 |
| | 12 | Numeric | 123456789012 | Animal number. Start number > 2,000,000,000 |
| Group/Lot Identification Number | 13 Total | | | |
| | 7 | Alphanumeric | A234567 | First seven characters are the entity's Premises Identification Number |
| | 6 | Date | 100302 | Date on which the group/lot was assembled. Format is MMDDYY |

[1] *See check digit formula in NAIS Technical Supplement.*

**Table 1**

## I. A. 1. Premises

Tracing a subject animal or a group/lot of animals to its origin and determining other potentially exposed premises and animals can only be achieved with a complete record of all locations that manage or hold livestock. Such locations are referred to as "premises." While the diversity of the environments in which we manage livestock makes the definition of such locations quite complex, we offer the following general definition of the term "premises":

> A premises is an identifiable physical location that, in the judgment of the State Animal Health Official or Area Veterinarian in Charge and, when appropriate, in consultation with the affected

producer, represents a unique and describable geographic entity where activity affecting the health and/or traceability of animals may occur.

Production locations that have multiple species would have to have one unique PIN in the NAIS. More specific premises definitions would be established to define livestock operations and environments as the NAIS is developed. In addition to farms, ranches, other production units, markets, packing plants, quarantine facilities, ports of entry, veterinary clinics, exhibitions, etc., would also be registered in the national premises system.

**Premises Identification Number (PIN)**

Identifying these premises with a single and unique number is essential to trace animals potentially exposed to disease. If more than one premises number were to be used for the same location, animals subject to contagious disease could go undetected.

The PIN would be the official premises identification number in the NAIS. The PIN would be nationally unique and have no meaning in itself. The PIN would be associated with an address or legal land description. The field specification for the PIN is:

7 characters (right-most character is a check digit)

Example: A123R69

On November 8, 2004, we published in the *Federal Register* (69 FR 64644-64651, Docket No. 04-052-1) an interim rule recognizing this numbering format for use in officially identifying premises.

## I. A. 2. Nonproducer Participants

A person or entity that engages in a designated role in the NAIS but is not associated with a specific premises would be designated as a nonproducer participant. These nonproducer participants would perform a number of functions, including, but not limited to, manufacturing and distributing official identification tags and submitting information to designated NAIS databases. USDA/APHIS will establish application and enrollment procedures for nonproducer participants and would be responsible for the allocation of unique nonproducer participant numbers to such individuals or entities.

**Nonproducer Participant Number**

Data supplied to NAIS databases by a nonproducer participant would be associated with that person or entity's nonproducer participant number so that proper data controls and integrity measures could be maintained. The enrollment of nonproducer participants in the NAIS would be administered through the State/tribe Premises Registration Systems (see I.B.1) in the location in which the individual or entity maintains its primary business office. In other words, a nonproducer participant would obtain a nonproducer participant number through the Premises Registration System, which would be administered by the State/tribe.

The nonproducer participant number would be generated through the same computer program that would generate the PIN. The field specification for the nonproducer participant number is:

7 characters (right-most character is a check digit)

Example: H892345

**Nonproducer Participant Type Codes**

The types of entities and individuals listed in the following table could participate in the NAIS and would be assigned nonproducer participant type codes. These codes would be used to establish authorization levels for the appropriate databases.

| Nonproducer Participants – Type Codes | | |
|---|---|---|
| **Name** | **Nonproducer Participant Type** | **Role and/or Responsibility** |
| Animal Health Official – Government | 1 | |
| Animal Health Official – Accredited Veterinarians | 2 | |
| AIN Tag Managers | 3 | An entity authorized by APHIS to distribute AIN tags to a premises. The AIN Tag Manager agrees to validate the PIN of the receiving operation and report the AINs distributed to that receiving operation to the National Premises Information Repository. |
| AIN Tag Manufacturers | 4 | A company that is authorized by APHIS to receive AINs and produce AIN tags. |
| AIN Tag Distributors | 5 | A person or entity that distributes and/or takes orders for AIN tags. The distributor has an agreement with an AIN Tag Manager who must report distribution information to the National Animal Records Repository. |
| Laboratories | 6 | Diagnostic laboratories that submit data to the national databases |
| Order Buyers/Dealers | 7 | Individuals that buy or sell livestock or act as agents for a buyer or seller of livestock. They will have their nonproducer participant number recorded in lieu of a premises number. |
| Service Providers | 8 | Submit animal records to the National Animal Identification Database |
| Identification Services/Sites | 9 | Identify animals using the AIN on behalf of producer and submit records to the National Records Repository, according to communication standards prescribed in the Technical Supplement |
| **Table 2** | | |

## I. A. 3. Animal Identification

Two types or levels of animal identification are necessary to support animal disease management programs: Individual animal and "group/lot" identification. Individual animals may be identified with unique numbers or with premises numbers. Unique individual animal identification is needed for tracking animals that are destined to be commingled with animals outside the production system in which they were born as they move through the production chain. While certain traceback functions can be achieved with premises identification alone, premises identification cannot be used to record an individual animal's movement through multiple marketing and commingling points. In such instances, individual animal identification is necessary. Individual animals would be identified in the NAIS by means of the AIN.

Group/lot identification can be used in species where groups of animals are assembled from within the same production system and are tracked by recording group movements and maintaining required production record elements. In the event animals identified through group/lot identification are to be commingled with animals outside the production system, unique individual animal identification would become necessary. In the NAIS, groups or lots of animals would be identified by means of the GIN.

**Animal Identification Numbers (AIN)**

Current numbering systems considered official for the interstate movement of livestock include:

- USDA/APHIS uniform State series code

- Breed registration numbers

- Premises identification used in combination with unique herd management identification

The standard for the single national numbering system would:

- Be compatible with national numbering systems already established in other countries

- Avoid duplication of any existing numbers

The November 2004 interim rule referred to earlier also recognized the AIN as an official number for use in identifying individual animals. Over time, the AIN would become the sole national numbering system used when unique individual animal identification is required.

The field specification for the AIN is:

> 15 digits (the first three digits would be the national code defined by ISO 3166 [USA is 840]; the remaining 12 digits would comprise the nationally unique individual animal number)

> Example: 840123456789012

**Official Identification Devices and Methods**

Individual animals or groups of animals would be identified in the NAIS using devices or methods approved by the USDA/APHIS Administrator, including, but not limited to, official tags, tattoos, radio frequency identification, and registered brands when accompanied by a certificate of inspection from a recognized brand inspection authority. Animals identified as individuals would have different requirements from animals identified by group or lot. The specifications would be defined through species-specific standards, which are provided in the species-specific section (Part IV) of this document.

Official identification devices would be distributed to be readily available for producers to purchase either through direct delivery, drop shipment, or through the retail sector.

While the NAIS would be technology neutral, AIN tags would become the de-facto standard for certain species when visual, unique individual animal identification is necessary. The following chart lists what we envision would be the minimum standards for the AIN tag. Certain species could incorporate other technologies as part of the AIN tag. For example, the cattle industry has established RFID eartags as its preferred form of identification to meet these minimum standards.

| AIN Tags |
| --- |
| **Standards for AIN Tags** |
| • The tag must bear the entire 15-digit number. <br><br> • The tag must be designed for one-time use (tamper evident). <br><br> • The tag may not be readily altered or otherwise tampered with. <br><br> • The national identification number must be easily and reliably readable. <br><br> • The tag must have the US Shield imprinted. |
| **Table 3** |

**Prohibitions on Tampering with or Removing Official Identification Devices**

USDA/APHIS would promulgate regulations, as appropriate and/or necessary, to prohibit any person from:

- Removing an official identification device or causing the removal of one unless the animal is terminated, except in cases when an AIN has become illegible or the device malfunctions

- Causing the application of an AIN tag to an animal that is currently carrying an AIN tag, unless that same AIN is imprinted on the second device

- Altering an AIN tag to change its number, or to make the number unreadable

- Selling or providing an identification device bearing the USDA Shield unless so authorized

- Manufacturing, selling, or providing an identification device that so closely resembles an approved device that it is likely to be mistaken for official identification.

**Group/Lot Identification Numbers (GIN)**

Group/lot identification is used in industries where production practices involve management of animals by groups, i.e., animals move in groups through the production chain. In such cases, there is no traceback advantage to individual identification. Instead, groups of animals can be tracked using appropriate group identifiers and production records.

In the NAIS, an animal production system would be able to use group/lot identification if the producer is able to demonstrate, through group identification and production records, that 48-hour traceback can be accomplished to all premises with animals potentially exposed to disease. Specific requirements for group/lot identification would vary by species.

A unique and standardized number would be necessary to track groups of animals in the national system. The November 2004 interim rule also established the GIN as an official number for the identification of groups or lots of animals. The field specification for the GIN is as follows:

> 13 characters, combining the 7-digit PIN of the premises where the group was assembled and the date (6 digits) on which the group was assembled (mmddyy)

> Example: A234567100302 (group assembled on October 3, 2002)

If more than one group of animals were to be assembled on a particular day at a given premises, the animals would still be considered a single group for the purpose of assigning a GIN.

## I. B. INFORMATION SYSTEM

The primary information system components of NAIS would include the National Premises System and National Animal Identification and Tracking System. These systems would be integral components of the USDA/APHIS National Animal Health Surveillance System. To ensure that animal heath officials would have immediate, reliable, and uninterrupted access to essential NAIS information in the event of a disease concern, certain basic data would be maintained at the Federal level (see Tables 5 and 6). Accordingly, the two main NAIS information repositories, the National Premises Information Repository and the National Animal Records Repository, would be maintained and managed by USDA/APHIS. These information repositories would also be integrated with current information systems already established for animal disease control, monitoring, surveillance, and eradication programs (e.g., the Emergency Management Response System, the Generic Data Base, and the National Animal Health Laboratory Network). The NAIS data systems would also need to be well integrated with other systems as they are developed and implemented (e.g., the Interstate Certificate of Veterinary Inspection System).

The overall system would allow for the identification of each premises and the recording and reporting of animal identification and animal movement data. Additionally, the system would associate or link the animal identification data to each premises where the animal or group was located and the specific dates on which the animal(s) was at the premises. Only information essential to the enhancement of animal disease surveillance and monitoring would be stored in federally managed database under the NAIS.

Premises registration systems and animal identification and tracking systems maintained by the States or regional alliances (or contracted through a third party) would be an integral part of the overall NAIS information infrastructure. These systems would be maintained and operated by the States or regional alliances or third parties, and essential data would be "pushed" from them to the national repositories. Once participating State/regional and third-party systems have been evaluated for data compliance, USDA/APHIS would support the establishment of interfaces between these systems and the national repositories. The State/regional systems or third-party systems would be able to collect and maintain more information than is required for NAIS, but only the Federally required data would need to be sent to the national repositories. NAIS data would be kept confidential to the extent allowed by law, and routine access would be restricted to State and Federal animal health officials when information is required to perform their responsibilities for maintaining the health of the U.S. herd.

Event(s) that would trigger State or Federal access to the data management system would include the following:

1.     A confirmed positive test for List A diseases

2.     An animal disease emergency, as determined by the Secretary of Agriculture

3.     The need to conduct a traceback to determine the origin of infection for a program disease (brucellosis, tuberculosis, etc.)

4.     The need to conduct surveillance for another domestic or emerging disease

### I. B. 1. National Premises System

The National Premises System would include the Premises Number Allocator, the Premises Registration Systems, and the National Premises Information Repository.

**Premises Number Allocator**

The uniqueness of each PIN would be achieved through the Premises Number Allocator with which the Premises Registration Systems would interface when administering the registration of premises. Assigning premises numbers to a valid address or legal land description would help avoid having multiple numbers assigned to the same operation, regardless of species. The allocator would be maintained by USDA/APHIS.

**Premises Registration Systems**

The Premises Registration Systems (databases) would provide for the administration of premises enrollments according to the national requirements. The States and tribes that would be responsible for administering the registration of premises within their geographic areas, or would be jointly responsible for administering the registration of premises in boundary areas, could use either a standardized Web-based premises registration system provided by USDA/APHIS or a compliant registration system developed by the States or tribes or by third parties through contractual arrangements and evaluated by USDA/APHIS for compliance with NAIS data standards.

States and tribes could establish various means for collecting and entering the data into the system they elect to operate. These cooperative efforts could involve industry organizations, brand inspection entities, third party service providers, etc. While each State or tribe would be required to adhere to the national standards and requirements, other functionality and data collection would be at the discretion of the State or tribe. Compatibility between the Premises Registration Systems and the National Premises Information Repository would be achieved through adherence to NAIS data standards. At a minimum, States and tribes would have to collect and maintain the information defined in Table 4 below.

A location would maintain the same PIN when sold intact. The States or tribes would maintain the historic data for 20 years. This would provide animal health officials with the proper contact reference when the current contact person was not associated with the premises during the period being researched in a traceback situation.

States/tribes would submit data on all premises to the National Premises Information Repository listed in Table 5 using the file transfer protocols provided in the NAIS IT Supplement. The transmission of data would include new and revised premises records daily and monthly "master" updates. The "master" updates would contain all records from the State/tribe premises database. Premises information would be kept confidential to the extent allowable by law, and only partial data would be routinely available to State or Federal animal health officials.

National Animal Identification System – Draft Program Standards                                     Page 10

| Premises Registration Systems - Data Elements | | |
|---|---|---|
| **Field Name** | **Type** | **Length** |
| Premises Identification Number | Alphanumeric | 7 |
| Name of Entity | Alphanumeric | 30 |
| Owner or Appropriate Contact Person* | Alphanumeric | 30 |
| Street Address | Alphanumeric | 30 |
| City | Alphanumeric | 20 |
| State | Alpha | 2 |
| Zip/Postal Code | Numeric | 9 |
| Contact Phone Number | Numeric | 15 |
| Operation Type | Character | 1 |
| Date Activated | Date (YYYYMMDD) | 8 |
| Date Retired | Date (YYYYMMDD) | 8 |
| Reason Retired | Character | 1 |
| Historic Data** | | |
| Previous Contact Person | Alphanumeric | 30 |
| Previous Contact Person Phone | Numeric | 15 |
| Previous Contact Person - Start Date | Date (YYYYMMDD) | 8 |
| Previous Contact Person - End Date | Date (YYYYMMDD) | 8 |
| GPS<br>Longitude<br>Latitude | <br>Numeric (6 decimals)<br>Numeric (6 decimals) | <br>11<br>11 |
| Alternative Phone Numbers ** | Numeric | 15 |
| *The contact person should be the person with whom the animal health official is to communicate when performing a traceback (as determined by the entity).*<br>*\*\* Requires facility to store multiple records.* | | |
| **Table 4** | | |

## National Premises Information Repository

The National Premises Information Repository, maintained by USDA/APHIS, would centralize data from the Standardized and Compliant Premises Registration Systems. A real-time subset of all Premises Registration Systems will be necessary to support the national infrastructure. For example, the National Premises Information Repository will support the allocation of AINs to a premises. AIN Distributors would be able to verify in the National Premises Information Repository that a producer has a valid PIN before distributing AINs to that producer.

The following chart defines the fields (data elements) that would be required by the National Premises Information Repository.

| National Premises Information Repository - Data Elements | | |
|---|---|---|
| **Field Name** | **Type** | **Length** |
| Premises Identification Number | Alphanumeric | 7 |
| Name of Entity | Alphanumeric | 30 |
| Owner or Appropriate Contact Person* | Alphanumeric | 30 |
| Street Address | Alphanumeric | 30 |
| City | Alphanumeric | 20 |
| State | Alpha | 2 |
| Zip/Postal Code | Numeric | 9 |
| Contact Phone Number | Numeric | 15 |
| Operation Type | Character | 1 |
| Date Activated | Date (YYYYMMDD) | 8 |
| Date Retired | Date (YYYYMMDD) | 8 |
| Reason Retired | Character | 1 |

*\* The contact person should be the person with whom the animal health official is to communicate when performing a traceback (as determined by the entity).*

**Table 5**

## I. B. 2. National Animal Identification and Tracking System

The National Animal Identification and Tracking System would include the AIN Allocator, Animal Identification and Tracking Systems, and the National Animal Records Repository.

**AIN Allocator**

USDA/APHIS would administer the AIN Allocator that would assign AINs to AIN tag manufacturers. Only authorized AIN tag manufacturers would have access to the AIN Allocator. USDA/APHIS would maintain the information on authorized AIN tag manufacturers and records of all animal numbers allocated to each manufacturer.

**Animal Identification and Tracking Systems**

States/tribes would administer their Animal Identification and Tracking System. States/tribes could establish agreements to administer their systems on a regional basis. USDA/APHIS would provide a Standardized Animal Identification and Tracking System (SAITS) that States could elect to use. The SAITS would be housed within a technology center maintained by or contracted through USDA/APHIS to operate the system. Each State, tribe, or region using the system would have a secured, partitioned area on the database that it administers through the Internet.

States/tribes could also elect to have their information administered through their own system or through systems provided by third parties. USDA/APHIS would designate systems that meet the data standards

and communication security requirements as a Compliant Animal Identification and Tracking System (CAITS).

The data submitted to the National Animal Records Repository would be consistent from both the standardized and compliant systems. (See file format and communication protocol in NAIS IT Supplement.)

**National Animal Records Repository**

USDA/APHIS would administer the National Animal Records Repository (NARR), a centralized database maintained and integrated within the USDA/APHIS National Animal Health Surveillance System. Records would be received from the Standardized and Compliant Animal Identification and Tracking Systems, as well as direct submissions. Tables 6 and 8 below list the fields that would be maintained for individual animals and group/lots of animals in the NARR. Tables 7 through 9 contain individual animal event codes, group/lot data elements, and group/lot event codes, respectively.

| National Animal Records Repository – Individual Animal Data Elements | | | | |
|---|---|---|---|---|
| **Field Description** | **Data Type** | **Size** | **Reqd.** | **Example** |
| Event Type Code | Numeric | 2 | Y | 1 *(see following event code table)* |
| Sighting/Reporting Premises Identification | Character | 7 | Y | |
| Source/Destination Premises Identification | Character | 7 | N | |
| Event Date & Time | Numeric | 12 | Y | YYYYMMDDHHMM 200308011223 |
| Animal Identification number | Numeric | 15 | Y * | AIN with leading "840" |
| Species | Character | 3 | N | |
| Identification Electronically Read | Boolean | 1 | Y | 0 (False default) / 1 (True) |
| Animal Date of Birth | Character | 8 | N | YYYYMMDD 20020101 |
| Age of Animal | Character | 3 | N | (M)onth, (D)ay, (Y)ear e.g. M11 (Zero fill if less than 10) |
| Gender | Character | 1 | N | (M)ale, (F)emale, (C)astrated/neutered male, (S)payed/neutered female |
| Breed of Animal | Character | 2 | N | See document Breed codes US and Can1.pdf |
| Remarks | Character | 50 | N | Description/other comments (may include brand information) |
| Status | Character | 1 | N | (C)orrection |
| Alternate Animal ID 1 | Character | 17 | N * | Alternate official identification number if 840 AIN not available, Lot identification number if animal has AIN number and was moved out of a lot, old AIN number if tag replaced |
| Alternate Animal ID Type 1 | Character | 1 | N | (A) AIN with leading USA, (U)SDA eartag, (R) AIN with lead manufacture code, (B)reed registry number, (G) GIN, |

National Animal Identification System – Draft Program Standards                                                    Page 13

| | | | | |
|---|---|---|---|---|
| | | | | (T)attoo, required if alternate identification (field 15) is provided, R(E)placement AIN number if event code 6 used |
| Alternate Animal ID 2 | Character | 17 | N * | Second alternate official Identification number if 840 AIN not available, or GIN if animal has AIN and was moved out of a lot |
| Alternate Animal ID Type 2 | Character | 1 | N | (A) AIN with leading USA, (U)SDA eartag, (R) AIN with lead manufacture code, (B)reed registry number, (L)ot number, (T)attoo, required if alternate identification (field 17) is provided |
| *\* At least one official ID required* | | | | |
| **Table 6** | | | | |

**Animal Event Codes**

| Animal Event Codes | |
|---|---|
| **Event Code #** | **Description** |
| 1 | AIN tag distributed – AIN is distributed to a premises or Nonproducer Participant (tags transferred to another entity in the distribution chain). |
| 2 | Tag applied – AIN tag is applied to an animal |
| 3 | Moved in – Animal is moved into a premises |
| 4 | Moved out – Animal is moved out of a premises |
| 5 | Lost Tag – New tag is applied to an animal that lost a tag and previous AIN is unknown |
| 6 | Replaced Tag or Re-Tagged – New tag is applied to an animal that lost a tag and previous AIN is known |
| 7 | Imported – Animal is imported into the U.S. |
| 8 | Exported – Animal is exported out of the U.S. |
| 9 | Sighting – Animal has a confirmed sighting at a location, no movement has occurred. (Ex: veterinarian sighting) |
| 10 | Harvested – Animal was terminated at an abattoir |
| 11 | Died – Animal died of natural causes or euthanized at the farm/ranch |
| 12 | Tag retired – Tag retired by producer, packing house, etc. |
| 13 | Animal Missing (lost stolen, etc) |
| 14 | ICVI – Certificate of veterinary inspection |
| **Table 7** | |

**Group/Lot Data Elements**

| National Animal Records Repository - Group/Lot Data Elements | | | | |
|---|---|---|---|---|
| **Field Description** | **Data Type** | **Size** | **Reqd.** | **Example** |
| Event Type Code | Numeric | 2 | Y | 1 *(see following event code table)* |
| Premises Identification | Character | 7 | Y | (Required when event code is 2, 3, or 4) |
| Event Date & Time | Numeric | 12 | Y | YYYYMMDDHHMM 200308011223 |
| Group/Lot Identification Number (GIN) | Character | 13 | Y | GIN is composed of premises ID number and date the lot was established |
| G/L Subset Identifier | Character | 30 | N | Used to identify subset such as a barn |
| Group Type | Character | 1 | Y | (S)tatic, (D)ynamic |
| Species | Character | 3 | Y | |
| Event Remark | Character | 50 | N | |
| Status | Character | 1 | N | (C)orrection |
| **Table 8** | | | | |

**Group/Lot Event Codes**

| Group/Lot Event Codes | |
|---|---|
| **Event Code #** | **Description** |
| 1 | Begin Group/Lot, Group/Lot of animals was established at a premises |
| 2 | Moved Group/Lot in, Group/Lot of animals was moved into a premises |
| 3 | Moved Group/Lot out, Group/Lot of animals moved out of a premises |
| 4 | Lot has a confirmed sighting at a location, no movement has occurred (i.e. vet sighting) |
| 5 | End Group/Lot, Group/Lot inventory is zero |
| **Table 9** | |

## List Codes

Certain fields are predefined for list standards that would allow the data to be selected and stored consistently. Such list standards are presented below.

| Species | | | | |
|---|---|---|---|---|
| **Code** | **Description** | **Code** | **Description** | |
| AQU | Aquaculture | CER | Cervids | |
| *CLM* | *Clams* | *DEE* | *Deer* | |
| *CRA* | *Crawfish* | *ELK* | *Elk* | |
| *CTF* | *Catfish* | EQU | Equine (Horses) [1] | |
| *MSL* | *Mussels* | OVI | Ovine (Sheep) | |
| *OYS* | *Oysters* | POR | Porcine (Swine) | |
| *SAL* | *Salmon* | POU | Poultry | |
| *SBA* | *Striped Bass* | *CHI* | *Chickens* | |
| *SHR* | *Shrimp* | *DUC* | *Ducks* | |
| *SLP* | *Scallops* | *GEE* | *Geese* | |
| *TIL* | *Tilapia* | *GUI* | *Guineas* | |
| *TRO* | *Trout* | *PGN* | *Pigeon* | |
| BOV | Bovine (Bison and Cattle) | *PHE* | *Pheasants* | |
| CAM | Camelid (Alpaca and Llama) | *QUA* | *Quail* | |
| CAP | Caprine (Goats) | *TUR* | *Turkeys* | |

[1] *Equine industry will expand as necessary*

**Table 10**

| Operation Type | | | |
|---|---|---|---|
| **Code** | **Description** | **Code** | **Description** |
| B | Port of Entry | P | Production Unit [1] |
| C | Clinic | Q | Quarantine Facility |
| E | Exhibition | R | Rendering |
| L | Laboratory | S | Abattoir |
| M | Market/Collection Point | T | Tagging Site |
| N | Nonproducer Participant | | |

[1] *Includes Hunt Ranches, etc.*

**Table 11**

| Reason Premises Retired | |
|---|---|
| **Code** | **Description** |
| D | Developed (Operation terminated resulting from commercial development) |
| E | Error (Reported in error) |
| M | Merged |
| O | Sold or Transferred |
| S | Split |

**Table 12**

| Animal Gender | |
|---|---|
| **Code** | **Description** |
| M | Male |
| F | Female |
| C | Neutered / castrated male |
| S | Neutered / spayed female |
| X | Mixed (used only in groups) |

**Table 13**

# PART II – HOW THE SYSTEM WOULD WORK

## II. A. ROLES AND RESPONSIBILITIES

A key to the functioning of the NAIS would be the sharing of administrative responsibilities by State and tribal governments, Federal agencies, producers, and nonproducer participants. Part II of this document provides an overview of how the various sectors would carry out their responsibilities, as well as flow-charts detailing the premises registration, tag distribution, and animal tracking processes.

## II. A. 1. USDA/APHIS, States and Tribes

USDA/APHIS would execute cooperative agreements and/or Memoranda of Understanding (MOU) with the animal health authority of States or tribes to administer the NAIS. State/tribe and USDA/APHIS administrative responsibilities are summarized in the following table.

| Responsibilities of States/Tribes and USDA | |
|---|---|
| **States/Tribes** | **USDA APHIS** |
| • Register/identify premises within their geographic area<br>• Maintain data required by the Premises Registration System<br>• Submit premises data to National Premises Information Repository<br>• Recognize the use of the AIN as an official identification number within their State/regions<br>• Recognize the use of the GIN as an official identification number within their State/regions<br>• Administer intrastate movements<br>• Administer the enrollment of Nonproducer Participants located in their area<br>• Approve Tagging Sites/Services | • Administer Premises Number Allocator<br>• Provide a Standardized Premises Registration System and Standardized Animal Identification and Tracking System<br>• Evaluate other Premises Registration and Animal Identification and Tracking Systems developed by States and/or third parties for compliancy<br>• Administer National Premises Information Repository<br>• Administer allocation of AINs and GINs<br>• Administer National Animal Records Repository<br>• Approves AIN Tag Manufacturers and administers the authorization of AIN Tag Managers |

**Table 14**

## II. A. 2. Other Stakeholders

**Producers**

Premises Registration: The owner of the premises, or person designated by the owner of the premises, would register his or her location(s) and would have to keep the required information current. All individuals who own or lease livestock would be responsible for having a PIN for the holding location(s) of their livestock.

Owners with multiple production units and/or holding units would consult with their State/tribe Animal Health Official or Area Veterinarian in Charge (AVIC) to determine if multiple PINs are required.

Animal Identification: The owner of the animal (or lessee of a leased animal) at its current premises would be solely responsible for having each animal or lot of animals properly identified when an event

"triggers" the identification requirement. The method of identification would be species specific. Part III of this document contains species-specific procedures and requirements.

*Animal Movements:* The reporting of animal movements would be the sole responsibility of the receiving premises or person responsible for the animals at the receiving premises. The receiving premises are the premises to which animals are moved and at which a responsible party (not necessarily the buyer) would be responsible for reporting that identified animals have arrived.

**Market Operators**

Market operators would submit a record of each animal or group of animals that enters their facility to the National Animal Records Repository or appropriate State/tribe Animal Identification and Tracking System in accordance with communication standards prescribed in the Technical Supplement. Records would have to be submitted within 24 hours of the animals' departure from the facility or by the close of the next business day.

**Abattoirs - Processing Plants**

Abattoirs, or processing plant operators, would submit a record of each animal or group of animals that entered their facility to the National Animal Records Repository or appropriate State/tribe Animal Identification and Tracking System. The processing plant would submit the data within 24 hours of the animals' slaughter at their facility in accordance with communication standards prescribed in the Technical Supplement.

**AIN Tag Manufacturers**

AIN Tag Manufacturers are companies that would be authorized by USDA/APHIS to manufacture approved identification devices and would be responsible for the overall production of the official identification devices that contain AIN. AIN Tag Manufacturers could also be AIN Tag Managers.

AIN Tag Manufacturers would have to:

- Only produce approved AIN Tags with the AINs that have been allocated to them by USDA/APHIS.

- Demonstrate a functioning computerized system, compatible with NAIS standards, that ensures the uniqueness of the AINs allocated to them;

- Maintain a database of the manufacturer product code for all devices that contain an AIN;

- Furnish official identification devices to AIN Tag Managers and Distributors as prescribed by the policy on official identification devices; and

- Have a means to support the distribution of AIN devices, either by being AIN Tag Managers themselves or through third-party distributors.

**AIN Tag Managers**

AIN Tag Managers are individuals, organizations, or companies that, either directly or working in concert with an AIN Tag Distributor, would provide AIN Tags to a premises that manages or holds livestock. The AIN Tag Manager would have an AIN Tag distribution agreement with an AIN Tag Manufacturer(s). As an authorized AIN Tag Manager, the individual or firm would agree to:

- Validate the PINs of the premises that are to receive AIN Tags

- Submit a record of all AINs provided to a premises to the National Animal Records Repository in accordance with communication standards prescribed in the Technical Supplement

- Educate customers on the proper use of official identification devices

**AIN Tag Distributors**

AIN Tag Distributors would have marketing agreements with AIN Tag Managers. The AIN Tag Distributor would provide AIN Tags to a producer with a valid PIN. Through a documented procedure, The AIN Tag Distributor would have the record of distribution submitted to the National Premises Repository by the AIN Tag Manager with whom the Distributor had entered into a marketing agreement.

**Tagging Sites**

Tagging sites are authorized premises that would receive animals that were not identified with approved tags. Individuals at the tagging site would apply the AIN tags to the animals on behalf of the owners or persons having possession, care, or control of the animals when they are brought to the site. Individuals at the tagging site would have to:

- Obtain AIN Tags from an AIN Tag Manager or Distributor or become AIN Managers themselves;

- Validate the PIN of the premises at which the animals had been located prior to arriving at the tagging site;

- Tag the animals with approved devices prior to commingling the animals with animals from other premises; and

- Report the AIN of the approved tags that are applied to the animals, the date applied, and the PIN of each animal tagged by the close of the next business day, in accordance with communication standards prescribed in the Technical Supplement.

In the event the person responsible for the animals did not have a PIN, the tagging site would record the necessary information on the form provided by the state animal health authority, and submit the information according to the established protocol with the State/tribe.

**Tagging Services**

Tagging services would tag animals at the animals' premises prior to their leaving. Like tagging sites, the tagging service would obtain AIN tags, and when the animals were tagged, would validate the PIN of the premises where the animals were located. The tagging service would report the AINs of each animal tagged at the premises to the National Animal Records Repository, in accordance with communication standards prescribed in the Technical Supplement, within 24 hours or at the close of the next business day.

**Summary**

The chart on the following pages describes responsibilities producers and other stakeholders in the cattle and bison industries would have for NAIS-related activities. Information for goats and sheep, pigs, and horses is currently being developed by those industries.

National Animal Identification System – Draft Program Standards                                           Page 20

| Activity | Cattle/Bison | Goats | Sheep | Pigs | Horses |
|---|---|---|---|---|---|
| Registration of Premises | Owner of premises<br>*Person responsible for cattle on grazing scenarios | | | | |
| Responsible party for the identification of the animals | Owner of animals at current premises (lessee of a leased animal) | | | | |
| When is the animal to be officially identified | When an event triggers the need for official ID<br>Exception: Tagging sites or when a condition of trade | | | | |
| What animals must be identified | All classes and types | | | | |
| Events that "trigger" the requirement of official identification | Change of ownership (even at same premises)<br>Interstate movement<br>Multiple owners commingle their cattle. | | | | |
| ID Method to be used | AIN/RF Tag<br>Left ear<br>ISO 11784/85 | | | | |
| Reporting of Movements – who is responsible | Person responsible for the animals at the receiving premises<br>Markets, processing plants are "receiving" premises<br>Optional reporting for ship-from premises | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Who reports Interstate Movement | Accredited Veterinarian when Interstate Certificate of Veterinary Inspection is required<br><br>Receiving premises uses e-permit system when no health certificate is required | | | | |
| Time frame requirement for reporting movements | Within 24 hours or the close of the next business day | | | | |



## II. B. ILLUSTRATIONS AND EXPLANATIONS OF BASIC PROCESSES

### II. B. 1. Premises Registration

The following flow chart provides an overview of how the premises registration system would be administered.

1. The premises identification data would be administered in a Premises Registration System used by the State/tribe. In some States/reservations, the producer, or agent for the producer, would provide the information. Additionally the State/tribe could "merge" or integrate data from existing databases or use a combination of both methods to obtain the premises information.

2. The Premises Registration System being used by the State/tribe, through a machine-to-machine interface, would pass the address (or land description if no address exists for the premises) to the Premises Number Allocator. The Premises Number Allocator would determine if the address is valid and if the address has previously been allocated a premises ID number.

   When the address is valid and has no premises ID number on record, the Premises Number Allocator would return the next available sequential premises ID number to the Premises Registration System. If a premises ID number is on record for the premises being processed, the Premises Number Allocator would return the premises ID number already on file for that premises. In cases where the premises does not have an address, an exception process would be established to assign a premises ID number to the appropriate locations of the livestock enterprise.

   The Premises Registration System would complete the identification/enrollment process for the premises by collecting data elements required by the National Premises Information Repository (see table 5 above).



*The Standardized Premises Registration System is housed at a single technology center and is operated by USDA/APHIS.*

3. The Premises Registration System would update the National Premises Information Repository according to prescribed update procedures. This would include updates of new and revised premises records daily and monthly "master" updates. The "master" updates would contain all records from each Premises Registration System.

## II. B. 2. Animal Identification and Tracking

**AIN Tag Distribution**

1.  The AIN Manufacturer would access the AIN Allocator through the AIN Management System for a pre-approved volume of AINs or on an "as needed" basis. The system would maintain a record of the numbers and the date the numbers are released to each AIN Tag Manufacturer. AIN Tag Manufacturers would produce AIN tags for their supply distribution chain or would provide the AIN tags to AIN Tag Managers as the tags are ordered.



Note: AIN Tag Manufacturers may also be AIN Tag Managers.

2.  The Premises representative would request AIN tags from an AIN Tag Manager or Reseller and provide that person or entity with their PIN.

3.  The AIN Tag Manager or Reseller, through authorized access to the National Premises Information Repository, would validate the reported PIN of the producer. If the PIN is correct, the AIN Tag Manager or Distributor would provide AIN tags to the producer/premises.

    *Note: AIN tags could only be provided to entities that have a valid PIN.*

4.  The AIN Tag Manager (or Reseller) would report the AINs printed on the AIN Tags to the National Animal Records Repository.

5.  The report of AINs would be shared with the appropriate State/tribe Animal Identification and tracking System.

6.      The AIN tags would be shipped or delivered to the premises (or sold at the retail outlet to the representative of the premises).

**AIN Tag Distribution – Tagging Services**



1.      The tagging site/service would request AIN tags from the AIN Tag Manager or Distributor.

2.      The AIN Tag Manager or Distributor would confirm that the request came from an authorized tagging service and would validate the service's nonproducer participant number.

3.      The AINs provided to the tagging service would be reported to the National Animal Records Repository by the AIN Tag Manager.

4.      The AIN Tags would be provided to the tagging service.

5.      A producer would request tagging services.

6.      The PIN would be validated or established.

7.      After the animals are tagged, the AIN numbers would be reported to the State/tribe Animal Identification and Tracking System or the National Animal Records Repository.

8.      The report of AINs would be shared between the National Animal Records Repository and the appropriate State/tribe Animal Identification and Tracking System.

9.  The record of AINs would be provided to the producer that requested the service.

    *Note: A PIN could be established after tagging the animals in cases where the movement of the animals does not permit the establishment or validation of the PIN prior to tagging.*

**Reporting Animal Movement/Sightings**

Records that provide animal location and movements would be received from various sectors of the industry (producers, animal health officials, service providers, markets, and slaughter plants). Such input would be obtained through the integration of the AIN/Animal Transaction file.



1.  Using standard operating procedures, States/tribes would submit Animal transaction records of events related to animal/herd testing programs, certifying animals for interstate movement, completing electronic Interstate Certificate of Veterinary Inspection, etc. to the National Animal Records Repository

2.  Producers could submit records directly from their farms/ranches to the State/tribe Animal Identification and Tracking System used in their State or region.

3.  Records obtained from other premises would be reported to either the State/tribe Animal Identification and Tracking System, or to the National Animal Records Repository.

4.      Animal location records are submitted to the Animal Records Repository.

5.      Animal records received directly from any premises would be provided to the appropriate State/tribe Animal Identification and Tracking System.

## II. C. IDENTIFICATION AND REPORTING REQUIREMENTS FOR EXPORTED AND IMPORTED ANIMALS

### II. C. 1. Identification and Reporting Requirements for Exportation of Individual Animals

All animals being exported from the United States would be identified with the approved AIN tag for that species prior to being moved from their point-of-origin premises. The AIN, the PIN from where the animal was last received, and the PIN of the export facility would be reported to the National Animal Records Repository. The AIN of the animals being exported and the PIN of the export facility would also be recorded on the U.S. Origin Health Certificate which would accompany the animal(s) to the country of destination. USDA/APHIS port veterinarians would report to the National Animal Records Repository the AINs of the animals being exported, date of export shipment, and validation that the animals have been received at the export destination location.

### II. C. 2. Identification and Reporting Requirements for Importation of Individual Animals

Each animal arriving in the United States would be identified with an official RFID tag of the country of origin bearing the animal's individual number and would be accompanied by a USDA/APHIS-approved International Certificate of Identification, which include a listing of the age and sex of the animal.

**Cattle**

If an animal or groups of cattle do not contain the equivalent or the U.S. AIN/RF tag, the animal(s) would be off-loaded at the U.S. border, or final destination location, and be individually identified with an AIN tag. USDA/APHIS animal health officials or port veterinarians would assume responsibility for reporting to the National Animal Records Repository all official individual numbers of imported cattle with or without RFID tags, including any cross-referenced number on the animals at the time of entry, the date of import, date of tagging with the official AIN tag (if not previously tagged), premises of last destination prior to being imported into the United States, and the destination premises within the United States where the cattle are to be shipped, with subsequent validation that the cattle have been received at their designated U.S. premises.

# PART III. SPECIES-SPECIFIC PROCEDURES AND REQUIREMENTS

This section will provide species-specific information developed by the stakeholders representing each sector of the industry. Currently, the section contains only information pertaining to the cattle industry. Reports on other species are under development. The proposed requirements in this section reflect how the industry, in collaboration with State and Federal animal health authorities, plans to implement certain protocols and technologies in the NAIS. Certain recommendations address issues on which USDA/APHIS has taken a "neutral" position, including animal identification technologies.

## III. A. CATTLE

### III. A. 1 Individual Identification Methods for Cattle

The NAIS Cattle Working Group (CWG) fully endorses the utilization of ISO-compliant radio frequency identification (RFID) eartags as the standard for implementing NAIS in the U.S. cattle industry. The CWG considers RFID eartags to be the most practical technology used today in automating the collection of individual animal identification for cattle. However, the industry remains receptive to other technologies that may prove to be both effective and efficient in either replacing or augmenting RFID eartags.

The official AIN tag with an RFID transponder encased in an eartag that is compliant with ISO 11784 and 11785 would be referred to as the AIN/RF Tag. The 3-digit country code (or manufacture code) and the 12-digit animal number imbedded in the transponder code would also be printed on the AIN/RF Tag.

**Performance Standards for AIN/RF Tags - Cattle**

| Performance Standards for AIN/RF Tags (Cattle) | |
|---|---|
| **Description** | **Performance measurement/requirement** |
| Read Rates and Range (transponder) | |
| In a laboratory with a neutral electromagnetic environment, | 100% read rate in best orientation at 24 inches (60 cm), in a stationary test and a moving test of 1 m/ sec over a passage length of at least 20 inches (50 cm). |
| In a field test environment | Transponders must be reliably machine read without regard to orientation by a standardized dual HDX/FDX reader, as cattle move by in single file in a passage 48 inches (1.2 m) wide with animals moving at 4 mph (1m/sec) at a read rate of 99.5%. |
| Transponder security | The official number encoded within each transponder must not be able to be altered and must be contained within tag. |
| | Tags will be tamper-evident and impossible to unseal without visible evidence of tempering. |
| | The tag is designed for one-time use. The tag design makes it impossible to remove and re-apply the tag securely without damaging the portion containing the transponder. |
| Tag toxicity/animal injury | Tags shall do no harm to animal or affect its health or well-being. |
| | Tags will not cause chemical contamination of meat or edible offal or damage the hide. |
| Tag deterioration | There will be no diffusion of colorant from tags. |
| | There will be no apparent physical deterioration (other than color) due to detrimental effects to UV light, rain, heat (45C) and cold (-30C) or other environmental influences such as chemicals, mud, urine, and manure for |

| | at least 5 years of wear. |
|---|---|
| Tag plasticity | Devices will not split or crack under normal use. |
| Transponder failure rates | The transponder within the tag shall be reliably machine-readable for the expected lifetime of the animal. |
| Tag retention rates | When applied in a manner approved by the manufacturer, the average tag loss shall not exceed 1% per annum under normal field conditions. |
| Tag coupling/tensile strength | Evaluation standards conform to ICAR testing standards and at minimum ISO standards 37 and 527. |
| Tag abrasion resistance | Tag shall not exhibit damage or change due to wear and will be subjected to ICAR testing standards and at minimum ISO standard 9352. |
| Tag applicator devices | A single action applicator that provides minimal risk of pain or distress, that safeguards animal and operator from danger, guards against the spread of disease. |
| Identification device visual characteristics | The tag color shall be white.<br>Print color shall be black, or in contrast to the background color or pattern.<br>Printed information on the tag will require a visible U.S. logo and the AIN.<br>Print size for bovine tags shall be a minimum height of 0.2 inches (5 mm) for numbers, letters, and the official logo.<br>The US Shield shall have a minimum width of 0.2 inches (5 mm).<br>The printing and color contrast of the U.S. Shield, lettering and numbers are to remain readable at a distance of 30 inches (0.75 m) for the expected lifetime of the tag. |
| **Table 35** | |

*Other species reports pending.*

# PART IV – TRANSITIONING TO THE NAIS

## IV. A. TRANSITION OF OFFICIAL ANIMAL NUMBERING SYSTEMS

As noted earlier, the AIN, containing the "840" country code as the first three digits, was recognized for official identification of animals through an interim rule published in the *Federal Register* on November 8, 2004. Through a transitional phase, the following additional types of numbers, which are currently also considered official when imprinted on devices that meet USDA/APHIS official ID tag requirements, would remain so:

> (1) A 15-digit sequence that begins with a 3-digit manufacturer code. Manufacturer codes are assigned by the International Committee for Animal Recording; the current range is 935 to 985. The last 12 digits are unique within the manufacturer code numbering sequence.
>
> Example: 985123456789012
>
> (2) A 15-character alphanumeric sequence that begins with "USA." The last 12 digits are unique within the USA numbering sequence.
>
> Example: USA123456789012

In the long term, however, the AIN, with the "840" prefix, would become the standard for individual animal identification in the NAIS. USDA/APHIS and the States would terminate the distribution of all identification tags with the Uniform State Series number at an agreed-upon future date. Notice of this date would be published in the *Federal Register*.

## IV. B. STATE STATUS DESIGNATION

The NAIS would be implemented in stages. The concept of using stages of progress as a way of measuring national implementation is not new. It is how we measure progress in the brucellosis, tuberculosis, and pseudorabies eradication programs. The NAIS is also envisioned as a cooperative State/Federal/industry program and, therefore, would lend itself to similar tracking.

> *Note: The following is presented as a "concept" for measuring progress toward full implementation of the NAIS through establishing State designations. The five-stage process described below is a transitional one that would be in effect while the NAIS is still being administered on a voluntary basis, prior to full implementation.*

**Stage I:**

Qualifications:

To qualify for Stage I recognition, the State would have to meet the following standards:

1.  A State animal identification committee composed of representatives of major segments of the farm animal industry is formed and functioning. Membership could include, but is not limited to the following stakeholders:

    a.  Major producer organizations;

    b.  Major breed organizations;

    c.  Major marketing organizations;

    d.  Major packer organizations;

    e.  State and Federal animal health agencies and tribal organizations;

    f.  Technology providers (tags, readers, integrators);

    g.  Data service providers; and

    h.  Transportation (trucking industry).

2.  Plans are formulated for a reliable system of determining the number of animals and the number of premises in the State.

3.  State officials and/or industry representatives have, or are actively seeking, legislative and regulatory authority to:

    a.  Participate in the NAIS;

    b.  Require the registration with State or Federal eradication programs of premises where animals reside that are susceptible to known foreign animal diseases or domestic diseases of concern to the State or Federal eradication programs, unless applicable Federal requirements are already in effect; and

    c.  Require identification of animals that move intrastate to a point where they are commingled with other animals.

4.  A system for distribution of NAIS literature to producers and other interested groups is developed and functioning.

5.  Applicable regulations are enforced.

6.  The States will prepare a quarterly report of NAIS activities and submit it to APHIS for tabulation and distribution in a national progress report. Veterinary Services shall issue reports as requested and at least annually to the NAIS Subcommittee of the Secretary's Advisory Committee on Foreign Animal and Poultry Diseases, on progress, operation, and use of Federal funds.

**Stage II: Premises Identification**

Qualifications:

To qualify for Stage II recognition, the State would have to meet the following standards:

1.  All qualifying requirements of Stage I continue to be met.

2.  The State has implemented a premises registration system that is compliant with NAIS data standards.

3.  Thirty-five percent of the qualifying premises in the State are registered with information that is reported to the National Premises Information Repository.

4.  The State has a requirement that registered premises update the contact information at least annually.

**Stage III: Animal Identification**

Qualifications:

To qualify for Stage III recognition, the State would have to meet the following standards:

1.  All qualifying requirements of Stage II continue to be met.

2.  The State has begun to identify nonproducer participants within their State who may qualify as AIN Managers. These entities will need to apply to USDA/APHIS to make certain they meet the strict requirements. USDA/APHIS will make a list of all certified AIN Managers available to the States.

3.  A system to issue AINs to producers has been implemented in the State.

4.    Eighty percent of the qualifying premises in the State are registered with information that is re-ported to the National Premises Information Repository.

5.    Twenty-five percent of the qualifying animals in the State are identified and reported to the Na-tional Animal Identification and Tracking Repository in accordance with the requirements of the NAIS.

**Stage IV: Animal Tracking**

Qualifications

To qualify for Stage IV recognition, the State would have to meet the following standards:

1.    All qualifying requirements of Stage III continue to be met.

2.    The State has begun to implement an animal tracking system that is compliant with NAIS data standards.

3.    Key locations where animals commingle are equipped with the infrastructure to record the infor-mation required by the NAIS and report it to the National Animal Tracking Information Reposi-tory.

4.    Ninety-five percent of the qualifying premises in the State are registered with information that is reported to the National Premises Information Repository.

5.    Sixty percent of the qualifying animals in the State are identified and reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS.

6.    Twenty-five percent of the qualifying animal movements in the State are recorded and reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS.

**Stage V: NAIS Full implementation**

Qualifications:

To qualify for Stage V recognition, the State would have to meet the following standards:

1.    All qualifying requirements of Stage IV continue to be met.

2.    One hundred percent of the qualifying premises in the State are registered with information that is reported to the National Premises Information Repository.

3.    Ninety percent of the qualifying animals in the State are identified and reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS.

4.    Eighty percent of the qualifying animal movements in the State are recorded and reported to the National Animal Tracking Information Repository in accordance with the requirements of the NAIS.

**Duration of status**

Following a 12–14 month assignment for any Stage status by USDA/APHIS, a State would have to (1) indicate that it continues to meet the current Stage requirements, utilizing the same certification proce-dures as followed initially, or (2) certify that it meets the requirements of a subsequent Stage. States fail-ing to recertify as required will automatically lose their current status and revert to the previous stage.

# APPENDIX A – DEFINITIONS

**Animals:**

For the purposes of this document, the term "animals" refers only to those species listed in the Species Codes Definitions in Part II. B.

**Animal Identification Number (AIN):**

Ultimately, the Animal Identification Number will be the sole national numbering system for the official identification of individual animals in the United States. The format contains 15 digits: the first three are the country code (840 for the United States), and the following 12 digits are the animal's national number.

**AIN Allocator:**

The program administered by APHIS that releases and maintains a record of AINs provided to AIN tag manufacturers.

**AIN Tag:**

Official, visual animal identification devices that have an AIN printed on them.

**AIN/RF Tags:**

AIN tags that also contain Radio Frequency Identification (RFID) transponders.

**AIN Tag Distributor:**

A person or entity that distributes and/or takes orders for AIN tags. The distributor has an agreement with an AIN Tag Manager who must report distribution information to the National Animal Records Repository.

**AIN Tag Manager:**

An entity authorized by APHIS to distribute AIN tags to a premises. The AIN Tag Manager agrees to validate the premises number of the receiving operation and report the AINs distributed to that receiving operation to the National Premises Information Repository.

**AIN Tag Manufacturer:**

A company that is authorized by APHIS to receive AINs and produce AIN tags.

**Brand Inspection Entity:**

State brand inspection agencies or other brand inspection organizations authorized by either by a State or the Grain Inspection, Packers and Stockyards Administration (USDA).

**Breeding Stock:**

Sexually intact animals of either sex (except for veal calves and females of any species) moving directly to a terminal feedlot.

**Check Digit:**

A digit contained within a number that provides a test to the validity of that number.

**Compliant Premises Registration System:**

A State, Tribe, or third party premises registration system that meets with NAIS data standards and communication security requirements. APHIS determines compliance or noncompliance.

**Country Code:**

A 3-digit numeric code representing the name of a country in accordance with ISO 3166.

**Electronic Identification (EID):**

An identification method that utilizes electronic technology, including, but not limited to, bar codes, 2-D symbology, and radio frequency.

**Group/Lot Identification Number (GIN):**

The number used to identify a unit of animals of the same species that is managed together throughout the pre-harvest production chain. The GIN consists of a 7-character Premises Identification Number and a 6-digit representation of the date that the group or lot of animals was assembled (MMDDYY).

**Individual Animal Identification:**

A means of identification that differentiates one animal from another. Official individual-animal- identification uses APHIS-approved methodology.

**Identification Methods:**

A means of identifying an animal, including: ear tags, biometrics, brands and brand inspection records, breed registry certificates, etc.

**Interstate Movement:**

Movement that crosses State lines, regardless of ownership, at either shipping or receiving premises.

**Intrastate Movement:**

Movement within a State that does not meet criteria for being interstate commerce.

**ISO**

International Organization for Standardization.

**ISO Transponder:**

An ISO Transponder is a Radio Frequency Identification (RIFD) device that transmits its transponder code according to ISO 11784/11785 when activated by a transceiver. The International Committee on Animal Recording (ICAR) must verify that a transponder is ISO 11784/11785 compliant and also assigns a manufacturer's code to the manufacturer. The manufacturer's code is a 3-digit number that ICAR assigns to a company when their evaluated transponders are deemed ISO 11784/11785 compliant.

**ISO Transceiver (Reader):**

A device that receives and reads radio signals from both ISO FDX-B and ISO HDX transponders as defined in ISO 11784/11785.

**Mandatory Identification:**

A State and/or Federal identification requirements that defines which livestock must be identified according to established protocols.

**National Animal Identification & Tracking:**

The National Animal System of NAIS that contains and coordinates the AIN Allocator, Animal Identification and Tracking Systems, and the National Animal Records Repository.

**National Premises System:**

The National Premises System contains the Premises Number Allocator, the Premises Registration Systems, and the National Premises Information Repository.

**Nonproducer Participant:**

A person or entity who engages in NAIS activity in a designated role/s where that role/s is not associated with a specific premises. Typical roles include USAIN Manager, AIN Distributor, Animal Health Official, Brand Inspection Entity, Diagnostic Laboratory, etc. Nonproducer Participants may provide data to the national identification database.

**Official Identification Devices and Methods:**

Means of officially (approved by the APHIS Administrator) identifying an animal, or group of animals, including, but not limited to: official tags, tattoos, and registered brands when accompanied by a certificate of inspection from a recognized brand inspection authority.

**Officially Identified:**

The moment when an official identification number is applied to an animal by means of an identification method or device approved by the APHIS Administrator for purposes related to official disease control programs or animal movements in interstate or international commerce.

**Official Animal Identification Number Systems:**

Currently, there are three official numbering systems; the three National Uniform Ear Tagging System, AIN, and the premises-based system that combines an official PIN with a producer's livestock production numbering system.

**Premises:**

A physical location that represents a unique and describable geographic entity where activity affecting the health and/or traceability of animals may occur. The State Animal Health Official or Area Veterinarian in Charge (and when appropriate, in conjunction with the affected producer) determines what is a premises.

**Premises Identification Number (PIN):**

An official, 7-character identification code assigned to a premises; the final PIN digit is a check digit

**Premises Identification of Individual Animals:**

The method of identification in which an official identification device (bearing the last PIN and thus, associating the animal to its last location) is attached to the animal prior to movement.

**Premises Number Allocator:**

The APHIS computer program that assigns PINs to a specific location through interfaces with Standardized or Compliant Premises Registration Systems.

**Radio Frequency Identification (RFID):**

An identification device that utilizes radio frequency technology. The RFID device includes ear tags, bolus, implants (injections), and Tag attachments (transponders that work in concert with ear tags).

**Standardized Premises Registration System:**

The Premises Registration System that APHIS makes available to all States and tribes.

**Terminal Feedlot (Designated Feedlot):**

A livestock feeding operation where all animals, upon exit of the operation, move directly to a slaughter plant.

**Transponder code:**

The code programmed into a transponder as defined in ISO 11784 and ISO 11785.

**Mary-Louise Zanoni**
P.O. Box 501
Canton, New York 13617
315-347-1100
mlz@slic.com

**Bar Admissions**   New York, 1988; New Jersey, 1989; also admitted to the United States Supreme Court, Court of Appeals for the Third Circuit, Southern and Eastern Districts of New York, District of New Jersey

**Education**

> **J.D., Yale Law School**, 1987
> **Ph.D., Cornell University**, Field of Medieval Studies, 1982
> **M.A., Boston College**, English literature, 1976
> **B.A., Fordham University**, English, 1972

**Writing Experience**

> **Freelance Writer,** 2005-present.  Articles on agricultural topics such as the USDA's National Animal Identification System and avian influenza have appeared in such periodicals as Sheep! Magazine, Hobby Farms, and The Milkweed. Regular contributor to The Milkweed since January 2008.

**Legal Experience**

> **Supervising Staff Attorney, United States District Court,** Trenton, New Jersey, 1994-98.  Screened prisoner civil rights complaints and habeas petitions; supervised drafting of opinions by two junior lawyers.  Advised Chief Judge and Board of Judges on implementation of major changes in federal civil rights and habeas law.

> **Criminal Appeals Attorney, Legal Aid Society of New York,** 1993-94.  Pursued appeals to Appellate Division, First and Second Departments, and New York Court of Appeals for indigent clients.

> **Law Clerk, the Honorable Morton I. Greenberg, United States Court of Appeals for the Third Circuit,** 1992-93. Death-penalty habeas, white-collar crime, narcotics, securities law, intellectual property.

> **Law Clerk, the Honorable Mary L. Cooper, United States District Court,** Trenton, New Jersey, 1992 and 1999-2000.  Habeas review of state criminal cases, constitutional law, federal procedure.

> **Law Clerk, the Honorable Alan B. Handler, Supreme Court of New Jersey,** 1990-91.  State and federal constitutional law, attorney ethics, insurance law.

> **Litigation Associate, Cravath, Swaine & Moore,** New York, New York, 1987-89.  Brief writing, research, and trial preparation involving large-scale cases in the areas of intellectual property, mergers and acquisitions, insurance regulation, securities law.

**Teaching Experience**

> **Assistant Professor of English, The University of Texas at Austin,** 1981-84.
> **Teaching Assistant, Cornell University,** Field of Medieval Studies, 1976-78.
> **Teaching Assistant, Boston College,** Department of English, 1974-76.

**Honors and Awards**

> **Semifinalist,** Yale Law School Moot Court Competition, Spring 1987.
> **Director,** Thomas Swan Barristers' Union Trial Competition, Yale Law School, 1986-87.
> **American Fellow,** dissertation-year fellowship sponsored by American Association of University Women, 1980-81.
> **Avalon Fellow,** Cornell University, 1979-80.



www.newfarm.org

# Export-fueled national animal ID program raises many farmer objections

**Costly "mark for the beast" idea fails to address livestock health or meat contamination while adding crushing burdens and risks, campaigning opponents maintain.**

By Maggie Fry-Manross



*Photos courtesy of Walter Jeffries*

**With scrutiny from foreign importers, USDA says "nobody can afford to be left behind."**

In a March 30 press release, the National Cattlemen's Beef Association reported on a speech by USDA Secretary Johanns to 400 cattlemen gathered in Washington, D.C., for the NCBA's spring legislative conference.

The story said Johanns "… emphasized that today the system remains voluntary, and he shares NCBA's desire to achieve participation voluntarily, rather than by government mandate. NCBA policy calls for voluntary, market-driven

**April 13, 2006:** Whether its purpose is to increase meat exports or control disease outbreaks, the proposed National Animal Identification System is ruffling the feathers of livestock producers, large- and small-scale. NAIS is raising questions among farmers regarding their privacy, its costs, the government's real intent, and -- for small-scale farmers and homesteaders -- their eventual right to raise livestock at all.

The United States Department of Agriculture Animal and Plant Health Inspection Service (USDA APHIS) web site (www.aphis.usda.gov) describes NAIS as a quick way to identify sick or at-risk animals during a disease outbreak. "The goal of the National Animal Identification System (NAIS) is to be able to identify all animals and premises that have had contact with a foreign or domestic animal disease of concern within 48 hours after discovery. As an information system that provides for rapid tracing of infected and exposed animals during an outbreak situation, the NAIS will help limit the scope of such outbreaks and ensure that they are contained and eradicated as quickly as possible."

The system has three phases: registration of premises, registration of animals linked to a specific registered place

*Despite resistance from both small- and large-scale producers, the goal is to have 40 million new animals per year tagged in 2009, the USDA says, with 1 million animals tagged during 2006.*

participation by producers in an industry-led animal movement database that protects their confidential information.

"'Our hope, which I think is the same as yours, is to bring the system along and hit the benchmarks on a voluntary basis,' Johanns said. 'But I just think it's going to be absolutely necessary. Because of the retail market and foreign competition, nobody can afford to be left behind.'"

### NAIS misses food safety issues

"The reality is that virtually all food contamination happens after the farm, when the animals are slaughtered at the processing plant or later. NAIS does nothing for that. The best protections would be for the USDA to do its job of properly inspecting processing plants rather than making up complex and costly new regulations that will be impossible to enforce."

– Walter Jeffries, in a brochure from NoNAIS.org

### NAIS resources, pro and con

USDA APHIS web site outlines NAIS proposal http://animalid.aphis.usda.gov/nais/index.shtml

Walter Jeffries' personal site -- extensive NAIS links, websites, blogs, national news items: www.nonais.org

Mary Zanoni
Farm for Life™
mlz@slic.com
(315)386-3199

Debbie Davis – Farm &

number, then animal tracking. The first phase involves landowners filling out a questionnaire about the location of their land and what type of animals they are raising there. At present, this phase of NAIS is voluntary, but the USDA timeline for the program calls for 100 percent premises registration by the end of 2008.

### You start with a number

Each premises will be assigned a unique, seven-character identifying number. The animals raised there will be assigned numbers, as well, although large-scale facilities will be able to use a group identification number for a flock or herd that is acquired as a group instead of having individual numbers for each animal. Small farmers and homesteaders tend to acquire animals at different times and this option will not be available to them.

"It's the same information as is in the phone book," said Dore Mobley, APHIS public affairs specialist, of the premises sign-up. "At present it's voluntary, but Wisconsin has gone mandatory, Indiana is in the process, and Texas is talking about it."

The second phase – apparently already begun -- involves tagging animals with a Radio Frequency Identification Device (RFID). "At present, the only species with an approved ID device are cattle and bison," Mobley said. There are working groups in place to recommend ID devices for other species such as sheep, goats, pigs, horses, and poultry. The goal is to have 40 million new animals per year tagged in 2009, the USDA says, with 1 million animals tagged during 2006.

Animal owners will be required to tag every animal that leaves an identified premises. Every time an animal is sent to auction, to the slaughter house, to a fair or taken on a trail ride, the government wants to be informed. Fines of up to $1,000 per day are built into the proposal for non-compliance. Cost estimates by APHIS run to as much as $3 for each RFID device and up to $2,000 for readers. There will be additional costs (read taxes or fees) to administer the program.

### Local customers happy without tracking

Texas beef producer Debbie Davis objects to NAIS as an invasion of privacy. Davis is a member of the recently-formed Farm and Ranch Alliance, a non-profit lobbying group founded to oppose NAIS. "I market my product locally," Davis said. "I diligently keep records including approximate calving dates, sires, dams, which pasture they were in at any given time throughout their life, vaccinations, and any medical treatments of every one of my animals. I can source verify for quality control and peace of mind for my customers--with whom I have contact.

"I have no need to export my product and therefore no need for government intervention into my record-keeping," Davis said. "My property is my own, not the business of the prying eyes of Big Brother wanting to know how many animals I own, where they are and how much land I manage. The way I see it, NAIS is money-driven, having little impact on practical control of disease and is an unconstitutional infringement on my privacy."

Mary Zanoni, of Canton, New York, is a founder and executive director of Farm for Life. The group's intent was to help small-scale producers wade through the ever-growing quagmire of

Ranch Freedom Alliance
debwd@dwdlong
horns. com
(830) 562-BEEF (2333)

National Pork Producers
Council (NPPC)
www.nppc.org

Interactive map for state
premises ID programs
www.nppc.org/hot_topics/
premidstatesites2.html

National Cattlemen's Beef
Association
www.beefusa.org

National Institute of Animal
Agriculture (NIAA)
Animal Identification and
Information Systems
Committee
Vet & industry groups, Farm
Bureau, state agencies,
university departments:
http://animalagriculture.
org/aboutNIAA/committees/
AIDIS/animalid.asp

### National sustainable ag coalition wants COOL; small farmer relief

Asked for an assessment of sentiment by the many partnering organizations of the National Campaign for Sustainable Agriculture (www.sustainable agriculture.net) , NCSA policy coordinator Pam Browning told NewFarm.org:

"For years, the National Campaign for Sustainable Agriculture has advocated for the implementation of Country of Origin Labeling (COOL), so that consumers could make meaningful choices in the food that they eat. Though this program was authorized in the 2002 Farm Bill, corporate agriculture has successfully lobbied to thwart implementation of COOL with regard to meat, fruit and vegetables on the grounds that it would be too costly to

government regulations. "Farm for Life was founded … to produce educational materials for people who want to sell directly to customers from their farm," Zanoni said. "But we haven't gotten to do that yet! About the time we were starting up, NAIS came along and people wanted to hear about that."

Then there's Vermont hog farmer turned NAIS e-activist, Walter Jeffries. He said NAIS began as a plan to increase international meat exports, especially to Japan, which requires that the movements of cattle be physically traceable. The plan's rationale shifted to disease prevention in 2003 when a case of Bovine Spongiform Encephalopathy (BSE or Mad Cow Disease) was found in the U.S.

### Animal-ID industry dream

"NAIS was originally motivated by the large cattle producers' and meat exporters' desire to sell to markets like Japan that require traceback," Jeffries said. "The RFID tag and tracking companies drooled at such a large market and backed the plan out of greed. They stand to sell 12 billion tags a year to a mandatory captive market. At a minimum of $3 each, this represents tens of billions of dollars in annual sales for them."

Jeffries disputes the stated goal of NAIS, which is rapid response to disease outbreaks. "The Ag Department is doing everything but the right thing," Jeffries said. "They claim they need premises ID so that they will know where all the poultry is in the event of Avian Influenza (H5N1) so that they can kill it." According to Jeffries, NAIS would give the USDA the power to destroy any susceptible livestock within 10 kilometers of a disease outbreak.

He stumbled upon NAIS by accident two years ago when he was looking for information on applying for a sustainable ag grant. Appalled by the implications of NAIS for small-scale producers, he began a letter writing campaign, but no one responded. After repeated tries, he launched the website NoNAIS.org in October of 2006.

Jeffries sees clear danger from NAIS, if it works as proposed and if it goes only slightly wrong. "In addition to sheep and poultry we breed pastured pigs. We sell both piglets and full-sized market pigs. If NAIS goes through, we will stop selling piglets because it's too expensive and too much of a risk for us," he explained."Under the government's NAIS plan, if a



Many farmers worry NAIS will make it harder, if not impossible, to sell breeding stock due to expense and increased risk.

piglet left our farm and contracted a disease somewhere else, the government could easily mistakenly trace-back to our farm. They could then come to our farm and kill all of our breeding stock and other animals without testing, a warrant, or any form of legal appeal. This is a violation of our Constitutional rights."

implement.

"Now, without supporting COOL, USDA is moving toward mandatory animal ID with agri-business' blessing. There should be no animal ID without COOL.

"What we are hearing from around the country is that the weight of this animal tracking program falls most heavily on small farmers and ranchers because they would be required to ID all of their animals individually, while large farmers and ranchers can use one ID number per animal group.

"And yet, pastured animals raised sustainably without the conditions of confinement present in factory farming are less likely to be susceptible to the diseases that animal ID was designed to track.

"The burden and cost of implementing this program should not fall on small farmers and ranchers.

"Opposition also is unified against privatization of animal ID, with the feeling that this program could easily be exploited for financial gain."

**editor's NOTE:**

Be alert when using Internet search engines that you are finding the NAIS you want. The acronym can represent the National Association of Independent Schools or, more likely, the NASA Acquisition Internet Service.

## No help against food-borne pathogens

Jeffries and Zanoni point out that food-borne disease poses a much more common and serious threat to the human population that NAIS does not even address. Disease prevention will come from better import controls, more-thorough facilities inspections and incentives for agricultural methods that stress biodiversity and access to natural pasture.

NAIS will be especially costly to small-scale livestock producers, because their profit margins are already small. "NAIS would make it more expensive to raise food for my own family by approximately $500 per year," Jeffries said. "This amounts to a hidden tax on our food. With NAIS there are annual fees, costs for tags, threats of high fines if we make a mistake, and NAIS is such a complex system that it is guaranteed a lot of people will make innocent mistakes.

"The big factory farms get to use group animal IDs, because they do everything all-in and all-out at the same time, as a flock or herd. "Homesteaders and small farmers have mixed-age animals which means we would be required to tag, record, report and track every single, individual animal. This puts small farms at even more of a disadvantage and favors the big factory farms since they can keep their costs and effort low," Jeffries said.

Zanoni says strict Christian groups which insist on a literal reading of Revelations 13 will refuse to place what they feel could be a "Mark of the Beast" on their animals. A different and significant religious issue is with the use of the technology per se. One Amish spokesman stated publicly at a local NAIS local meeting in Wisconsin that electronic animal identification is forbidden for their use. This could be a problem without some flexibility, which is not currently being considered. "There is no opt out," said APHIS's Mobley. "Animals are to be tagged before leaving the premises. Perhaps the Amish could have an intermediary."

## Great for exporters, no benefit for local sales

As a program for large-scale producers interested in export markets, mandatory participation in NAIS may make sense, but it could spell the end for many small producers. "NAIS should be kept as a strictly voluntary program," Jeffries said. "NAIS is not about disease. It is about profits for the big meat-exporting companies and the RFID tag manufacturers. States love it, because once NAIS becomes mandatory, they will charge a $10 or more premises ID fee per year.

"If you raise your own food, you end up paying a tax to do so," he stated. "This burden will fall most heavily on the rural poor who least can afford to pay it."

NAIS could also do serious damage to the local foods movement that is spreading across the country. Local foods proponents stress buying directly from small producers to save family farms and to provide consumers with fresh, wholesome food that is not trucked thousands of miles.

Tim Bowser is a local foods entrepreneur and former executive director of the FoodRoutes Network (www.foodroutes.org), a group which assists efforts to rebuild local, community-based food systems.

"I believe that the proposed National Animal Identification Program is an absolute joke as a solution to the problem of livestock disease outbreaks and a very significant threat to local food systems," Bowser said. "It will hurt most the very livestock and poultry producers who are the solution to diseases associated with CAFOs [factory farms] -- those appropriately scaled producers that serve direct farmer-to-consumer markets, especially organic and pasture-based meat, poultry, and dairy operations."

### Big pork, beef cite cost to farmers

Ironically, the solution to the NAIS problem may come from the very people who started it: the large meat producers. During testimony to the U.S. House of Representatives Subcommittee on Livestock and Horticulture Committee on Agriculture, Joy Phillippi, current president of the National Pork Producers Council, testified that pork producers are willing to go along with NAIS as long as it doesn't involve any increase in costs to the producers. "The pork industry supports an effective swine database, accessible by both federal and state animal health officials, without producers having to pay additional costs over and above that which they already pay today."



drawing courtesy of Holly Jeffries

"You want him tagged... You do it!"

In an APHIS Fact Sheet titled National Animal Identification System: Goal and Vision, dated January, 2005, APHIS states that, "Both public and private funding will be required for the NAIS to become fully operational." Private funding means out of the producers' pockets, both large and small.

In the cattle camp, an article by Joe Roybal in the on-line newsletter BEEF reported that beef producers were more concerned about the costs of implementing NAIS than they were about the possible privacy issues. "A mid-October survey of 16,223 readers found 21.2 percent consider data confidentiality their biggest single concern with NAIS," Roybal wrote. "More concerning was the cost and labor requirements of NAIS for producers (48.3 percent). Coming in third was the potential for producer liability under NAIS."

NAIS isn't a done deal yet. On his web site, Jeffries gives detailed instructions for fighting NAIS, including sample letters and contact information for legislators. "The comment periods are still open,"

Jeffries said. "The USDA needs to know, in no uncertain terms, that people are not going to stand still for this sort of treatment. Big business should not be able to take over every aspect of our lives and profit from everything. Individual independence and freedom are more important to maintaining our national security than profits." **NF**

**Maggie Fry-Manross** is a free-lance writer and homesteader who lives in northwestern Pennsylvania. Her family raises (as yet unregistered) poultry, goats, hogs and way too many cats.

All material © 2007, The Rodale Institute®

tal Stewarasmp

The award is in its 14th year and is sponsored by .the Dow •

ttcuveTUicnrnir——

(Turn toPageA34)

*Lancaster Farming* 9/25/04 p. A1

# *Pa. A Step Closer To Premise ID Program*

p. A1

"Oct. icing ! un- 6r in rania 3 for r the *ilk in* lo-till cool, fyear , de- jrms; ;ilage Jews; wing sndar meet-

### CHARLENE M. SHUPP ESPENSHADE
*Lancaster Farming Staff*

HARRISBURG (Dauphin Co.) — When the "cow that stole Christmas" made an appearance in Washington State with BSE last December, the issue of animal identification moved from the drawing board and onto the fast track.

>4/

Forcing the issue further was the delays in traceback and traceforward of the movement of this cow.

Pennsylvania is close to activating its consolidated animal record database, Pennsylvania Herds.

Last week at the Pennsylvania Pork Producers Council meeting,

(Turn toPageA31)



The Me Dave Me l 100 head grazing p buffers, a erodible l

Lancaster Farming, Saturday, September 25, 2004 - A31

# Premise ID Program

(Continued from Page A1)

Ron Miller, Pennsylvania Department of Agriculture Bureau of Animal Health, spoke about the project and the national animal identification program as it relates to the swine industry.

According to Miller, the goal of the national animal identification plan is to have traceback and traceforward of an animal be accomplished in 48 hours.

"Before we got into animal identification, we had 22 databases within the bureau that did not talk to one another," said Miller.

Pennsylvania Herds is the end-result that includes a consolidated database, which will help reduce the multiple data entry and improve service to producers. It is also designed to work with regulatory disease programs and the national premise identification numbers.

By consolidating the animal databases, Miller hopes the bureau will more effectively handle a disease outbreak such as pseudorabies. With the new system in place, the department will be able to evaluate and pinpoint farms near an outbreak and view their testing histories.

"Disease control is what we are worried about — tracebacks and traceforwards," said Miller.

Pennsylvania Herds is within weeks of being ready, Miller said that the department is waiting to receive premise identification numbers from USDA to issue to farms.

The premise ID will be a seven-digit alphanumeric numbers that are issued by USDA. There will not be any Pennsylvania specific numbers.

"Your neighbor and you might have numbers that are thousands apart," said Miller. "That is so there are no duplications."

The Bureau of Animal Health will register farms that have participated in a disease regulatory program. For other farms, they plan to have both a Web-based

and paper-based registration program to sign up.

The premise ID numbers will be "any premise, it won't just be farms. It will be farms, auction barns, buying stations, slaughter facilities, fairs, and exhibitions. Every place will have a premise number that food-producing animals move through at any place and time," said Miller.

To address confidentiality issues of premise identification and animal identification, right now, information used to begin a national animal identification program is confidential because the programs are voluntary.

As USDA is moving toward a mandatory program, work has begun to secure legislation at the state and federal level to ensure farms are protected and farm information remains private.

Miller said the privacy issue is critical to farms to protect them from people or organizations that might want to harm an operation. The plans are to secure farm information exemption from the Freedom of Information Act as a homeland security/ biosecurity issue.

Listening sessions sponsored by USDA have been completed

for feedback on the proposed national proposed animal identification program. While the official comment period is over, the meeting's take-home message was this: Pennsylvania's swine producers need to make sure the final identification program is usable.

For each livestock species, a task force of industry stakeholders has met extensively to develop an animal ID system that would not overburden the farmer and meet the identification requirements.

The proposed swine animal identification program will be based on groups or lots.

For static groups of "all-in-all-out" or premise-based dynamic groups, the goal is to identify the pigs as a group.

The group will be formed on the date they arrive on the farm and remain intact for the entire group life. For pigs that will leave group early, they will need to be individually tagged.

The group/ lot ID number will contain the National Premises ID of the location where the group was established and a six-digit numerical number reflecting the date the group was created.

Under the

dition to
required
fields
Group/L
ID, prod
tion rec
will be nece



**GT**

# York Fair Posts

proposed
plan, in ad-

sary for utilization of Group/Lot ID. These records must be kept at the local level for two years after group retirement or "end group." The production records must meet the necessary requirements to internally track all group pig movements and those records must be readily available to USDA if a significant animal health event occurs.

The following production information is required to utilize Group/Lot ID:

• Animal additions: source group/lot ID(s) or source premise(s), date entered, and number of head.

• Removals: removal date, removal type (sales, transfers, death)

• Destination: group/lot ID(s), premise(s)

• Inventory reconciliation.

Operations that have group-identified animals that enter concentration points — where commingling with other animals outside the farm happens — will need to individually identify the swine.

Producers at the meeting expressed concerns on the workload the record-keeping could have on their operations. Miller noted that now is the time to make sure that the task force hears their opinions.

Farmers can comment on the United States Animal Identification Plan (USAIP) Website http://www.usaip.info. The proposed plan for swine and other livestock species is also available for review.

## Cooperative Agreements for Implementation of the National Animal Identification System (NAIS)

**United States Department of Agriculture (USDA)**
**Animal and Plant Health Inspection Service (APHIS)**
**Veterinary Services (VS)**

**Announcement Type**: Initial Announcement

**Catalog of Federal Domestic Assistance Number**: 10.025, Plant and Animal Disease, Pest Control, and Animal Care

**Dates**: Applications must be received by December 18, 2006

**Funding Opportunity Description:** USDA initiated implementation of the NAIS in 2004. The Department's first priority with the initial funding in FY2004 was to have the components of the national premises registration system in place in every State by July 2005. With this accomplished, the next step was to use FY2005 funds to increase the number of registered eligible premises in each State. As of November 2006, over 327,000 premises have been registered nationwide, or just under twenty-three percent of the estimated number eligible[1].

Funding for FY2007 will be provided to State and Native American Tribal governments to support the continued implementation and maintenance of the national premises identification system and NAIS implementation within their respective areas. NAIS remains an industry-State-Federal partnership. In response to stakeholder input, on October 31, 2006, USDA unveiled a renewed, uniform educational message for all individuals, businesses, and organizations that focuses on the benefit of NAIS to producers. Applications for cooperative agreement funding must include an aggressive plan for education and outreach, including effective use of existing outreach resources such as cooperative extension, State Area Veterinarian in Charge (AVIC) offices, and State industry organizations, to stakeholders at all levels within the State or Tribe.

Approved applications for funding will be administered as a performance-oriented, base-plus cooperative agreement. Applications must present well-defined measurable outcomes and total allocation of funding will be dependent upon achieving projected results with a mid-year assessment.

This funding opportunity does NOT include funds for conducting pilot projects to develop solutions for animal identification and/or collecting animal movement data. Similarly, funds are not to be used for the purchase of animal identification devices or the development, support, or maintenance of animal tracking databases. Animal movement tracking will be developed, implemented, and funded within the private and/or State/Tribal sector.

States/Tribes/Territories must contribute premises registration data to the National Premises Information Repository (NPIR) to be eligible for FY2007 NAIS Implementation Cooperative Agreement funding. The work plan must describe in detail the resources needed, training required, if any, and timelines for achieving measurable outcomes.

---

[1] Based upon USDA National Agricultural Statistics Service (NASS) 2002 Census data adjusted for duplication of premises estimates by species.

**Total Amount to be Awarded**: $14,454,000

**Plans to be Awarded**: Approximately 80 Cooperative Agreements

**Eligibility**:    State Governments
Federally recognized Native American Tribal governments

**Cost Sharing**:  20 percent cost sharing is required for all applicants unless the work plan describes in detail a plan for purchase and distribution within this funding period of NAIS-approved official animal identification tags/devices with non-NAIS implementation cooperative agreement funds.   For applicants that wish to purchase NAIS-approved official animal identification tags/devices, the amount of the 20 percent cost sharing requirement will be reduced by the amount of the purchase.  Applicants must include the proposed amount of purchase within the original work plan and budget submission.  Applicants must also furnish documentation of the purchase of the NAIS-approved official animal identification tags/devices by submission of the first quarterly report.  If documentation is not provided, the work plan and budget will need to be revised to reflect the 20 percent cost share requirement.

**Application and Submission:** A State or Tribal government may submit only one application and/or be a third party in an application submitted by another State or Tribal government.

Applicants can apply through the Grants.gov Web site or submit paper applications to the address at the end of this announcement.

# Table of Contents

I.    Funding Opportunity Description.................................................................. 4
      A. Background.................................................................................... 4
      B. USDA Approach ............................................................................ 4
      C. Project Criteria ............................................................................ 11

II.   Award Information............................................................................... 12

III.  APHIS Role ...................................................................................... 13

IV.   Eligibility Information........................................................................ 13
      A. Eligible Applicants:........................................................................ 13
      B. Cost Sharing or Matching ................................................................. 13
      C. Other Eligibility Criteria ................................................................. 13

V.    Application and Submission Information ..................................................... 14
      A. Address to Request Application Package ............................................... 14
      B. Content and Form of Application Submission.......................................... 15

VI.   Submission Dates and Times:................................................................. 21

VII.  Intergovernmental Review..................................................................... 21

VIII. Funding Restrictions ........................................................................... 21

IX.   Other Submission Requirements............................................................... 22

X.    Application Review Information .............................................................. 23
      A. Criteria ...................................................................................... 23
      B. Review and Selection Process............................................................ 23

XI.   Award Administration Information ........................................................... 24
      A. Award Notice................................................................................ 24
      B. Administrative and National Policy Requirements..................................... 24

XII.  Reporting.......................................................................................... 24

XIII. Agency Contacts................................................................................ 24

XIV.  Other Information ............................................................................... 25

XV.   Appendix A: Accomplishment Report Summary Format .................................. 26

XVI.  Appendix B: Reserved Allocations to States .............................................. 27

XVII. Appendix C: Reserved Allocations to Tribes .............................................. 28

## I.    Funding Opportunity Description

### A.  Background

Increased media exposure of animal disease outbreaks around the world over the past decade has intensified the public interest in developing a national animal identification system for safeguarding animal health in the United States. Some populations of certain species have been required to be officially identified as part of cooperative State-Federal program disease eradication and control activities over the past several years. In addition, some significant regional voluntary and mandatory animal identification programs are in place. However, there is currently no mandatory, uniform national animal identification system in the United States.

Fundamental to controlling any disease threat to the Nation's animal resources is to have a system that can identify the following: individual animals or groups of animals, the premises where they are located, and the date of entry to each premises. Further, in order to achieve optimal success in controlling or eradicating an animal health threat, the timely retrieval of this information and implementation of intervention strategies after confirmation of a disease outbreak is necessary.

USDA, therefore, initiated implementation of the NAIS in 2004. In late 2004, Federal funds were provided on a competitive basis to State and Tribal governments to implement the national premises registration system component of the NAIS, and to conduct field trials or research into certain areas of interest in the proposed system. Subsequently, all States were provided access to Federal funds to begin NAIS implementation.

Implementation of the NAIS continued to progress in 2005 when funds were dispersed to States enabling them to implement the essential components of the national premises registration system by July 2005. This important milestone was achieved by the target date and allowed producers across the entire country to begin participation in the NAIS by registering livestock premises in their respective States.

Funding for 2007 will continue focus on increasing the number of registered premises, the foundation component of the NAIS. Significant emphasis will be placed on providing sufficient education and outreach to make sure all producers and stakeholders in States and Tribes receive the uniform NAIS message outlined by USDA on October 31, 2006. State/Tribe animal identification coordinating/advising committees, initiated as a requirement for cooperative agreement funding in FY2006, will be a requirement for Federal funding in FY2007.

### B.  USDA Approach

Safeguarding the health of the nation's herds and flocks is dependent upon a functional, uniform National Animal Identification System. Essential for implementation is a system that is practical for producers and all others involved in production and animal disease surveillance. NAIS is voluntary and presents the opportunity for producers and stakeholders to obtain experience with the system and provide feedback as successful and practical solutions evolve. As a voluntary effort, full implementation of the NAIS will be achieved as a phased-in plan, emphasizing premises registration as the foundation of the system. Additional progress in implementation of the animal identification component and the animal movement reporting component will be made according to the needs of producers. States, however, may choose to direct implementation of the NAIS within their jurisdiction according to their own dictates.

FY2007 marks the fourth year of Federal funding support for implementation of the NAIS. Significant variation currently exists among States and Tribes with regard to percent of premises

registered. In order to most effectively use Federal funds to continue implementation of the NAIS, a performance-oriented, base-plus system will be used to administer the FY2007 NAIS cooperative agreement. All States will have access to the full reserved amount identified for each State (Appendix B); however, certain States, based upon percent premises registration to date (using 2002 National Agricultural Statistics Service premises estimates adjusted for duplication of premises by species type), will be provided only 90% of the full reserved amount at the beginning of the funding period that can be used in planning for the entire 12 months of the funding period. Depending upon successful achievement of measurable outcomes proposed in the initial work plan as determined by the Authorized Departmental Officer's Designated Representative (ADODR) as of June 15, 2007, the remaining 10%, or appropriate portion of the remaining 10%, of the reserved amount may be allocated to the State for the remaining six months of the funding period. This will be accomplished by a Revision to the Notice of Award and submission of a revised SF-424 and SF-424A, reflecting the amount of the increases only. (It is anticipated that for FY2008, the base plus percentage will be 80%-20% and based upon updated NAIS implementation goals and achievements.)

Premises registration remains a priority for use of FY2007 NAIS Implementation Cooperative Agreement funding. All States/Tribes/Territories must include an aggressive and comprehensive plan for outreach and education in support of premises registration to stakeholders at all levels within the State, Tribe, or Territory in the proposed work plan. The plan must include documentation of a functional NAIS coordination advisory group/committee/organization including established outreach resources in the State or Tribe such as State/Tribe species organizations representatives, non-affiliated producer representative(s), AVIC representative(s), State/Tribe/Territory animal health representatives, State and/or Federal animal identification coordinator(s), and cooperative extension specialists that are representative of the stakeholders in the State or Tribe. The plan must also include assigned function(s) of the group/committee/organization and frequency of planned meetings. The work plan must describe how the USDA NAIS updated outreach messages and plan as of October 31, 2006 (http://animalid.aphis.usda.gov/nais/index.shtml in the "browse by subject" section) will be implemented and used regarding the outreach effort. The work plan must also include specific goals of achievement (measurable outcomes) regarding premises registration efforts. In addition to projected numbers of premises registered, performance measures may also be included to document effort and productivity such as number of meetings conducted; number of producers/owners contacted; outcomes associated with animal identification coordinating committees; outreach materials distributed; mass mailing results; cooperative extension programming outcomes, including NAIS funded and unfunded cooperative extension efforts; and use of promotional incentives to register premises. Measurable outcome(s) for FY2007 NAIS Implementation Cooperative Agreement funding, including premises registration, among others, is/are to be emphasized over measurable outputs (what was accomplished is to be prioritized over what was done and documented in quarterly and final reports).

Federal fund will be approved through FY2007 NAIS Implementation Cooperative Agreements to States/Tribes/Territories to maintain capacity to interface with the national premises number allocator and data resources. Funds may be used for staff resources needed to support the administration of premises identification systems. States/Tribes who have already achieved registration of a significant portion of eligible premises may also request funding for administration of animal identification numbers (AIN) in the system, but will not be approved to develop, maintain, or purchase any system or database used to record the shipment record associating AINs with a premises identification number (PIN)

Since States vary greatly relative to percent of premises registration, use of FY2007 NAIS Implementation Cooperative Agreement funding may be more appropriately used by States with higher percent premises registered to support other components of the NAIS for implementation purposes. For FY2007 NAIS Implementation Cooperative Agreement funding, allowable expenditures will include support for animal movement infrastructure that facilitates collection of animal movement data, but does not report the collected data to a State or private animal tracking database (ATD). Support for animal movement infrastructure will be limited to livestock markets and dealers and for NAIS integration with established State/Federal cooperative animal health programs within a State/Tribe/Territory. It is anticipated that allowances for animal movement infrastructure support may enhance premises registration efforts. Consistent with emphasis on premises registration, however, the amount of the proposed total budget submitted to support animal movement infrastructure must be in accordance with the following:

| NAIS Component | <6% Prem. Registered | 6% - 10% Prem. Registered | 11%-25% Prem. Registered | >25% Prem. Registered |
|---|---|---|---|---|
| Outreach and Premises Registration | 100% | 80% min. | 70% min. | 60% min. |
| Animal Movement Infrastructure | 0% | 20% max. | 30% max. | 40% max. |

Eligible entities or cooperators for receiving animal movement infrastructure support will be limited to livestock markets and dealers. States may also use animal movement infrastructure support for NAIS integration with established State/Federal Cooperative Animal Health Programs. All applicants who wish to utilize FY2007 NAIS Implementation Cooperative Agreement funding for this purpose must submit an accounting of all eligible items listed below under allowable expenditures that were purchased with Federal NAIS funds for the three previous years of funding (FY2004, FY2005, and FY2006), including pilot projects and field trial components or funding, and also must include current status and dispensation. The following descriptions apply:

Livestock Markets and Dealers

- States will be responsible for selecting cooperating livestock markets and dealers in their State and coordinating support, including documentation of performance for required reports. Participating livestock markets and dealers must cost share and provide a minimum of 20 percent of out of pocket costs for data collection equipment, and the Federal contribution through the State would be a maximum of 80 percent of their allowable "animal movement infrastructure funds" per facility. States will determine whether use of the Federal funds would be best distributed to as many markets and dealers as possible, or to optimally assist a targeted few, basing the decision on achieving the greatest impact for NAIS implementation within the State. Markets and dealers would also cover the cost of any retrofitting of their facilities that may be required to accommodate the automated data capture equipment. Participating livestock markets and dealers must be actively promoting NAIS premises registration efforts and their success in acquiring premises registration results must be documented by the State in the proposed work plan and quarterly and

final reports. Allowable device and data collection infrastructure costs are listed below. Software program purchases or costs for livestock market and dealer inventory, management, or accounting purposes cannot be approved as an allowable expense with this cooperative agreement, nor as part of the cost matching requirement.

NAIS Integration with Established State Federal Cooperative Animal Health Programs

- States may use up to 50 percent of their allowable "animal movement infrastructure" funds for further integration of NAIS standards with cooperative State Federal animal health programs by purchasing devices and equipment listed below to support the administration of State/Federal cooperative animal health programs (tuberculosis testing, brucellosis vaccination, etc.) in that State. The work plan must describe how the collection of official animal identification numbers, and premises identification numbers (PINs) consistent with appropriate State/Federal animal health forms, will be accurately and electronically recorded, reported, and transferred to an appropriate federal database, depending upon the specific program. Documenting the amount of data accurately collected and reported to the appropriate federal animal disease program database must be one of the measurable outcomes described in the work plan. In order to provide animal movement infrastructure, States must provide the number of animal health employees; the number of animal health employees that would need access to or use such infrastructure; and the plan for implementing and inventorying appropriate animal movement infrastructure items. Applicants that may wish to use brand inspectors as part of State/Federal cooperative animal health program efforts must document that all necessary non-brand inspector, animal health personnel are supported; and then provide animal movement infrastructure to brand inspector personnel only to the extent that brand inspectors perform State/Federal cooperative animal health functions (if 10% of a brand inspection program is documented as serving a State/Federal cooperative animal health function, then 10% of brand inspection employees would be eligible for support for animal movement infrastructure). If this option is pursued, the work plan must document the specific, intended State/Federal cooperative animal health program(s) to be enhanced; document compatibility and coordination of hardware and software requests in the proposed work plan with the specific State/Federal cooperative animal health program coordinators by attaching a letter (copy of email is acceptable) from the AVIC attesting that the proposed effort is compatible, coordinated, and approved by the specific State/Federal animal health program coordinators; and include the amount of data transferred to federal animal health databases as a measurable outcome. The clear intent must be to enhance the accurate collection and transfer of cooperative State/Federal animal health program information to Federal animal health databases. Applicants must recognize that not all cooperative State/Federal animal health program planning efforts are at the same level of completion or status regarding information technology (IT) functionality. As such, not all cooperative State/Federal animal health program efforts may be eligible for inclusion in this cooperative agreement. It is the responsibility of the applicant, in coordination with the AVIC, to inquire of the selected cooperative State/Federal animal health program coordinator(s) regarding the compatibility of the proposed work plan and use of animal movement data collection infrastructure with the specific program goals and objectives, including hardware and software intraoperability.

Allowable expenditures for support of animal movement infrastructure will only be associated with ISO 11784/11785 Compliant RFID technology. The following are allowable expenditures:

Devices and Data Collection Infrastructure
1. Tag applicators
2. ISO Compliant Automated Data Capture Equipment
   - Handheld and Stationary readers
     Includes:
       ❖ Antennae, reader module, and software for the reading equipment
       ❖ PC for onsite data storage to support communications with Animal Tracking Databases
3. Communication Interfaces
   - Development, testing, and deployment of communication interfaces with an Animal Tracking Database and the AIN Distribution Database

NAIS-approved official animal identification tags/devices cannot be purchased with FY2007 NAIS Implementation Cooperative Agreement funding. States/Tribes/Territories may, however, purchase NAIS-approved official animal identification tags/devices for use in advancing NAIS implementation with non-federal NAIS-implementation monies. Purchased NAIS-approved animal identification tags/devices cannot be used as part of the cost matching requirement. If NAIS-approved official animal identification tags/devices are purchased by States/Tribe/Territories to develop or evaluate animal tracking programs, the amount used cannot be part of the cost matching requirement.

Incentives
    It is anticipated that some States/Tribes/Territories may request Federal funds, or allowance for matching funds, to utilize varying types of incentive efforts to encourage producers to adopt or implement portions of the NAIS. For purposes of these guidelines, "incentive(s)" in this context refers to giveaways, including promotional items. The purpose of incentive(s) is to boost or accelerate premises registration participation within a State/Tribe/Territory.
    USDA/APHIS can use appropriated funds for incentives to promote/increase participation in the NAIS. Incentive costs associated with participation in the NAIS are allowable costs for the purposes of this cooperative agreement.
    The following guidelines regarding incentive(s) should be followed:
   - For FY2007 NAIS activities with increased premises registration as a primary objective, no more than 10 percent of total project funding intended for outreach and education activities, including both base and plus amounts, can be used for incentive purposes. Producers/owners can receive only one incentive per premises registered and States/Tribes/Territories wishing to utilize incentives to increases premises registration must be able to document such.
   - The most important aspect of the workplan or application for funds with regard to premises registration incentive(s) is the applicant's description and justification for the proposed approach. The justification and support should include terms of cost per item, intended use, and measurable outcomes. Maximum allowance for individual items is $12.00 per item.
   - Applicants are limited to making incentives available only to producers/owners who register their premises during the funding period. In anticipation of potential producers/owners voicing concerns regarding registering their premises without receiving an incentive, applicants must describe their intended response.

- In general, applicants must be able to provide evidence that only premises registered by owners/producers within the funding period were provided the incentive once and only once. Each quarterly accomplishment report must contain an accounting of incentive efforts to date if this option is described in the work plan.
- Competitive incentive plan programs designed to reward groups or organizations with "prize" money are not allowed. Allocation of monies for incentive purposes of registering premises are to be aligned solely with registration of a premises.
- Promotional items not intended for use as a specific reward for registering a premises are required to have information imprinted on the item that can direct recipients to further contact information associated with registering a premises in that State/Tribe/Territory.
- Items that are provided as a specific reward only to people who sign up for NAIS premises registration must be identified or associated with the State/Tribe/Territory animal identification effort or the NAIS. This can be an associated thank-you note provided along with the intended item documenting the connection of the reward with registration of a premises. The item itself may be imprinted with the NAIS or State/Tribe/Territory animal identification logo; or the logo can be imprinted on one portion of the item such as a holster associated with a selected tool item; or an attached item imprinted with an appropriate logo such as a "tag" attached to a rope halter. At a minimum, the language or logos must somehow show or detail the Federal-State cooperative effort.

Twenty percent cost sharing[2] is required, demonstrated by the applicant's cash contributions[3], or third-party in-kind contributions[4]. The eligibility of specific items of cost is outlined in OMB Circular A-87 regardless of the origin of the funds.

States that have achieved greater than 25 percent of premises registered (DE, ID, IN, MA, MI, MN, NE, NV, NY, ND, PA, UT, WV and WI) may apply for an amount up to the total reserved amount as listed in Appendix B. Of the reserved amount for these States, a minimum of 60% of the applied funds must be expended on outreach and premises registration activities and up to a maximum of 40% of the applied funds can be directed for animal movement data collection infrastructure support. The amount applied for can be used for the entire funding period without any base-plus approach requiring a mid-year assessment by the ADODR.

States that have less than $82,000 reserved (AK, CT, DE, HI, ME, MD, MA, NV, NH, NJ, RI, and VT) will not be subject to a base-plus administration of funding. They may apply for an amount up to the total reserved amount as listed in Appendix B. The amount applied for can be used for the entire funding period without any base-plus approach requiring a mid-year assessment by the ADODR. They will, however, be subject to the amount of funds required for outreach and premises registration efforts and allowable for animal movement data collection infrastructure support as based upon percent premises registration achieved. DE, MA, and NV must allocate a minimum of 60% of the applied funds on outreach and premises registration

---

[2] As defined by 7 CFR 3016.3 *Cost Sharing or Cost Matching* means the value of the third party in-kind contributions and the portion of the costs of a federally assisted project or program not borne by the Federal Government.

[3] As defined by 7 CFR 3016.3 *Cash Contributions* means the grantee's (recipients) cash outlay, including the outlay of money contributed to the grantee or subgrantee by other public agencies and institution, and private organization and individuals.

[4] As defined by 7 CFR 3016.3 *Third Party in-kind contributions* means property or services which benefit a federally assisted project or program and which are contributed by non-Federal parties without charge to the grantee, or a cost type contractor under the grant agreement.

activities and up to a maximum of 40% of the applied funds can be directed for animal movement data collection infrastructure support. HI, MD, and NJ must allocate a minimum of 70% of the applied funds on outreach and premises registration activities and up to a maximum of 30% of the applied funds can be directed for animal movement data collection infrastructure support. AK and ME must allocate a minimum of 80% of the applied funds on outreach and premises registration activities and up to a maximum of 20% of the applied funds can be directed for animal movement data collection infrastructure support. CT, NH, RI, and VT are restricted in using applied funds only for outreach and premises registration activities.

**The states below are being funded on a base-plus approach. They must submit an SF-424 and SF-424A for the initial 90% of the total funding indicated in Appendix B. The detailed budget that accompanies the workplan should reflect the initial 90% funding with a separate itemized budget for the additional 10%, included as a separate breakout on the same financial plan.**

States that have achieved between 11 percent and 25 percent of premises registered and have greater than $82,000 reserved (AZ, AR, CA, CO, FL, IL, IA, KS, KY, MO, NC, SC, SD, TN, and TX) are subject to a 90 percent base-10 percent plus administration of funding. Only 90 percent of the full reserved amount can be approved for expenditures for the entire duration of the funding period. Any amounts applied for above the 90 percent of the total reserved amount will be approved by the ADODR for use only after assessment of achieving the measurable outcomes stated in the work plan following submission of the second quarterly report prior to July 1, 2007. States that have achieved between 11 percent and 25 percent of premises registered must subject a work plan with a minimum of 70 percent directed to outreach and premises registration efforts and up to a maximum of 30 percent directed to animal movement infrastructure requests.

States that have achieved between 6 percent and 10 percent of premises registered and have more than $82,000 reserved (AL, GA, NM, OR, VA, and WY) are subject to a 90 percent base-10 percent plus administration of funding. Only 90 percent of the full reserved amount can be approved for expenditures for the entire duration of the funding period. Any amounts applied for above the 90 percent of the total reserved amount will be approved by the ADODR for use only after assessment of achieving the measurable outcomes stated in the work plan following submission of the second quarterly report prior to July 1, 2007. States that have achieved between 6 percent and 10 percent of premises registered must subject a work plan with a minimum of 80 percent directed to outreach and premises registration efforts and up to a maximum of 20 percent directed to animal movement infrastructure requests.

States that have achieved less than 6 percent of premises registered and have more than $82,000 reserved (LA, MS, MT, OH, OK, and WA) are subject to a 90 percent base-10 percent plus administration of funding. Only 90 percent of the full reserved amount can be approved for expenditures for the entire duration of the funding period. Any amounts applied for above the 90 percent of the total reserved amount will be approved by the ADODR for use only after assessment of achieving the measurable outcomes stated in the work plan following submission of the second quarterly report prior to July 1, 2007. States that have achieved less than 6 percent of premises registered can only apply for funds to support outreach and premises registration activities.

## C. Project Criteria

The cooperative agreements will support the continued implementation and maintenance of the national premises registration effort within the area the projects are administered. Funds should support premises identification and animal movement data collection infrastructure within the limits described above.

The USDA has established the primary data standards for the NAIS. The integration of these data standards in information systems at the State level is critical and a requirement for these cooperative agreements. USDA will support projects, to the extent possible, that:

- Include a plan for continuing the registration of premises in the State(s), reservations (including the Native American Standardized Premises Registration System), etc., in which the project is based;
- Utilize systems that integrate with and establish the necessary data interfaces with the premises allocator and national premises information repository.
- Contain an outreach program plan for stakeholders based upon the Community Outreach Event materials presented by USDA on October 31, 2006. The outreach program's goal should be for stakeholders to learn more about the identification system and offer a plan to share experiences and feedback from stakeholders with USDA.

Additionally, projects should:

- Have contributing funds, cost-shared (20 percent) by the applicant and/or third party in-kind contributions (as described on Page 2 of this announcement); and
- Involve premises and animal identification of multiple species and in multiple sectors of the industry.

Projects may include:

- An option that provides for the successful integration of premises data from existing databases

Projects must focus on implementation of premises and animal identification methods according to the standards defined in the NAIS Draft Program Standards. This funding opportunity does NOT include funds for conducting research to develop or test potential solutions for animal identification and animal movement data collection.

USDA WILL NOT provide funding for:

- Development of software/system applications/computer programs, including premises registration and animal identification/tracking
- Hardware for state or privately based compliant systems including servers, data storage,
- Maintenance and operational costs of such compliant systems.
- Cleansing of the data (for example, fixing duplicate records) to meet the requirements of premises registration system.
- The interfacing of internal systems. For example, if a state needs to interface their Compliant Premises Registration System (CPRS) with a permitting system, such interface is not supported (pulling records from the CPRS or State Premises Registration

System (SPRS)) to support other State systems. Similarly, the interfaces of other systems (two systems that are independent of the CPRS) are not supported.

USDA WILL provide funding for:

- Establishing the interface of a CPRS with the premises allocator and national premises repository. The NAIS IT Team in Ft Collins will provide the technical specifications and communication protocols that are necessary for this interface, but will provide no programming for a private or State system. The normal time requirement for the coding/developing both interfaces is 3 days (24 hrs) and typically in the neighborhood of $2400.
- The Integration of existing State systems with the SPRS or a CPRS. This "pulling" of data from existing databases that already contain premises related information seems to be a prudent and cost effective method in many cases. States must carefully consider whether this type of data integration to register livestock premises under NAIS would be interpreted as "voluntary" and if this would create any problems for premises registration in the long term.
- Consideration will be given for the development of systems to automate and/or support the collection of data needed for premises registration. Such systems must be developed to allow their integration with all CPRS and SPRS. Under the terms of the cooperative agreements, USDA has the right to use the products developed with the funds provided and to let others use them as well. For this reason, the development of products that are State specific or proprietary in nature are outside the scope of funding.
- Outreach and education including hiring of outside contractors, and demonstration or display items.
- Transportation costs related to NAIS implementation including attendance at national NAIS training and coordination meetings for officially recognized NAIS State/Tribe/Territory administrators/coordinators or their substitutes.
- Equipment necessary for the implementation of NAIS premises registration including, but not limited to, such things as laptop computers, wireless aircards, high speed internet connection for sites where NAIS administrators register premises online a large portion of the time (not private residences), GPS devices, and off-the-shelf mapping software such as Street Atlas USA. Quarterly reports should include the measurable outcomes associated with these equipment purchases.

## II.    Award Information

**A. Total Available Funds**: $14,454,000

**B. Anticipated Number of Awards**:   80

**C. Expected Amounts of Individual Awards:**  Approx. $272,111/State; $12,213/Tribe

**D. Average funding per award in 2006:** $204,077

**E. Anticipated Start Date:** January 1, 2007

**F. Period of Performance**:   To be completed by December 31, 2007

**G. Renewal/Supplemental:**  Applicants who received funding in 2005/2006 to implement the NAIS may apply for funding to continue implementation in 2007.  Applicants who received

funding in 2004 or 2005 to conduct field trials/research associated with NAIS are not eligible to apply to continue funding for those projects under this announcement.

**H. Assistance Instrument:**  Cooperative Agreement

## III.     APHIS Role

APHIS Veterinary Services will administer the Cooperative Agreements and will provide advice to the project administrator, track funding, receive and review progress reports, offer comments and suggestions, and will track project performance.

APHIS personnel will meet with cooperators as often as necessary to ensure progress in accomplishing the goals of the project, identifying obstacles, and resolving concerns.

APHIS will provide the systems for allocating premises and animal identification numbers, the national premises repositories, the standardized premises registration system, and animal identification number management system.

APHIS will work closely with cooperators to develop the necessary interfaces with the national premises allocator and the national animal identification database.

APHIS will provide extensive information regarding NAIS on their Web site and will provide materials to support the outreach efforts of the States and Tribes.

## IV.     Eligibility Information

### A.  Eligible Applicants:

The State Animal Health Authorities and Native American Tribal governments may submit an application. In the event multiple States or Tribes work cooperatively as one project, one person from either a State or Tribe involved in the project must be responsible for the application for and administration of the agreement. This person will be referred to as the Project Administrator and will be the primary contact for the USDA. This person will also be the duly authorized representative who will sign the cooperative agreement application. The Project Administrator must submit an application package and the workplan in the format described in section V.B.

Project Administrators whose projects are considered for funding on an individual basis will be required to complete the application package and workplan for the official award of the cooperative agreement.

Please note funding restrictions in section I.C.  Applications involving a request for funds for a use that is restricted will be returned to the cooperator and will not be eligible for award.  The cooperator must resubmit an application which does not involve a request for funds for restricted use in order to be considered eligible for award.

### B.  Cost Sharing or Matching

USDA requires that projects demonstrate 20 percent contributing funds, cost-shared by the applicant or in-kind contributions, including third-party in-kind contributions.

### C.  Other Eligibility Criteria

An Applicant may submit only one application and/or be a subrecipient or subcontractor in an application submitted by another State or Tribal government.

**V.    Application and Submission Information**

*A.    Address to Request Application Package*

(V.B., "Content and Form of Application Submission" contains the project workplan which outlines the format applicants need to use when applying.  Paper copies of the other required application forms [SF-424, Application for Federal Assistance; SF-424A, Budget Information – Non Construction Programs; SF-424B, Assurances – Non-Construction Programs; SF-LLL Disclosure of Lobbying Activities (required for Federal Assistance greater than $100,000); and Certification Regarding Lobbying can be requested from the following address:

> USDA, APHIS, MRPBS, Agreements Services Center
> Eileen Berke
> 4700 River Road, Unit 55, Station 3B-06.3
> Riverdale, MD  20737

They can also be retrieved from the APHIS website at the following address:
http://www.aphis.usda.gov/mrpbs/forms/grantforms.html

If an applicant chooses to apply through Grants.gov, the SF-424, SF-424A and B, and SF-LLL (required for Federal Assistance greater than $100,000), can be filled out and submitted online.  The work plan format described in V.B, "Content and Form of Application Submission" should then be submitted as an attachment.

*B.    Content and Form of Application Submission*

# National Animal Identification System (NAIS)
# Implementation

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0579-0259. The time required to complete this information collection is estimated to average 20 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

## WORK PLAN FORMAT

**Cover Page**

    Plan Administrator:

    Name of State or Tribal Government:

    Address:

    City, State, Zip:

    Office Phone:

    Cell Phone:

    Fax:

    Email address (Plan Administrator):

    List additional State departments, Tribes, etc. that have confirmed participating in the plan (complete name, address, etc.)

These funds may only be used for the implementation and administration of premises registration in accordance with the NAIS and support of outreach efforts pertaining to all activities that promote the NAIS implementation plan for achieving full participation by 2009. Special field trials and research projects which attempt to address problems or questions about NAIS implementation must be funded through a separate application to the announcement specific for that funding.

**Signature of Plan Administrator:** _____

  **Date:** _____

*Please complete each section explained on the following pages and maintain the format on your application. Section V, "Application and Submission Information" provides more details on the information requested and how it will be used to evaluate applications for funding.*

**Objectives and Need for the Assistance**

This section should include a narrative on how the financial assistance will facilitate the cooperator in carrying out the implementation of the NAIS. Clearly and thoroughly explain the objectives and purpose of the plan. Explain why this work is critical to the successful implementation of the NAIS in your area.

**Results or Benefits Expected**

Identify the results to be accomplished through assistance.
- What do you hope to achieve through this work?
- How will the results of this work be of merit to the overall implementation of NAIS?
- Explain how the applicant and industry will benefit from the work.

**Approach**

This section should discuss the overall plan of action and outline the roles and responsibilities that are mutual, those of the cooperator, and those of APHIS in terms of work to be performed, expected accomplishments by each party, and resources to be contributed by each.

**Outline a Plan of Action**

Provide a brief overview of the work to be performed and how the plan builds upon the 2005 or 2006 cooperative agreement plan. Also, explain how this plan will support the timelines for full implementation of NAIS as outlined in the draft strategic plan.

**Detail work to be accomplished.**

Indicate what components of the NAIS will be addressed within this plan and explain how the components will be implemented through the plan.

Premises Identification (required)
- Explain what system will be used (Standard or Compliant)
- Identify how many and what percent of estimated premises have been registered to date overall and by species
- Plan (logistics) for the registration of premises
- Plan for successful integration of premises data from existing databases (if applicable)
- Explain how this work will support eventual registration of all premises in the area.

Stakeholder Participation
  Please provide a description of the NAIS coordinating group/committee/organization in the State/Tribe listing the names of members and explaining their role/involvement:
  1. Producer, processor/marketing organizations
  2. Government
  3. Academia and/or Extension
  4. Service providers (companies that provide services to producers)
  5. Other
  Please also provide

1. A schedule of when and where the NAIS coordinating group/committee/organization will meet.
2. A plan for preparing agendas, recording minutes, taking attendance, and other administrative duties necessary for the proper functioning of the group/committee/organization.

Industry Focus

1. List the livestock types that will be a significant part of the project. Include an estimated count of the number of eligible premises for each species and an estimated count of the number of eligible animals in each species.

   Beef:          Dairy:          Pigs:          Sheep:
   Other (list):

2. List the sectors of the production/marketing/processing industry involved and explain their involvement. Include an approximate number of eligible premises from each and an approximate number participating from each:

   Producers:          Markets:          Order Buyers:
   Feed Lots:          Transportation:          Packing Plants:
   Other (list):

Communication Plan

1. Explain how this plan supports the outreach efforts of USDA, APHIS.
2. Explain how the industry will gain a better understanding of NAIS.
3. Explain how the communication efforts will be coordinated in the state/region.
4. Explain how this plan will work with key producer contacts to disseminate information (i.e., livestock markets, feed stores, and veterinarians).
5. Explain how you will obtain feedback from stakeholders and share this feedback with USDA, APHIS.

**Describe how each activity is to be accomplished.**

**Describe any unusual features of the plan.**

**Resources Required**

Number and Type of Personnel:

1. Are they currently employed or will employees have to be hired? Identify mechanism to be used to hire any new employees for this plan.
2. Will employees work on this plan full-time or part-time? If part time, list the number of employees working on this plan, the percentage of time each will spend on this plan and the number of full time equivalents for this plan.
3. Identify any other issues surrounding staff resources that may need to be covered.

Note: Personnel involved in data entry, education, etc. are eligible for funding. Personnel involved in software development, computer programming, etc. are not eligible for funding.

Equipment Needed:
1. What equipment will be provided by the cooperator?
2. What equipment will be provided by APHIS?
3. What equipment will be provided through APHIS funds?
4. Identify any major purchase needs and the use of the equipment to be purchased.
5. Identify the method of procurement to be used.
6. Identify the method of disposition of equipment to be used.
Note: Equipment eligible for funding would include PCs for data entry, etc. Equipment such as servers, data storage, etc. are not eligible for funding.

Travel Needs:
1. Method of payments
2. Rate of payments for travel and per diem
3. Approving official
4. Type of travel to be authorized
5. Number of trips to be authorized

Supplies:
1. Special supplies
2. Method of procurement

Other Resource Needs
Detail resource needs that do not fit the categories above.

**Accomplishments to be achieved**

Identify each activity or function which is to be a part of this plan.   Be sure to include the required activities listed here.

Premises registration (required)
Prepare an accomplishment plan involving the variety of species to be involved within each reporting period and the number of premises registered for each species type reported to the National Premises Information Repository as a raw number and as a percentage of the total estimated, qualified premises holding that species in the State or Tribal area.

Prepare an accomplishment plan involving the variety of sectors of the industry to be registered and the number of premises registered in each sector of the industry as a raw number and as a percentage of the total estimated, qualified premises to be registered in that sector.

Animal Identification (Not supported with Federal funds, but to be reported, if appropriate)

If individual animal identification is planned, prepare an accomplishment plan for the activity.

Include in the plan how data will be gathered to provide in the quarterly reports the number and percentage of animals identified for each species. Also include a similar plan for estimating the number and percentage of Group/Lot identification used within the State or Tribe.

Animal Tracking (Not supported with Federal funds, but to be reported, if appropriate)
Although the animal tracking databases are operated and maintained by the private sector and/or States/Tribes, it is important to document how the effectiveness of system(s) is/are functioning in each State or Tribe. If tracking of animal movements is planned, prepare an accomplishment plan for that activity.

Measure the number of animal movement transactions in each species reported to private or State/Tribal Animal Tracking/Tracing databases as a raw number and a percentage of total eligible transactions.

Outreach/Education (required)
Prepare an accomplishment plan involving the number of stakeholders to be educated regarding NAIS.

Identify the number of groups/organizations and businesses to be contacted in the various stakeholder sectors as a raw number and as a percentage of the total number of groups/organizations available in the area. Specific target areas should be identified (livestock markets, feed stores and veterinarians, etc.). Number and percentage of the targeted areas that actually displayed and supported the distribution of NAIS information (requires follow-up to ensure the information is being disseminated).

Identify the number of contacts made with individual stakeholders as a raw number; for example, the number of stakeholders that participated in informational meetings.

Prepare an accomplishment plan for retrieving feedback from stakeholders.

Legislation Implemented
Indicate what current legislative aspects associated with NAIS, or impacting NAIS, currently exists in the State or Tribal entity regarding premises registration, animal identification, and animal movement activities.

Prepare an accomplishment plan around determining the need for and addressing any legislative changes needed to participate in the NAIS.

Other
Develop other plans for accomplishments that fit the specifics of your work plan.

Using the format provided in Appendix A as a guide, please summarize each accomplishment expected within each activity or function. For States that are subject to the 90 percent base-10 percent plus mid-year assessment, the due date for this quarterly report is June 15, 2007. Plus amounts will not be determined for allocation without this acceptable quarterly report.

For quantitative accomplishments, list what portion of that accomplishment you expect to be able to achieve in each quarter.

For accomplishments that can not be quantified, list in chronological order with a target date for completion of each.

Identify what criteria will be used to evaluate the results/success of the plan.

**Budget**

Provide budget details that reflect the expenditures for the plan presented for the entire funding period, including the base and plus amounts , broken out separately, if appropriate (or that will be presented) on Standard Form 424A.

The budget should include the detail for the budget object class categories reflected on the SF-424A Section B, including indirect costs. The total costs of the project should then be distributed to APHIS and the applicant, based on the 80/20 cost share ratio.

Note: The plan funds are to be obligated by APHIS during FY 2007 and will be available for cooperator expenditure through December 31, 2007.

**The following forms must be submitted with the "NAIS Implementation" Work Plan (above):**

- **Application for Federal Assistance:** Standard Form 424
- **Budget Information:** Standard Form 424A
- **Assurances – Non-construction Programs:** Standard Form 424B
- **Disclosure of Lobbying Activities:** SF-LLL (required for Federal Assistance greater than $100,000)
- **Certification Regarding Lobbying (required for Federal Assistance greater than $100,000)**
- **Indirect Cost Rate Agreement (if claiming indirect costs)**

Note: The Certification Regarding Lobbying and Indirect Cost Rate Agreement cannot be submitted through grants.gov. If you are applying through grants.gov, these items will be requested at the time of award.

VI.    **Submission Dates and Times:**

- Deadline:  4:30 EST,  December 18, 2006
  Applications received after the deadline will not be reviewed or considered.

- Evaluation and Selection

  The evaluation of applications will be conducted within approximately 30 days after the
  application deadline.  Following the selection process, all applicants will be notified of
  the amount of the available funds that have been reserved to support their plan and any
  changes to the work plan that are needed to justify the reserved amount.

- Allocation of Funds

  Funds will be awarded for the period beginning on the date indicated in the Notice of
  Award and continuing until December 31, 2007.

VII.    **Intergovernmental Review**

CFDA 10.025 is subject to Executive Order 12372, "Intergovernmental Review of Federal
Programs" in the States of:  Arkansas, Delaware, District of Columbia, Georgia, Illinois, Iowa,
Kentucky, Maine, Maryland, Michigan, Mississippi, Missouri, Nevada*, New Hampshire, North
Dakota, South Carolina, Texas, Utah, and West Virginia.  Awards will not be made until this
process has been completed in the applicable States.  Names and addresses of States' Single
Points of Contact (SPOC) are listed in the Office of Management and Budget's home page at:
http://www.whitehouse.gov/omb/grants/spoc.html.  For those applicants that have this process in
their State, submit your application to the SPOC simultaneously to submitting to APHIS.  Failure
to meet with this requirement will result in a rejection of your application.  A copy of the SPOC
receipt and approval letter will be required at the time the award is made.
*Nevada only requires a copy of the SF-424 be mailed to them for information.  Check "Not
selected for Review" on Block 16 of the SF-424.

VIII.    **Funding Restrictions**

Plan funds must be obligated by the recipient by December 31, 2007.  Extensions of time to
complete projects beyond this date may be granted on a case-by-case basis.  Construction,
including renovations of real property, is not authorized.

Plan funds may not be used for certain types of personnel, including computer software
developers and programmers.  The types of personnel who <u>may</u> be funded under these plans
would include data entry clerks and program delivery personnel.

Plan funds may not be used for certain types of equipment, including servers and data storage
devices.  Types of equipment which <u>may</u> be funded under these plans would include PCs for data
entry.

Plan funds granted under this announcement may not be used for field trials or research.  These
funds may only be used for the implementation and maintenance of the NAIS.

The applicant must submit a copy of its fully executed current Negotiated Indirect Cost Rate Agreement, negotiated by its cognizant Federal agency, when indirect costs are assessed in the budget. Each Native American Tribal government desiring reimbursement of indirect costs must submit its indirect cost proposal to the Department of the Interior (its cognizant Federal agency).

## IX.    Other Submission Requirements

Applicants can apply to this funding opportunity through http://grants.gov. First time users should go to the "Get Registered" tab on the Web site and carefully read and follow the steps listed in order to apply. Your organization will need to be registered with the Central Contractor Registry (CCR). In order to register with the CCR, a requirement for registering with grants.gov, your organization will need a Data Universal Number System ( DUNS ) Number . A DUNS number is a unique nine-character identification number provided by the commercial company, Dun & Bradstreet (D&B). To investigate if your organization already has a DUNS number or to obtain a DUNS number, contact Dun & Bradstreet at 1-866-705-5711. Be sure to complete the Marketing Partner ID (MPIN) and Electronic Business Primary Point of Contact fields during the CCR registration process. These are mandatory fields that are required when submitting grant applications through Grants.gov.

**Please note:  The DUNS and CCR requirements described above are applicable to all applicants whether you choose to apply through grants.gov or submit a paper application package.**

Applications must be received through grants.gov or at the address below by close of business on the closing date indicated in V.I. "Submission Dates and Times".

Applications may be submitted electronically in MS Word , PDF format (email or delivered electronic media), or one original paper application package to the Area Veterinarian in Charge covering the Area in which the applicant is located. The name and contact information for these people may be found at:  http://www.aphis.usda.gov/vs/area_offices.htm

If you experience difficulty in getting your application to the Area Veterinarian In Charge in your area, you may contact:

USDA APHIS VS
c/o Deborah L. Sweitzer, NAIS Program
National Center for Animal Health Programs
4100 River Road – 3A70
Riverdale, MD  20737
Deborah.L.Sweitzer@aphis.usda.gov
(301) 734-5791

### X.     Application Review Information

#### A. Criteria

1. States

Of the total available funds for plans involving the continued implementation of the NAIS, $13,609,000 will be set aside for use by States.   Each State will be eligible for funding in an amount up to the reserved amount shown in Appendix B.  However, the work plan must clearly justify the funding requested at the 90% level, but also include those activities that would be conducted with 100% funding, indicating those that would be completed only if the additional 10% funding is awarded.  If the work plan does not justify the entire reserved amount, the State will be awarded the amount justified in the work plan.

2. Tribes

Of the total available funds for plans involving the continued implementation of the NAIS, $845,000 will be set aside for use by Tribes. Each Tribe will be eligible for funding in an amount up to the reserved amount shown in Appendix C.  However, the work plan must clearly justify the funding requested.   If the work plan does not justify the entire reserved amount, the Tribe will be awarded the amount justified in the work plan.

3.  Other Criteria

Cost sharing is required.

4.  Multi-State/Tribe applications

States and Tribes may wish to submit an application for the amount equal to the combined amounts reserved for the individual participating States and Tribes.  For multi-State/Tribe applications, a single State or Tribe will be deemed the cooperator with USDA and will be responsible for distributing the funds to the participating States/Tribes, for coordinating the performance of each participating State/Tribe, and for submitting required reports and fulfilling the terms of the agreement

#### B. Review and Selection Process

USDA, APHIS, VS is responsible for the allocation of funds to support the implementation plans that will be funded through cooperative agreements.  The work plan will be reviewed by the Area Veterinarian in Charge for consistency with national standards.  Once the Area Veterinarian in Charge is satisfied that the work plan and accompanying supporting information is accurate, the package will be forwarded to the appropriate USDA, APHIS, VS Regional Office.  Staff within the Regional Office will review the package and submit it for final approval.  If the Area Veterinarian in Charge or Regional Office Staff encounter areas of the work plan which need adjustments, they will contact the applicant to discuss these issues.  VS has final authority in determining the amount of available funds that will be allocated to each implementation plan.

## XI.    Award Administration Information

### A.  Award Notice

Applications selected for funding will be notified by email or phone after the selection process is complete (late December, 2006).  Approximately 10 days after the email notification, APHIS will prepare and submit a Notice of Award to the cooperator for signature.  Once the Notice of Award is signed and returned to APHIS for final signature, the agreement will become effective. A letter will be mailed to any unsuccessful applicants on approximately the same date the selected applicants are first notified.

### B.  Administrative and National Policy Requirements

Access privileges to national databases provided to cooperators by APHIS will be given only to specific individuals specified in the agreements and must not be shared with any other individual, organization, company, or other entity.  Animal health data specified under the agreement that are collected under the terms of the agreement are to be provided to APHIS in accordance with the data transfer protocols required by the national databases.

Successful applicants must comply with the requirements contained in the United States Department of Agriculture "Uniform Federal Assistance Regulations", 7 CFR 3015; "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments", 7 CFR 3016;  in addition to "Government wide Debarment and Suspension (Non-Procurement)", 7 CFR 3017; "Government wide Requirements for Drug-Free Workplace", 7 CFR 3021; "New Restrictions on Lobbying," 7 CFR 3018; and Office of Management and Budget regulations governing "Controlling Paperwork Burdens on the Public", 5 CFR 1320.

## XII.    Reporting

The Plan Administrator will provide to the APHIS authorized representative **quarterly** accomplishment reports on program activities outlined in the work plan.  It is suggested that these reports be submitted in the format illustrated in Appendix A.  The reports will be used by APHIS to verify compliance with provisions of this **Agreement**.  These reports are due **no later than 30 days** after the end of each Federal fiscal quarter except the final report which is due **no later than 90 days** after the **Agreement** expires or terminates.

The Plan Administrator will provide to the APHIS authorized representative a properly certified **quarterly** Financial Status Report, SF-269, **no later than 30 days** after the end of each Federal fiscal quarter and a final SF-269 **no later than 90 days** after the **Agreement** expires or terminates.  Any requests for an extension of time to submit the SF-269 must be made in writing to APHIS' authorized representative before expiration of the initial 30 or 90 day period allowed for submitting the report.  Extensions of time to submit the SF-269 are subject to the discretion of APHIS' authorized representative and, if allowed, shall be provided by the authorized representative in writing.

## XIII.   Agency Contacts

For questions of programmatic content, please contact:

David L. Morris

APHIS, Veterinary Services
Ph. 970-494-7375
Fax 970-494-7369
David.L.Morris@aphis.usda.gov

For administrative questions, please contact:

Eileen Berke
APHIS, Agreements Services Center
Ph. 301-734-8330
Fax 301-734-8064
Eileen.M.Berke@aphis.usda.gov

## XIV.   Other Information

It is anticipated that the FY 2007 Federal budget will contain funds for additional Cooperative Agreements that will follow requirements similar to this Request for Applications. The USDA is not obligated to make any award as a result of this announcement. Only the APHIS Authorized Departmental Officer (ADO) can bind the Government to expenditure of funds.

XV.    Appendix A:  Accomplishment Report Summary Format

## COOPERATIVE AGREEMENT ACCOMPLISHMENT PLAN AND REPORT
### 07-9XX-0XXXCA
#### Program: NAIS

| Quarter Completed: | | Report Date: | Contact Person: | | |
|---|---|---|---|---|---|
| **Activity** | **Planned Accomplishment –** List Specific Performance Measures | **Performance Measures – Achievements –** | **If Objectives Have Not Been Met, Explain Below** | **Work Site Visited Dates** | |
| Activity 1 | Enter planned accomplishment:  Explain planned accomplishment: | MEASURABLE OUTCOMES | | | |
| Activity 2 | Enter planned accomplishment:  Explain planned accomplishment: | MEASURABLE OUTCOMES | | | |
| Activity 3 | Enter planned accomplishment:  Explain planned accomplishment: | MEASURABLE OUTCOMES | | | |
| Activity 4 | Enter planned accomplishment:  Explain planned accomplishment: | MEASURABLE OUTCOMES | | | |

11/22/06

**XVI.  Appendix B: Reserved Allocations to States (FY2007 NAIS Implementation)**

### Distribution by States

| State | Amount | State | Amount |
|---|---|---|---|
| Alabama | $276,000 | Montana | $279,000 |
| Alaska | $80,000 | Nebraska | $672,000 |
| Arizona | $178,000 | Nevada | $82,000 |
| Arkansas | $277,000 | New Jersey | $80,000 |
| California | $575,000 | New Hampshire | $80,000 |
| Colorado | $376,000 | New Mexico | $276,000 |
| Connecticut | $80,000 | New York | $276,000 |
| Delaware | $80,000 | North Carolina | $179,000 |
| Florida | $277,000 | North Dakota | $277,000 |
| Georgia | $180,000 | Ohio | $276,000 |
| Hawaii | $81,000 | Oklahoma | $575,000 |
| Idaho | $278,000 | Oregon | $276,000 |
| Illinois | $180,000 | Pennsylvania | $277,000 |
| Indiana | $179,000 | Rhode Island | $80,000 |
| Iowa | $474,000 | South Carolina | $177,000 |
| Kansas | $673,000 | South Dakota | $474,000 |
| Kentucky | $375,000 | Tennessee | $279,000 |
| Louisiana | $178,000 | Texas | $1,200,000 |
| Maine | $80,000 | Utah | $179,000 |
| Maryland | $81,000 | Vermont | $81,000 |
| Massachusetts | $80,000 | Virginia | $277,000 |
| Michigan | $179,000 | Washington | $179,000 |
| Minnesota | $279,000 | West Virginia | $177,000 |
| Mississippi | $179,000 | Wisconsin | $378,000 |
| Missouri | $572,000 | Wyoming | $276,000 |

## XVII. Appendix C: Reserved Allocations to Tribes (FY2007 NAIS Implementation)

$845,000 is reserved for Native American Tribal governments. Each entity may apply for Federal funding associated with this announcement, or combine each entity's allocation into a collaborative effort. Native American Tribes that have received previous funding associated with NAIS implementation are eligible up to $10,000 per entity. Native American Tribes that have not received previous funding associated with NAIS implementation are eligible up to $18,000 per entity.

Coordination of Native American Tribal governments relative to NAIS implementation is being accomplished by:

Terry W. Clark
USDA/APHIS/VS
Native American Program Coordinator
920 Main Campus Drive
Suite 200, 4th Floor
Raleigh, NC  27606
(919) 855-7167

All Native American Tribal government applications will be directed to the appropriate Regional Office following initial discussion, coordination, and direction from Terry Clark.

NCDA&CS Divisions ▼ | Go

**Home** | **Programs** | **Services** | **Divisions** | **Newsroom** | **Search**



❌ NCDA&CS Hay Alert

**Hay Alert Home**

**Submit Your Ad**

**Update or Remove Your Ad**

### Hay For Sale

**All hay for sale ads**

**Hay for sale by NC County**

**Hay for sale by US State or Canadian Province**

**Forage In Field For Sale That You Can Come Bale**

### Hay Wanted

**All hay wanted ads**

**Hay wanted by NC County**

**Hay wanted by US State or Canadian Province**

**Forage In Field Wanted For Baling**

**Submit a "Share The Load" Ad**

**"Share The Load" Ads**

**Transportation Section**

**Baling Services / Balers for Hire**

**Drought Resource Information Page**

**Other State-Sponsored Hay Directories**

**Retail Hay Sellers**

# Emergency Hay Program's regular sales have
# sites are keeping a small inventory for emerg

April 1 was the last day of regular sales for the Emergency Hay Program, wh
December to help livestock owners meet their animals' winter feeding needs.
N.C. Department of Agriculture and Consumer Services is keeping a small in
and small bales of hay at each of the six distribution sites in case livestock o
an animal welfare emergency in the next few weeks.

Livestock owners experiencing an emergency should contact the location nea
arrange to purchase and pick up hay. Farmers and ranchers also can call the t
Alert hotline at **1-866-506-6222** for assistance.

The following locations have an emergency inventory of hay:

- Mountain Research Station, 265 Test Farm Road, Waynesville, (828) ⸱
- Upper Mountain Research Station, 8004 N.C. Highway 88 East, Laure
  982-2501;
- Piedmont Research Station, 8350 Sherrills Ford Road, Salisbury, (704
- Piedmont Triad Farmers Market, 2914 Sandy Ridge Road, Colfax, (33
- Caswell Research Farm, 2415 W. Vernon Ave., Kinston, (252) 208-33
- Oxford Tobacco Research Station, 300 Providence Road, Oxford, (919

Currently, livestock owners may purchase up to **eight large bales and 60 sm
day**. Limits may be adjusted based on supply and demand.

Hay buyers must have an N.C. Farm ID Premises Identification Number. If y
one, download the registration form (PDF file), fill it out and bring it with yo
distribution site. This will start the Farm ID registration process and qualify
hay.

NOTE: If you need a full truckload of hay, you are encouraged to use the Ha
or hotline to find and order hay. By doing this, you could be eligible for trans
share assistance of up to $500 per load through Ag Partners or Equine Partne

On Dec. 4, the Council of State voted unanimously to authorize the state to u
million to purchase and transport hay to North Carolina. The state sold the ha
owners for the same price the state paid for the forage and transportation.

Updated April 2, 2008

Jobs   |   Mission Statement   |   Accessibility Statement   |   Disclaimer   |   Privacy S
Steve Troxler, Commissioner of Agriculture



New York State Department of Agriculture and Markets

# National Animal Identification System
## Premises Registration

Return Forms to: NYSDAM
Premises Registration
10B Airline Drive, Albany, NY 12235
For questions, contact NYSDAM support:
Phone 800-554-4501 or e-mail: **nysdam@agmkt.state.ny.us**

**Please print all entries**

*If you have more than one premises, please request additional sheets.*

## Business/Farm/Ranch Information

Business/Farm/Ranch Name

Primary Contact  ○ Dr.  ○ Mr.  ○ Ms.
*First Name*     *Middle Initial  Last Name*

Secondary Contact*  ○ Dr.  ○ Mr.  ○ Ms.
*(*optional)*
*First Name*     *Middle Initial  Last Name*

911 Mailing Address

City     State     Zip     -

County

Phone Number     -     -     Ext:     (○ Business  ○ Home  ○ Cell  ○ Fax  ○ Pager)

Phone Number     -     -     Ext:     (○ Business  ○ Home  ○ Cell  ○ Fax  ○ Pager)

Phone Number     -     -     Ext:     (○ Business  ○ Home  ○ Cell  ○ Fax  ○ Pager)

E-mail address

Operation Type   ○ Producer/Farm                          ○ Tagging Site      ○ Vet Clinic        ○ Port of Entry
*(Select one primary type)*  ○ Slaughter/Render Plant                ○ Market            ○ Laboratory       ○ Show Facility
○ Non-Producer Participant (no animal ownership)  ○ Livestock Dealer  ○ Boarding Facility

## Species at Premises *(check all species and the number on the property that apply)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ○ Cattle-Dairy | ○ 1 - 10 | ○ 11 - 50 | ○ 51 - 100 | ○ 101 - 300 | ○ 301 - 500 | ○ 501 or more |
| ○ Cattle-Beef | ○ 1 - 10 | ○ 11 - 50 | ○ 51 - 100 | ○ 101 - 300 | ○ 301 - 500 | ○ 501 or more |
| ○ Horses | ○ 1 - 5 | ○ 6 - 10 | ○ 11 - 15 | ○ 16 - 20 | ○ 21 - 30 | ○ 31- 40 ○ 41 or more |
| ○ Sheep | ○ 1 - 5 | ○ 6 - 10 | ○ 11 - 15 | ○ 16 - 20 | ○ 21 - 30 | ○ 31- 40 ○ 41 or more |
| ○ Swine | ○ 1 - 5 | ○ 6 - 10 | ○ 11 - 30 | ○ 31 - 50 | ○ 51 - 70 | ○ 71 or more |
| ○ Goats | ○ 1 - 5 | ○ 6 - 10 | ○ 11 - 15 | ○ 16 - 20 | ○ 21 - 30 | ○ 31 - 40 ○ 41 or more |
| ○ Poultry | ○ 1 - 10 | ○ 11 - 50 | ○ 51 - 100 | ○ 101 - 300 | ○ 301 - 500 | ○ 501 or more |
| ○ Llama | ○ 1 - 5 | ○ 6 - 10 | ○ 11 - 15 | ○ 16 - 20 | ○ 21 - 30 | ○ 31 - 40 ○ 41 or more |
| ○ Bison | ○ 1 - 10 | ○ 11 - 50 | ○ 51 - 100 | ○ 101 - 300 | ○ 301 - 500 | ○ 501 or more |
| ○ Deer/Elk | ○ 1 - 10 | ○ 11 - 50 | ○ 51 - 100 | ○ 101 - 300 | ○ 301 - 500 | ○ 501 or more |
| ○ Other | ○ 1 - 5 | ○ 6 - 10 | ○ 11 - 15 | ○ 16 - 20 | ○ 21 - 30 | ○ 31 - 40 ○ 41 or more |

*(write in)*
Questions? Call (518) 457-3502 or 1-800-554-4501

**Producer/Contact Signature**     Date     -     -

## PREMISES DATA INFORMATION SHEET

**\* Denotes Required Field**

**1. Very Important - Animal Housing Location**

\*Address:                                    \*City:


\*State:                                      \*Zip:


\*County:                                     \*Township:


**2. GPS Information: (If known)**

Latitude:                                     Longitude:


**3. PRIMARY CONTACT (Correspondence and Emergency)**

Name:

Address                                       City

State                                         ZipCode

\*Home Phone                                   Business Phone

Cell Phone                                    Fax:

Email:

**CHECK ALL THAT APPLY:**

☐ Land Owner      ☐ Manager

☐ Animal Owner    ☐ Other

**4. SECONDARY CONTACT (Correspondence and Emergency)**

Name:

Address                                       City

State                                         ZipCode

\*Home Phone                                   \*Business Phone

\*Cell Phone                                   Fax:

\*Email:

**CHECK ALL THAT APPLY:**

☐ Land Owner    ☐ Manager

☐ Animal Owner    ☐ Other

## 5. Domestic Species at this location? Check All That Apply:

☐ **Dairy Cattle**                              ☐ **Chickens**
    ☐ Milking Herd              ☐ **Turkeys**
    ☐ Heifer Grower             ☐ **Waterfowl**
    ☐ Veal Grower               ☐ **Upland Game Birds**
☐ **Beef Cattle**                               ☐ **Ratite**
    ☐ Cow/Calf                  ☐ **Pigeons**
    ☐ Backgrounder              ☐ **Equine (horses, donkeys, ect.)**
    ☐ Feedlot                   ☐ **Cervids**
☐ **Swine**                                         ☐ Deer- _____
    ☐ Breeder                       ☐ Elk
    ☐ Nursery                   ☐ **Camelids**
    ☐ Finisher                      ☐ Alpacas
☐ **Sheep**                                         ☐ Llamas
☐ **Goats**                                     ☐ **Other Domestic Species**
    ☐ Dairy
    ☐ Meat

## 6. Submit your information

**CMDAC**

\* Type the characters you see in the picture above

[ Submit ]



United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

Legislative and
Public Affairs

Freedom of
Information

4700 River Road
Unit 50
Riverdale, MD
20737-1232

Leonard G. Brown, III
Clymer & Musser, PC
408 West Chestnut Street
P.O. Box 1766
Lancaster, Pennsylvania  17608-1766

JUN 1 9 2008

Dear Mr. Brown:

This is an interim response to the Freedom of Information Act (FOIA) appeal that you submitted on behalf of Mary-Louise Zanoni, which requested copies of:

> 1) All records of registered premises contained in the National Premises Information Repository or NAIS database;
>
> 2) The number of requests to be removed from the premises database that APHIS has received from owners/managers of registered premises; and,
>
> 3) The number of premises that actually have been removed from the database.

The FOIA appeal dated December 21, 2007, was received in this office on December 27, 2007, and assigned case number FOIA 08-100.  This interim response addresses Items Nos. 2 and 3 referenced above.

After careful consideration, we have determined to disclose records that are responsive to Items Nos. 2 and 3.  These records are contained on a spreadsheet being provided to you on the enclosed CD-ROM.  The columns from the spreadsheet responsive to your request are: "Submitted to NAIS Team Date"; "Data to be Deleted (Account, Premises ID, User)"; "Reason for Deletion (Opt-Out, Duplicate)"; and "Step1/Removed from NPIR (contact) and SPRS date."  We consider the remaining columns to be non-responsive to the FOIA appeal.

Also contained on the CD-ROM is Adobe® Acrobat® Reader™, which is needed to view the responsive records.  By opening rp505enu.exe and following the on-screen instructions, you will install Adobe Reader.  After the installation, the Adobe Reader should render the PDF files correctly.

Sincerely,

*Coelos D Coons*
Tonya G. Woods
Director
Freedom of Information & Privacy Act
Legislative and Public Affairs

Enclosure(s): as stated.



| | PM | | | Customer service | | | | Received from Customer Service Date | DBA Step 1 | DBA Step 2 | | DBA Step 3 | Information submitted by program staff | | | | | | | | | | |
| Submitted to NAIS Team Date | Returned to program staff Date | Data to be Deleted (Account, Premises ID, User) | Reason for Deletion (Opt-Out, Duplicate) | Received Date | SPRS Y/N | NPIR Y/N | CS Research Initials | | Removed from NPIR (contact) and SPRS Date | Research other VS databases complete Date | In other other VS databases? Y/N | Removed from NPIR (Premises) Date | Account | NPID | Username | Status (Active, Inactive) | Name | Account Business Name | Address | Town | State | Report to | CC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 11/30/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 12/4/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 12/4/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 12/4/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 12/4/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 12/4/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 12/4/2006 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 1/4/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 1/4/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 1/4/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 1/4/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 1/4/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 1/4/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 1/4/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/1/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/1/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/1/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/20/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/20/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/20/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/20/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/21/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 3/23/2007 | | | | | | | | | 5/25/2007 | | | | | | | | | | | | | | |
| 4/2/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 4/5/2007 | | | | | | | | | 5/24/2007 | | | | | | | | | | | | | | |
| 5/17/2007 | | | | | | | | | | | | | | | | | | | | | | | |
| 5/29/2007 | | | | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 5/29/2007 | | | | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/13/2007 | | Premises ID | Duplicate | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/25/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/25/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/25/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |
| 6/11/2007 | | Premises ID | Opt-Out | | | | | | 8/24/2007 | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 6/11/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/16/2007 | Premises ID | Opt-Out | | | | | | | | | | | |
| 7/16/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |
| 7/17/2007 | Premises ID | Opt-Out | | | | 8/24/2007 | | | | | | | |

| | | | |
|---|---|---|---|
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 7/17/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 8/2/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 8/3/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 8/7/2007 | Premises ID | Opt-Out | 8/24/2007 |
| 8/14/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/20/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/20/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/20/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/20/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/20/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/20/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/20/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 8/22/2007 | Premises ID | Opt-Out | 8/29/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/10/2007 | Premises ID | Opt-Out | |
| 9/10/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/11/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/11/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/11/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/11/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/11/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/11/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/11/2007 | Premises ID | Opt-Out | 9/12/2007 |
| 9/19/2007 | Premises ID | Opt-Out | 10/12/2007 |
| 9/26/2007 | Premises ID | Opt-Out | 10/12/2007 |
| 9/26/2007 | Premises ID | Opt-Out | 10/12/2007 |
| 9/26/2007 | Premises ID | Opt-Out | 10/12/2007 |
| 9/26/2007 | Premises ID | Opt-Out | 10/12/2007 |
| 10/1/2007 | Premises ID | Opt-Out | 10/12/2007 |
| 10/9/2007 | Premises ID | Opt-Out | 10/12/2007 |